**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| OLUFEMI SALU, derivatively on behalf of BED BATH & BEYOND, INC., <br><br> Plaintiff. <br><br> vs. <br><br> MARK J. TRITTON, MARY A. WINSTON, ROBYN M. D'ELIA, STEPHANIE BELL-ROSE, HARRIET EDELMAN, JOHN E. FLEMING, PATRICK R. GASTON, SUE E. GOVE, JEFFREY A. KIRWAN, JOHNATHAN B. OSBORNE, HARSHA RAMALINGAM, VIRGINIA P. RUESTERHOLZ, JOSHUA E. SCHECHTER, ANDREA WEISS, and ANN YERGER, <br><br> Defendants, <br><br> and <br><br> BED BATH & BEYOND, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) VIOLATIONS OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934;** <br> **(2) VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934;** <br> **(3) BREACH OF FIDUCIARY DUTY;** <br> **(4) UNJUST ENRICHMENT; AND** <br> **(5) WASTE OF CORPORATE ASSETS** <br><br> <u>JURY TRIAL DEMANDED</u> |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

### <u>INTRODUCTION</u>

Plaintiff Olufemi Salu ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Bed Bath & Beyond, Inc. ("Bed Bath" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Mark J. Tritton, Mary

A. Winston, Robyn M. D'Elia, Stephanie Bell-Rose, Harriet Edelman, John E. Fleming, Patrick R. Gaston, Sue E. Gove, Jeffrey A Kirwan, Johnathan B. Osborne, Harsha Ramalingam, Virginia P. Ruesterholz, Joshua E. Schechter, Andrea Weiss and Ann Yerger (collectively, the "Individual Defendants", and together with Bed Bath, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Bed Bath, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Bed Bath, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Bed Bath's directors and officers between October 2, 2019 and February 11, 2020, both dates inclusive (the "Relevant Period").

2.      Bed Bath describes itself as an omnichannel retailer that sells an assortment of domestic merchandise, home furnishings, various textile products, and other related items.  The Company operates under many brand names, including Christmas Tree Shops, Harmon, buybuy Baby, and Cost Plus World Market.

2

3.     In May 2019, as the result of a proxy contest led by three hedge funds, the composition of Bed Bath's Board of Directors ("the Board") was significantly altered due to a settlement with the preexisting Board and the activist group, which alleged, *inter alia*, the Company engaged in bad faith with the proxy process and severely mismanaged the business. Four directors on the preexisting Board remained and eight new directors were appointed. Following the resignation of the Company's then-Chief Executive Officer ("CEO"), Defendant Mary A. Winston ("Winston") was appointed as interim CEO, and the search for a permanent CEO commenced.

4.     Defendant Winston, as interim CEO, and the other Individual Defendants, as officers and directors of the Company, were aware of nonpublic information regarding the details of Bed Bath's operations, and exerted control over both the Company's operations and over its public statements.

5.     By her own statements in the Company's quarterly report on Form 10-Q report filed with the SEC on October 9, 2019 (the "October 2019 10-Q"), beginning at least in September 2019, Defendant Winston caused the Company to pursue an "aggressive" disposition of inventory.

6.     This foreseeably caused the Company to lack "sufficient inventory in key categories to support holiday sales," which was a fundamental aspect of the Company's business. This resulted in lower sales and less profitability than was represented to the public market for Bed Bath stock.

7.     Neither the insufficiency of key inventory, nor the inadequacy of internal inventory control mechanisms, nor the resultant unprofitability, was disclosed by the Individual Defendants during the Relevant Period.

8.      On January 8, 2020, Bed Bath withdrew its fiscal 2019 guidance, citing pressures on sales and profitability, as well as a new strategic plan for the Company's operations.

9.      On this news, the Company's stock price fell from $16.65 at close on January 8, 2020, to close at $13.45 per share on January 9, 2020, a loss of $3.20 per share, or over 19% in value. Trading volume was unusually high on January 9, 2020: 40,361,300 shares were traded compared with 13,688,800 shares on January 8; 7,960,500 shares on January 7; and 8,120,600 shares on January 6. The heightened volume, together with the price sensitivity to Bed Bath's statement, indicates an efficient market for Bed Bath shares.

10.     On February 11, 2020, Bed Bath issued a press release announcing preliminary fourth-quarter 2019 financial results.  Therein, the Company disclosed "a 5.4% decline in comparable sales driven primarily by store traffic declines combined with inventory management issues, and increased promotional activity and markdowns" specifying that "inventory within certain key categories in the Bed Bath & Beyond assortment was too low or out-of-stock during the [holiday] period."  The press release further indicated that the 5.4% figure understated the true extent of the Company's declining sales, stating, "[a]djusting for the calendar shift to exclude Cyber Monday week in both [2019 fourth quarter and 2018 fourth quarter] periods, comparable sales for the first two months of the fiscal 2019 fourth quarter declined 13%."

11.     On this news, the Company's stock price fell an additional $3.06, or over 20% per share from $14.85 at close on February 11, 2020, to close at $11.79 per share on February 12, 2020. Again, unusually heavy trading volume on February 12, 2020 is shown by 78,011,600 shares being traded in comparison to 12,378,600 and 10,670,200 on the two days earlier in the week. The previous week, trading volume was even lower with a range of 2,855,800 to 4,789,400 over five days.

12.     Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) due to its "aggressive disposition of inventory" in which "more than approximately $350 million of inventory of retail will be removed from our stores before the 2019 holiday season," the Company lacked sufficient inventory in key categories to support holiday sales; (ii) the Company's internal control over inventory levels and financial reporting was ineffective; (iii) as a result of the foregoing, the Company was likely to experience reduced sales; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

13.     Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Approximately 117,400 shares of the Company's common stock were repurchased during the Relevant Period for over $1,637,115. As the Company's stock was actually only worth $11.79 per share during that time, the price at closing on October 23, 2019, the Company overpaid by over $252,969 in total.

14.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's CEO, the Company's former interim CEO, and the Company's former Chief Financial Officer ("CFO"), to two federal securities fraud class action lawsuits, both pending in the United States District Court for the District of New Jersey (the "Securities Class Actions"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were

improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

15.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of one of the directors' liability in the Securities Class Actions, of their not being disinterested or independent directors, a majority of the Company's Board of Directors cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

17.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

21.     Plaintiff is a current shareholder of Bed Bath. Plaintiff has continuously held Bed Bath common stock since he purchased it during the beginning of the Relevant Period. Plaintiff is a citizen of the State of Mississippi.

**Nominal Defendant Bed Bath**

22.     Bed Bath is incorporated under the laws of Delaware with its principal executive offices located at 650 Liberty Avenue, Union, New Jersey 07803.  Bed Bath's common stock trades on the NASDAQ exchange under the symbol "BBBY."

**Defendant Tritton**

23.     Defendant Mark J. Tritton ("Tritton") has served as the Company's CEO and, in that capacity, as a member of the Board since November 2019.  According to Bed Bath's Form 8-K filed October 24, 2019, the Board appointed Defendant Tritton as CEO to replace Defendant Winston as the Company's Interim CEO, effective November 4, 2019.  In the same filing, Bed Bath increased the number of Board seats from 13 to 14, and appointed Defendants Tritton and Winston to serve on the since-disbanded Business Transformation and Strategy Review Committee of the Board (the "Transformation Committee").

24.     According to the Company's Schedule 14A filed with the SEC on June 18, 2020 (the "2019 Proxy Statement"), as of May 5, 2020, Defendant Tritton beneficially owned 432,305 shares of the Company's common stock. Given that the price per share of the Company's common

stock at the close of trading on June 5, 2020 was $9.32, these shares were worth approximately $4,029,083.

25.     For the fiscal year ended February 29, 2019, Defendant Tritton received a salary of $346,154, a $375,000 bonus, $11,632,199 in stock awards, $750,000 in non-equity incentive plan compensation, and $661,045 in all other compensation.

26.     The Company's quarterly report on Form 10-Q report filed with the SEC on January 9, 2020 (the "January 2020 10-Q") stated the following about Defendant Tritton:

> During the first two months of his tenure, Mr. Tritton has been assessing the operations, portfolio, capabilities and culture of the Company while maintaining focus on accelerating its extensive transformation efforts and driving against these near-term priorities to generate saving and reinvest for future growth. Early actions include the extensive restructure of the Company's leadership team, including the departure of six senior members, which was announced subsequent to the fiscal 2019 third quarter, on December 17, 2019. Interim leaders have been appointed in merchandising, digital, marketing, owned brands and legal, while the Company actively recruits for these roles. The new leadership team will be charged with streamlining decision-making, accelerating the pace of transformation, and re-establishing the Company's authority in the home space through a more customer focused, omnichannel retail operation, a redefined product assortment, and a more convenient and inspirational shopping experience. Subsequent to the end of the third quarter of fiscal 2019, the Company completed a sale-leaseback transaction with respect to approximately 2.1 million square feet of owned real estate, generating over $250 million in net proceeds.

27.     Upon information and belief, Defendant Tritton is a citizen of Australia.

**Defendant Winston**

28.     Defendant Winston served as the Company's Interim CEO from May 2019 until November 4, 2019, and after that time remained as a Director on the Board.

29.     According to the Company's 2019 Proxy Statement, as of June 5, 2020, Defendant Winston beneficially owned 94,189 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $9.32, Defendant Winston owned approximately $877,841 worth of Bed Bath stock.

30.     For the fiscal year ended February 29, 2019, Defendant Winston received a salary of $533,081, $1,899,995 in stock awards, and $46,930 in all other compensation.

31.     On its Corporate website, Bed Bath states:

Ms. Winston is a seasoned executive with significant governance expertise across a broad range of industries, having served on large public company boards and audit committees for many years. She has a strong background in all aspects of finance and accounting, as well as experience in M&A, corporate strategy, cost restructuring programs, corporate governance/compliance, and investor relations/communications. Among other roles, she has served as Interim Chief Executive Officer, Bed Bath & Beyond Inc., Executive Vice President and Chief Financial Officer at Family Dollar Stores Inc., Senior Vice President and Chief Financial Officer at Giant Eagle, Inc., Executive Vice President and Chief Financial Officer at Scholastic Corporation, Vice President and Controller of Visteon Corporation and Vice President, Global Financial Operations at Pfizer Inc. in the Pharmaceuticals Group. She started her career as a CPA and auditor at Arthur Andersen & Co. She currently serves as Founder and President of WinsCo Enterprises Inc., a financial and board governance consulting firm. She is currently a member of the boards of Acuity Brands, Inc., Domtar Corporation and Dover Corporation.

Ms. Winston received a bachelor's degree in Accounting from the University of Wisconsin, an MBA in Finance, Marketing and International Business from Northwestern University's Kellogg Graduate School, and is a CPA, as well as a National Association of Corporate Directors (NACD) Board Leadership Fellow.

32.     Upon information and belief, Defendant Winston is a citizen of North Carolina.

**Defendant D'Elia**

33.     Defendant Robyn M. D'Elia ("D'Elia") served as the Company's CFO at all relevant times.  She was appointed as the Company's CFO in June 2018, and resigned on May 4, 2020.  In connection with her promotion, the Company entered into an employment agreement with D'Elia which provides for severance pay equal to one year's salary if the Company terminates Ms. D'Elia's employment other than for "cause."

34.     For the fiscal year ended February 29, 2019, D'Elia received $1,919,593 in total compensation from the Company, comprised of $750,000 in salary and $1,169,593 in common stock which will vest in 2021.

35.     According to the Company's 2019 Proxy Statement, as of June 5, 2020, Defendant D'Elia beneficially owned 15,543 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $9.32, Defendant D'Elia owned approximately $144,861 worth of Bed Bath stock.

36.     Upon information and belief, Defendant D'Elia is a citizen of New Jersey.

**Defendant Bell-Rose**

37.     Defendant Stephanie Bell-Rose ("Bell-Rose") was elected to the position of Director in May 2018. She currently serves on the Nominating and Corporate Governance Committee.

38.     For the fiscal year ended February 29, 2019, Defendant Bell-Rose received $71,456 in cash awards and $81,000 in stock awards from the Company.

39.     According to the Company's 2019 Proxy Statement, as of June 5, 2020, Defendant Bell-Rose beneficially owned 12,428 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $9.32, Defendant Bell-Rose owned approximately $115,828 worth of Bed Bath stock.

40.     On its corporate website, Bed Bath states:

Stephanie Bell-Rose, 61, is Senior Managing Director, Corporate Strategy at TIAA and Head of the TIAA Thought Leadership Governing Board and Head of TIAA Institute. Before joining TIAA in 2010, Ms. Bell-Rose served as a Managing Director at The Goldman Sachs Group, Inc. and President of its foundation, and as Counsel and Program Officer at the Andrew W. Mellon Foundation. She is a Trustee of The John S. and James L. Knight Foundation, the Council on Foundations and the Public Welfare Foundation. Bell-Rose is also Trustee Emerita of the Barnes Foundation and Honorary Trustee of the American Museum of Natural History.

Ms. Bell-Rose received an AB, JD and MBA from Harvard University.

41.     Upon information and belief, Defendant Bell-Rose is a citizen of New York.

**Defendant Edelman**

42.     Defendant Harriet Edelman ("Edelman") has served as a Company director since May 2019.  Defendant Edelman was originally recommended for appointment by the Nominating and Corporate Governance Committee. Defendant Edelman was Chair of the Audit Committee and a member of the Compensation Committee during the Relevant Period. She stepped down from those roles on or about May 29, 2020, in connection with her appointment to serve as independent Chair of the Board for Bed Bath, replacing Defendant Gaston.

43.     For the fiscal year ended February 29, 2019, Defendant Edelman received $101,532 in cash awards and $81,000 in stock awards from the Company.

44.     According to the Company's 2019 Proxy Statement, as of June 5, 2020, Defendant Edelman beneficially owned 8,345 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $9.32, Defendant Edelman owned approximately $77,775 worth of Bed Bath stock.

45.     On its corporate website, Bed Bath states:

Ms. Edelman, 63, is an accomplished senior executive with over 30 years of global operating experience in consumer goods and financial services. Harriet has served on large public company boards for nearly 20 years in the U.S. and Europe. She currently serves on the Board of Directors of Assurant, Inc. and Brinker International, Inc. Harriet is currently Special Advisor to the Chairman of Emigrant Bank, and previously spent over 25 years at Avon Products, Inc. until 2008, rising to senior leadership positions in Marketing, Sales, New Product Development, Business Strategy and Transformation, Global Supply Chain and Information Technology. Harriet also serves as Vice Chairman of the Board of Trustees of Bucknell University.

Ms. Edelman received a Bachelor of Music from Bucknell University and an MBA in Marketing and Operations Research at the Fordham Gabelli School of Business.

46.     Upon information and belief, Defendant Edelman is a citizen of Connecticut.

**Defendant Gaston**

47.     Defendant Patrick R. Gaston ("Gaston") served as a member of the Board from 2007 to May 29, 2020.  He also served as Chairman of the Board from April 2019 until May 29, 2020.  Defendant Gaston served on the Nominating and Corporate Governance Committee, which appointed Edelman and four other defendants as Directors.  The Company's 2019 Proxy Statement states that in April 2019, the Company appointed Defendant Gaston as Chairman of the Board. Prior to this appointment, Defendant Gaston had served as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance and Business Transformation and Strategy Review Committees.

48.     For the fiscal year ended February 29, 2019, Defendant Gaston received $299,674 in cash awards and $124,269 in stock awards from the Company.

49.     According to the Company's 2019 Proxy Statement, as of June 5, 2020, Defendant Gaston beneficially owned 46,089 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $9.32, Defendant Gaston owned approximately $429,549 worth of Bed Bath stock.

50.     On its corporate website, Bed Bath states:

Patrick R. Gaston, 61, is Chief Executive Officer of Gaston Consulting, which focuses on building public/private partnerships that addresses issues related to corporate responsibility, sustainability, diversity and social and economic change for businesses, the public sector and civil society. He also served as an adjunct professor of business management at the Community College of Denver from 2017 through 2018, Prior to that, he was President of the Western Union Foundation (2013 - 2016) and initiated a workforce education program focused on youth and women throughout the world. From January to December 2011, he served a one-year term as Executive in Residence and Senior Advisor with the Clinton Bush Haiti Fund to support the rebuilding efforts in Haiti. Until January 2011, Mr. Gaston was President of the Verizon Foundation since 2003. Mr. Gaston pioneered the creation of a corporate social responsibility program and created a consumer advisory board focused on external stakeholder engagement on governance, public policy and community investment matters. Prior to assuming that position, Mr. Gaston held a variety of management positions at Verizon Communications, Inc. and its predecessors

since 1984, including positions in operations, marketing, human resources, strategic planning and government relations. He has been a director of the Company since 2007 and was named Independent Chairman of the Board in May 2019.

Mr. Gaston earned a BS, in Management from the University of Massachusetts, an International Certificate in Business, Ecole Superieure De Commerce, Reims, France, and an MBA from Northeastern University.

51.     Upon information and belief, Defendant Gaston is a citizen of the District of

Columbia.

**Defendant Schechter**

52.     Defendant Joshua E. Schechter ("Schechter") was recommended by the

Nominating and Corporate Governance Committee and appointed by the Board to serve as director

effective May 29, 2019. Defendant Schechter is a "Financial Expert" for SEC purposes and was a

member of the Audit Committee during the Relevant Period. He has since been appointed Chair

of the Audit Committee.

53.     For the fiscal year ended February 29, 2019, Defendant Schechter received $76,099

in cash awards and $81,000 in stock awards from the Company.

54.     According to the Company's 2019 Proxy Statement, as of June 5, 2020, Defendant

Schechter beneficially owned 8,342 shares of the Company's common stock. Given that the price

per share of the Company's common stock at the close of trading on June 5, 2020 was $9.32,

Defendant Schechter owned approximately $77,747 worth of Bed Bath stock.

55.     On its corporate website, Bed Bath states:

Joshua E. Schechter, age 46, is a private investor and public company director. Mr. Schechter has also served as Chairman of the Board of Directors of SunWorks, Inc., a premier provider of high-performance solar power solutions, since May 2018 and as a director since April 2018, and as a director of Viad Corp, an S&P SmallCap 600 international experiential services company, since April 2015, and a director of Support.com, Inc., a leading provider of cloud-based software and services, since June 2016. From 2001 to June 2013, Mr. Schechter served as Managing Director of Steel Partners Ltd., a privately-owned hedge fund sponsor, and from 2008 to June 2013, Mr.

Schechter served as co-President of Steel Partners Japan Asset Management, LP, a private company offering investment services.

Mr. Schechter earned an MPA in Professional Accounting and a BBA from The University of Texas at Austin.

56.     Upon information and belief, Defendant Schechter is a citizen of California.

**Defendant Osborne**

57.     Defendant Johnathan B. Osborne ("Osborne") was elected by the Company's shareholders at the company's 2018 Annual Meeting.  Defendant Osborne is a member of the Audit Committee.

58.     For the fiscal year ended February 29, 2019, Defendant Osborne received $114,397 in fees from the Company and $81,000 in stock awards.

59.     According to the Company's 2019 Proxy Statement, as of June 5, 2020, Defendant Osborne beneficially owned 12,428 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $9.32, Defendant Osborne owned approximately $115,829 worth of Bed Bath stock.

60.     On its corporate website, Bed Bath states:

Johnathan B. (JB) Osborne, 38, is the Co-Founder and CEO of Red Antler, a branding company he co-founded in 2007, which was named one of Fast Company's Most Innovative in Marketing & Advertising. Leading a multi-disciplinary team of strategists, designers, marketers and engineers with his co-founders at Red Antler, Osborne has helped define a new generation of products and services that people love. Osborne oversees Red Antler's operations and venture partnerships, and frequently speaks to venture portfolios, accelerators, and at conferences about the role of brand in building a category leading business. Osborne was selected as one of WWD's (Women's Wear Daily) 40 under 40 in fashion and retail in 2017 and was also selected as one of Forbes' Consumer Catalysts: 2017's Top Dealmakers and Influencers in the Consumer Industry.
Prior to founding Red Antler, Osborne opened the New York office of Consortium, a boutique creative shop based in Auckland, New Zealand. He began his career at advertising agency Saatchi & Saatchi working with global brands.

Mr. Osborne earned his BS in Applied Economics and Management, Magna Cum Laude from Cornell University.

61.     Upon information and belief, Defendant Osborne is a citizen of New York.

**Defendant Ruesterholz**

62.     Defendant Virginia P. Ruesterholz ("Ruesterholz") was elected by the Company's shareholders at the company's 2018 Annual Meeting.  Defendant Ruesterholz is a member of the Audit Committee, and Chair of the Nominating and Corporate Governance Committee.

63.     For the fiscal year ended February 29, 2019, Defendant Ruesterholz received $123,015 in cash awards from the Company and $81,000 in stock awards.

64.     According to the Company's 2019 Proxy Statement, as of June 5, 2020, Defendant Ruesterholz beneficially owned 19,102 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $9.32, Defendant Ruesterholz owned approximately $175,738 worth of Bed Bath stock.

65.     On its corporate website, Bed Bath states:

Virginia P. Ruesterholz, 58, most recently served as Executive Vice President, Strategic Initiatives of Verizon Communications, Inc. She was previously President of Verizon Services Operations, a $10 billion global shared-services business group with over 25,000 employees that operated Verizon's wireline network as well as the finance operations, real estate and supply chain services that supported all Verizon companies. Prior to this, Ms. Ruesterholz served as President of Verizon Telecom, where she led the $30 billion wireline unit that served Verizon's domestic consumer, general business and wholesale markets, and where she also oversaw the U.S. rollout of the high-speed fiber optic network known as Fios®. She serves on the Board of Directors of The Hartford Financial Services Group, Inc. and is also a Trustee of Stevens Institute of Technology, where she served as the first female Chair in its 149-year history.

Ms. Ruesterholz earned a BS in Chemical Engineering from Stevens Institute of Technology and an MS in Telecommunications Management from Brooklyn Polytechnic. She also received an honorary Doctorate in Engineering from Stevens Institute of Technology.

66.     Upon information and belief, Defendant Ruesterholz is a citizen of New Jersey.

**Defendant Weiss**

67.     The 2019 Proxy Statement provides that Defendant Andrea Weiss ("Weiss") was recommended by the Nominating and Corporate Governance Committee and appointed by the Board to serve as director effective May 1, 2019.  Defendant Weiss is a member of the Audit Committee. She is also a Financial Expert for SEC purposes.

68.     For the fiscal year ended February 29, 2019, Defendant Weiss received $99,505 in cash awards from the Company and $81,000 in stock awards.

69.     According to the Company's 2019 Proxy Statement, as of June 5, 2020, Defendant Weiss beneficially owned 11,851 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $9.32, Defendant Weiss owned approximately $109,029 worth of Bed Bath stock.

70.     On its corporate website, Bed Bath states:

Ms. Weiss, 64, was an early innovator in multi-channel commerce and brings nearly 30 years of entrepreneurial leadership experience in the retail industry, currently serving as Founding Partner of The O Alliance, LLC and Chief Executive Officer and Founder of Retail Consulting Inc. She is recognized as a pioneer in creating a seamless customer experience and has been a key player in transforming retail into the digital space. She also has extensive experience developing high-level business strategy and tactical execution plans, including implementing turnaround initiatives for leading brands in the U.S. and Europe. She has held executive leadership roles at dELiA*s, Inc., The Limited Inc., GUESS, Inc., and Ann Taylor Stores, Inc. Ms. Weiss is a National Association Corporate Directors (NACD) Boar Governance Fellow and was named to the NACD Top 100 Best Public Directors in 2016. She currently serves as a director on the boards of Cracker Barrel Old Country Store, Inc., O'Reilly Automotive, Inc. and RPT Realty.

Ms. Weiss received a Bachelor of Fine Arts from Virginia Commonwealth University and a Masters of Administrative Science from The Johns Hopkins University. She also completed post-graduate studies at Harvard Business School and The Kellogg School at Northwestern University.

71.     Upon information and belief, Defendant Weiss is a citizen of Florida.

**Defendant Ramalingam**

72. The 2019 Proxy Statement provides that Defendant Harsha Ramalingam ("Ramalingam") was recommended by the Nominating and Corporate Governance Committee and appointed by the Board to serve as director effective May 1, 2019. Defendant Ramalingam is a member of the Nominating and Corporate Governance Committee.

73. For the fiscal year ended February 29, 2019, Defendant Ramalingam received $87,610 in fees from the Company and $81,000 in stock awards.

74. According to the Company's 2019 Proxy Statement, as of June 5, 2020, Defendant Ramalingam beneficially owned 8,342 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $9.32, Defendant Edelman owned approximately $77,747 worth of Bed Bath stock.

75. On its corporate website, Bed Bath states:

Mr. Ramalingam, 60, who currently serves as a Senior Advisor at Boston Consulting Group and who is the President and Owner of his own consulting firm, brings over 30 years of operational leadership experience and global expertise in areas including information technology and internet software. He has previously served in various leadership roles at Amazon.com, Inc., including as Global Vice President of the e-commerce Platform Group, which included ownership of the Chief Information Officer and CISO Functions. Mr. Ramalingam also spent six years at EMC Corporation, including as Vice President, Products and Operations of EMC's SaaS/Cloud business, where he was responsible for R&D, product and program management, financing, and technical and business operations from conception to launch. He spent the earlier part of his career in various information management and technology roles including as Chief Technology Officer, Head of Research and Development and Technical Operations, FreeBorders, Inc., and Global Development Manager, Storage Area Network Software Development and IBM Storage Systems Division, SAN Strategy Leadership, International Business Machines Corporation.

Mr. Ramalingam received a Bachelor of Technology from the Indian Institute of Technology, Kharagpur, an MBA in General Management from the Indian Institute of Management, Bangalore, and received an Executive Education at Stanford University Graduate School of Business.

76.     Upon information and belief, Defendant Ramalingam is a citizen of the State of Washington.

**Defendant Fleming**

77.     The 2019 Proxy Statement provides that Defendant John E. Fleming ("Fleming") was recommended by the Nominating and Corporate Governance Committee and appointed by the Board to serve as director effective May 29, 2019. Defendant Fleming is Chair of the Compensation Committee.

78.     For the fiscal year ended February 29, 2019, Defendant Fleming received $93,479 in cash awards and $81,000 in stock from the Company.

79.     According to the Company's 2019 Proxy Statement, as of June 5, 2020, Defendant Fleming beneficially owned 13,342 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $9.32, Defendant Fleming owned approximately $124,347 worth of Bed Bath stock.

80.     On its corporate website, Bed Bath states:

John E. Fleming, 60, is currently serving as Interim Chief Executive Officer of r21Holdings, Inc., a specialty retailer of young men and women's casual apparel and accessories, where he has served as a member of its Board of Directors since August 2017. He has served as a member of the Advisory Board of UNTUCKit LLC, a casual men's apparel company, since December 2017, and as a member of the Board of Directors of The Visual Comfort Group, a lighting company that serves both wholesale and direct to consumer channels, since May 2017. Additionally, Mr. Fleming has served as an independent director and advisor since August 2016. Previously, Mr. Fleming was the Chief Executive Officer of Global eCommerce at Uniqlo Co. Ltd., a Japanese casual wear designer, manufacturer and retailer, from October 2013 to August 2016. Prior to that, he was at Walmart, Inc. ("Walmart"), a multinational retail corporation, from 2000 to 2010, where he held a number of executive positions, including Executive Vice President, Chief Marketing Officer (2005 to 2006) and Executive Vice President, Chief Merchandising Officer (2007 to 2010). From 2001 to 2005, Mr. Fleming was the Chief Executive Officer of Walmart.com, Walmart's e-commerce platform, and was the Chief Merchandising Officer in 2000. He began his career at Dayton Hudson, previously a department store chain, and rose through the ranks to become the Senior Vice President of Merchandising. He was at Dayton Hudson from 1981 to 2000. Since April 2005, Mr. Fleming has served

on the Board of Directors of USA Hockey Foundation, the philanthropic arm of USA Hockey. Mr. Fleming received his BA from Colorado College.

Mr. Fleming received his BA from Colorado College.

81.     Upon information and belief, Defendant Fleming is a citizen of the Commonwealth of Pennsylvania.

**Defendant Gove**

82.     The 2019 Proxy Statement provides that Defendant Sue E. Gove ("Gove") was recommended by the Nominating and Corporate Governance Committee and appointed by the Board to serve as a director effective May 29, 2019. Defendant Gove is a member of the Nominating and Corporate Governance Committee.

83.     For the fiscal year ended February 29, 2019, Defendant Gove received $78,294 in cash awards and $81,000 in stock from the Company.

84.     According to the Company's 2019 Proxy Statement, as of June 5, 2020, Defendant Gove beneficially owned 8,342 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $9.32, Defendant Gove owned approximately $77,747 worth of Bed Bath stock.

85.     On its corporate website, Bed Bath states:

Sue E. Gove, 60, is President of Excelsior Advisors, LLC, a retail consulting and advisory firm, and served as a Senior Advisor to Alvarez & Marsal, a corporate consulting firm from March 2017 to March 2019. Prior to founding Excelsior Advisors in August 2014, she was the President and Chief Executive Officer of Golfsmith International Holdings, Inc., an American golf specialty retailer, from October 2012 to April 2014 and President, from February 2012 to April 2014. Ms. Gove also served Golfsmith as Chief Operating Officer from September 2008 to October 2012, as Chief Financial Officer from March 2009 to July 2012 and as Executive Vice President from September 2008 to February 2012. In addition, she spent 25 years at Zale Corporation, a jewelry retailer, where she served in senior financial, operating and strategic roles, culminating in the EVP and Chief Operating Officer role. Ms. Gove currently serves on the boards of Conn's, Inc., a specialty retailer of furniture and mattresses, home appliances, consumer electronics and home office products, and provider of consumer credit, since March 2020; Tailored Brands, Inc., a retail holding company for various men's apparel stores since August 2017; and IAA, Inc., a

leading North American salvage auto auction since July 2019. She has been a member of the National Association of Corporate Directors (NACD) since May 2019 and was named a NACD Board Leadership Fellow, which demonstrates her commitment to the highest standards of exemplary board leadership. NACD Fellowship is a comprehensive and continuous program of study that empowers directors with the latest insights, intelligence, and leading boardroom practices.

Ms. Gove received her BBA in Accounting from the University of Texas at Austin.

86.     Upon information and belief, Defendant Gove is a citizen of Texas.

**Defendant Kirwan**

87.     The 2019 Proxy Statement provides that Defendant Jeffrey A. Kirwan ("Kirwan") was recommended by the Nominating and Corporate Governance Committee and appointed by the Board to serve as director effective May 29, 2019.

88.     For the fiscal year ended February 29, 2019, Defendant Kirwan received $76,099 earned in cash but paid in stock, and $81,000 in stock awarded from the Company.

89.     According to the Company's 2019 Proxy Statement, as of June 5, 2020, Defendant Kirwan beneficially owned 13,709 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $9.32, Defendant Kirwan owned approximately $127,768 worth of Bed Bath stock.

90.     On its corporate website, Bed Bath states:

Jeffrey A. Kirwan, 52, previously served as the Global President and Chief Executive Officer, Gap ("Gap"), a division of The Gap, Inc., a worldwide clothing and accessories retailer, from December 2014 until March 2018. Prior to that, he worked at Gap China as Executive Vice President and President, from February 2013 to December 2014, and as Senior Vice President, Managing Director and Chief Operating Officer from May 2011 to February 2013. Previously, he worked as Senior Vice President, Stores and Operations, Old Navy, a division of The Gap, Inc., from August 2008 to May 2011, and at Old Navy Canada as Senior Vice President and General Manager, from March 2008 to August 2008, and as Vice President and General Manager, from April 2007 to March 2008.

Mr. Kirwan received his B.S. from Rhode Island College and an MBA from the University of Maryland University College.

91.     Upon information and belief, Defendant Kirwan is a citizen of New York.

**Defendant Yerger**

92.     The 2019 Proxy Statement provides that Defendant Ann Yerger ("Yerger") was recommended by the Nominating and Corporate Governance Committee and has served as a director since May 2019.

93.     For the fiscal year ended February 29, 2019, Defendant Yerger received $85,886 earned in cash but paid in stock, and $81,000 in stock awarded from the Company.

94.     According to the Company's 2019 Proxy Statement, as of June 5, 2020, Defendant Yerger beneficially owned 11,371 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $9.32, Defendant Yerger owned approximately $105,977 worth of Bed Bath stock.

95.     On its corporate website, Bed Bath states:

Ms. Yerger, 57, spent nearly 20 years with the Council of Institutional Investors (CII), including ten years in leadership as CII's Executive Director. CII is a nonprofit, nonpartisan association of asset owners, asset managers and other service providers representing assets under management of approximately $40 trillion focused on effective corporate governance practices. Previously, Ms. Yerger was the Investor Responsibility Research Center's Deputy Director for Corporate Governance Service. Ms. Yerger's deep corporate governance and shareholder-oriented work also includes service as an Advisor to Spencer Stuart's North America Board Practice group, which helps companies strengthen their boards and improve their effectiveness, a member of Grant Thornton's Audit Quality Advisory Council, executive director of Ernst & Young's Center for Board Matters. She is a National Association Corporate Directors (NACD) Board Leadership Fellow and an independent director of Hershey Entertainment and Resorts.

Ms. Yerger received a Bachelor of Arts in Economics from Duke University and an MBA from Tulane University. She is a CFA charter holder.

96.     Upon information and belief, Defendant Yerger is a citizen of the District of Columbia.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

97.     By reason of their positions as officers and/or directors of Bed Bath and because of their ability to control the business and corporate affairs of Bed Bath, the Individual Defendants owed Bed Bath and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Bed Bath in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Bed Bath and its shareholders so as to benefit all shareholders equally.

98.     Each director, officer, and controller of the Company owes to Bed Bath and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

99.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Bed Bath, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

100.    To discharge their duties, the officers, directors, and controllers of Bed Bath were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

101.    Each Individual Defendant, by virtue of her or his position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and officers of Bed Bath, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Bed Bath's Board at all relevant times.

102.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

103.    To discharge their duties, the officers and directors of Bed Bath were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Bed Bath were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New Jersey and the United States, and pursuant to Bed Bath's own Corporate Governance Policies, which are contained in the *Policy of*

23

*Ethical Standards for Business Conduct* and *Corporate Governance Guidelines*;

(b)        conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)        remain informed as to how Bed Bath conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)        establish and maintain systematic and accurate records and reports of the business and internal affairs of Bed Bath and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)        maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Bed Bath's operations would comply with all applicable laws and Bed Bath's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)        exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)        refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)        examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

104.    Each of the Individual Defendants further owed to Bed Bath and the shareholders the duty of loyalty requiring that each favor Bed Bath's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

105.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Bed Bath and were at all times acting within the course and scope of such agency.

106.    Because of their advisory, executive, managerial, directorial, and controlling positions with Bed Bath, each of the Individual Defendants had access to adverse, non-public information about the Company.

107.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Bed Bath.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

108.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

109.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse

information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

110.    The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Bed Bath was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

111.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

112.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Bed Bath, and was at all times acting within the course and scope of such agency.

## BED BATH'S GOVERNANCE POLICIES

113.    The Company's Policy of Ethical Standards and Business Conduct ("Policy") "sets forth the ethical standards all associates (including all officers) and members of the Board are expected to abide by when acting on behalf of the Company." It provides:

Members of the Board shall act at all times in accordance with the requirements of the Corporation's Policy of Ethical Standards for Business Conduct, which shall be applicable to each director in connection with his or her activities relating to the Corporation. This obligation shall at all times include, without limitation, adherence to the Corporation's policies with respect to conflicts of interest, confidentiality, protection of the Corporation's assets, ethical conduct in business dealings and respect for and compliance with applicable law. Any waiver of the requirements of the Policy of Ethical Standards for Business Conduct with respect to any individual director shall be reported to, and be subject to the approval of, the Board.

114.    In violation of the Policy, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Exchange Act. Moreover, in violation of the Policy, the Individual Defendants failed protect the Company's assets when the Company, under their control, repurchased shares at a price the Individual Defendants knew or should have known was artificially inflated by their own false or misleading statements regarding material facts. In violation of the Policy, the Individual Defendants failed to exhibit ethical conduct in business dealings by failing to uphold their fiduciary duties as set forth above. In violation of the Policy, the Individual Defendants failed to respect and comply with applicable laws.

115.    In addition, the Policy contains a section entitled "Associate Honesty," which is applicable to Directors under the preamble reproduced in paragraph 54 which specifies that Directors are included as Associates. This section states:

"As each of us experiences more personal accountability, we must ensure that we maintain the highest level of intellectual honesty in our daily responsibilities. Examples of conduct that are considered to violate this standard include but are not necessarily limited to:

• Knowingly failing to bring to senior management's attention violations of any provisions of this Policy of which you become aware.

• Misstating of inventory by non-compliance with Company policies or procedures through deliberate action.

• Deliberate disregard for policies or procedures in order to manipulate a result regardless of whether or not the effect is positive or negative upon the Company.

• Purchasing merchandise with an associate discount for the purpose of re-selling such merchandise for personal gain.

Obviously, all situations cannot be covered by a policy statement. Good judgment coupled with a high sense of personal integrity is the best policy."

116.    The Individual Defendants violated the inclusive language of the "Associate Honesty" section of the Policy by failing to uphold their fiduciary duties, by making misrepresentations as to the company's financial state and business controls, and by failing to comply with applicable laws and regulations relating to duties and disclosures.

117.    More specifically, the "aggressive disposition of inventory" violated the standard against "misstating of inventory"  by failing to disclose that this "aggressive disposition" would cause the company to lack sufficient inventory in key categories to support holiday sales, thereby causing non-compliance with Company policy and procedure as well as SEC rules by causing the company's true financial state to be misrepresented to the market.

118.    These misstatements effectively manipulated the company's price per share, an additional violation of the Policy.

119.    In addition to the Policy, Bed Bath promulgates The Bed Bath & Beyond Inc. Corporate Governance Guidelines (the "Guidelines"), dated July 25, 2019, which state:

**E. RECOVERY OF INCENTIVE COMPENSATION**

It is the Board's policy that the Corporation will, to the extent permitted by applicable law, seek reimbursement with respect to incentive compensation paid or awarded to a Named Executive Officer after February 28, 2009 where (i) the payment or award (or the vesting of such award) was predicated upon the achievement of financial results, which financial results were the product of fraudulent activity or that were subsequently the subject of a material negative restatement, (ii) in the Board's view such Executive engaged in fraud or conduct known by the Executive to be in violation of SEC rules and regulations or

Corporation policy that caused or that otherwise makes such Executive personally responsible for the fraudulent activity or the need for the restatement, and (iii) a lower payment or award would have been made to such Executive (or lesser or no vesting would have occurred with respect to such award) based upon the restated financial results or the financial results that would have pertained absent such fraudulent activity. In each such instance, the Board will seek to recover such portion of such Executive's incentive compensation for the relevant period as the Board deems appropriate after a review of any factors or information it considers appropriate or relevant. Generally, this review would include consideration of:

- the Board's view of what incentive compensation would have been paid or awarded to the Executive had the financial results been properly reported;

- the nature of the events that led to the improper reporting of financial results;

- the conduct of the Executive in connection with the events relating to the improper reporting;

- whether the assertion of a claim against the Executive could prejudice the Corporation's overall interests; whether other penalties or punishments are being imposed on the Executive, including by third parties such as regulators or other authorities; and the tax treatment of the recovery and related matters; and

- any other facts and circumstances that the Board deems relevant.

Where incentive compensation covered by this policy above consists of an equity award, including circumstances where vesting with respect to such equity award is predicated on the achievement of financial results as aforesaid, the Board shall take such action as it deems appropriate consistent with the foregoing principles, including, where appropriate, seeking to the extent described above the cancellation of stock or option awards or reimbursement of gains realized on the exercise of stock options or the sale of shares.

**RESTRICTIONS ON HEDGING AND PLEDGING** 1. Hedging Transactions The Board believes that it is important to align the interests of the directors and executive officers with those of the Corporation's shareholders and considers it inappropriate for directors and executive officers of the Corporation to engage in speculative transactions in the Corporation's securities. Accordingly, directors and executive officers of the Corporation are prohibited from engaging in hedging or monetization transactions with respect to the Corporation's securities, including through the use of financial instruments such as prepaid variable forward contracts, equity swaps, collars, exchange funds, puts, calls, forwards and other derivative instruments, or through the establishment of a short position in the Corporation's securities. 2. Pledging Transactions Securities held in a margin account as collateral for a margin loan may be sold by the broker without the customer's consent if the customer fails to meet a margin call. Similarly, securities pledged as collateral for a loan may be sold in foreclosure if the borrower defaults on the loan. Because a margin sale or foreclosure sale may occur at a time when the pledgor is aware of material nonpublic information or otherwise not permitted to trade in the Corporation's securities, except as otherwise permitted below, directors and executive officers of the Corporation are prohibited from holding the Corporation's securities in a margin account

or otherwise pledging the Corporation's securities as collateral for a loan. This anti-pledging policy shall not prohibit a pledge where a person covered by this policy wishes to pledge the Corporation's securities as collateral for a loan and certifies to the Corporation's General Counsel his or her financial capacity to repay the loan without resort to the pledged securities. Any person seeking an exception from this policy (other than as permitted in the immediately preceding sentence hereof) must submit a request for pre-approval to the Board prior to the contemplated transaction. Any securities of the Corporation that are pledged will not be counted towards meeting the requirements of the Corporation's stock ownership guidelines.

120.    In addition to the Policy and the Guidelines, Bed Bath's Board has an Audit Committee, the charter of which provides, *inter alia*, that:

The purpose of the Audit Committee (the "Committee") is to oversee the Corporation's accounting and financial reporting processes and the audit of the Corporation's financial statements. The Committee will also advise and assist the Board of Directors (the "Board") of the Corporation in fulfilling its oversight responsibilities with respect to the following, in addition to other duties related to its mission:
• **the integrity of the Corporation's quarterly and annual financial statements** and financial reporting processes;
• the Corporation's earnings announcements, as well as financial information and earnings guidance provided to analysts and ratings agencies;
• audits of the Corporation's financial statements;
• **the company's internal control system and the quality of internal control by management;**
• **management's practices to ensure adequate risk management and business continuity;**
• **compliance with legal and regulatory requirements and the Corporation's ethical conduct policy;**
• the independent auditor's qualifications, independence and performance;
• the performance of the Corporation's internal audit function;
• cyber-security, data privacy, information technology, and information protection; and
• procedures for receipt and treatment of complaints received by the Company from its customers, vendors or employees relating to accounting, internal accounting controls or auditing matters.

(Emphasis added.)

121.    The members of the Audit Committee during the Relevant Period included Defendant Edelman, Defendant Osborne, Defendant Ruesterholz, Defendant Schechter, and Defendant Weiss (the "Audit Committee Defendants").

122.    The Audit Committee Defendants are responsible for effectuating the aims of the Audit Committee Charter, above. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading financial statements to the SEC.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

123.    Bed Bath describes itself as "an omnichannel retailer that makes it easy for our customers to feel at home. The Company sells a wide assortment of domestic merchandise and home furnishings. The Company also provides a variety of textile products, amenities and other goods to institutional customers in the hospitality, cruise line, healthcare and other industries. Additionally, the Company is a partner in a joint venture which operates retail stores in Mexico under the Bed Bath & Beyond name."

124.    Bed Bath was the subject of a shareholder activist movement, which in May 2019 had the result of ousting then-CEO Steven Temares, adding several new members to the Board, hiring Defendant Winston as interim CEO, and commencing a search for a permanent CEO.

125.    Bed Bath was led by Defendant Winston until Defendant Tritton assumed the role of CEO in November 2019.

126.    While led by Defendant Winston, Bed Bath opted to dispose of approximately $350 million worth of inventory using coupons, sales, clearances, and other similar methods between October 9, 2019 and the beginning of the winter holidays.

127.    Bed Bath's business is seasonal; its sales are greatest in August, November, and December, and lower in February.

128.     Because of the decision to aggressively dispose of inventory, during the important seasonal months of November and December, Bed Bath foreseeably did not have sufficient inventory to meet consumer demand, negatively impacting the Company's financial performance.

**False and Misleading Statements**

**The Second Quarter 2019 Results**

129.     On October 2, 2019, Bed Bath released and filed with the SEC a shareholder letter discussing its financial results for the fiscal quarter ended August 31, 2019. These included a net loss of $1.12 per diluted share, or a total of $138.8 million. It also disclosed that net sales were $2.7 billion, or 7.3%, less than the prior year period. The shareholder letter stated the following, in relevant part:

> For the fiscal 2019 second quarter, the Company reported a net loss of $(1.12) per diluted share ($(138.8) million), which included an unfavorable impact of approximately $1.46 per diluted share from charges related to the first wave of transformation initiatives including, severance costs associated with the corporate workforce reduction and decision to outsource certain functions, and an inventory write down. . . . Net sales for the fiscal 2019 second quarter were approximately $2.7 billion, a decrease of approximately 7.3% compared to the prior year period. Comparable sales in the fiscal 2019 second quarter declined approximately 6.7%.
>
> * * *
>
> Fiscal 2019 Updated Financial Outlook
>
> Fiscal 2019 full-year results continue to be in line with the Company's most recent guidance and assumes current investment plans to drive top-line performance in the back half, as well as its comp sales trends year to date, and excludes goodwill and other impairments, severance costs, shareholder activity costs, the inventory write down, and any incremental impact from tariffs. Fiscal 2019 full-year net sales are estimated to be around $11.4 billion and net earnings per diluted share are estimated to be between $2.08 and $2.13.

130.     The most recent guidance to which the above refers can be found in the shareholder letter dated July 10, 2019 and filed with the SEC, which stated in relevant part:

> For the fiscal 2019 full year, excluding the goodwill and other impairments, severance and shareholder activity costs, the Company is modeling to be at the lower end of its previously

provided ranges of $11.4 billion to $11.7 billion for net sales and $2.11 to $2.20 for net earnings per diluted share.

131.     During a conference call held on October 9, 2019 to discuss the Company's second quarter results, Defendant Winston stated that "[t]o further drive holiday sales, we are adding marketing and promotional support for Bed Bath & Beyond in the back half of the year." Defendant Winston also stated:

> As we mentioned in the recent shareholder letter, we have plans to aggressively reduce up to $1 billion of inventory at retail over the next 18 months. As a result of the decision, we took $194 million inventory writedown in the second quarter.
>
> …In the short term, more than approximately $350 million of inventory at retail will be removed from our stores before the 2019 holiday season."

132.     On October 10, 2019, Bed Bath filed its October 2019 10-Q, which reported on the fiscal quarter ended August 31, 2019, and expanded on the information from the October 9 conference call and shareholder letter. In relevant part, the Company noted that:

> Retail inventory, which includes inventory in the Company's distribution facilities for direct to customer shipments, was approximately $2.3 billion at August 31, 2019, a decrease of 17.8% compared to retail inventory at September 1, 2018. The Company continues to focus on its inventory optimization strategies.

133.     Bed Bath also stated that its "management, with the participation of its Principal Executive Officer and Principal Financial Officer, have reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures," and based upon that review, the CEO and CFO "have concluded that the Company's current disclosure controls and procedures are effective."

134.     The quarterly report was signed by Defendant D'Elia, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants D'Elia and Winston attesting to the accuracy of the financial

statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

135.    The statements referenced in ¶¶ 129-134 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) due to "aggressive disposition of inventory," the Company lacked sufficient inventory in key categories to support holiday sales; (ii) the Company's internal control over inventory levels and financial reporting was ineffective; (iii) as a result of the foregoing, the Company was likely to experience reduced sales; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Gradually Emerges While Misleading Statements Continue**

136.    On January 8, 2020, the day before releasing its January 2020 10-Q, Bed Bath withdrew its fiscal 2019 guidance.  In a shareholder letter regarding the quarterly results, the Company stated, in relevant part:

**Fiscal 2019 Third Quarter Results**

For the fiscal 2019 third quarter, the Company reported a net loss of $(0.31) per diluted share ($(38.6) million), which included a net benefit of $0.07 from the favorable impact from an adjustment to the incremental inventory reserve for future markdowns associated with its inventory initiative, that was partially offset by a non-cash charge for the impairment of certain store-level assets. This compares to net earnings of $0.18 per diluted share ($24.4 million) for the fiscal 2018 third quarter, which included the favorable impact of $0.16 per diluted share from the gain on the sale of a building. Excluding these net favorable impacts in both periods, the Company reported an adjusted net loss of $(0.38) per diluted share ($(46.9) million) for the fiscal 2019 third quarter, compared to adjusted net earnings of $0.02 per diluted share ($2.7 million) for the fiscal 2018 third quarter. Net sales for the fiscal 2019 third quarter were $2.8 billion, a decrease of 9.0% compared to the prior year period. Comparable sales in the fiscal 2019 third quarter declined 8.3%.

The Company's fiscal 2019 third quarter was significantly impacted by the calendar shift of the Thanksgiving holiday this year resulting in one less week of holiday sales compared to the prior year period. Adjusting for this calendar shift to include Thanksgiving and Cyber Monday weeks in both periods, comparable sales for the fiscal 2019 third quarter declined 3.6%. During the key five-day shopping period from Thanksgiving to Cyber Monday for both this year and last year, comparable sales on a shifted basis increased 7.1%.

\* \* \*

**Outlook**

The Company expects its sales and profitability to remain pressured during the fiscal 2019 fourth quarter. Considering these headwinds reflected in the Company's results to date, and the ongoing work by recently appointed President & CEO Mark Tritton to assess the business and finalize the details of the Company's go-forward strategic plan as well as the extensive senior leadership changes within the past month, the Company believes it is appropriate to withdraw its fiscal 2019 full year financial guidance.

137.    On this news, the price of the Company's stock fell on heavy trading volume from $16.65 per share at close on January 8, 2020, to close at $13.45 per share on January 9, 2020, a loss of $3.20 per share, or over 19%.

138.    On January 9, 2020, Bed Bath filed its January 2020 10-Q, which reported on the fiscal quarter ended November 30, 2019. The January 2020 10-Q reiterated points made in the January 9, 2020 shareholder letter and confirmed the previously described financial results of the quarter.  Regarding inventory levels, the Company stated:

Retail inventory, which includes inventory in the Company's distribution facilities for direct to customer shipments, was approximately $2.5 billion at November 30, 2019, a decrease of 15.6% compared to retail inventory at December 1, 2018. The Company continues to focus on its inventory optimization strategies.

139.    In the same report, Bed Bath also stated that its "management, with the participation of its Principal Executive Officer and Principal Financial Officer, have reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures," and based upon that review,

the CEO and CFO "have concluded that the Company's current disclosure controls and procedures are effective."

140.    The quarterly report was signed by Defendant D'Elia, and contained SOX certifications signed by Defendants D'Elia and Tritton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

141.    The statements referenced in ¶¶136, 138-140 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) due to "aggressive disposition of inventory," the Company lacked sufficient inventory in key categories to support holiday sales; (ii) the Company's internal control over inventory levels and financial reporting was not effective; (iii) as a result of the foregoing, the Company was likely to experience reduced sales; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

142.    On February 11, 2020, Bed Bath issued a press release previewing its fourth-quarter 2019 financial results.  The Company explained that its disappointing results—including, *inter alia*, a 13% drop in  adjusted comparable sales—were "driven primarily by store traffic declines combined with inventory management issues, and increased promotional activity and markdowns." Bed Bath stated, in relevant part:

Fiscal December 2019/January 2020 Comparable Sales

For the first two months of the fiscal 2019 fourth quarter (December 2019 and January 2020), the Company's comparable sales declined 5.4%, reflecting a low-double-digit percentage decrease in transactions in stores, partially offset by a mid-single-digit percentage increase in the average transaction amount. On a directional

basis, comparable sales from stores declined nearly 11%, while comparable sales from digital channels grew approximately 20%.

Comparable sales include the shift of the Cyber Monday holiday week, which is in the Company's fiscal fourth quarter this year versus the fiscal third quarter of last year. **Adjusting for the calendar shift to exclude Cyber Monday week in both periods, comparable sales for the first two months of the fiscal 2019 fourth quarter declined 13%.**

**Product availability leading into the holiday period was also a contributing factor, as inventory within certain key categories in the Bed Bath & Beyond assortment was too low or out-of-stock during the period.** The Company is immediately reforming its internal planning and inventory management procedures to master the fundamentals.

(Emphasis added.)

143.    Subsequently, the Company's stock price fell on unusually heavy trading volume from $14.85 per share at close on February 11, 2020, to close at $11.79 per share on February 12, 2020, a loss of $3.06 per share, or over 20%.

144.    Several months later, on May 4, 2020, Defendant D'Elia stepped down from her role as the Company's CFO.

## **REPURCHASES**

145.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $1,669,100 to repurchase approximately 119,992 shares of its own common stock at artificially inflated prices.

146.    According to the January 2020 10-Q, from September 29, 2019 until October 26, 2019, the Company purchased 7,200 shares of its common stock at an average price of $12.21 per share.

147.    As the market correction on February 12 in response to the revelation of the previously misstated and/or omitted information indicated, Bed Bath's stock was actually worth

only $11.79 per share, the price at closing on February 12, 2020. In total, the amount the Company overpaid for repurchases of its own stock between September 29, 2019 until October 26, 2019 was approximately $3,024.

148.     According to the January 2020 10-Q, between October 27, 2019 and November 30, 2019, the Company purchased 76,700 shares of its common at an average price of 13.54 per share.

149.     As the Company's stock was actually worth only $11.79 per share, the price at closing on February 12, 2020, the amount the Company overpaid for repurchases of its own stock between October 27, 2019 and November 30, 2019 was approximately $134,225.

150.     According to the Company's annual report on Form 10-K report filed with the SEC in April, 2020 (the "2019 10-K"), between December 1, 2019 and December 28, 2019, the Company purchased 30,900 shares of its common stock for approximately $477,405, at an average price of $15.45 per share.

151.     As the Company's stock was actually worth only $11.79 per share, the price at closing on February 12, 2020, the amount the Company overpaid for repurchases of its own stock between December 1, 2019 and December 28, 2019 was approximately $113,094.

152.     According to the 2019 10-K, between December 29, 2019 and January 25, 2020, the Company purchased 2,600 shares of its common stock for approximately $33,280, at an average price of $65.12.80 per share.

153.     As the Company's stock was actually worth only $11.79 per share, the price at closing on February 12, 2020, the amount the Company overpaid for repurchases of its own stock between December 29, 2019 and January 25, 2020 was approximately $2,626.

154.     In total, the Company overpaid an aggregate amount of approximately $252,969 for repurchases of its own stock during the Relevant Period.

## DAMAGES TO BED BATH

155.    As a direct and proximate result of the Individual Defendants' conduct, Bed Bath has lost and will continue to lose and expend many millions of dollars.

156.    Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Actions filed against the Company, its CEO, its former interim CEO, and its former CFO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

157.    Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

158.    Such losses include, but are not limited to, amounts that the Company overpaid, at the direction of the Individual Defendants, for the Company's repurchases of its own stock at artificially inflated prices.

159.    As a direct and proximate result of the Individual Defendants' conduct, Bed Bath has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and Individual Defendants' misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

160.    Plaintiff brings this action derivatively and for the benefit of Bed Bath to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Bed Bath, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

161.    Bed Bath is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

162.    Plaintiff is, and has been at all relevant times, a shareholder of Bed Bath. Plaintiff will adequately and fairly represent the interests of Bed Bath in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

163.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

164.    A pre-suit demand on the Board of Bed Bath is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following fourteen individuals: Defendant Tritton, Defendant Edelman, Defendant Bell-Rose, Defendant Fleming, Defendant Gove, Defendant Kirwan, Defendant Gaston, Defendant Osborne, Defendant Ramalingam, Defendant Ruesterholz, Defendant Schechter, Defendant Weiss, Defendant Winston, and Defendant Yerger (the "Directors"). Plaintiff needs only to allege demand futility as to seven of the fourteen Directors who are on the Board at the time this action is commenced.

165.    Demand is excused as to each of the fourteen Directors because each one of them face, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, and, at the same time, to cause the Company to overpay by approximately $254,395 for repurchases of its own stock, which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

166.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

167.    Additional reasons that demand on Defendant Tritton is futile follow. Defendant Tritton has served as the Company's President and CEO, and as a director since November 2019. Thus, as the Company admits, he is a non-independent director. Defendant Tritton received approximately 14,435,000 in compensation from the Company during fiscal 2019. Defendant Tritton was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein. As the Company's highest officer and as a trusted director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Tritton also signed, and thus personally made the false and misleading statements in the January 2020 10-Q. Further, because much of Defendant Tritton's compensation is in stock awards, he cannot be disinterested as a scheme to artificially inflate the price of Company stock benefits him personally. Moreover, Defendant Tritton is a defendant in the Securities Class Actions. For these reasons, Defendant Tritton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168.     Additional reasons that demand on Defendant Winston is futile follow. Defendant Winston has been a Company director and officer since May 2019, when she was appointed Interim CEO. Since stepping down from that role in November 2019, she has been a director. Defendant Winston received amounts in excess of $1,899,995 worth of stock in compensation from the Company during fiscal 2019 in relation to her tenure as interim CEO, and has received and continues to receive compensation for her role as a director as described above. During her time as an officer and then as a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Winston also signed, and thus personally made the false and misleading statements in the October 2019 10-Q. Further, because a significant part of Defendant Winston's compensation is in stock awards, she cannot be disinterested as a scheme to artificially inflate the price of Company stock benefits her personally. Moreover, Defendant Winston is a defendant in the Securities Class Actions. For these reasons, Defendant Winston breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

169.     Additional reasons that demand on Defendant Edelman is futile follow. Defendant Edelman has served as a Company director since May 2019. She also served as the Chair of the Audit Committee during the Relevant Period. Defendant Edelman has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements that artificially raised the price of the Company's stock, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and

consciously disregarded her duties to protect corporate assets when she approved the Repurchases.. For these reasons, Defendant Edelman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

170.    Additional reasons that demand on Defendant Bell-Rose is futile follow. Defendant Bell-Rose has served as a Company director since May 2018. She also served as a member of the Nominating and Corporate Governance Committee during the Relevant Period. Defendant Bell-Rose has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements that artificially raised the price of the Company's stock, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets when she approved the Repurchases. For these reasons, Defendant Bell-Rose breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

171.    Additional reasons that demand on Defendant Fleming is futile follow. Defendant Fleming has served as a Company director since May 2019. He also served as the Chair of the Compensation Committee during the Relevant Period. Defendant Fleming has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements that artificially raised the price of the Company's stock, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets when he approved the

Repurchases. For these reasons, Defendant Fleming breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172.    Additional reasons that demand on Defendant Gaston is futile follow. Defendant Gaston has served as a Company director for thirteen years. He also served as the Chairman of the Board during the Relevant Period. Defendant Gaston has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements that artificially raised the price of the Company's stock, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets when he approved the Repurchases. For these reasons, Defendant Gaston breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.    Additional reasons that demand on Defendant Gove is futile follow. Defendant Gove has served as a Company director since May 2019. She also served as a member of the Nominating and Corporate Governance Committee during the Relevant Period. Defendant Gove has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements that artificially raised the price of the Company's stock, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets when she approved the Repurchases. For these reasons, Defendant Gove breached her fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Kirwan is futile follow. Defendant Kirwan has served as a Company director since May 2019. Defendant Kirwan has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements that artificially raised the price of the Company's stock, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets when he approved the Repurchases. For these reasons, Defendant Kirwan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant Osborne is futile follow. Defendant Osborne has served as a Company director since May 2018. He also served as a member of the Audit Committee during the Relevant Period. Defendant Osborne has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements that artificially raised the price of the Company's stock, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets when he approved the Repurchases. For these reasons, Defendant Osborne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Ramalingam is futile follow. Defendant Ramalingam has served as a Company director since May 2019. He also served as a member of the Nominating and Corporate Governance Committee during the Relevant Period. Defendant Ramalingam has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements that artificially raised the price of the Company's stock, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets when he approved the Repurchases. For these reasons, Defendant Ramalingam breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.    Additional reasons that demand on Defendant Ruesterholz is futile follow. Defendant Ruesterholz has served as a Company director since May 2018. She also served as Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee during the Relevant Period. Defendant Ruesterholz has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements that artificially raised the price of the Company's stock, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets when she approved the Repurchases. For these reasons, Defendant Ruesterholz breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

178.    Additional reasons that demand on Defendant Schechter is futile follow. Defendant Schechter has served as a Company director since May 2019. He also served as a member of the Audit Committee during the Relevant Period. Defendant Schechter has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements that artificially raised the price of the Company's stock, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets when he approved the Repurchases. For these reasons, Defendant Schechter breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

179.    Additional reasons that demand on Defendant Weiss is futile follow. Defendant Weiss has served as a Company director since May 2019. She also served as a member of the Audit Committee during the Relevant Period. Defendant Weiss has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements that artificially raised the price of the Company's stock, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets when she approved the Repurchases. For these reasons, Defendant Weiss breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

180.    Additional reasons that demand on Defendant Yerger is futile follow. Defendant Yerger has served as a Company director since May 2019. She also served as a member of the Nominating and Corporate Governance Committee and a member of the Compensation Committee during the Relevant Period. Defendant Yerger has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements that artificially raised the price of the Company's stock, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets when she approved the Repurchases. For these reasons, Defendant Yerger breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

181.    Additional reasons that demand on the Board is futile follow.

182.    The Directors, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $252,969 for its own common stock during the Relevant Period. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

183.    The Audit Committee Defendants (Defendants Edelman, Osborne, Ruesterholz, Schechter, and Weiss) served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting

processes and the Company's compliance with legal and regulatory requirements. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading financial statements to the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

184.    In violation of the Policy, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Exchange Act. In further violation of the Policy, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, and conduct business in an honest and ethical manner. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them

185.    Bed Bath has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Bed Bath any part of the damages Company suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

186.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision

exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

187.   The acts complained of herein constitute violations of fiduciary duties owed by Bed Bath's officers and directors, and these acts are incapable of ratification.

188.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Bed Bath. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Bed Bath, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

189.   If there is no directors' and officers' liability insurance, then the Directors will not cause Bed Bath to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

190.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least seven of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

191.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Bed Bath. Not only is Bed Bath now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Bed Bath by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices during the Relevant Period due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase thousands of its own shares at artificially-inflated prices, damaging Bed Bath.

193.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

194.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue

and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Bed Bath not misleading.

195.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Bed Bath.

196.     The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

197.     By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

198.     Plaintiff on behalf of Bed Bath has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

199.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.     The Individual Defendants, by virtue of their positions with Bed Bath and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Bed Bath and

each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Bed Bath and the other Individual Defendants to engage in the illegal conduct and practices complained of herein.

201.    Plaintiff on behalf of Bed Bath has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Bed Bath's business and affairs.

204.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

205.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Bed Bath.

206.    In breach of their fiduciary duties owed to Bed Bath, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) due to its "aggressive disposition of inventory" in which "more than approximately $350 million of inventory of retail will be removed from our stores before the 2019 holiday season,"  the Company lacked sufficient inventory in key categories to support holiday sales; (ii) the Company's internal control over inventory levels and financial reporting was ineffective; (iii) as a result of the foregoing, the

Company was likely to experience reduced sales; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

207.     The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

208.     Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

209.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Bed Bath's securities.

210.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Bed Bath's

securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

211.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

212.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Bed Bath has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

213.    Plaintiff on behalf of Bed Bath has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

214.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Bed Bath.

216.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses, stock options, or similar compensation from Bed Bath that was tied to the performance or artificially inflated valuation of Bed Bath, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

217.    Plaintiff, as a shareholder and a representative of Bed Bath, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and due to their wrongful conduct and breach of their fiduciary and contractual duties.

218.    Plaintiff on behalf of Bed Bath has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

219.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

220.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Bed Bath to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets. In addition, the Individual Defendants have caused the Company to incur many millions of dollars of legal liability and costs to defend unlawful actions, thereby wasting the Company's assets.

221.    Furthermore, the Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

222.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

223.    Plaintiff on behalf of Bed Bath has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Bed Bath, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Bed Bath;

(c)     Determining and awarding to Bed Bath the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Bed Bath and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Bed Bath and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

i.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

ii.     a provision to permit the shareholders of Bed Bath to nominate at least seven candidates for election to the Board; and

iii.    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Bed Bath restitution from each of the Individual Defendants;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: July 10, 2020                         Respectfully submitted,

                                            **THE ROSEN LAW FIRM, P.A.**

                                            By: /s/ Laurence M. Rosen
                                            Laurence M. Rosen, Esq.
                                            One Gateway Center, Suite 2600
                                            Newark, NJ 07102
                                            Telephone: (973) 313-1887
                                            Facsimile: (973) 833-0399
                                            Email: lrosen@rosenlegal.com


                                            **THE BROWN LAW FIRM, P.C.**
                                            Timothy Brown
                                            240 Townsend Square
                                            Oyster Bay, NY 11771
                                            Telephone: (516) 922-5427
                                            Facsimile: (516) 344-6204
                                            Email: tbrown@thebrownlawfirm.net

                                            *Counsel for Plaintiff*

## __VERIFICATION__

I, Olufemi Salu am a plaintiff the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2020.

7/10/2020

_Olufemi Salu_

CE6547FE23D54b2...

Olufemi Salu