Edna D. Guerrasio
Jonathan E. Richman (admitted *pro hac vice*)
Proskauer Rose LLP
Eleven Times Square
New York, New York  10036
(212) 969-3000
eguerrasio@proskauer.com
jerichman@proskauer.com

*Attorneys for Defendants and for*
*Nominal Defendant Bed Bath & Beyond Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE BED BATH & BEYOND STOCKHOLDER DERIVATIVE LITIGATION** | **Master File No. 2:20-cv-08673-MCA-MAH** |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS
## <u>PLAINTIFFS' CONSOLIDATED COMPLAINT</u>

January 4, 2022

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ......................................................................... 1

FACTUAL BACKGROUND ............................................................................ 4

    A.    BBBY's Business, Management, and Transformation Plans ..................... 4

    B.    Defendants' Actions and Statements During the Relevant Period ............. 5

    C.    The Complaint's Allegations ..................................................................... 7

ARGUMENT ..................................................................................................... 8

    I.    THE COMPLAINT DOES NOT PLEAD PARTICULARIZED ALLEGATIONS OF DEMAND FUTILITY. ............................................. 9

        A.    No Showing that a Majority of the Board Was Interested ....................... 10

            1.    No Showing of Direct Financial Benefit ....................................... 10

            2.    Allegedly Substantial Threat of Liability Not Enough to Show Interest .................................................................................. 11

            3.    No Substantial Likelihood of Liability for Breach of Fiduciary Duty ...................................................................... 12

            4.    No Substantial Likelihood of Liability for Unjust Enrichment ................................................................................. 25

            5.    No Substantial Likelihood of Liability for Waste ......................... 26

            6.    No Substantial Likelihood of Liability for Contribution .............. 27

        B.    No Showing that a Majority of Board Was Not Reasonably Informed ............................................................................................. 28

        C.    No Showing that a Majority of Board Lacked Sound Business Judgment ............................................................................................ 29

    II.    THE COMPLAINT FAILS TO STATE A COGNIZABLE CLAIM. .................. 30

        A.    No Claim for Breach of Fiduciary Duty ................................................. 30

            1.    No Claim for Inventory-Reduction Program ................................ 31

            2.    No Claim for Statements to the Public .......................................... 33

            3.    No Claim for Stock Repurchases .................................................. 42

        B.    No Claim for Unjust Enrichment ............................................................ 42

        C.    No Claim for Corporate Waste ............................................................... 42

        D.    No Claim for Contribution ...................................................................... 42

i

*Page*

CONCLUSION..................................................................................................................43

# TABLE OF AUTHORITIES

*Page(s)*

CASES:

*Alpert v. Nat'l Ass'n of Sec. Dealers, LLC*,
    2004 WL 3270188 (Sup. Ct. N.Y. Cty. July 28, 2004) ..........................................................11

*Ash v. McCall*,
    2000 WL 1370341 (Del. Ch. Sept. 15, 2000) ..........................................................................18

*Baker v. Andover Assocs. Mgmt. Corp.*,
    2009 WL 7400085 (N.Y. Sup. Ct. Westchester Cty. Nov. 30, 2009).....................................32

*Bildstein v. Atwater*,
    222 A.D.2d 545, 635 N.Y.S.2d 88 (2d Dep't 1995) ..........................................................13, 15

*Brautigam v. Blankfein*,
    8 F. Supp. 3d 395 (S.D.N.Y. 2014),
    *aff'd*, 598 F. App'x 53 (2d Cir. 2015)....................................................................................22

*Brewster v. Lacy*,
    2004 WL 5487868 (Sup. Ct. N.Y. Cty. June 21, 2004)....................................................10, 18

*British Printing & Commc'n Corp. v. Harcourt Brace Jovanovich, Inc.*,
    664 F. Supp. 1519 (S.D.N.Y. 1987)........................................................................................11

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004).............................................................................................31, 35

*Carpenters' Pension Trust of Ill. v. Target Corp. (In re Target Corp. Sec. Litig.)*,
    955 F.3d 738 (8th Cir. 2020) ...................................................................................................39

*Cent. Laborers' Pension Fund v. Dimon*,
    2014 WL 3639185 (S.D.N.Y. July 23, 2014),
    *aff'd*, 638 F. App'x 34 (2d Cir. 2016).....................................................................................25

*Chan v. New Oriental Educ. & Tech. Grp., Inc.*,
    2019 WL 2865452 (D.N.J. July 3, 2019).................................................................................31

*City of Tallahassee Ret. Sys. v. Akerson*,
    2009 WL 6019489 (Sup. Ct. N.Y. Cty. Oct. 16, 2009) ....................................................12, 14

*Clifford R. Gray, Inc. v. LeChase Constr. Servs.*,
    31 A.D.3d 983, 819 N.Y.S.2d 182 (3d Dep't 2006) ...............................................................25

*Feldmeier v. Feldmeier Equip., Inc.*,
    164 A.D.3d 1092, 84 N.Y.S.3d 609 (4th Dep't 2018)............................................26

*Fialkov v. Alcobra Ltd.*,
    2016 WL 1276455 (S.D.N.Y. Mar. 30, 2016) ........................................................38

*Ficus Invs., Inc. v. Private Capital Mgmt., LLC*,
    61 A.D.3d 1, 872 N.Y.S.2d 93 (1st Dep't 2009) ...................................................2

*Fisher v. Sanborn*,
    2021 WL 1197577 (Del. Ch. Mar. 30, 2021)............................................17, 22, 25

*Gammel v. Immelt*,
    2019 WL 2869378 (Sup. Ct. N.Y. Cty. July 3, 2019) ...............12, 14, 16, 17, 19, 28

*Goldstein v. Carnell Assocs., Inc.*,
    74 A.D.3d 745, 906 N.Y.S.2d 905 (2d Dep't 2010) ..............................................32

*Grika v. McGraw*,
    2016 WL 8716417 (Sup. Ct. N.Y. Cty. Dec. 21, 2016),
    *aff'd*, 161 A.D.3d 450, 76 N.Y.S.3d 546 (1st Dep't 2018)..........................12, 13, 15

*Hampshire Grp., Ltd. v. Kuttner*,
    2010 WL 2739995 (Del. Ch. July 12, 2010)....................................................25, 26

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ...............................................................................35

*Hildene Capital Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*,
    2012 WL 3542196 (S.D.N.Y. Aug. 15, 2012)........................................................12

*Howard v. Arconic, Inc.*,
    395 F. Supp. 3d 516 (W.D. Pa. 2019)...................................................................38

*In re Aetna, Inc. Sec. Litig.*,
    617 F.3d 272 (3d Cir. 2010)..................................................................................37

*In re Am. Int'l Grp., Inc. Deriv. Litig.*,
    700 F. Supp. 2d 419 (S.D.N.Y. 2010)..............................................................24, 25

*In re Caremark Int'l, Inc. Deriv. Litig.*,
    698 A.2d 959 (Del. Ch. 1996).....................................................14, 15, 16, 22, 23

*In re Ceridian Corp. Sec. Litig.*,
    542 F.3d 240 (8th Cir. 2008) ...............................................................................31

*In re Citigroup Inc. S'holder Deriv. Litig.*,
    2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009)...................................................20, 27

*In re Donald J. Trump Casino Sec. Litig.*,
  793 F. Supp. 543 (D.N.J. 1992),
  *aff'd*, 7 F.3d 357 (3d Cir. 1993) ............................................................................36

*In re Gen. Motors Co. Deriv. Litig.*,
  2015 WL 3958724 (Del. Ch. June 26, 2015) ..........................................................20

*In re Goldman Sachs Grp., Inc. S'holder Litig.*,
  2011 WL 4826104 (Del. Ch. Oct. 12, 2011) ....................................................17, 30

*In re GoPro, Inc. Stockholder Deriv. Litig.*,
  2020 WL 2036602 (Del. Ch. Apr. 28, 2020) .............................................2, 18, 23

*In re Hertz Global Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018) ....................................................................................41

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
  2015 WL 4469143 (D.N.J. July 22, 2015) (*"Hertz I"*) .............................. 31-32, 40

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
  2017 WL 1536223 (D.N.J. Apr. 27, 2017) (*"Hertz II"*),
  *aff'd*, 905 F.3d 106 (3d Cir. 2018) .......................................................................1, 39

*In re Leapfrog Enter., Inc. Sec. Litig.*,
  200 F. Supp. 3d 987 (N.D. Cal. 2016) ..............................................................35, 37

*In re Lear Corp. S'holder Litig.*,
  967 A.2d 640 (Del. Ch. 2008) .................................................................................32

*In re LendingClub Corp. Deriv. Litig.*,
  2019 WL 5678578 (Del. Ch. Oct. 31, 2019) ..........................................................15

*In re Newell Brands, Inc. Sec. Litig.*,
  2019 WL 6715055 (D.N.J. Dec. 10, 2019),
  *aff'd*, 837 F. App'x 869 (3d Cir. 2020) ..................................................................35

*In re Omnicom Grp. Inc. S'holder Deriv. Litig.*,
  43 A.D.3d 766, 842 N.Y.S.2d 408 (1st Dep't 2007) ...........................................9, 29

*In re Party City Sec. Litig.*,
  147 F. Supp. 2d 282 (D.N.J. 2001) ..........................................................................35

*In re Target Corp. Sec. Litig.*,
  275 F. Supp. 3d 1063 (D. Minn. 2017),
  *reconsideration denied*, 2018 WL 1378755 (D. Minn. Mar. 19, 2018),
  *aff'd*, 955 F.3d 738 (8th Cir. 2020) ........................................................................35

*In re TrueCar, Inc. Stockholder Deriv. Litig.*,
  2020 WL 5816761 (Del. Ch. Sept. 30, 2020) ......................................................22

*In re Walt Disney Co. Deriv. Litig.*,
  907 A.2d 693 (Del. Ch. 2005),
  *aff'd*, 906 A.2d 27 (Del. 2006) ..............................................................18, 32

*In re Wayport, Inc. Litig.*,
  76 A.3d 296 (Del. Ch. 2013) ................................................................21

*In re Zimmer Biomet Holdings, Inc. Deriv. Litig.*,
  2021 WL 3779155 (Del. Ch. Aug. 25, 2021) ................................................22, 23

*Jiminian v. Seabrook*,
  760 F. App'x 38 (2d Cir. 2019) ............................................................12, 28

*Kamen v. Kemper Fin. Servs., Inc.*,
  500 U.S. 90 (1991) ................................................................................8

*Karfunkel v. USLIFE Corp.*,
  116 Misc. 2d 841, 455 N.Y.S.2d 937 (Sup. Ct. N.Y. Cty. 1982),
  *aff'd*, 98 A.D.2d 628, 469 N.Y.S.2d 1020 (1st Dep't 1983) ...............................27

*Levy v. Huszagh*,
  2012 WL 4512038 (E.D.N.Y. Sept. 28, 2012) .............................................29

*Lewis v. Akers*,
  227 A.D.2d 595, 644 N.Y.S.2d 279 ( 2d Dep't 1996) .....................................12

*Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings,
  Inc.)*,
  625 B.R. 268 (D. Del. 2020) ..............................................................12, 13

*Lockridge v. Krasnoff*,
  2008 WL 2076363 (Sup. Ct. N.Y. Cty. Apr. 30, 2008) ...................................19

*Malone v. Brincat*,
  722 A.2d 5 (Del. 1988) ........................................................................21

*Mancuso v. Rubin*,
  52 A.D.3d 580 (2d Dep't 2008) ............................................................32

*Marx v. Akers*,
  88 N.Y.2d 189, 666 N.E.2d 1034 (1996).............................................. *passim*

*Official Comm. of Unsecured Creditors v. Sabine Oil & Gas Corp. (In re Sabine
  Oil & Gas Corp.)*,
  562 B.R. 211 (S.D.N.Y. 2016) ..............................................................13

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016)................................................................37

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015).............................................................................38, 39

*Park v. Song*,
    61 Misc. 3d 1047, 85 N.Y.S.3d 855 (Sup. Ct. N.Y. Cty. 2018) ................................3

*Ravenswood Inv. Co., L.P. v. Winmill*,
    2011 WL 2176478 (Del. Ch. May 31, 2011).............................................24

*Reiter v. Fairbank*,
    2016 WL 6081823 (Del. Ch. Oct. 18, 2016) .............................................16

*Ressler v. Liz Claiborne, Inc.*,
    75 F. Supp. 2d 43 (E.D.N.Y. 1998),
    *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999).......................35

*Ret. Plan for Gen. Emps. of City of N. Miami Beach v. McGraw*,
    2016 WL 7475835 (Sup. Ct. N.Y. Cty. Dec. 21, 2016),
    *aff'd*, 158 A.D.3d 494, 71 N.Y.S.3d 27 (1st Dep't 2018)................................17, 28

*Rojas ex rel. J.C. Penney Co. v. Ellison*,
    2019 WL 3408812 (Del. Ch. July 29, 2019)............................................15

*Sherman v. Ryan*,
    911 N.E.2d 378 (Ill. App. Ct. 2009) ......................................................25

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
    499 F. Supp. 3d 49 (D. Del. 2020)........................................................36

*South v. Baker*,
    62 A.3d 1 (Del. Ch. 2012)...................................................................15

*Steed Fin. LDC v. Laser Advisers, Inc.*,
    258 F. Supp. 2d 272 (S.D.N.Y. 2003)....................................................43

*Stein v. Immelt*,
    472 F. App'x 64 (2d Cir. 2012) .............................................................10

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) ...........................................................15, 16, 20

*Stoner v. Walsh*,
    772 F. Supp. 790 (S.D.N.Y. 1991) ........................................................11

*Teachers' Ret. Sys. of La. v. Welch*,
  244 A.D.2d 231, 664 N.Y.S.2d 38 (1st Dep't 1997) ............................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................................40

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
  325 F. Supp. 3d 728 (N.D. Tex. 2018),
  *aff'd*, 935 F.3d 424 (5th Cir. 2019) ..................................................................41

*Walsh v. Wwebnet, Inc.*,
  116 A.D.3d 845, 984 N.Y.S.2d 100 (2d Dep't 2014) ....................................10, 11

*Wandel v. Eisenberg*,
  60 A.D.3d 77, 871 N.Y.S.2d 102 (1st Dep't 2009) ............................12, 23, 28, 29

*West Palm Beach Firefighters' Pension Fund v. Conagra Brands Inc.*,
  2020 WL 6118605 (N.D. Ill. Oct. 15, 2020) ......................................................38

*Wietschner v. Dimon*,
  139 A.D.3d 461, 32 N.Y.S.3d 77 (1st Dep't 2016) .............................................14

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017) ..........................................................................36, 37

*Wood v. Baum*,
  953 A.2d 136 (Del. 2008) ..............................................................................17, 23

*Zelouf Int'l Corp. v. Zelouf*,
  2014 WL 4976135 (Sup. Ct. N.Y. Cty. Oct. 6, 2014),
  *reargument granted in part on other grounds*, 47 Misc. 3d 346, 999 N.Y.S.2d
  731 (Sup. Ct. N.Y. Cty. 2014) ...........................................................................26

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ..............................................................................31

**STATUTES:**

15 U.S.C. § 78u-4 ...................................................................................................40

15 U.S.C. § 78u-5 .............................................................................................37, 38

N.Y. Bus. Corp. L. § 402 .......................................................................................13

N.Y. Bus. Corp. L. § 626 .........................................................................................8

N.Y. Bus. Corp. L. § 717 ...................................................................................13, 18

**OTHER AUTHORITIES:**

17 C.F.R. § 240.13a-13 ....................................................................................................35

Fed. R. Civ. P. 23.1 ....................................................................................................3, 8

## PRELIMINARY STATEMENT

In 2019, Bed Bath & Beyond Inc. ("BBBY") announced it would begin a bold strategic "transformation," undertaking a number of "significant changes" to its business to respond to investor concerns and challenges in the competitive marketplace.  Those projected changes involved refreshing almost all of BBBY's directors over two years, replacing the company's CEO and COO and "restructuring" its entire senior leadership team, reducing corporate staff after a prior reduction of approximately 7%, and launching an ambitious program to "aggressive[ly] reduc[e]" up to $1 billion of "excess aged inventory" in 18 months to enable BBBY to focus on selling "higher-margin products."  [9/4/19 8-K at 4 (Ex. H)][1]

Although the business-execution risks of such a sweeping "transformation" plan were obvious, BBBY warned from the start that "there is critical work to do and there are challenges we are working to address" [7/10/19 Tr. at 7 (Ex. E)] and that "[t]he success of the Company is dependent, in part, on the ability of its employees in all areas of the organization to execute its business plan" [FY2018 10-K at 10 (Ex. C)].  BBBY also discussed with market analysts that the "aggressive disposition of inventory" could lead to the "cannibalization of sales."  [10/2/19 Tr. at 5 (Ex. I)]  BBBY further cautioned that, while "eliminating" less-profitable inventory and "modifying our pricing algorithms" might "unfavorably impact our sales in the near term, we believe these sound business decisions will lead to a stronger company and improved profitability over time."  [1/9/19 Tr. at 5 (Ex. A)]

---

[1]      "Ex." refers to the exhibits attached to the accompanying Declaration of Jonathan E. Richman.  The Court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice, such as SEC filings, press releases, and transcripts."  *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *2 n.1 (D.N.J. Apr. 27, 2017) ("*Hertz II*") (internal quotations omitted), *aff'd*, 905 F.3d 106 (3d Cir. 2018).

Plaintiffs' Verified Shareholder Derivative Consolidated Complaint (the "Complaint" or

"Compl.") alleges that some of those risks later came to pass and that certain aspects of the

transformation strategy did not initially work as well as expected, causing BBBY to suffer

reduced holiday sales in 2019 because (in part) it "'didn't have enough of the right stuff'" on the

"'inventory side.'"  [Compl. ¶ 116]  Using hindsight based on those subsequent, disclosed

events, this shareholder derivative action now attempts to piggyback on an earlier-filed securities

class action (which the parties have agreed to settle for $7 million) by asserting claims on behalf

of nominal defendant BBBY against its directors and officers (new CEO Mark Tritton, former

Interim CEO Mary Winston, and former CFO Robyn D'Elia (the "Officer Defendants")).

The Complaint's theory seems to be that, rather than experiencing difficulty

implementing an ambitious business strategy during a significant corporate transformation,

Defendants consciously or recklessly embarked on a new inventory-management program and

allowed it to "cannibalize" holiday sales – and then concealed that information from the market,

even though the impact of that alleged sabotage would be disclosed each quarter in BBBY's

financial results (which are not alleged to have been inaccurately reported), and even though

Defendants are not alleged to have sold any stock.  *See, e.g.*, *In re GoPro, Inc. Stockholder

Deriv. Litig.*, 2020 WL 2036602, at *11 (Del. Ch. Apr. 28, 2020) (no "conceivable explanation"

of why directors "would intentionally cause the Company to release false statements to the

market knowing full well the . . . inventory shortage would be known to stockholders and the

market within a matter of weeks").[2]  Based on this theory, which is not supported by any fact-

---

[2]    New York courts often look to Delaware law for guidance on s*ubstantive* matters of
corporate law even though, as discussed below in Part I.A.2, New York's standard for *pleading*
demand futility differs to some extent from Delaware's.  *See, e.g.*, *Ficus Invs., Inc. v. Private
Capital Mgmt., LLC*, 61 A.D.3d 1, 9, 872 N.Y.S.2d 93, 99 (1st Dep't 2009) ("Delaware courts
have had ample opportunity to address [issues of corporate law] and, although not binding as to

based allegations, Plaintiffs assert claims for breach of fiduciary duty, unjust enrichment, and corporate waste under New York law against all Defendants and a contribution claim under the Securities Exchange Act of 1934 (the "Exchange Act") against the Officer Defendants.

The Court should dismiss the Complaint in its entirety. As an initial matter, Plaintiffs are not entitled under Fed. R. Civ. P. 23.1 to prosecute their derivative claims because they did not make a demand on BBBY's Board of Directors (the "Board") before filing suit, as New York law requires, and they have not pled particularized facts showing that such a demand would have been futile. The Complaint's allegations do not establish that a majority of the Board was interested in the challenged transactions, failed to inform themselves sufficiently about those transactions, or failed to exercise their business judgment in approving them. Those deficiencies are especially glaring in light of the standard provision in BBBY's charter that exculpates the directors from any liability to the company except for bad faith, intentional misconduct, knowing violations of law, or receipt of improper personal benefits, none of which has been pled here.

Even apart from their failure to establish that a pre-suit demand was excused, Plaintiffs have not stated a claim on which relief could be granted. Nothing in the Complaint suggests that the directors engaged in any *intentional* misconduct or *conscious* disregard of duty or that the Officer Defendants (who are not covered by the exculpation provision) acted with gross negligence amounting to recklessness in implementing the inventory-reduction program, making statements to the public, or approving BBBY's repurchases of its stock. Nor does the Complaint plead claims for unjust enrichment or waste, which are based on the meritless allegations relating to the inventory-reduction program, the statements to investors, and the stock repurchases.

---

. . . New York law, their holdings can be instructive"); *Park v. Song*, 61 Misc. 3d 1047, 1049 n.4, 85 N.Y.S.3d 855, 857 n.4 (Sup. Ct. N.Y. Cty. 2018) (same).

## FACTUAL BACKGROUND

A.     **BBBY's Business, Management, and Transformation Plans**

BBBY is a large retailer of household merchandise and home furnishings.  [Compl. ¶ 53]

BBBY competes for sales against a wide range of companies, from specialty retailers to

department stores and discounters, as well as online and multichannel retailers.  [2018 10-K at 8

(Ex. C)]  According to Plaintiffs, BBBY did not effectively adapt to changes in the marketplace.

[Compl. ¶ 56]  In 2019, certain "activist investors" pressured BBBY to address "'weak sales'"

and gross margins [*id.*] and to "'improve inventory by increasing inventory turns'" [*id.* ¶ 60].

The "activists" also pushed BBBY to change its leadership structure.  [*Id.* ¶¶ 56-64]

In response, in April 2019, BBBY announced a "[t]ransformation of [its] Board of

Directors" [4/22/19 8-K at 6 (Ex. B)] – including the appointment of five "new and independent,

highly qualified, and diverse directors" [*id.* at 15] – as well as additional governance

enhancements, such as the formation of a "Business Transformation and Strategy Review

Committee" (the "Transformation Committee") to "review all aspects of the Company's business

transformation, strategy and structure" [*id.* at 6; Compl. ¶¶ 57-59].  Four more independent

directors were appointed in May 2019.  [*Id.* ¶ 63]  Following those changes, 12 out of BBBY's

13 directors had joined the Board within the prior two years.  [5/29/19 8-K (Ex. D)]

During this time, BBBY also made sweeping changes to its executive ranks.  On May 12,

2019, BBBY's CEO was replaced on an interim basis by Ms. Winston, who served until the new

CEO (Mr. Tritton) took over on November 4, 2019.  [Compl. ¶ 26]  On July 23, 2019, BBBY

announced "a reduction in corporate staff at its headquarters" – including the departure of its

President and Chief Operating Officer – after an earlier "reduction of approximately 7% of its

corporate staff, including vice presidents, directors, managers and professional staff."  [7/23/19

8-K at 5 (Ex. G)]  And on December 17, 2019, BBBY announced "an extensive restructure of its

4

leadership team, including the departure of six senior members," a restructuring that BBBY called a "bold pivot" and a "new vision for the Company." [12/17/19 8-K at 4 (Ex. J)]

Upon assuming her position, Ms. Winston cautioned that BBBY was "at an important inflection point" [5/29/19 8-K at Ex. 99.1 (Ex. D)], recognized that "there needs to be a fundamental change in our approach" [7/10/19 8-K at Ex. 99.1 (Ex. F)], and acknowledged that BBBY had suffered from "a lack of strategic focus" [7/10/19 Tr. at 5 (Ex. E)]. She told the market that the Transformation Committee was tasked with "review[ing] and evaluat[ing] the ongoing business transformation" and "mak[ing] recommendations on how the company can best capitalize on and navigate the evolving retail environment to accelerate the company's evolution." [*Id.*]

### B.       Defendants' Actions and Statements During the Relevant Period

On September 4, 2019, the first day of what Plaintiffs call the "Relevant Period" [Compl. ¶ 1], BBBY published a letter (signed by Ms. Winston) giving shareholders "a strategic update on the Company's business transformation efforts" [9/4/19 8-K at 4 (Ex. H)]. The letter reported that BBBY had "initiated significant changes," but cautioned that the "transformation" remained "in its early stages." [*Id.*] BBBY said that, as part of its "transformation," it "expected" to execute an "aggressive reduction" of up to $1 billion of inventory over the next 18 months, "including the removal of excess aged inventory . . . anticipated before the 2019 holiday season." The program was intended to "quickly reset inventory levels . . . in an effort to drive customer traffic." [*Id.*; Compl. ¶¶ 77, 97] BBBY warned, however, that such an outcome was not guaranteed, but depended on a number of factors, including BBBY's "ability to achieve a successful outcome for . . . its business strategies" [9/4/19 8-K at 6 (Ex. H)]. BBBY promised a fuller update during the next earnings call, on October 2, 2019. [*Id.* at 5]

Four weeks later, on October 2, BBBY reported financial results for its second fiscal quarter and gave an update for the rest of the 2019 fiscal year.  [Compl. ¶¶ 79, 99]  During a conference call with analysts on the same day, BBBY reported a $194 million inventory write-down in the second quarter because of the inventory-reduction plan, stated that it hoped to reduce inventory by $350 million before the 2019 holiday season, and reduced guidance for the 2019 fiscal year.  [*Id.* ¶¶ 79-80][3]  BBBY told investors that the inventory reduction would "'be accomplished with a series of markdowns and clearance events as well as with the assistance of an independent liquidator'" [*id.* ¶ 101], but warned that BBBY was still "in the early innings of starting that process" [10/2/19 Tr. at 12 (Ex. I)] and that the reduction would need to be "'managed thoughtfully'" to "'prevent cannibalization of sales'" [Compl. ¶ 101].  Ms. Winston characterized the "new promotional framework developed around the retail holiday calendar" as "bigger, bolder and beyond anything that we've done before."  [10/2/19 Tr. at 4 (Ex. I)]

Ms. Winston and Ms. D'Elia also addressed the risk that promotions and inventory reduction could erode margins and undercut sales.  Ms. D'Elia explained that, as to "the margin impact as we take out the merchandise[,] . . . we're mindful not to cannibalize sales during the holiday period.  And we can, using a third-party liquidator, remove that merchandise from our stores but not have it out in the market competing against ourselves or be liquidating in a heavy fashion during this time frame."  [*Id.* at 14]  And Ms. Winston noted that "[t]he implementation of markdown optimization software and processes is accelerating sell-through, resulting in less aged inventory and optimizing the profitability of our seasonal and fashion assortment."  [*Id.* at 4]  BBBY used an inventory software called Revionics, which helps companies "oversee and

---

[3]      The conference call took place on October 2, 2019 [*see* Compl. ¶¶ 79-80; 10/2/19 Tr. (Ex. I)], not on October 9, 2019, as Compl. ¶ 101 incorrectly states.

make complex decisions about inventory" [Compl. ¶¶ 54, 55].  BBBY also used other software (JDA) for "[g]eneral inventory management."  [*Id.* ¶ 81]

On January 8, 2020, BBBY reported lower earnings and margins for the third quarter and announced that it "expect[ed] its sales and profitability to remain pressured during the fiscal 2019 fourth quarter."  [1/8/20 8-K at 5 (Ex. K)]  "Considering these headwinds reflected in the Company's results to date, and the ongoing work by recently appointed President & CEO Mark Tritton to assess the business and finalize the details of the Company's go-forward strategic plan as well as the extensive senior leadership changes within the past month," BBBY chose "to withdraw its fiscal 2019 full year financial guidance."  [*Id.*; Compl. ¶ 112]

On February 11, 2020, the last day of the Relevant Period – and two months before its regular report on fourth-quarter results in mid-April [Compl. ¶ 118] – BBBY voluntarily disclosed preliminary, unaudited results for the first two months of the quarter [*id.* ¶ 114]. BBBY reported a "'decline in comparable sales driven primarily by store traffic declines combined with inventory management issues and increased promotional activity and markdowns.'"  [*Id.* ¶¶ 11, 114]  "'Product availability leading into the holiday period was also a contributing factor, as inventory within certain key categories in the [BBBY] assortment was too low or out-of-stock during the period.'"  [*Id.* ¶ 114]  One week later, during a conference call with analysts, Mr. Tritton discussed holiday sales and observed that, "'on that inventory side, we didn't have enough of the right stuff,'" but he considered that issue "'fully rectifiable in terms of the learning plan and implementation for third and fourth [quarters] in 2020.'"  [*Id.* ¶ 116]

### C.    <u>The Complaint's Allegations</u>

The securities class action was filed two months later, *see Vitiello v. Bed Bath & Beyond Inc.*, No. 2:20-cv-04240-MCA-MAH (D.N.J.), and the first of these consolidated derivative

actions was filed in July 2020.[4]  Plaintiffs' Complaint (as amended) alleges that BBBY mismanaged the inventory-reduction program and that the Transformation Committee and the Board did not properly oversee it.  [Compl. ¶¶ 6-7, 84-96]  Relying on allegations from the securities class action, Plaintiffs also allege that Defendants made false or misleading statements during the Relevant Period [*id.* ¶¶ 7-14, 97-110], purportedly failing to disclose that (*i*) due to the "'aggressive disposition of inventory,'" BBBY "lacked sufficient inventory in key categories to support holiday sales," (*ii*) its "internal control over inventory levels and financial reporting was ineffective," and (*iii*) it thus "was likely to experience reduced sales" [*e.g.*, *id.* ¶ 13].  In addition, Plaintiffs contend that BBBY's stock price was artificially inflated during the Relevant Period and that BBBY therefore overpaid when it repurchased its stock.  [*Id.* ¶¶ 14, 121-30]

## ARGUMENT

BBBY is incorporated in New York [*id.* ¶ 24], so New York law substantive law applies to Plaintiffs' claims.  *E.g.*, *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991). Under New York law, a complaint in a derivative action must "set forth *with particularity* the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort."  N.Y. Bus. Corp. L. § 626(c) (emphasis added).  Federal Rule of Civil Procedure 23.1, which prescribes the pleading standards for derivative claims in federal court, is similar.  Fed. R. Civ. P. 23.1(b)(3) (derivative complaint must "state *with particularity* (A) any effort by the plaintiff to obtain the desired action from the directors . . . and (B) the reasons for not obtaining the action or not making the effort") (emphasis added).

---

[4]      Two duplicative (and unnecessary) derivative actions were later filed in New York state court.  *See Schneider v. Tritton*, Index No. 516051/2020 (N.Y. Sup. Ct. Kings Cty.); *Anthony v. Tritton*, Index No. 514167/2021 (N.Y. Sup. Ct. Kings Cty.).  [Exs. O, P, Q]

Plaintiffs admit they did not make a pre-suit demand on the Board [Compl. ¶¶ 16, 139], but their Complaint fails to plead particularized allegations showing that such a demand would have been futile.  Moreover, the claims lack merit under controlling substantive law.

## I.   THE COMPLAINT DOES NOT PLEAD PARTICULARIZED ALLEGATIONS OF DEMAND FUTILITY.

Plaintiffs' Complaint fails at the outset because it does not plead particularized facts showing that Plaintiffs were excused from making a pre-suit demand on the Board.

"By their very nature, shareholder derivative actions infringe upon the managerial discretion of corporate boards," which generally are entitled to decide "whether and to what extent to explore and prosecute such derivative claims . . . ."  *Marx v. Akers*, 88 N.Y.2d 189, 194, 666 N.E.2d 1034, 1037 (1996) (internal quotations omitted).  "Consequently, we have historically been reluctant to permit shareholder derivative suits, noting that the power of courts to direct the management of a corporation's affairs should be exercised with restraint."  *Id.* (internal quotations omitted).

Because of this reluctance to allow shareholders to arrogate to themselves powers reserved for the board, New York law excuses a plaintiff's failure to make a pre-suit demand only if the complaint "alleges with particularity that (1) a majority of the directors are interested in the transaction, or (2) the directors failed to inform themselves to a degree reasonably necessary about the transaction, or (3) the directors failed to exercise their business judgment in approving the transaction."  *Id.*, 88 N.Y.2d at 198, 666 N.E.2d at 1039.  These exceptions to the demand requirement must be construed narrowly, because "excusing demand is the exception [to the rule], and th[e] exception should not be permitted to swallow the rule."  *In re Omnicom Grp. Inc. S'holder Deriv. Litig.*, 43 A.D.3d 766, 768, 842 N.Y.S.2d 408, 410 (1st Dep't 2007).

The Board had 14 members when the first complaint in this consolidated action was filed. [Compl. ¶ 139]  Accordingly, Plaintiffs must plead particularized facts alleging that demand would have been futile as to at least seven of the directors.  They have not done so.

### A.      No Showing that a Majority of the Board Was Interested

To establish that a director was interested in the relevant transaction, a plaintiff must plead particularized allegations showing either that the director was self-interested in the transaction or that a director with no direct interest nevertheless lost his or her independence because he or she was controlled by a self-interested director.  *Marx*, 88 N.Y.2d at 199-202, 666 N.E.2d at 1040-41.  The "test for self-interestedness is not whether a director or someone who controls him has engaged in or is liable for some sort of misconduct, but whether he will 'receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally.'"  *Stein v. Immelt*, 472 F. App'x 64, 66 (2d Cir. 2012) (quoting *Marx*, 88 N.Y.2d at 202, 666 N.E.2d at 1034); *accord, e.g.*, *Walsh v. Wwebnet, Inc.*, 116 A.D.3d 845, 847-48, 984 N.Y.S.2d 100, 103-04 (2d Dep't 2014) (same).

### 1.      No Showing of Direct Financial Benefit

In this case, the relevant "transactions" challenged in the Complaint appear to be BBBY's inventory-reduction program, its statements to the market, and its repurchases of its stock at allegedly inflated prices.  The Complaint does not plead particularized facts showing that any director received any direct financial benefit from any of those "transactions."  *Cf. Brewster v. Lacy*, 2004 WL 5487868 (Sup. Ct. N.Y. Cty. June 21, 2004) (plaintiff admitted self-interest prong was inapplicable where no director was "interested" in challenged transaction involving company's credit-card project).  None of the directors is alleged to have benefited from the inventory-reduction program or the stock-repurchase program, to have sold any shares while the

stock price was purportedly inflated, or to have received any other benefit from BBBY apart from normal compensation or director fees.  [Compl. ¶¶ 25-39]

Receipt of normal compensation does not establish a direct financial benefit sufficient to excuse a pre-suit demand.  *See, e.g.*, *Alpert v. Nat'l Ass'n of Sec. Dealers, LLC*, 2004 WL 3270188, at *10 (Sup. Ct. N.Y. Cty. July 28, 2004) ("'[T]he receipt of directors' fees is not sufficient to show self-interest by a board member,' and plaintiffs fail to allege that payments to [two directors] were 'substantially in excess of normal directors' fees.'" (quoting *British Printing & Commc'n Corp. v. Harcourt Brace Jovanovich, Inc.*, 664 F. Supp. 1519, 1530 (S.D.N.Y. 1987))); *see also Walsh*, 116 A.D.3d at 847, 984 N.Y.S.2d at 104 (receipt of "'unwarranted'" directors' fees is not a direct financial benefit under *Marx* absent allegations that compensation rates were "excessive on their face" or otherwise were unfair to corporation when approved) (internal quotations omitted); *cf. Stoner v. Walsh*, 772 F. Supp. 790, 805 (S.D.N.Y. 1991) ("[A] director's desire to continue receiving general director's fees or other benefits is [not] sufficient to imply that he or she was not disinterested when rejecting demand.").[5]

Nor does the Complaint plead any facts showing that any otherwise disinterested director was controlled by a self-interested director or officer.

### 2.    Allegedly Substantial Threat of Liability Not Enough to Show Interest

The Complaint contends the directors were interested because they face a substantial likelihood of liability for the alleged misconduct.  [Compl. ¶¶ 143, 147, 150, 151, 152, 154]  But

---

[5]    In addition, to the extent Ms. Winston received compensation other than director fees for her service as Interim CEO, she had no expectation of receiving those payments except for a short period of time, beginning before the Relevant Period and ending two months into it. Ms. Winston was appointed as Interim CEO on May 10, 2019, when BBBY announced it was searching for someone to replace her on a permanent basis.  [Compl. ¶ 60]  Mr. Tritton's appointment was announced five months later, on October 9, 2019 [*id.* ¶ 82], and he assumed his position on November 4 [*id.* ¶ 26].

under New York law, a substantial threat of liability does not establish director self-interest where the directors are not alleged to have received a *direct financial benefit* from the purported misconduct. *Wandel v. Eisenberg*, 60 A.D.3d 77, 80, 871 N.Y.S.2d 102, 105 (1st Dep't 2009) ("assertion that directors are interested because they are 'substantially likely to be held liable' applies a standard employed in Delaware" and "is not enough" under New York law).[6]

Moreover, where, as here, an overwhelming majority of the Board (12 of 14 members) consists of outside directors [Compl. ¶¶ 25-39], "it [is] not reasonable for the plaintiff to conclude that [the majority] would not be responsive to a demand" under a substantial-threat-of-liability theory. *Lewis v. Akers*, 227 A.D.2d 595, 596, 644 N.Y.S.2d 279, 281 (2d Dep't 1996); *Gammel v. Immelt*, 2019 WL 2869378, at *4 (Sup. Ct. N.Y. Cty. July 3, 2019).

But even if a substantial likelihood of liability could show a director's self-interest under New York law, Plaintiffs have not pled particularized facts suggesting that any such threat exists.

### 3. No Substantial Likelihood of Liability for Breach of Fiduciary Duty

To plead a substantial likelihood of liability for breach of fiduciary, plaintiffs must allege particularized facts showing a violation of the duty of care or the duty of loyalty and good faith. *Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings, Inc.)*, 625 B.R. 268, 279 (D. Del. 2020) (applying New York law); *Grika v. McGraw*, 2016 WL 8716417, at *15-16 (Sup. Ct. N.Y. Cty. Dec. 21, 2016) (same), *aff'd*, 161 A.D.3d 450, 76 N.Y.S.3d 546

---

[6]     *Accord, e.g.*, *Jiminian v. Seabrook*, 760 F. App'x 38, 42 (2d Cir. 2019) (allegation that directors "are 'interested' because they 'face substantial likelihood of liability' resulting from this lawsuit . . . fails as a matter of New York law to establish director interest"); *Hildene Capital Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, 2012 WL 3542196, at *3 (S.D.N.Y. Aug. 15, 2012); (*Marx* "does not contemplate excusing demand merely because the trustee may potentially be liable"); *Gammel v. Immelt*, 2019 WL 2869378, at *3 (Sup. Ct. N.Y. Cty. July 3, 2019) (argument that directors "would have declined to initiate the litigation because they would have been subject to personal liability is insufficient"); *City of Tallahassee Ret. Sys. v. Akerson*, 2009 WL 6019489 (Sup. Ct. N.Y. Cty. Oct. 16, 2009) ("Risk of personal liability by a majority of a board of directors does not render a demand futile.").

(1st Dep't 2018); *see also id.* at *14 (claim for breach of fiduciary duty must be pled with particularity).

The duty of care requires directors to perform their duties "in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances." *Lipscomb*, 625 B.R. at 279 (internal quotations omitted); *see also* N.Y. Bus. Corp. L. § 717(a) (same). The liability standard is one of gross negligence. *Lipscomb*, 625 B.R. at 280; *accord Official Comm. of Unsecured Creditors v. Sabine Oil & Gas Corp. (In re Sabine Oil & Gas Corp.)*, 562 B.R. 211, 231 (S.D.N.Y. 2016) (same).

The duty of loyalty and good faith requires directors to act independently, without self-interest, and without "an *actual intent* to do harm, or a *conscious disregard* of one's fiduciary duties involving misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision." *Lipscomb*, 625 B.R. at 282 (emphasis added).

As permitted by New York Business Corporation Law § 402(b), BBBY's charter exculpates directors from duty-of-care claims and any other liability to the company except in narrow circumstances: "No director . . . shall be personally liable to the corporation or any of its shareholders for damages for any breach of duty" unless the acts were taken "in *bad faith* or involved *intentional* misconduct or a *knowing* violation of law or that he personally gained in fact a financial profit or other advantage to which he was not legally entitled . . . ." Restated Certificate of Incorporation, dated May 31, 1992, Article Eighth (Ex. R at 8) (emphasis added).

As shown above, no director is alleged to have gained any profit to which he or she was not entitled, so the directors face no threat of liability unless Plaintiffs can plead particularized allegations showing bad faith (*e.g.*, conscious disregard of duty), intentional misconduct, or knowing violations of law. *See Bildstein v. Atwater*, 222 A.D.2d 545, 546, 635 N.Y.S.2d 88, 89

13

(2d Dep't 1995) (fiduciary claims barred by exculpation clause because no showing that alleged conduct "rose to the level of intentional misconduct, bad faith, or a knowing violation of law").[7]

Plaintiffs have not pled any facts suggesting that the directors *intentionally* engaged in misconduct, *knowingly* violated any law, or *consciously* disregarded their duties in connection with the inventory-reduction program, BBBY's disclosures to investors, or its stock repurchases.

### a.    Inventory-Reduction Program

Plaintiffs allege that a majority of BBBY's directors breached their fiduciary duty by failing to oversee the inventory-reduction program and that a pre-suit demand on them would therefore have been futile.  [Compl. ¶¶ 141-43, 151]  The claim for breach of fiduciary duty, however, focuses only on alleged misstatements or omissions and unspecified failures of "internal controls"; it does not mention oversight of the inventory-reduction program.  [*Id.* ¶¶ 159-65].  But even if the fiduciary-duty count could be read to encompass an alleged failure to oversee the inventory-reduction program, no substantial threat of liability would exist.

Pleading demand futility based on a board's purported failure to oversee a company's business operations has been considered "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l, Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).  "[M]erely alleging that a director or officer was negligent in managing and administering the affairs of the corporation is not enough; only a 'sustained or systemic failure of the board to exercise oversight' of a corporation's activities by the board of

---

[7]       *See also, e.g.*, *Wietschner v. Dimon*, 139 A.D.3d 461, 462, 32 N.Y.S.3d 77, 79 (1st Dep't 2016) (no showing of demand futility where charter insulated directors from liability for breach of fiduciary duty and plaintiffs failed to show directors' bad faith or "'utter'" failure to perform duties); *Gammel*, 2019 WL 2869378, at *16 ("gross negligence" exculpated); *City of Tallahassee Ret. Sys.*, 2009 WL 6019489 (alleged conduct exculpated where no showing that directors "acted intentionally in violation of law or in bad faith"); *cf. Teachers' Ret. Sys. of La. v. Welch*, 244 A.D.2d 231, 231-32, 664 N.Y.S.2d 38, 39 (1st Dep't 1997) (negligence exculpated).

directors or senior officers will establish a lack of good faith sufficient to impose personal liability." *Grika*, 2016 WL 8716417, at \*16 (quoting *Caremark*, 698 A.2d at 971). An oversight claim requires a plaintiff to plead particularized facts "showing that the directors *knew* that they were not discharging their fiduciary obligations." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (emphasis added). And because BBBY's charter exculpates the directors from financial liability for alleged breaches of the duty of care, the directors face no risk of liability unless Plaintiffs can plead particularized facts showing that a majority of them *intentionally* disregarded their duties and *knew* they were not sufficiently overseeing BBBY's operations. *E.g.*, *Bildstein*, 222 A.D.2d at 546, 635 N.Y.S.2d at 89. Plaintiffs have not come close to meeting that heavy burden.

*First*, the Complaint's allegations demonstrate that the Board had established controls over the inventory-reduction program. For example, the Complaint alleges that the Board created the Transformation Committee to oversee BBBY's strategic initiatives, including inventory reduction. [Compl. ¶¶ 58, 66] The creation of a committee to oversee specific corporate activities "do[es] not support an inference of an utter failure to attempt to assure a reasonable information and reporting system exists, but rather the opposite: an evident effort to establish a reasonable system." *South v. Baker*, 62 A.3d 1, 18 (Del. Ch. 2012) (internal quotations omitted).[8]

*Second*, the Complaint demonstrates that the Board and, once it was formed, the Transformation Committee, did oversee the inventory-reduction program. The Committee

---

[8]    *Accord, e.g.*, *In re LendingClub Corp. Deriv. Litig.*, 2019 WL 5678578, at \*13 (Del. Ch. Oct. 31, 2019) (rejecting allegation that board failed to oversee company's compliance with federal law when complaint pled that board had created subcommittee "specifically for this purpose"); *Rojas ex rel. J.C. Penney Co. v. Ellison*, 2019 WL 3408812, at \*11 (Del. Ch. July 29, 2019) (allegation that company had "created a Promotional Pricing Governance Committee" to implement price-comparison advertising policy was a "critical flaw" in claim that board had not sufficiently overseen company's pricing procedures).

considered potential timelines and discussed execution options relating to the program [Compl. ¶ 75], reviewed a specific inventory-reduction plan with percentage reduction goals [*id.* ¶ 76], received a presentation on inventory-reduction strategies for the second half of 2019 [*id.* ¶ 86], reviewed results of the early stages of the inventory-reduction program [*id.* ¶ 88], and "'discussed key items'" for further roll-out of the program [*id.* ¶ 91].[9]  This level of review belies a total and intentional failure of oversight.  *See, e.g.*, *Stone*, 911 A.2d at 372-73 (allegations that board "received and approved relevant policies and procedures" "refute[d] the assertion that the directors never took the necessary steps to ensure that a reasonable . . . compliance and reporting system existed").

*Third*, Plaintiffs have not pled any particularized facts suggesting that a majority of the Board (including the Transformation Committee members) *consciously* and *intentionally* failed to monitor or oversee the inventory-reduction program once such controls were in place. Shareholders typically try to plead oversight failures by pointing to "red flags" that actually came to the directors' attention, but that the board consciously ignored.  *See, e.g.*, *Gammel*, 2019 WL 2869378 at *4-5.  Red flags must involve *serious* types of problems; indeed, Delaware courts have observed that red flags must show misconduct or violations of law, not merely (as here) alleged business risks or operational problems.[10]  Failure to allege that directors knew of the

---

[9]    The Complaint also admits that directors Fleming and Kirwan "had taken 'deep dives' into 'retail operations and sourcing,' giving them significant knowledge of how the inventory reduction Program was progressing in advance of and during the crucial 2019 holiday season." [Compl. ¶ 142]  This allegation contradicts the contention that Messrs. Fleming and Kirwan "failed to conduct oversight" [*id.*] of the inventory-reduction program.

[10]    *See, e.g.*, *Reiter v. Fairbank*, 2016 WL 6081823, at *8 (Del. Ch. Oct. 18, 2016) ("In applying the *Caremark* theory of liability, even in the face of alleged red flags, this Court has been careful to distinguish between failing to fulfill one's oversight obligations with respect to fraudulent or criminal conduct as opposed to monitoring the business risk of the enterprise . . . . [I]mposing *Caremark*-type duties on directors to monitor business risk is fundamentally different

problems at issue or were "presented with red flags" that they "consciously chose to overlook or ignore" requires dismissal. *Gammel*, 2019 WL 2869378, at *4.[11]

Plaintiffs charge that, "[i]f the Board or a subcommittee thereof had convened during the holiday season, they would have known, through the weekly Revionics reports and other inventory software, that the inventory reduction led to sales cannibalization and margin erosion." [Compl. ¶ 96]  This contention, which lacks any particularized factual allegations, is pure speculation, asserting at most the directors' inattention or negligence, not their conscious disregard of known adverse information.  The Complaint pleads no particularized allegations about *what* the data from Revionics or other software programs showed; it merely assumes – without any factual basis – that those reports revealed that the inventory-reduction program was adversely affecting holiday-season sales.  Moreover, even if the undescribed reports did show such an impact, Plaintiffs assert that the Board and the Transformation Committee did *not* see them because the Board and the Committee did not meet during the holiday season.  [*Id.* ¶¶ 95-96, 141]  Thus, Plaintiffs concede that any supposed red flags did *not* come to the Board's or the Committee's attention and thus could not have been *consciously* disregarded.

---

from imposing on directors a duty to monitor fraud and illegal activity.") (internal quotations omitted); *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *19-20 (Del. Ch. Oct. 12, 2011) ("[T]he oversight of legal compliance and the oversight of business risk raise distinct concerns . . . .  Legal, if risky, actions that are within management's discretion to pursue are not 'red flags' that would put a board on notice of unlawful conduct."); *see also, e.g., Fisher v. Sanborn*, 2021 WL 1197577, at *12, *16 (Del. Ch. Mar. 30, 2021) (no "strong factual allegations of *board knowledge of ongoing legal violations*"; no red flags where board presentations had not indicated violations of law) (internal quotations omitted).

[11]     *See also Ret. Plan for Gen. Emps. of City of N. Miami Beach v. McGraw*, 2016 WL 7475835, at *2 (Sup. Ct. N.Y. Cty. Dec. 21, 2016) (no failure of oversight where complaint failed to allege directors had actually been informed of purported red flag); *cf. Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008) ("red flags are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer").

The Complaint's allegations show instead that the Transformation Committee reviewed information regarding the initial roll-out of the inventory-reduction program in October 2019 [*id.* ¶ 88], discussed a plan and an expected timeline to reduce inventory over the rest of fiscal year 2019 [*id.* ¶ 87], and was told that management and the company's pricing team would "optimize markdown cadence through [the] use of Revionics" [*id.* ¶ 90]. The directors also understood that the inventory-reduction program would be run by management, including the CEO [*id.* ¶ 95], and an outside liquidator [*id.* ¶ 87].[12] Thus, the Transformation Committee left the October 22, 2019 meeting with a plan for inventory reductions during the holidays and with "aggressive markdowns" to begin in January 2020, at which point the directors had another meeting scheduled. [*Id.* ¶ 87] Where, as here, a "complaint is devoid of particularized nonconclusory allegations that defendants were unaware of details of" a particular program or policy, but admits that, "in general, defendants had been kept informed of the" policy on an ongoing basis, demand will not be excused due to a purported failure of oversight. *Brewster*, 24 A.D. 3d at 136, 805 N.Y.S.2d at 57.

---

[12]    Plaintiffs charge that, by "entrusting the newly appointed CEO to oversee the business transformation," the Board "abdicated its oversight duties." [Compl ¶ 95] But delegation of management of a program to senior executives and an outside consultant not only is reasonable and protected by the business-judgment rule, but also is necessary for a corporation to function. *See* N.Y. Bus. Corp .L. § 717(a)(2) (permitting directors "to rely on information, opinions, reports or statements . . . in each case prepared or presented by . . . persons as to matters which the director believes to be within such person's professional or expert competence"); *see also In re GoPro*, 2020 WL 2036602, at *14 (directors entitled to rely on management's reports and forecasts, which "render[ed] unreasonable any inference the Board *knew* [company] was headed for a significant revenue miss"); *Ash v. McCall*, 2000 WL 1370341, at *9 (Del. Ch. Sept. 15, 2000) (directors "quite properly delegate responsibility to qualified experts in a host of circumstances"; "[t]o delegate this assignment is not an 'abdication' of duty"). Indeed, "the only logical way for [a] corporation to operate is that the everyday governance should be 'under the direction' of the board of directors rather than 'by' the board." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 761 n.490 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

*Fourth*, the Complaint's focus on the number of meetings held – including the lack of meetings between October 2019 and January 2020 – does not show a knowing, conscious disregard of duty.  During the 2019 fiscal year (which ended on February 29, 2020 and covered the entire Relevant Period), the Board met 32 times, the Transformation Committee met six times, the Audit Committee met eight times, the Nominating and Governance Committee met seven times, and the Compensation Committee met 40 times.  [2020 Proxy Statement at 14, 17-18 (Ex. N)]  Meetings of this frequency rebut any suggestion that the directors *knew* they allegedly were failing to exercise reasonable oversight over BBBY's affairs.  *See, e.g.*, *Lockridge v. Krasnoff*, 2008 WL 2076363 (Sup. Ct. N.Y. Cty. Apr. 30, 2008) (although audit committee met only twice in one year and three times the next year, no showing of oversight failure where it met 49 times during ten-year period); *see also Gammel*, 2019 WL 2869378 at *4 ("regular meetings are examples of directors exercising their fiduciary obligations").

Plaintiffs also erroneously assume that the number of official meetings reflects the full extent of the work that the Transformation Committee or the Board actually did.  As the Complaint acknowledges, the Transformation Committee oversaw the inventory-reduction program outside of its formal, minuted meetings.  Each of the five Committee members was assigned, based on his or her "'expertise,'" "'to serve as key work flow liaisons with Company management'" in five different areas [Compl. ¶ 71], and the members took "'deep dives'" into those functional areas [*id.* ¶ 142].  Moreover, the Transformation Committee decided in July 2019 that it "would work with the informal working group of the Board that was tasked with reviewing inbound proposals with respect to the Company's concepts in the first instance.'"  [*Id.* ¶ 71]  The Complaint's allegations thus show that the mere number of formal, minuted meetings does not reflect the full scope of the Transformation Committee's work.

19

Plaintiffs' myopic focus on the extent of the Board's review of the inventory-reduction program also ignores the many other things that the Board and its committees were required to oversee. BBBY's transformation plan involved far more than just inventory reduction; it also included renovating BBBY's stores, resetting BBBY's overall cost structure, changing BBBY's sourcing and buying approach, creating a better balance between BBBY's physical and digital marketing, and changing senior leadership [9/4/19 Form 8-K (Ex. H)] – not to mention the many other normal corporate and financial tasks with which all boards of directors are involved.

At bottom, Plaintiffs' criticism of the Board for not meeting during the 2019 holiday season is just that – a criticism. It comes nowhere near demonstrating that the directors *knew* or *consciously disregarded* that, by supposedly not working hard enough or meeting often enough, they were jeopardizing the inventory-reduction program's prospects or otherwise harming BBBY. Plaintiffs are impermissibly trying to use the "benefit of hindsight . . . to equate a bad outcome with bad faith." *Stone*, 911 A.2d at 373. Alleging that BBBY "*had* a system for reporting risk to the [b]oard, but in the [p]laintiffs' view it should have been a better system," cannot support a claim for oversight failure sufficient to create a substantial threat of liability for the directors. *In re Gen. Motors Co. Deriv. Litig.*, 2015 WL 3958724, at *14 (Del. Ch. June 26, 2015); *see also In re Citigroup Inc. S'holder Deriv. Litig.*, 2009 WL 2610746, at *5 (S.D.N.Y. Aug. 25, 2009) (rejecting attempt to invoke oversight duty "to hold the director defendants personally liable for making (or allowing to be made) business decisions that, in hindsight, turned out poorly for the Company") (internal quotations omitted; applying Delaware law).

### b.    Disclosures to Investors

The Complaint asserts that seven directors – Mr. Tritton, Ms. Winston, and the five members of the Audit Committee – are not disinterested because they face a threat of liability for

breach of fiduciary duty by making or allowing others to make allegedly false statements in SEC filings and analyst calls and by failing to "ensure the integrity of the Company's accounting and financial reporting processes . . . ."  [Compl. ¶¶ 145, 150, 152]  Plaintiffs are incorrect.

New York case law does not appear to have addressed the standard of liability for breach of fiduciary duty for making alleged misstatements to the market in general, rather than specifically to shareholders in the context of seeking action from them (*e.g.*, requests for votes on proxies, mergers, etc.).  Delaware, however, has a well-developed body of law on that subject: "[w]hen the directors are *not* seeking shareholder action, but are *deliberately* misinforming shareholders about the business of the corporation," they violate their fiduciary duty.  *Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1988) (emphasis added); *accord id.* at 9 ("in the absence of a request for shareholder action[,] . . . directors who *knowingly* disseminate false information that results in corporate injury . . . violate their fiduciary duty") (emphasis added); *see also In re Wayport, Inc. Litig.*, 76 A.3d 296, 315 (Del. Ch. 2013) (same).

Thus, where, as here, the fiduciaries were not seeking shareholder action in making (or allowing) the alleged misstatements, they did not breach any fiduciary duty unless they acted knowingly or deliberately.  The Complaint does not plead particularized facts that satisfy this stringent standard as to any of the seven directors at issue.

The Complaint focuses on the statements that Ms. Winston made in September and October 2019.  [Compl. ¶¶ 97-104, 106-110]  Mr. Tritton did not start work at BBBY until November 4, 2019 [*id.* ¶¶ 25-26], so he cannot be held responsible for the September and October statements, and the Complaint does not appear to allege that anything he said after November 4 was false or misleading.  Moreover, none of the Officer Defendants' statements,

regardless of who made them, was false or misleading, or made with the requisite degree of scienter, for the reasons discussed in Part II.A.2 below.

But in any event, even if Ms. Winston and/or Mr. Tritton could be deemed interested by virtue of having made any alleged misstatements, they are only two of the 14 directors. None of the other 12 – including the five Audit Committee members – is alleged to have made *any* statements of any kind during the Relevant Period, or even to have played any role in commenting on alleged misstatements made by the Officer Defendants. *See, e.g.*, *Fisher v. Sanborn*, 2021 WL 1197577, at *19 (Del. Ch. Mar. 30, 2021) (no threat of liability where "Complaint fails to allege that any of the outside directors played a role in the making of [CEO's] comments during the . . . conference call"); *see also In re Zimmer Biomet Holdings, Inc. Deriv. Litig.*, 2021 WL 3779155, at *14-15, *17 (Del. Ch. Aug. 25, 2021) (same as to statements on earnings calls and in SEC filings).[13]

Thus, the most that the Complaint pleads as to the five Audit Committee members is a failure of oversight as to the Interim CEO's and CFO's statements. But an alleged failure of oversight is not a breach of the fiduciary duty of candor and is subject to the heightened *Caremark* standard. *E.g.*, *Brautigam v. Blankfein*, 8 F. Supp. 3d 395, 405 (S.D.N.Y. 2014) ("Claims alleging that directors caused or allowed corporate misstatements to be made must meet the *Caremark* standard.") (applying Delaware law), *aff'd*, 598 F. App'x 53 (2d Cir. 2015);

---

[13] The alleged misstatements were made only in SEC Forms 10-Q and 8-K signed by the CEO and/or CFO, or in analyst calls involving the CEO and CFO. [Compl. ¶¶ 97-110] The Complaint does not address any statements in Form 10-K filings, which directors sign. In fact, however, under Delaware law, even directors who *sign* financial reports containing allegedly false statements cannot be liable for breach of fiduciary duty unless they had "actual or constructive notice of any illegality" *and* were involved in preparing or were otherwise responsible for those reports. *In re TrueCar, Inc. Stockholder Deriv. Litig.*, 2020 WL 5816761, at *13 (Del. Ch. Sept. 30, 2020) (internal quotations omitted). No such allegations exist here.

accord, *e.g.*, *In re GoPro*, 2020 WL 2036602, at *10 ("Board *acquiescence* cannot support an inference of *affirmative* Board-level misconduct," but only an oversight claim).

The Complaint does not plead any particularized facts to support an oversight-failure claim as to the Audit Committee members.  Not only did BBBY not make any false or misleading statements (as explained below in Part II.A.2), but the Complaint [¶ 152] does not allege any facts suggesting that the Audit Committee members *knew* that any such statements were false or misleading or *consciously* disregarded their duty to oversee them; it does not point to any "red flags" that the Committee members willfully ignored.  *See, e.g.*, *Zimmer*, 2021 WL 3779155, at *14, *16, *19 (demand not futile where no particularized facts showing that majority of directors "knew" of allegedly material misstatements and underlying operational difficulties); *In re GoPro*, 2020 WL 2036602, at *12 (same).

If Plaintiffs mean to imply that the Audit Committee members should have investigated the inventory-reduction program's impact on BBBY's financial performance between September 2019 and January 2020, outside directors' "[t]aking a self-guided tour through an [inventory-monitoring] system to check inventory levels . . . is not the sort of 'oversight' *Caremark* contemplates."  *In re GoPro*, 2020 WL 2036602, at *13.  Nor is mere service on the Audit Committee enough to establish a substantial threat of liability for failure to oversee compliance with disclosure standards.  *Wood*, 953 A.2d at 142, 143 n.19; *see also Wandel*, 60 A.D.3d at 80, 871 N.Y.S.2d at 104.

Plaintiffs thus have not pled any particularized allegations showing that the Audit Committee members knowingly or willfully disregarded their oversight duties as to the CEO's and CFO's statements to the market.  *See, e.g.*, *In re GoPro*, 2020 WL 2036602, at *12-13.  And

BBBY's charter exculpates the directors from financial liability for anything other than "bad faith," "intentional misconduct," or "knowing violation of law" [Ex. R at 8].

### c.  <u>Share Repurchases</u>

Plaintiffs also allege that the entire Board faces a substantial threat of personal liability for authorizing BBBY to repurchase its stock at purportedly inflated prices.  [Compl. ¶¶ 151, 154]  But the cause of action for breach of fiduciary duty says nothing at all about the stock repurchases.  [*Id.* ¶¶ 159-65]  In any event, however, as discussed below in Part II.A.2, BBBY did not make false or misleading statements to the market, so Plaintiffs have not pled any facts showing that BBBY's stock price was inflated when BBBY repurchased its shares.

Moreover, regardless of whether the stock price was or was not artificially inflated, Plaintiffs' theory of demand futility "depends on the inference that the Board *knew* that [BBBY's] stock was overvalued at the time it authorized and executed the repurchases."  *In re Am. Int'l Grp., Inc. Deriv. Litig.*, 700 F. Supp. 2d 419, 441 (S.D.N.Y. 2010) (applying Delaware law).  But the Complaint does not allege any particularized facts showing that the Board had any such knowledge.  Plaintiffs have not shown that the directors *knew* of or *consciously disregarded* any red flags relating to the roll-out of the inventory-reduction program (*supra* at § I.A.3.a) or the company's public statements (*supra* at § I.A.3.b).

Without such allegations, Plaintiffs have not shown that the directors *intentionally* engaged in misconduct or *consciously* disregarded their duties by authorizing the share repurchases even if BBBY's stock price was artificially inflated when those repurchases were made.  *Ravenswood Inv. Co., L.P. v. Winmill*, 2011 WL 2176478, at *5 (Del. Ch. May 31, 2011) (dismissing derivative claim based on stock-buyback program where plaintiff failed to allege "with sufficient particularity facts indicating that [defendants] were interested parties to the stock

buybacks or that the decision to engage in the buyback program was not the product of a valid

business judgment"). A finding that "a corporate board, in bad faith, would authorize a share

repurchase program despite its knowledge that the shares were overvalued" requires "exceptional

circumstances" not present here. *In re Am. Int'l Grp.*, 700 F. Supp. 2d at 442 (dismissing

allegations that board violated fiduciary duty by authorizing share-repurchase program "in order

to maintain a false appearance of prosperity").

### 4.    No Substantial Likelihood of Liability for Unjust Enrichment

To establish a substantial likelihood of liability for unjust enrichment, Plaintiffs must

plead particularized facts showing that the directors were enriched at BBBY's expense and "that

it would be inequitable to permit the[m] to retain that which is claimed by the plaintiff."

*Clifford R. Gray, Inc. v. LeChase Constr. Servs.*, 31 A.D.3d 983, 988, 819 N.Y.S.2d 182, 187

(3d Dep't 2006). Although New York law does not appear to have directly addressed the issue,

Delaware law rejects unjust-enrichment claims against directors or officers for receipt of normal

compensation in the absence of viable claims for breach of fiduciary duty. *See, e.g., Cent.*

*Laborers' Pension Fund v. Dimon*, 2014 WL 3639185, at *5 (S.D.N.Y. July 23, 2014) (applying

Delaware law and holding, after rejecting fiduciary-duty claim, that "the unjust enrichment claim

fails because the 'only enrichment alleged by plaintiffs consists of defendants' salaries, benefits,

and unspecified bonuses'") (citation omitted), *aff'd*, 638 F. App'x 34 (2d Cir. 2016).[14]

---

[14]    *See also, e.g., Sherman v. Ryan*, 911 N.E.2d 378, 399 (Ill. App. Ct. 2009) (applying
Delaware law and rejecting argument of "'absence of justification' for compensation" paid to
executives while company had been "engaged in conduct that caused it to sustain more than
$228 million in [antitrust] settlements," because "plaintiffs d[id] not allege that [defendants]
performed *no work* in exchange for their compensation") (emphasis added); *cf. Fisher*, 2021 WL
1197577, at *7 (noting plaintiff's "appropriate[]" concession that viability of unjust-enrichment
claim depends on whether oversight and disclosure claims survive); *Hampshire Grp., Ltd. v.
Kuttner*, 2010 WL 2739995, at *37 (Del. Ch. July 12, 2010) (because "any harm caused by th[e]
problems [for which the defendants allegedly were responsible] is remediable in damages as a

### 5.   No Substantial Likelihood of Liability for Waste

To establish a substantial likelihood of liability for waste of corporate assets, Plaintiffs must plead particularized facts "demonstrat[ing] that no person of ordinary sound business judgment would say that the corporation received [a] fair benefit.  If ordinary businessmen might differ on the sufficiency of consideration received by the corporation, the courts will uphold the transaction."  *Feldmeier v. Feldmeier Equip., Inc.*, 164 A.D.3d 1092, 1100, 84 N.Y.S.3d 609, 616 (4th Dep't 2018) (internal quotations).

To the extent Plaintiffs allege waste from payments of normal compensation, they must prove that the "challenged compensation bore no relationship to the value received by the company, rendering it unjustifiably excessive."  *Id*. (internal quotations omitted).  Plaintiffs have not pled any facts showing that the directors' compensation bore *no* relation to the work they did for BBBY.  *See, e.g.*, *Marx*, 88 N.Y.2d at 204, 666 N.E.2d at 1043 ("bare allegations that the compensation set lacked a relationship to duties performed . . . are insufficient").  And courts have frequently rejected waste claims based on compensation payments in the absence of a viable claim for breach of fiduciary duty.  *See, e.g.*, *Zelouf Int'l Corp. v. Zelouf*, 2014 WL 4976135, at *10-11 (Sup. Ct. N.Y. Cty. Oct. 6, 2014) (dismissing compensation-based waste claim despite "severe[] lack[] [of] adherence to [executive's] ethical obligations" and his "loot[ing] the company," and contrasting that claim with paying to executive's mother a "no-show 'salary'" of "almost $1 million for nothing"), *reargument granted in part on other grounds*, 47 Misc. 3d 346, 999 N.Y.S.2d 731 (Sup. Ct. N.Y. Cty. 2014); *cf. Hampshire Grp., Ltd. v. Kuttner*, 2010 WL 2739995, at *35 (Del. Ch. July 12, 2010) (under Delaware law, "[t]he waste test is just another way to examine whether a fiduciary breach has been committed").

remedy for breach of fiduciary duty, . . . it would be unwise to use the crude tool of unjust enrichment to strip an executive of any bonus earned during the period in question").

Nor have Plaintiffs established that BBBY's stock repurchases bore no relationship to the value received.  As explained below, BBBY's stock price was not artificially inflated by any alleged misstatements or omissions.  Moreover, Plaintiffs themselves allege an overpayment of only $252,969 on repurchases of $1,669,100 [Compl. ¶¶ 121, 130] – meaning that the repurchased shares purportedly were worth at least 85% of what BBBY paid for them.  That high percentage of value undermines Plaintiffs' argument that the amounts paid for repurchases bore *no* relationship to the value received and had *no* legitimate corporate purpose.  *See, e.g.*, *Karfunkel v. USLIFE Corp.*, 116 Misc. 2d 841, 847-48, 455 N.Y.S.2d 937, 941-42 (Sup. Ct. N.Y. Cty. 1982) (rejecting claim based on company's purchase of its shares at price above market price where no showing that directors personally profited or had improper motive), *aff'd*, 98 A.D.2d 628, 469 N.Y.S.2d 1020 (1st Dep't 1983); *see also In re Citigroup*, 2009 WL 2610746, at *8 (no risk of liability for waste claim based on share repurchases because "plaintiffs have alleged nothing that would explain how buying stock at the market price . . . could possibly be so one sided that no reasonable and ordinary business person would consider it adequate consideration") (internal quotations omitted).

### 6.   No Substantial Likelihood of Liability for Contribution

Although the Complaint alleges that Mr. Tritton and Ms. Winston are liable to BBBY for contribution under the Exchange Act, the Complaint does not assert that claim against the other 12 directors.  [Compl. ¶¶ 178-82]  Thus, 12 of the 14 directors have *no* likelihood of being liable for contribution.  And, as explained below, even Mr. Tritton and Ms. Winston are not likely to be held liable for contribution because no securities-law violation took place.

Plaintiffs therefore have not pled particularized facts showing that a majority of the Board members had a direct personal interest in the challenged transactions.

### B.    No Showing that a Majority of Board Was Not Reasonably Informed

Plaintiffs also have not pled particularized allegations that the directors failed to inform

themselves to the degree reasonably necessary about the inventory-reduction program, BBBY's

public statements, and the stock repurchases.  To satisfy this standard, Plaintiffs needed to "plead

with the requisite particularity that the directors had *specific* information or reason to inform

themselves about the details of [the relevant transactions], and failed to do so."  *Wandel*, 60

A.D.3d at 81, 871 N.Y.S.2d at 105 (emphasis added).  No such allegations exist here.

As shown above, during the fiscal year ended February 29, 2020, the Board met 32 times,

the Tranformation Committee met six times (in the ten months between May 2019 and February

2020), the Audit Committee met eight times, the Compensation Committee met 40 times, and the

Nominating and Corporate Governance Committee met seven times.  This extraordinary number

of meetings belies any suggestion that the Board did not make reasonable efforts to inform itself.

And as also discussed above, the number of formal, minuted meetings does not reflect the total

work done.  Nor do Plaintiffs allege that the directors saw any specific information or "red flags"

that supposedly should have alerted them to the need to do even more than they were doing.  *See,*

*e.g.*, *Gammel*, 2019 WL 2869378, at *4-5 (no failure to be fully informed where Board and

committees "met regularly," directors were not alleged to have "been presented with red flags

warning of" problems, and "no allegation that any member of the Board actually read or learned

the contents of" reports purportedly showing problems) (internal quotations omitted).[15]

---

[15]    *See also, e.g.*, *Jiminian*, 760 F. App'x at 43 (no failure to "self-inform" in absence of
"particularized allegations as to what the board members should have considered or investigated
to properly inform themselves") (internal quotations omitted); *Ret. Plan for Gen. Emps. of City
of N. Miami Beach v. McGraw*, 2016 WL 7475835, at *8 (Sup. Ct. N.Y. Cty. Dec. 21, 2016) (no
failure to inform where "'red flags' d[id] not demonstrate that the directors had specific
information or reason to inform themselves about the details of [the company's] misconduct, yet
failed to do so"), *aff'd*, 158 A.D.3d 494, 71 N.Y.S.3d 27 (1st Dep't 2018).

### C.   No Showing that a Majority of Board Lacked Sound Business Judgment

Plaintiffs have not pled particularized facts showing that a majority of "the directors failed to exercise their business judgment in approving the [conduct]" at issue.  *Marx*, 88 N.Y.2d at 198, 666 N.E.2d at 1039.  As an initial matter, the Complaint does not allege any facts showing that the Board *approved* the challenged conduct.  Rather, the Complaint alleges that Ms. Winston – not the Board or even the Transformation Committee – approved the inventory-reduction plan.  [Compl. ¶¶ 76, 149]  And the Complaint does not plead any facts suggesting that the Board approved the relevant SEC filings.

But even apart from failing to allege anything about Board approval, the Complaint does not plead particularized facts showing that "the challenged [conduct] was so egregious on its face that it could not have been the product of sound business judgment of the directors."  *Marx*, 88 N.Y.2d at 200-01, 666 N.E.2d at 1041.  Demonstrating demand futility on this basis requires alleging a "purposeful and egregious" scheme that the directors "knowingly" approved or in which they "knowingly" participated.  *Wandel*, 60 A.D.3d at 82, 871 N.Y.S.2d at 106 (dismissing complaint for lack of demand futility because of failure to allege directors had knowingly engaged in purported misconduct); *In re Omnicom Grp.*, 43 A.D.3d at 769, 843 N.Y.S.2d at 411 (reversing denial of dismissal on demand-futility grounds because complaint's allegations showed directors "could have been making a business judgment" that company would succeed in turning around failing acquisition targets, and therefore "do not rule out all possibility that the transaction was the product of sound business judgment").

Here, based only hindsight, Plaintiffs have alleged, at most, an ill-advised new business strategy that BBBY supposedly did not have the experience or expertise to implement.  Such allegations are insufficient.  *See, e.g.*, *Levy v. Huszagh*, 2012 WL 4512038, at *4-5 (E.D.N.Y.

Sept. 28, 2012) (plaintiffs failed to satisfy *Marx* where allowances for loan losses, although overly optimistic "[w]ith the aid of hindsight," did not indicate directors "thought at the time that their calculations were flawed"); *see also In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *22 (Del. Ch. Oct. 12, 2011) (dismissing complaint that sought to hold defendants "personally liable for making (or allowing to be made) business decisions that, in hindsight, turned out poorly for the company").  None of the conduct alleged here was "so egregious on its face" that it could not have been the product of sound business judgment, particularly in the absence of particularized facts showing that a majority of the directors was not independent or disinterested.  *Marx*, 88 N.Y.2d at 201, 666 N.E.2d at 1041.

The Court therefore should dismiss the Complaint based on Plaintiffs' failure to plead particularized facts showing that a pre-suit demand on the Board would have been futile.

## II.     THE COMPLAINT FAILS TO STATE A COGNIZABLE CLAIM.

In addition to lacking particularized allegations establishing that a pre-suit demand on the Board would have been futile, the Complaint fails to state a viable claim for relief.  The above discussion shows why Plaintiffs have not pled unexculpated claims for breach of fiduciary duty, unjust enrichment, or waste against the director Defendants.  And even though the exculpation provision in BBBY's charter does not apply to the Officer Defendants, the Complaint also fails to state a claim against them.

### A.     No Claim for Breach of Fiduciary Duty

The Complaint does not plead any facts showing that the Officer Defendants (Ms. Winston, the interim CEO; Ms. D'Elia, the CFO; and Mr. Tritton, the new CEO as of November 2019) breached their fiduciary duty by acting with at least gross negligence as to the inventory-reduction program, statements to the public, or BBBY's stock repurchases.

1.     **No Claim for Inventory-Reduction Program**

Plaintiffs' allegations about the inventory-reduction program amount to the following: the Officer Defendants received weekly Revionics reports about inventory levels, pricing, and margins [Compl. ¶¶ 81, 146], but, despite those reports and Mr. Tritton's "knowledge of the Company's sales and inventory throughout the Relevant Period" [*id.* ¶ 145], the officers "failed to conduct full oversight of the Company's poor inventory management that led to margin erosion, cannibalized sales, and empty store shelves during the Company's most important sales period" [*id.* ¶ 149; *see also* ¶ 146].   Those claims do not meet the standard of gross negligence.

First, the allegations that any Officer Defendant received weekly Revionics reports and that those reports were discussed at "weekly meetings at Company headquarters" [*id.* ¶ 81] lack adequate foundation even at the pleading stage.  Plaintiffs cribbed those allegations from a so-called confidential witness (the "CW") cited in the *Vitiello* securities complaint.  [*Id.*]  But as the *Vitiello* complaint confirms, the CW had left BBBY in July 2019, two months before the start of the Relevant Period and four months before Mr. Tritton arrived as CEO.  [*Vitiello* Compl. ¶ 69 (Ex. S)]  Moreover, the CW was only a divisional merchandise manager in a financially insignificant division [*id.* ¶ 70] and thus was not in a position to have known which senior corporate officers received "weekly reports from Revionics" or attended "weekly meetings at Company headquarters."  [Compl. ¶ 81]  Courts routinely disregard allegations by CWs who were not in a position to have known the substance of what they were alleging.[16]

---

[16]     *See, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (discounting allegations by CWs who left company before class period began); *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 247 (8th Cir. 2008) (same); *Chan v. New Oriental Educ. & Tech. Grp., Inc.*, 2019 WL 2865452, at *10 n.7 (D.N.J. July 3, 2019) (same); *see also, e.g.*, *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 149-53 (3d Cir. 2004) (not sufficiently probable that CWs in branch offices knew what executives knew); *In re Hertz Global Holdings, Inc. Sec.*

Second, even if one or more of the Officer Defendants did receive reports or attend meetings, the Complaint does not allege *what* those reports said or *what* was discussed at those meetings; nor does it specify any supposedly alarming data from Revionics (or from BBBY's "[g]eneral inventory management" software, JDA [Compl. ¶ 81]) that the Officer Defendants ignored.  The absence of any such factual allegations defeats a claim of at least gross negligence, because "the pleading requirement for a claim of gross negligence . . . requires 'factual allegations of conduct evincing a reckless disregard for the rights of others or smacking of intentional wrongdoing.'"  *Baker v. Andover Assocs. Mgmt. Corp.*, 2009 WL 7400085, at *26 (N.Y. Sup. Ct. Westchester Cty. Nov. 30, 2009) (quoting *Mancuso v. Rubin*, 52 A.D.3d 580, 538 (2d Dep't 2008)).[17]  The Complaint cannot establish a reckless disregard of duty without alleging *what* information the Officer Defendants supposedly saw but recklessly or deliberately ignored. *See, e.g.*, *Baker*, 2009 WL 7400085, at *26 (dismissing claims that defendants failed to conduct due diligence that would have discovered fraud by Madoff-run company; "merely alleg[ing]" that defendants "missed red flags" and failed "to supervise and manage the [entity] with good faith and due care based on their failure to perform or cause to be performed 'appropriate due diligence'" does not establish gross negligence).

---

*Litig.*, 2015 WL 4469143, at *15, *19 (D.N.J. July 22, 2015) ("*Hertz I*") (discounting allegations from "regional, low-level" employees not connected to management).

[17]    *Accord In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 n.45 (Del. Ch. 2008) (definition of gross negligence "is so strict that it imports the concept of recklessness into the gross negligence standard"); *Walt Disney*, 907 A.2d at 750 (gross negligence is a "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason") (internal quotations omitted); *see also Goldstein v. Carnell Assocs., Inc.*, 74 A.D.3d 745, 747, 906 N.Y.S.2d 905, 906 (2d Dep't 2010) (alleged failure to observe defects during inspection was not grossly negligent, because inspection "was not so defective as to evince a reckless indifference to the rights of others or a failure to exercise even slight care").

Third, Plaintiffs' attempt to show Mr. Tritton's supposedly contemporaneous knowledge of alleged problems from the inventory-reduction program is even more deficient.  The Complaint portrays certain after-the-fact statements that Mr. Tritton made in 2020 as purported admissions "indicat[ing] his [and others'] knowledge of the Company's sales and inventory throughout the Relevant Period."  [Compl. ¶ 145]  But when read correctly and in context, those statements do not suggest that Mr. Tritton – or the other Officer Defendants – had known *in 2019* about problems supposedly arising from the inventory-reduction program.[18]

The Complaint thus fails to plead a claim against the Officer Defendants for gross negligence in connection with the inventory-reduction program.

### 2.    No Claim for Statements to the Public

The Complaint alleges that the Officer Defendants have been sued in the *Vitiello* securities action for making false or misleading statements to the public and that they breached their fiduciary duty in making those statements.  [Compl. ¶¶ 25-27, 145, 148, 150, 159-62]  The only statements at issue appear to be those made in September and October 2019 by Ms. Winston and Ms. D'Elia, before Mr. Tritton arrived in November.  [*Id.* ¶¶ 97-110]  The

---

[18]    For example, Mr. Tritton's February 18, 2020 observation that BBBY "'didn't have [price management floated properly] coming into the third and fourth quarter'" [*id.* ¶ 117; 2/18/20 Tr. at 5 (Ex. M)] did not say that Mr. Tritton or anyone else had known *coming into the third and fourth quarter* that "price management" was not "floated properly."  His April 15, 2020 statement that "'[w]e knew we were plagued by issues in December and January'" [Compl. ¶ 118] did not say that anyone had known *in December and January* about those "issues."  And the Complaint's allegation that Mr. Tritton's January 8, 2020 statement about "'watching it hour by hour'" related to "key inventory data" during the Thanksgiving period [*id.* ¶¶ 96, 145] misrepresents what Mr. Tritton actually said.  Mr. Tritton was not discussing inventory data; he was explaining the interplay between in-store and digital marketing and BBBY's change of strategy when the company realized that its prior effort "to remain independently profitable in that [digital] space and not thinking about the gateway experience on the Thanksgiving period . . . was distorting our true price value equation and what we could mean to the customer at that time.  We made really sharp pivots, . . . and we instantly saw key items we're winning share back.  We're watching it hour by hour."  [1/8/20 Tr. at 12 (Ex. L)]

single paragraph about Mr. Tritton's statement in January 2020 [*id.* ¶ 112] does not even begin to suggest why anything he said was false or misleading.  But in any event, none of the Officer Defendants breached her or his fiduciary duty in connection with those statements.

To the extent Plaintiffs allege that the Officer Defendants violated the federal securities laws and thereby harmed BBBY, no such violation occurred.  And, *a fortiori*, the Complaint fails to plead a fiduciary breach, because the scienter level for a breach of fiduciary duty is even higher than is the standard for a securities-laws violation.

### a.   No Securities-Law Violation

On September 4, 2019, Ms. Winston announced BBBY's "'aggressive'" plan to reduce inventory over 18 months and promised to provide further details during the October 2 earnings call.  [*Id.* ¶ 97; 9/4/19 8-K at 4, 5 (Ex. H)]  During that call and in BBBY's second-quarter earnings release and Form 10-Q, Ms. Winston and Ms. D'Elia described how they expected to execute the new plan:  BBBY would reduce inventory through "'a series of markdowns and clearance events as well as with the assistance of an independent liquidator, all to be managed thoughtfully to prevent cannibalization of sales.'"  [Compl. ¶¶ 99, 101]  Ms. Winston also said that the inventory-reduction program would be based on "'new data-driven insights'" and that BBBY would use "'markdown optimization software and processes'" to clear inventory.  [*Id.* ¶ 103]  None of those statements is actionable under the securities laws.

### i.   No False or Misleading Statements

As an initial matter, nothing that Ms. Winston or Ms. D'Elia said was false or misleading. The inventory-reduction program was just being launched when BBBY issued the September 4 letter to shareholders, so nothing had yet happened.  And the October earnings call and financial statements concerned the second quarter, which had ended on August 31, before the new program began.  BBBY did not have a duty in October 2019 to speak about the first month

(September) of the third quarter, which would not be reported until January 2020.  *See* 17 C.F.R. § 240.13a-13; *see also Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) (no law requiring quarterly reports to be updated other than quarterly).

But in any event, Plaintiffs do not allege any facts showing that, by the end of September, the month-old program had yielded or projected bad results.  As discussed above, although the Complaint alleges that "weekly reports from Revionics" showed "inventory levels, pricing, and margins" and that "weekly meetings" were held at headquarters [Compl. ¶¶ 141, 81], it does not plead *what* those data showed or *what* was discussed at those meetings – or that the information had revealed any cause for concern by the end of September.  The mere existence of undescribed data and meetings does not establish that BBBY's statements were false when made.  *See, e.g.*, *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004) (plaintiff relying on internal reports must plead "who authored the alleged report, when it was authored, who reviewed the report, and what data its conclusions were based upon"); *In re Target Corp. Sec. Litig.*, 275 F. Supp. 3d 1063, 1068, 1071 (D. Minn. 2017) (no evidence that statements were false when made because plaintiffs did not plead facts showing that defendants had had contrary information at that time), *reconsideration denied*, 2018 WL 1378755 (D. Minn. Mar. 19, 2018), *aff'd*, 955 F.3d 738, 743 (8th Cir. 2020).[19]

---

[19]    *See also, e.g.*, *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1004-05 (N.D. Cal. 2016) (failure to cite contents of specific reports or meetings that allegedly would have alerted defendants to problems about excess inventory); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 306-09 (D.N.J. 2001) (failure to specify what weekly reports defendants saw about inventory, or substance of reports); *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 54 (E.D.N.Y. 1998) (failure to "identify specific reports or meetings, name the actors involved, or indicate the substance of the data or conversations"), *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999); *cf. In re Newell Brands, Inc. Sec. Litig.*, 2019 WL 6715055, at *3, *12 (D.N.J. Dec. 10, 2019) (alleged receipt of weekly "'Point of Sale'" data and "'perfect visibility'" into largest retailer's inventory position did not mean that defendants "were given

Nor does the Complaint plead any facts to support its conclusory allegation [*e.g.*, ¶ 98] that BBBY did *not* have price management in place by October. The Complaint concedes that BBBY used price-optimization and inventory-management programs (Revionics and JDA) [*id.* ¶ 81], and it does not allege that those programs were defective or that BBBY misused them.

Contrary to Plaintiffs' assertion [¶ 98], BBBY was not obliged to disclose the "risks" of the new program when announcing it in September. The alleged nondisclosure did not make anything that Ms. Winston or Ms. D'Elia said misleading, and Plaintiffs do not cite an affirmative disclosure obligation. *See, e.g.*, *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 64 (D. Del. 2020) (company "had no duty to disclose a risk that had not 'actually materialized' at the time of the allegedly misleading prior disclosure") (quoting *Williams v. Globus Med., Inc.*, 869 F.3d 235, 243 (3d Cir. 2017)).

Nevertheless, during the October 2 investor call, Ms. Winston and Ms. D'Elia addressed the program's specific risks (cannibalization of sales) and explained how BBBY hoped to manage them. *See, e.g.*, Compl. ¶ 101 ("'[We are] mindful not to cannibalize sales during the holiday season.'"); 10/2/19 Tr. at 14 (Ex. I) ("[W]e can, using a third-party liquidator, remove that merchandise from our stores but not have it out in the market competing against ourselves or be liquidating it in a heavy fashion during this time frame."). Ms. Winston and Ms. D'Elia thus disclosed the risks that Plaintiffs mention, as well as the company's expectations for addressing them. The statements thus were not false or misleading. *See, e.g.*, *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 562 (D.N.J. 1992) (alleged failure to disclose risks not actionable when disclosures "state[] exactly the fact that plaintiffs contend was covered up"), *aff'd*, 7 F.3d 357 (3d Cir. 1993).

---

internal warnings about the precise inventory issues that caused [company] to miss its predicted guidance figures"), *aff'd*, 837 F. App'x 869 (3d Cir. 2020).

In addition, regardless of their accuracy in September and October, the statements are shielded under the Private Securities Litigation Reform Act's (the "PSLRA's") safe harbor for forward-looking statements, 15 U.S.C. § 78u-5(c).  Under the safe harbor, "any forward-looking statement is protected if it is *either* accompanied by substantive and tailored cautionary statements *or* if the plaintiff fails to show [the defendant's] *actual knowledge* of falsehood."  *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 491 (3d Cir. 2016) (emphasis added).

The challenged statements here were based on BBBY's expectations of how the inventory-reduction program would play out over the next 18 months.  [9/4/19 8-K at 4 (Ex. H)] BBBY explained during the October earnings call that more than $350 million of inventory "'will be removed from our stores before the 2019 holiday season'" [Compl. ¶ 101] and that the process was only "in the early innings" [10/2/19 Tr. at 12 (Ex. I)].  Such statements about management's "plans and objectives . . . for future operations" and about future economic performance are forward-looking.  15 U.S.C. § 78u-5(i)(1).  So too are statements whose accuracy cannot be determined until sometime in the future.  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 281-82 (3d Cir. 2010); *see also In re Leapfrog Enter. Sec. Litig.*, 200 F. Supp. 3d 987, 1004 (N.D. Cal. 2016) (statements about "expected inventory reduction were forward looking").

The Complaint does not allege that Ms. Winston or Ms. D'Elia *actually knew* that the program would not work.  And as shown above, Ms. Winston and Ms. D'Elia adequately warned of the program's risks.  For both of those independent reasons, the safe harbor applies.  *See OFI*, 834 F.3d at 491.  The safe harbor also protects BBBY's reiteration of guidance for the 2019 fiscal year.  *See, e.g.*, *Williams*, 869 F.3d at 244-46.  Such projections are forward-looking, and

the Complaint does not plead any facts suggesting that BBBY actually knew by the first days of

October that future sales data would cause the company not to achieve its full-year estimates.[20]

In addition to falling within the PSLRA's safe harbor, Ms. Winston's and Ms. D'Elia's

statements about their expectations for the new inventory-reduction program are inactionable

expressions of opinion under *Omnicare, Inc. v. Laborers District Council Construction Industry*

*Pension Fund*, 575 U.S. 175 (2015).  Some of those statements were expressly labeled as

opinions – for example, Ms. Winston's assertion that "'we believe . . . that we can drive sales

and we may be on promotion, of course, through the holiday season and be doing more

advertising.'"  [Compl. ¶ 106; 10/2/19 Tr. at 16 (Ex. I)].  But opinions need not use words such

as "we believe" or "we think" to fall within *Omnicare.  E.g.*, *West Palm Beach Firefighters'*

*Pension Fund v. Conagra Brands Inc.*, 2020 WL 6118605, at *16 (N.D. Ill. Oct. 15, 2020)

("[E]ven without qualifiers, the content of future predictions makes the distinction clear:  it is

hard to express certainty about the future."); *see also Fialkov v. Alcobra Ltd.*, 2016 WL 1276455,

at *5-6 (S.D.N.Y. Mar. 30, 2016).  The question is whether the statements relate to "aspirational

goals" that are not "'determinate' or 'verifiable.'"  *Howard v. Arconic, Inc.*, 395 F. Supp. 3d 516,

549 (W.D. Pa. 2019) (quoting *Omnicare*, 575 U.S. at 184).  BBBY's statements about its plans

---

[20]     Contrary to the Complaint's assertion [¶ 100], lack of a "reasonable basis" for a forward-looking statement such as earnings guidance cannot create liability.  The PSLRA requires *actual knowledge* of falsity, 15 U.S.C. § 78u-5(c)(1)(B); *OFI*, 834 F.3d at 491, and the Complaint does not allege any facts showing BBBY's actual knowledge.  Nevertheless, Ms. Winston and Ms. D'Elia did have a reasonable basis to believe that BBBY could reduce inventory without cannibalizing sales.  The Revionics and JDA software and the independent liquidator were supposed to enable BBBY to accomplish that goal.  [Compl. ¶¶ 80-81, 103]  That BBBY "lacked a permanent CEO" [*id.* ¶ 98] does not mean that management did not exist.  BBBY had an interim CEO [*id.* ¶ 60]; it informed the market of the CEO search [10/2/19 Tr. at 14-15 (Ex. I)]; and it announced the new CEO just one week later, on October 9 [Compl. ¶ 82].

and hopes for the new program fit that description.  *See, e.g.*, Compl. ¶ 103 (BBBY's "'goal is to ensure our customers see a meaningful difference this critical holiday season'").

An opinion cannot be false unless the speaker actually disbelieved the opinion expressed or the opinion contained false embedded facts.  *Omnicare*, 575 U.S. at 189.  The Complaint contains no such allegations.  And an opinion cannot be misleading by omission unless it omits material supporting facts that "conflict with what a reasonable investor would take from the statement itself . . . ."  *Id.* (emphasis added).  A plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.  That is no small task for an investor."  *Id.* at 194 (citation omitted).  As shown above, Plaintiffs have not pled that any such conflicting facts existed when Ms. Winston and Ms. D'Elia made their statements in September and October 2019.

Finally, many of the challenged expressions of optimism about the new inventory-reduction program are inactionable because they are immaterial puffery; they are "not determinate [or] verifiable" and are "too imprecise to alter the total mix of available information."  *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *10-11 (D.N.J. Apr. 27, 2017) ("*Hertz II*"), *aff'd*, 905 F.3d 106 (3d Cir. 2018).  For example, Ms. Winston's statements about "'[m]anag[ing] [the inventory-reduction program] thoughtfully'" [Compl. ¶ 101] and aspiring "'to ensure our customers see a meaningful difference'" [*id.* ¶ 103] are quintessential puffery.  *See, e.g., Hertz II*, 2017 WL 1536223, at *10-11 ("'the strategies have been working'"; "'[w]e feel very confident the story is intact'"); *see also, e.g., Carpenters' Pension Trust of Ill. v. Target Corp. (In re Target Corp. Sec. Litig.)*, 955 F.3d 738, 743 n.2 (8th Cir. 2020) ("'we feel really good about where we are today'").

## ii.  <u>No Strong Inference of Scienter</u>

In addition to failing to plead any actionable misstatement or omission, the Complaint does not establish that any such alleged misrepresentation or omission was made with scienter – "a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  A complaint must plead "with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added).  A "strong inference" must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.

As shown above, Plaintiffs have not pled *any* facts suggesting that Ms. Winston or Ms. D'Elia knew or recklessly disregarded any alleged errors in their statements.  Nor can Plaintiffs rely on Mr. Tritton's after-the-fact statements from January, February, and April 2020 to impute scienter to Ms. Winston or Ms. D'Elia in September and October 2019.  As explained above in Part II.A.1, although Mr. Tritton acknowledged that problems had occurred and mistakes had been made, he did not suggest that Ms. Winston, Ms. D'Elia, or anyone else at BBBY had known about those problems months earlier, when the challenged statements were made.  Plaintiffs' use of Mr. Tritton's after-the-fact assessments is classic – and impermissible – fraud by hindsight.  *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2015 WL 4469143, at *18-19 (D.N.J. July 22, 2015) ("*Hertz I*") (post-period statements "say nothing about Defendants' knowledge or state of mind during the [Relevant] Period").[21]

---

[21]     Moreover, two of Mr. Tritton's comments – the statement that BBBY had been "'plagued by issues in December and January'" [Compl. ¶ 118] and the misconstrued statement that BBBY had been watching "key inventory data" "'hour by hour'" during the "'Thanksgiving period'" – [*id.* ¶¶ 96, 145] – concerned purported events well after September and October 2019, when Ms. Winston and Ms. D'Elia had made the challenged statements at issue here.

In addition, the affirmative steps that Ms. D'Elia and Mr. Tritton took in January and February 2020 undercut any inference that those two officers (or anyone else at BBBY) had any intent to deceive investors. As Plaintiffs admit, Ms. D'Elia and Mr. Tritton voluntarily withdrew BBBY's FY2019 guidance on January 8, 2020 – a move that the Complaint calls "rare" [Compl. ¶¶ 9-10] – and warned the market of "headwinds" and "pressure" for the fourth quarter [1/8/20 8-K at 5 (Ex. K); 1/8/20 Tr. at 7, 11 (Ex. L)]. They also voluntarily announced preliminary financial results for the two months of the fourth quarter on February 11, 2020 [Compl. ¶¶ 11, 114], even though they had no obligation to do so until April. This voluntary transparency hardly suggests an intent to deceive. *See, e.g.*, *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 748 (N.D. Tex. 2018) (voluntary early disclosure of "disappointing sales" undercuts interference of scienter), *aff'd*, 935 F.3d 424 (5th Cir. 2019).

Thus, to the extent Plaintiffs allege Ms. Winston and Ms. D'Elia breached their fiduciary duty by violating the federal securities violations, the Complaint fails to state a claim.

### b.      No Breach of Fiduciary Duty

If Plaintiffs mean to allege that Ms. Winston and Ms. D'Elia violated their duty of candor under New York law even apart from the federal securities laws, the claim is even weaker. As discussed above in Part I.A.3.b, a fiduciary does not violate her fiduciary duty in making allegedly false or misleading statements that do not request shareholder action unless she *knew* that those statements were false and *deliberately* attempted to mislead shareholders. The Exchange Act's scienter standard is lower: it can be met by particularized facts showing only recklessness (except as to forward-looking statements, for which the PSLRA requires actual knowledge of falsity). *In re Hertz Global Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018).

As shown above, Ms. Winston and Ms. D'Elia did not make any false or misleading statements, and, even if the statements were false, they were not made recklessly, much less with actual knowledge of falsity.  According, the claim for breach of fiduciary duty fails as well.

### 3.    No Claim for Stock Repurchases

The Complaint does not allege anything about the Officer Defendants' involvement with BBBY's stock repurchases.  But in any event, for the reasons explained above, the repurchases were not improper because the stock price was not artificially inflated and, even according to Plaintiffs' calculations, the stock was worth at least 85% of what BBBY paid for it.  Moreover, the Complaint does not plead any facts showing that the Officer Defendants' conduct was grossly negligent and akin to reckless.

### B.    No Claim for Unjust Enrichment

The Complaint does not allege that the Officer Defendants were "unjustly enriched" by anything other than their normal compensation.  [Compl. ¶ 169]  As discussed above in Part I.A.4, such claims do not lie in the absence of viable claims for breach of fiduciary duty, which do not exist here.  And as discussed above in Part II.A.2, the Officer Defendants did not make any misstatements that supposedly inflated BBBY's "valuation" [Compl. ¶ 169].

### C.    No Claim for Corporate Waste

The waste claim against the Officer Defendants [*id.* ¶¶ 173-74] fails for the same reasons it fails as to the director Defendants:  Plaintiffs have not shown that the Officer Defendants' compensation bore *no* relationship to the value of their services to BBBY or that BBBY's stock repurchases bore *no* relationship to the value received.  *See* Part I.A.5.

### D.    No Claim for Contribution

The Exchange Act claim for contribution against the Officer Defendant fails because, as shown above, no primary violation of the Exchange Act occurred, and the Complaint does not

plead any facts creating a strong inference that any of the Officer Defendants acted with the requisite scienter.  *See, e.g.*, *Steed Fin. LDC v. Laser Advisers, Inc.*, 258 F. Supp. 2d 272, 277-78 (S.D.N.Y. 2003) (plaintiff seeking contribution "must allege each and every element of a primary securities fraud violation in order to prevail"; "scienter must be properly alleged").

## CONCLUSION

The Court should therefore dismiss the Complaint in its entirety and with prejudice.

Dated: January 4, 2022

<div style="margin-left: 40%">

*/s/ Edna D. Guerrasio*
Edna D. Guerrasio
Jonathan E. Richman (admitted *pro hac vice*)
Proskauer Rose LLP
Eleven Times Square
New York, New York  10036
(212) 969-3000
eguerrasio@proskauer.com
jerichman@proskauer.com

*Attorneys for Defendants and*
*Nominal Defendant Bed Bath & Beyond Inc.*

</div>

43