# EXHIBIT P

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| MICHAEL ANTHONY, derivatively on behalf of BED BATH AND BEYOND INC. | Date Filed: June 11, 2021 |
| | Index No._____ |
| Plaintiff, | (NYSCEF Case) |
| -v- | **SUMMONS** |
| MARK J. TRITTON, MARY A. WINSTON, ROBYN M. D'ELIA, STEPHANIE BELL-ROSE, HARRIET EDELMAN, JOHN E. FLEMING, PATRICK R. GASTON, SUE E. GOVE, JEFFREY A. KIRWAN, JOHNATHAN B. OSBORNE, HARSHA RAMALINGAM, VIRGINIA P. RUESTERHOLZ, JOSHUA SCHECHTER, ANDREA WEISS, and ANAN YERGER | Plaintiff designates Kings County as the place of trial. The basis of venue is that this County is the location of one or more of the Defendants named herein. |
| Defendants, | |
| and | |
| BED BATH AND BEYOND INC., | |
| Nominal Defendant. | |

TO THE ABOVE-NAMED DEFENDANTS:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve

a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance on the Plaintiff's attorneys within twenty (20) days after the service of this summons,

exclusive of the day of service (or within thirty (30) days after the service is complete if this

summons is not personally delivered to you within the State of New York); and in case of your

1

failure to appear and answer, judgment will be taken against you by default for the relief demanded

in the complaint.

Dated: New York, New York
         June 11, 2021

**NEWMAN FERRARA LLP**

_____

Roger A. Sachar
1250 Broadway, 27th floor
New York, NY 10001
Telephone: (212) 619-5400
Facsimile: (212) 619-3090
*rsachar@nfllp.com*

**KAHN SWICK & FOTI, LLC**
Melinda A. Nicholson
Nicolas Kravitz
100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 648-1842
Facsimile: (504) 455-1498
*melinda.nicholson@ksfcounsel.com*
*nicolas.kravitz@ksfcounsel.com*

*Counsel for Plaintiff*

**Defendants' Addresses:**

MARK J. TRITTON
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

MARY A. WINSTON
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

ROBYN M. D'ELIA
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

2

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 4 of 229 PageID: 792

STEPHANIE BELL-ROSE
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

HARRIET EDELMAN
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

JOHN E. FLEMING
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

PATRICK R. GASTON
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

SUE E. GOVE
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

JEFFREY A. KIRWAN
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

JOHNATHAN B. OSBORNE
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

HARSHA RAMALINGAM
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

VIRGINIA P. RUESTERHOLZ,
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

3

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 5 of 229 PageID: 793

JOSHUA SCHECHTER
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

ANDREA WEISS
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

ANAN YERGER
c/o Bed Bath and Beyond Inc.
650 Liberty Ave
Union, New Jersey 07083

BED BATH AND BEYOND INC.
Attn: Risk Management
650 Liberty Avenue
Union, New Jersey, 07083

4

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 6 of 229 PageID: 794

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| MICHAEL ANTHONY, derivatively on behalf of BED BATH AND BEYOND, INC. | Index No.: |
| Plaintiff, | |
| -v- | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| MARK J. TRITTON, MARY A. WINSTON, ROBYN M. D'ELIA, STEPHANIE BELL-ROSE, HARRIET EDELMAN, JOHN E. FLEMING, PATRICK R. GASTON, SUE E. GOVE, JEFFREY A. KIRWAN, JOHNATHAN B. OSBORNE, HARSHA RAMALINGAM, VIRGINIA P. RUESTERHOLZ, JOSHUA SCHECHTER, ANDREA WEISS, and ANAN YERGER | |
| Defendants, | |
| and | |
| BED BATH AND BEYOND INC., | |
| Nominal Defendant. | |

COMES NOW, Plaintiff Michael A. Anthony ("Plaintiff"), derivatively and on behalf of nominal defendant Bed Bath and Beyond, Inc. ("Bed Bath" or the "Company") against certain current and/or former members of Bed Bath's board of directors (the "Board") and/or its officers for breaching their fiduciary duties. Plaintiff bases his allegations on personal knowledge as to his own acts, and on information and belief as to all other allegations, based upon due investigation by counsel, including: (a) review and analysis of public filings made by the Company and other persons with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and

other publications caused to be disseminated by certain of the Defendants and other persons; (c) review of news articles, stockholder communications, and postings on Bed Bath's website concerning the Company's public statements; (d) review and analysis of complaints and other related materials in litigation commenced by and/or against the Company and/or its affiliates; (e) review of correspondence by and between Plaintiff's counsel and counsel for Bed Bath; (f) documents (the "Production") produced by the Company in response to Plaintiff's demand (the "Demand") made pursuant to N.Y. Bus. Corp. L. Section 624 and New York common law (g) review of other publicly available information concerning Bed Bath and other persons.

## **INTRODUCTION AND OVERVIEW**

1.    This is a stockholder derivative action brought by a stockholder of Bed Bath on behalf of the Company against Defendants seeking to remedy violations of New York law, and harm resulting therefrom, from at least October 2019 to February 2020 that have caused, and continue to cause, substantial monetary losses to Bed Bath and other damages, including damages to the Company's reputation and goodwill.

2.    Bed Bath is a big box retailer, focusing primarily on domestic merchandise and home furnishings. In addition to its Bed Bath and Beyond stores, Bed Bath operates under brand names such as Christmas Tree Shops, Harmon, buybuy BABY and Cost Plus World Market.

3.    In May 2019, as part of the resolution of an intense proxy contest led by three hedge funds raising concerns about severe mismanagement, the Company's CEO and several Board members resigned. Four remaining members of the pre-existing Board remained and were joined by eight new directors.

2

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 8 of 229 PageID: 796

4.     Defendant Mary A. Winston ("Winston") who had been head of the Company's Audit Committee, was named as the interim Chief Executive Officer ("CEO"), and a search for a new CEO commenced.

5.     At about the same time as Winston took temporary control of the Company, Bed Bath announced the creation of a "Business Transformation and Strategy Review Committee" (the "BTSRC"), which would be comprised of individual Board members.

6.     The BTSRC was ostensibly to spearhead four "priorities" to turn around the Company.

7.     Chief among these priorities was the "aggressively reduce up to $1 billion of inventory at retail."

8.     For purportedly serving on the BTSRC, various Board members received additional compensation.

9.     ██████████████████████████████████████████
████████████████████████████████

10.     ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

11.     Like many retailers focusing on the domestic markets, Bed Bath's business is seasonal, and heavily tilted towards the holiday season; its busiest months are November and December.

12.     As part of its leadership shakeup, Bed Bath announced that "[i]n the short term, more than approximately $350 million of inventory will be removed from our stores before the 2019 holiday season."

13.     To monitor this inventory reduction, while still maintaining existing inventory to ensure that the Company's shelves were stocked with key items for the upcoming holiday season, Bed Bath utilized "markdown optimization software," manufactured by a company known as Revionics, which purportedly enabled the Company's leadership to "thoughtfully" and "meaningfully" decrease aged and excess inventory, while still guarding the Company against margin erosion and sales cannibalization.

14.     On October 9, 2019, Bed Bath named Defendant Mark Tritton ("Tritton") as Bed Bath's new CEO, replacing Defendant Winston. For her roughly six months of work, Winston received approximately $550,000 in salary, and $1.9 million in stock. Tritton officially took charge on November 4, 2019, and adopted Winston's inventory reduction plan.

15.     ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████.

16.     ████████████████████████████████████████
████████████████████████████████████████████████
███████████

17.     ████████████████████████████████████████
█████████████████████████████

18.     Had the Board conducted full oversight of the Company's operations and inventory, they would have known that the Company had "poor inventory management" that led to margin

erosion, cannibalized sales, and empty store shelves during the Company's most important sales period.

19. On December 17, 2019, there was an additional major shakeup in the Company's leadership. On that date, the Company announced that Tritton had terminated its Chief Merchandising Officer, Marketing Officer, Digital Officer, General Counsel, and Chief Administrative Officer.

20. ████████████████████████████████████
████████████████████████████████████████

21. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

22. On January 8, 2020, the truth gradually began to emerge, when Bed Bath withdrew its FY 2019 guidance completely. Bed Bath also reported a 3Q2109 adjusted loss of earnings per diluted share of $.38 (analysts had predicted a $.02 profit per diluted share), and an 8.3% plunge in comparable sales.

23. Completely withdrawing earnings guidance is exceedingly ████████████
████████████████████████████████████████████
████████████████████████████████ ████████████
████████████████████████████████████████████
████████████████████.

24. ████████████████████████████████████
████████████████████████████████████████████

5

██████████████████████████████████████████████████████

████████████████

25.     Tritton explained that the poor performance "was impacted to some extent by self-inflicted issues, like poor inventory management[.]"

26.     The Company's stock fell 19% in response.

27.     ██████████████████████████████████████████████████████

██████████████████

28.     ██████████████████████████████████████████████████████

███████████████████████████████████

29.     Not until February 11, 2020 was the full depth of the Company's holiday season problem revealed.

30.     On that date, the Company revealed that its poorly-executed inventory reduction plan had backfired, and disclosed a "5.4% decline in comparable sales driven primarily by store traffic declines combined with inventory management issues," which included "inventory within certain key categories in the [Bed Bath] assortment [were] too low or out-of-stock during the period."

31.     In other words, because of the inventory reduction plan, the Company's shelves were missing key sales items during the Company's most important sales period.

32.     ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████

33.     Making matters even more egregious, ████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████, the Company was repurchasing shares, including: 76,700 shares between October 27, 2019 and November 30, 2019; 30,900 shares between December 1, 2019 and December 29, 2019; 2,600 shares between December 29, 2019 and January 25, 2020; and an additional 5,400 shares between January 26, 2020 and February 29, 2020.

34.   ██████████████████████████████████████████

█████████████████████

35.   No prudent Company would have continued to repurchase Company stock, at inflated rates, knowing the Company's stock price did not reflect Bed Bath's inventory management failures.

36.   Following this disclosure, Plaintiff sent a demand for books and records to the Company pursuant to N.Y. Bus. Corp. L. Section 624 and New York common law to investigate possible breaches of fiduciary duty and other wrongdoing relating to the events described herein.

37.   After receiving the Demand and conferring through counsel, the Company agreed to produce a subset of the documents requested in the Demand (the "Production").

38.   Over the next few months, the Company, through counsel, ████████████████

████████████████████████

39.   ██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████.

7

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 13 of 229 PageID: 801

40.     As a result of the Board's abject failure to oversee the Company's operations, Bed Bath, along with Tritton, Winston, and Defendant Robyn M. D'Elia ("D'Elia"), Bed Bath's former Chief Financial Officer ("CFO") (who participated in the investor calls and public statements where the misstatements were made), are defendants in a securities class action, styled *Vitello, et ano. v Bed Bath & Beyond, Inc.*, *et al.*, No. 2:20-cv 04240 (D.N.J.) (the "Securities Class Action").

41.     Plaintiff has instituted this action derivatively, because demand on the current Board would be a useless and futile act.

42.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ In the wake of that dereliction, the Company suffered severe financial and reputational harm.

## JURISDICTION AND VENUE

43.     This Court has jurisdiction over the Nominal Defendant pursuant to CPLR Section 301 in that Bed Bath is a New York corporation, regularly transacts business in the State of New York, and the events giving rise to this Complaint occurred, in whole or in part, within the State of New York.

44.     This Court has jurisdiction pursuant to CPLR Section 301 over all the Defendants based on their current or former membership on Bed Bath's Board and in light of the fact that their actions giving rise to this Complaint occurred, in whole or in part, within the State of New York.

45.     Venue is proper in this Court under CPLR Section 503(a) because one or more of the parties reside or maintains executive offices in Kings County, a sufficient portion of the transactions and wrongs described herein took place in Kings County, and Defendants received

8

substantial compensation in Kings County by doing business here and engaging in numerous activities that had an effect in Kings County.

## **PARTIES**

46.     Michael A. Anthony is a resident of the State of Michigan, was a shareholder of Bed Bath during the time of the wrongdoing complained of herein, has continuously been a shareholder of Bed Bath since that time, and remains a current shareholder of Bed Bath.

47.     Nominal Defendant Bed Bath & Beyond, Inc. is a New York corporation with its corporate headquarters located at 650 Liberty Avenue Union, New Jersey 07083.

48.     Defendant Mark J. Tritton has been a Bed Bath director, President & CEO and since November 2019. Between November 2019 to June 2020, Defendant Tritton was a member of the BTSRC. Defendant Tritton is also a defendant in the Securities Class Action. For 2019 fiscal year, in exchange of his purported trust, loyalty, and fidelity to Bed Bath, Defendant Tritton received $13,764,398, in total compensation.

49.     Defendant Mary A. Winston has been a Bed Bath director since May 2019. Between May 2019 to November 2019, Defendant Winston served as Bed Bath's interim CEO. Between November 2019 to June 2020, Defendant Winston was a member of the BTSRC. Defendant Winston is also a defendant in the Securities Class Action. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant Winston received $2,480,006, in total compensation.

50.     Defendant Robyn M. D'Elia was Bed Bath's CFO from July 2018 to May 2020. Defendant D'Elia is a defendant in the Securities Class Action. Between 2015 to 2018, Defendant D'Elia was Bed Bath's Vice President of Finance. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant D'Elia received $2,334,406, in total compensation.

9

51.    Defendant Stephanie Bell-Rose ("Bell-Rose") has been a Bed Bath director from May 2018 to the present. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant Bell-Rose received $175,190, in total compensation.

52.    Defendant Harriet Edelman ("Edelman") has been a Bed Bath director from May 2019 to the present. Defendant Edelman served as Chairperson of the Company's Audit Committee from July 2019 to May 2020. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant Edelman received $182,532, in total compensation.

53.    Defendant John E. Fleming ("Fleming") has been a Bed Bath director from May 2019 to the present. Between July 2019 to June 2020, Defendant Fleming was a member of the BTSRC. For 2019 fiscal year, in exchange of his purported trust, loyalty, and fidelity to Bed Bath, Defendant Fleming received $174,479, in total compensation. Defendant Fleming's 2019 compensation included an additional $10,000 for his purported service in the BTSRC.

54.    Defendant Patrick R. Gaston ("Gaston") was a Bed Bath director from 2007 to May 2020. Defendant Gaston served as Chairman of the Board between April 2019-May 2020. Defendant Gaston also served on the BTSRC from July 2019 to June 2020. For 2019 fiscal year, in exchange of his purported trust, loyalty, and fidelity to Bed Bath, Defendant Gaston received $423,943, in total compensation. Defendant Gaston's 2019 compensation included an additional $10,000 for his purported service in the BTSRC.

55.    Defendant Sue E. Gove ("Gove") has been a Bed Bath director from May 2019 to the present. In 2019, Defendant Gove served on the Company's Nominating and Corporate Governance Committee. Since August 2020, Defendant Gove has been a member of the Company's Audit Committee. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant Gove received $159,294, in total compensation.

10

56.     Defendant Jeffrey A. Kirwan ("Kirwan") has been a Bed Bath director from May 2019 to the present. Defendant Kirwan served on the BTSRC from July 2019 to June 2020. For 2019 fiscal year, in exchange of his purported trust, loyalty, and fidelity to Bed Bath, Defendant Kirwan received $157,099, in total compensation. Defendant Kirwan's 2019 compensation included an additional $10,000 for his purported service in the BTSRC.

57.     Defendant Johnathan B. Osborne ("Osborne") has been a Bed Bath director from April 2018 to the present. Between July 2019 to June 2020, Defendant Osborne was a member of the Company's Audit Committee. Additionally, Defendant Osborne was a member of the BTSRC between July 2019 to June 2020. For 2019 fiscal year, in exchange of his purported trust, loyalty, and fidelity to Bed Bath, Defendant Osborne received $195,379, in total compensation. Defendant Osborne's 2019 compensation included an additional $10,000 for his purported service in the BTSRC.

58.     Defendant Harsha Ramalingam ("Ramalingam") has been a Bed Bath director from May 2019 to the present. Defendant Ramalingam was a member of the BTSRC between July 2019 to June 2020. For 2019 fiscal year, in exchange of his purported trust, loyalty, and fidelity to Bed Bath, Defendant Ramalingam received $168,610, in total compensation. Defendant Ramalingam's 2019 compensation included an additional $10,000 for his purported service in the BTSRC.

59.     Defendant Virginia P. Ruesterholz ("Ruesterholz") has been a Bed Bath director since 2017. Defendant Ruesterholz is the Chairperson of the Nominating and Corporate Governance Committee. Defendant Ruesterholz is also a member of the Company's Audit Committee and has been since July 2019. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant Ruesterholz received $204,015, in total compensation.

11

60.     Defendant Joshua Schechter ("Schechter") has been a Bed Bath director from May 2019 to the present. Since June 2020, Defendant Schechter has been the Chairperson of the Company's Audit Committee. For 2019 fiscal year, in exchange of his purported trust, loyalty, and fidelity to Bed Bath, Defendant Schechter received $157,099, in total compensation.

61.     Defendant Andrea Weiss ("Weiss") has been a Bed Bath director from May 2019 to the present. Defendant Weiss is a member of the Audit Committee. Between July 2019 to June 2020, Defendant Weiss was also served as the Chairperson of the BTSRC. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant Weiss received $180,505, in total compensation. Defendant Weiss' 2019 compensation included an additional $20,000 for her purported service as a Chair in the BTSRC.

62.     Defendant Ann Yerger ("Yerger") has been a Bed Bath director from May 2019 to the present. Defendant Yerger is a member of Compensation Committee and Nominating and Corporate Governance Committee. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant Yerger received $166,886, in total compensation.

63.     Defendants Tritton, Edelman, Fleming, Gove, Kirwan, Osborne, Ramalingam, Ruesterholz, Schechter, Weiss, Winston, and Yerger are referred to herein as the "Current Board Defendants."

64.     Collectively, the Current Board Defendants and Gaston, are referred to herein as the "Board Defendants."

## **GENERAL FIDUCIARY DUTIES OF THE DEFENDANTS**

65.     The Board Defendants had and have stringent fiduciary obligations to Bed Bath and its shareholders.

66.     By reason of their positions as Officers, Directors, and/or Fiduciaries of Bed Bath

the Board Defendants owed and owe Bed Bath and its shareholders fiduciary obligations of loyalty, good faith, due care, disclosure, and candor and were and are required to use their utmost ability to control and manage Bed Bath in a fair, just, honest, and equitable manner. The Board Defendants were and are required to act in furtherance of the best interest of Bed Bath, and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interest or benefits.

67. Each director and officer of Bed Bath owed and owes to Bed Bath and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets and to uphold the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to disseminate promptly accurate and truthful information with regard to the Company and its financial health and growth prospects.

68. The Board Defendants, because of their positions of control and authority as directors and/or officers of Bed Bath were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of various public statements issued by Bed Bath. Because of their advisory, executive, managerial, and directorial positions with Bed Bath, each of the Board Defendants had access to adverse, non-public, material information about the operations of Bed Bath.

69. At all times relevant hereto, each Board Defendant was the agent of the other Defendants and of Bed Bath and was at all times acting within the course and scope of such agency.

70. To discharge their duties, the officers and directors of Bed Bath were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the operational affairs of the Company. By virtue of such duties, the officers and directors of Bed Bath were required to, among other things:

a. Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

b. Ensure that the Company complied with all legal obligations and requirements, including state and federal laws relating to the procurement regulations.

c. Ensure that the Company was operated in a diligent, honest, and prudent manner.

71.     Each of the Board Defendants, by virtue of their position as a director and/or officer of Bed Bath, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, due care, disclosure and candor in the management and administration of the affairs of the Company. The conduct of the Board Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Bed Bath, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders. The Board Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.

72.     Because of their positions with the Company, and their access to material non-public information available to them, Bed Bath, through the Board Defendants, knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public. As a result of the Board Defendants' misconduct, the Company has suffered significant damages. Further, various Company executives, as described herein, misled investors and allowed the Company to breach its customer contracts for which the Company stands liable.

14

## DUTIES DERIVED FROM THE COMPANY'S CORPORATE
## GOVERNANCE DOCUMENTS

73.     According to the Company's Policy of Ethical Standards for Business Conduct, the

Company's employees', executives' and board members' responsibilities are described as follows:

> All individuals shall conduct their business affairs on behalf of the Company in
> accordance with all applicable laws of the United States and other governmental
> jurisdictions in which the Company does business, and shall observe the highest
> standards of business ethics. Specifically, and without limitation: …

> • All individuals must display the highest standard of legal and ethical
> behavior with respect to the intellectual property rights of third parties.

> • All individuals involved in the preparation, review and filing of financial
> reports and other information for public disclosure regarding the Company
> must accurately record all financial dealings and comply with the laws and
> regulations regarding such activities. All associates who provide
> information as a part of this process must comply with the Company's
> disclosure controls and procedures.

74.     According to the Company's Corporate Governance Guidelines, the Company's

board members' responsibilities are described as follows:

> As part of its oversight responsibility, the Board receives at least annually a report
> on the material risks facing the Corporation, which risks are identified through the
> Corporation's Enterprise Risk Management ("ERM") process. This report is
> presented to the Audit Committee by a committee of key executives representing
> legal, finance and internal audit (the "Executive Risk Committee"), and results from
> a formal process where members of the Executive Risk Committee meet with
> executives of each principal business function to identify and assess the significant
> risks in each such business function's areas of responsibility. The members of the
> Executive Risk Committee then analyze with those executives what risk mitigation
> efforts are or should be in place to eliminate or reduce such risks to acceptable
> levels, where possible, and then engage on these matters with the Audit Committee,
> which then reports to the full Board. In the annual ERM report, areas of risk and
> mitigation efforts reviewed with the Audit Committee and the full Board, in
> furtherance of the Board's oversight responsibilities, generally include: general
> business risks, such as economic forces, competition and weather; employment-
> related risks, such as recruitment and retention, succession, labor costs and
> associate relations; data security risks with respect to the Corporation, associate and
> customer data; compliance risks associated with the range of legal, accounting, tax
> and financial reporting systems under which the Corporation operates; supply chain

15

risks, including disruption arising from political instability or labor disturbances, supplier financial stability and legal compliance; and compliance with a variety of product, labor, social and environmental standards. The Audit Committee and the full Board are updated on certain risks more frequently than annually, upon request or as developments warrant.

The ERM process and report to the Audit Committee, and the Audit Committee's report to the full Board, also informs the more detailed Risk Factor disclosure in the Corporation's annual report on Form 10-K, filed with the Securities and Exchange Commission.

75.     According to the Charter of the Audit Committee of the Board of Directors of Bed

Bath, the Audit Committee members' responsibilities are described as follows:

The Committee shall oversee the Corporation's accounting and financial reporting processes and the audits of the Corporation's financial statements.

The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of any registered public accounting firm engaged (including resolution of disagreements between management and the Corporation's outside auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Corporation. Each such registered public accounting firm shall report directly to the Committee.

*** 

Review with management and the outside auditor significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including analyses of critical accounting policies and analyses of the effects of alternative GAAP methods on the financial statements.

The Committee shall review the Corporation's annual audited financial statements, including any certification, report or opinion rendered by the Corporation's outside auditor, and discuss the same with management and the auditor. The Committee shall recommend to the Board whether the annual financial statements should be included in the Corporation's Annual Report on Form 10-K.

The Committee shall review and discuss with the Company's outside auditors and management the Company's quarterly financial statements and review and discuss the Company's quarterly reports on Form 10-Q and annual reports on Form 10-K before such reports are filed with the Securities Exchange Commission (the

"SEC"), including the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

\*\*\*

The Committee shall review with management the Corporation's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, the outside auditors' report on the effectiveness of the Corporation's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

76.     According to the Charter of the Nominating and Corporate Governance Committee of the Board of Directors of Bed Bath, the Committee members' responsibilities are described as follows:

The Committee shall review the Board's committee structure and composition and make recommendations to the Board regarding the performance, composition, duties and responsibilities of each committee and the appointment of directors to serve as members and chairs of each committee.

\*\*\*

The Committee shall review and evaluate the compensation of directors annually, including the appropriate mix of cash compensation and equity compensation, and make recommendations to the Board regarding director compensation.

## SUBSTANTIVE ALLEGATIONS

**I.      THE COMPANY'S TRANSFORMATION PLAN**

77.     Bed Bath is a retailer that sells a wide assortment of domestic merchandise and home furnishings.

78.     On April 17, 2019, a group of activist shareholders filed a Proxy Statement with the SEC pressuring the Company to restructure its leadership, to whom it attributed a decade of underperformance. The activist shareholders critiqued the Company's directors' "lack of relevant retail expertise and stale perspectives" and demanded that the Company undertake series of changes to address the Company's stagnant inventory and weak margins. The Proxy Statement

17

stated that the activist shareholders' "slate of director nominees is committed to executing on a strategic plan" prioritizing initiatives such as "***addressing the Company's weak sales, improving gross margins, [and] optimizing inventory levels.***"

79. ████████████████████████████████████████

████████████████████████████████████████.[1]

80. ████████████████████████████████████████

████████████



81. ████████████████



82.     That same day, the Company issued a press release, announcing the Board members' departure, and the formation of the Business Transformation and Strategy Review Committee.[4]



[1] ████████████████████████████████████████████

[2] ████████████

[4] Ex. 2.

83.     In early May 2019, Bed Bath's then-CEO Steven Temares resigned from his role, and Winston, who had been named to the Board a few days prior, was named as the Company's interim CEO, and eight new directors were appointed to the Board.

84.



85.

86.

87.

19

88.   ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████[11]

89.   According to a Form 8-K filed with the SEC[12] on June 3, 2019, the following

individuals had been named to the BTSRC:

Andrea M. Weiss, Chair
John E. Fleming
Patrick R. Gaston
Jeffrey A. Kirwan
Johnathan B. Osborne
Harsha Ramalingam

90.   ████████████████████████████████████

████████████████████████████████████████[13]



---

[11] ██

[12] Ex. 6.

[13] ████████████████████████████████████████████

[14] ████████████████████████████████████

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 26 of 229 PageID: 814



91.    ████████████████ [15]

92.    On July 10, 2019, as part of the Fiscal 2019 First Quarter Earnings Call, the Company issued a PowerPoint presentation.[16] That presentation disclosed, as part of "Critical Work of the Board of Directors," that the Company had "Formed the Business Transformation and Strategy Review Committee," which would "Review and evaluate the ongoing business transformation" and "Make recommendations on how to accelerate the Company's evolution."[17]

93.    ████████████████████████████████

████████████████████████ [18]

---

[15] ████████████████.
[16] Ex. 8.
[17] *Id.* at p. 5
[18] ████

94. ███████████████████████████████████████ █████████

███████



95. ████████████████████████████████████████

████████████████████

96. ████████████████████████████████████████

██████████████████████████████████████████

█████████████████ [21]

97. ███████████████████████████ ██████████████████

██████████████████████████████████████████████ ██

████████████████████████████████

        ████████████████████████████████████

─────────────────────────

[19] ███████████████████████.
[20] ██████
██ ████████████████
███████████████████████████████████████
██████████████████

Case 2:20-cv-08673-MCA-MAH Document 27-6 Filed 01/04/22 Page 28 of 229 PageID: 816



Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 29 of 229 PageID: 817



102.

30

103.

31

104.

32

105.

33

24

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 30 of 229 PageID: 818



108.    On September 4, 2019, Winston issued a letter[38] to Bed Bath's shareholders and announced the Board's and management's key priorities, which were: "stabilizing and driving top-line growth; resetting the cost structure; reviewing and optimizing the Company's asset base, including the portfolio of retail banners; and refining Bed Bath & Beyond's organization



[38] Ex. 16.

25

structure." The letter further provided that the Company's plan for reviewing and optimizing its asset base was:

> ***An aggressive reduction of up to $1 billion of inventory is expected to be executed over the next 18 months, including the removal of excess aged inventory from our stores anticipated before the 2019 holiday season.*** This effort should allow us to quickly reset inventory levels in both our stores and distribution centers, as well as refresh our assortment, providing for newness and higher-margin products, all in an effort to drive customer traffic and support top-line performance.

109.



110.

111.     On October 2, 2019, the Company filed a Form 8-K with the SEC reporting BED BATH's 2019 second quarter results. The Form 8-K announced that more than "$350M of inventory (at retail) to be removed from Bed Bath & Beyond stores before 2019 holiday season" and quoted Winston's rosy statements concerning the new management's transformation plan, stating, in pertinent part:

> ***We are making good progress against our four key near-term priorities***, including: (1) stabilizing sales and driving top-line growth; (2) resetting the cost structure; (3) reviewing and optimizing the Company's asset base, including the portfolio of retail banners; and (4) refining our organization structure. ***Our second quarter financial results reflect the relentless effort of our teams and our progress in driving the Company's transformation efforts to delight our customers,***



*enhance our competitive position, improve our financial performance, and drive shareholder value*.

112.    The October 2nd Form 8-K also announced that "[f]or the fiscal 2019 second quarter, the Company reported a net loss of $1.12 per diluted share $138.8 million, which included an unfavorable impact of approximately $1.46 per diluted share from charges related to the first wave of transformation initiatives" and slightly lowered Company's 2019 fiscal year guidance for diluted earnings per share ("EPS") to between $2.08 and $2.13.

113.    Despite these negative results, during a conference call that same day, D'Elia downplayed the risks associated with the Company's "aggressive reduction" plan to review and optimize its asset base and stated that the transformation plan would not be "cannibaliz[ing] sales during holiday period."

114.    In fact, Winston reassured investors that the Company was managing the transformation plan "*thoughtfully to prevent cannibalization of sales*[,]" and trumpeted the Company's systems in place to prevent cannibalization of sales and stated that "[t]o *optimize this inventory off-load* the company is [*inter alia*] *employing markdown optimization software to speed the process*."

115.    Among other software, Bed Bath was utilizing Revionics' software, which enabled the management to access weekly inventory reports and real time data reflecting the progress of the new transformation plan.

116.    As revealed by the former employee statements referenced in the Securities Class Action Complaint,[41] senior Bed Bath management, including Winston and D'Elia, were receiving

---

[41] Ex. 19.

detailed Revionics reports demonstrating data on inventory levels, pricing, and margins and were

conducting weekly meetings at its Union, New Jersey Headquarters regarding the same.[42]

117.    Former employees also stated that the Company utilized JDA software for general

inventory management, which was geared towards "price optimization," as a secondary software

to Revionics.[43]

118.    On October 9, 2019, Bed Bath announced that Tritton would be the Company's

new CEO, replacing Winston.

119.    On the same day, the Company filed a Form 10-Q with the SEC and echoed

previous statements concerning transformation plan. With respect to the Company's inventory

levels, the Form 10-Q reported that:

> Retail inventory, which includes inventory in the Company's distribution facilities
> for direct to customer shipments, was approximately $2.3 billion at August 31,
> 2019, a decrease of 17.8% compared to retail inventory at September 1, 2018. The
> Company continues to focus on its inventory optimization strategies.



120.

---

[42] *Id.* at 5.
[43] *Id.* at 20.
[44]

Case 2:20-cv-08673-MCA-MAH Document 27-6 Filed 01/04/22 Page 34 of 229 PageID: 822



██████████████████████████████████████████████

██████████████████ [56]

125.    On December 17, 2019, Bed Bath announced via a press release an "extensive restructure of its leadership team, including departure of six senior members." According to the press release, the Chief Brand Officer, resigned the prior week and the Chief Merchandising Officer, Chief Marketing Officer, Chief Digital Officer, Chief Legal Officer & General Counsel, and Chief Administrative Officer were leaving their positions. This executive reshuffle reflected "the priorities of new President and CEO, Mark Tritton, who will launch his new vision for the Company in early 2020."

126.    

## II.    THE FAILURE OF THE TRANSFORMATION PLAN IS REVEALED

127.    Following the major leadership shakeup and the positive statements concerning the "aggressive" inventory reduction plan, the truth about the transformation plan was finally revealed on January 8, 2020. On that day, the Company filed its Form 8-K with the SEC, reporting its third

---

██
██
██
███████████████████████████████████████████████

quarter of 2019 results, and announced that the Company withdrew its financial guidance for 2019 fiscal year completely.

128. 

129. In particular part, the January 8, 2020 Form 8-K reported that:

The Company expects its sales and profitability to remain pressured during the fiscal 2019 fourth quarter. Considering these headwinds reflected in the Company's results to date, and the ongoing work by recently appointed President & CEO Mark Tritton to assess the business and finalize the details of the Company's go-forward strategic plan as well as the extensive senior leadership changes within the past month*, the Company believes it is appropriate to withdraw its fiscal 2019 full year financial guidance*.

130. On this news the Company's share price dropped almost 20%, falling $3.20 to close at $13.40 per share on January 9, 2020.

131. On February 11, 2020, the Company filed a Form 8-K with the SEC announcing preliminary, unaudited financial performance data for the first two months of the 2019 fourth quarter. These results showed that Bed Bath's "gross margin during the first two months of the fiscal 2019 fourth quarter *declined around 300 basis points primarily due to an unfavorable impact on merchandise margin from promotional activity* during the period."

132. Moreover, the results demonstrated "a 5.4% decline in comparable sales driven primarily by store traffic declines combined with *inventory management issues*" including that "inventory within *certain key categories* in the [Bed Bath's] assortment [were] *too low or out-of-*



*stock during the period*." More disturbingly, the Company announced that it is "*immediately reforming its internal planning* and inventory management procedures *to master the fundamentals*," indicating that the Company was not previously mastered the fundamentals with inventory issues, contrary to the public statements made regarding the transformation plan.

133.    On this news, Bed Bath's share price dropped again by over 20% to close at $11.79 per share on February 12, 2020, wiping out $388 million in market capitalization, on heavy trading volume.

134.    On February 18, 2020, during a conference call with the investors, Tritton admitted that Bed Bath's did not "*have price management floated properly* [] coming into the third and fourth quarter", which indicated that the transformation plan was significantly flawed from the start.  During the same call, Tritton detailed the inventory issues Bed Bath's was facing by stating:

> [Bed Bath's] had a double-edged sword in terms of inventory, and I would talk to, firstly, the negative in that we've been dealing with *some out-of-stocks in terms of our primary items that have been driving our business traditionally and that's what's hurt us in the third and fourth quarter*…. So on that inventory side, *we didn't have enough of the right stuff*…. We just need to course-correct in terms of the mix of merchandise and our focus.

135.    On April 15, 2020, Bed Bath's filed its Form 8-K with the SEC announcing its financial results for its 2019 fiscal fourth quarter and full year.  April 15th Form 8-K reported that 2019 fiscal years diluted EPS of $.46, which was a far cry from the Company's earlier expectations of $2.08 to $2.13. On the same day, during a conference call with the investors, Tritton acknowledged that Bed Bath's was aware of the inventory management issues, which were in part "*self-inflicted*."  In fact, he admitted that Bed Bath's was watching inventory issues "*hour by*

*hour*" in late November 2019 and they knew the Company was "***plagued by issues in December***

***[2019] and January.***"  In relevant part, he admitted that:

> ***We knew we were plagued by issues in December and January,…[s]ome of it was self-inflicted***.  I mean when we don't have best sellers in stock, ***we've got discounting and we don't have our inventory***.  I mean some of the sales decline we saw in our stores wasn't necessarily traffic.  ***We did some intel work on that, saw the customers were coming in, and they just couldn't find the product in stock***.  ***So we were shooting ourselves in the foot***.

136.     Moreover, during the same call, Tritton blamed Bed Bath's departure from coupon

marketing to an unprecedented promotion scheme for Bed Bath's "burn[ed]" inventory and

margins.  In particular part, he stated that:

> [W]*e entered into promotional activity in a way that we hadn't ever before*, Seth. I think that if we go back to the end of the third quarter, start of the fourth quarter, it was the first time ***we'd ever really been truly promotional outside of coupon. And we really didn't lay down the plans to get there in the right way***.  So ***we burn the margin and we burn a lot of inventory*** and ***weren't prepared to get back into stock***.  So they're kind of tough learnings.

137.     On April 30, 2020, Bed Bath announced that D'Elia had resigned. On July 14, 2020,

Bed Bath filed a Form 8-K with the SEC announcing its 2020 first quarter results. This Form 8-K

reported that the time frame for the "removal of about $1 billion of inventory at retail from [Bed

Bath's] stores" was extended from 18 months to 36 months.

## III.    PLAINTIFF RECEIVES BOOKS AND RECORDS FROM THE COMPANY, WHICH SHOW A DEARTH OF OVERSIGHT

138.     On February 9, 2021, Plaintiff sent the Books and Records Demand to the Company

seeking to investigate possible breaches of fiduciary duty and other wrongdoing relating to the

events described above.

139.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



34

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 40 of 229 PageID: 828



140. ████████████████████████████████████

████████████████████████████████████.

141. ████████████████████████████████████

███████████████████████████████████

142. ████████████████████████████████████

████████████████████████████████████████████

████████

143. ████████████████████████████████████.

144. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████.

145. ████████████████████████████████████

████████████████████.

146. The Board formed the BTSRC specifically to oversee the Company's transformation plan.

147. BTSRC Board members were amply compensated for service on that Committee.

148. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ [61]

149. ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

---

[61] ████████████████████

150. 

151.

## IV.      DAMAGES TO THE COMPANY

152.    As a result of the Defendants' failure to exercise oversight, the Company's credibility has been devastated, as demonstrated by the Company's 33% (approximately $752 million) market capitalization loss, that occurred once the truth emerged.

153.    Due to the Board's failure to fully oversee the Company's transformation plan, the Company incurred significant lost revenue in the second half of 2019.

154.    Further, by failing to oversee the Company's transformation plan, the Board negatively impacted Bed Bath's ability to attract new customers, and retain existing ones.

155.    And, Bed Bath has expended costs incurred investigating and defending the Company, Tritton, Winston, and D'Elia in the Securities Class Action, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment.

156.    The Company has paid director and executive compensation, bonuses, and benefits paid to individuals breaching their fiduciary duties, including during the Period in which the Board, and BTSRC, completely abnegating its responsibilities.

157.    Finally, between October 27, 2019, and December 28, 2019                the Company repurchased nearly 120,000 shares of its common stock, at vastly inflated rates, overpaying by

36

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 42 of 229 PageID: 830

hundreds of thousands of dollars. Additionally, the Company also repurchased 2,600 shares between December 29, 2019 and January 25, 2020, and 5,400 shares between January 26, 2020 and February 29, 2020 at artificially inflated prices.

158. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████

159. Thus, the continued repurchases at inflated prices are attributable to the Board's failure to conduct oversight.

## V.   DERIVATIVE ALLEGATIONS

160. Plaintiff brings this action derivatively in the right of and for the benefit of the Company to redress injuries suffered, and to be suffered, by the Company as a direct result of the violations of state and federal law, including breaches of fiduciary duty by the Defendants named herein.

161. The Company is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. The Company was a stockholder of the Company at the time of the transgressions of which he complains and continues to be a stockholder of the Company. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in prosecuting and enforcing

37

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 43 of 229 PageID: 831

their rights. Prosecution of this action, independent of the current Board, is in the best interests of the Company.

162.    The wrongful acts complained of herein subject, and will continue to subject, The Company to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

### VI.    DEMAND FUTILITY

163.    Plaintiff has not made a demand on the Board to institute this action against the Defendants. Such demand would be futile and useless because, at the time this shareholder derivative litigation was initiated, the Board was incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

164.    The current Board of Bed Bath consists of twelve (12) directors: Mark J. Tritton, Harriet Edelman, John Fleming, Sue E. Gove, Jeffrey Kirwan, Johnathan B. Osborne, Harsha

Ramalingam, Virginia P. Ruesterholz, Joshua Schechter, Andrea Weiss, Mary A. Winston, and Ann Yerger (the "Demand Board").

165.    If demand futile against seven (7) of the twelve (12) Current Board Defendants, demand would be futile. And here, demand is futile for all the Current Board Defendants.

166.    First, the Current Board Defendants Tritton and Winston are named defendants in the Securities Class Action and could not consider instituting this litigation without compromising their defense of the Securities Class Action.

167.    Second, the Current Board Defendants Tritton, Winston, Weiss, Fleming, Kirwan, Osborne, and Ramalingam all served on the BTSRC and received additional compensation for so doing.

168.    ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████

169.    ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████

Case 2:20-cv-08673-MCA-MAH    Document 27-6    Filed 01/04/22    Page 45 of 229 PageID: 833

170.    

171.    Accordingly, having failed to exercise the most basic functions of prudential oversight, the entire Board faces a substantial likelihood of liability for their breaches of fiduciary duties, so any demand on them is futile.

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against all Defendants)

172.    Plaintiff incorporates by reference and re-alleges each and every allegation contained in paragraphs 1 to 171, as though fully set forth herein.

173.    Each of the Board Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Board Defendants owed the Company the highest obligation of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to stockholders.

174.    These Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to the Company's stockholders.

175.    Each of these Defendants failed to conduct proper oversight of the Company, as described above.

176.    Such conduct could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

177.    In addition, by their actions alleged herein, the Defendants, either directly or through aiding and abetting one another, abandoned and abdicated their responsibilities and

fiduciary duties with regard to prudently managing the assets and business of Bed Bath in a manner consistent with the operations of a publicly-held corporation.

178.    As a direct and proximate result of the breaches of duty alleged herein, the Company has sustained and will sustain significant damages.

179.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duty
### (Derivatively Against the Current Board Defendants)

180.    Plaintiff incorporates by reference and re-alleges each and every allegation contained in paragraphs 1 to 171, as though fully set forth herein.

181.    Each of the Board Defendants owe and owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Current Board Defendants owed and owe the Company the highest obligation of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to stockholders.

182.    Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, and fair dealing by allowing the Company to continue to repurchase shares, while they remained ignorant of the state of the Company's transformation process.

183.    As a direct and proximate result of the breaches of duty alleged herein, Bed Bath has sustained and will sustain significant damages.

41

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 47 of 229 PageID: 835

184.    Plaintiff, on behalf of the Company has no adequate remedy at law.

### COUNT III

**Unjust Enrichment**
**(Derivatively Against all Defendants)**

185.    Plaintiff incorporates by reference and re-alleges each and every allegation contained in paragraphs 1 to 171, as though fully set forth herein.

186.    By violating and breaching their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to the Company's stockholders and failing to conduct proper oversight of the Company, the Board Defendants were unjustly enriched at the expense of and to the detriment of the Company. The Board Defendants were unjustly enriched as a result of the excessive compensation they received while breaching fiduciary duties owed to Bed Bath.

187.    Plaintiff, as a stockholder and representative of Bed Bath, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

188.    Plaintiff, on behalf of Bed Bath, has no adequate remedy at law.

### COUNT IV

**Waste of Corporate Assets**
**(Derivatively Against the Current Board Defendants)**

189.    Plaintiff incorporates by reference and re-alleges each and every allegation contained in paragraphs 1 to 171, as though fully set forth herein.

190.    As a result of their self-dealing, the Company has wasted its valuable assets by paying the Defendants' excessive compensation.

191.    Moreover, while the Board Defendants were violating and breaching their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to the

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 48 of 229 PageID: 836

Company's stockholders and failing to conduct proper oversight of the Company, they also caused the Company to repurchase its own stock at an artificially inflated prices and wasted Bed Bath's assets.

192.    As a result of the waste of corporate assets, the Board Defendants are liable to the Company.

193.    Plaintiff, on behalf of Bed Bath, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

a.    Against all of the Defendants and in favor of Bed Bath for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

b.    Directing Bed Bath to take all necessary actions to reform and improve its corporate governance and internal procedures to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder votes resolutions and amendments to the By-Laws and Articles of Incorporation, and any other measures able to guard against a repetition of the circumstances described herein, including measures to reform the Company's internal governance documents and Board charters;

c.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

d.    And such other relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:        June  11, 2021

43

Respectfully submitted,

**NEWMAN FERRARA LLP**

 *s/Roger A. Sachar*
Roger A. Sachar
1250 Broadway, 27th floor
New York, NY 10001
Telephone: (212) 619-5400
Facsimile: (212) 619-3090
*rsachar@nfllp.com*

**KAHN SWICK & FOTI, LLC**
Melinda A. Nicholson
Nicolas Kravitz
100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 648-1842
Facsimile: (504) 455-1498
*melinda.nicholson@ksfcounsel.com*
*nicolas.kravitz@ksfcounsel.com*

44

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 50 of 229 PageID: 838

## VERIFICATION

I, ROGER A. SACHAR, an attorney duly admitted to practice law before the Courts of the State of New York, hereby affirms the truth of the following under the penalties of perjury and pursuant to CPLR 2106:

1. I am the attorney in the above-entitled action with offices located at 1250 Broadway, 27th Floor, City of New York, County of New York.

2. I have read the foregoing complaint, and know the contents thereof, which are a true to the best of my knowledge, except as to the matters stated to be alleged upon information and belief, and with respect to those matters, I believe them to be true.

3. The reason this verification is made by me instead of the plaintiff is because the plaintiff is not within New York City, which is where the undersigned has his office.

Executed this 11th   day of June, 2021.

*s/Roger A. Sachar*
ROGER A. SACHAR

45

# EXHIBIT Q

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 52 of 229 PageID: 840

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| IN RE BED BATH & BEYOND INC. STOCKHOLDER DERIVATIVE LITIGATION | Lead Case: 516051/2020 |
| This Document Relates To: ALL ACTIONS | **CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

COMES NOW, Plaintiffs Mark Anthony and Robert Schneider ("Plaintiffs"), derivatively and on behalf of nominal defendant Bed Bath and Beyond, Inc. ("Bed Bath" or the "Company") against certain current and/or former members of Bed Bath's board of directors (the "Board") and/or its officers for breaching their fiduciary duties. Plaintiffs base their allegations on personal knowledge as to their own acts, and on information and belief as to all other allegations, based upon due investigation by counsel, including: (a) review and analysis of public filings made by the Company and other persons with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications caused to be disseminated by certain of the Defendants and other persons; (c) review of news articles, stockholder communications, and postings on Bed Bath's website concerning the Company's public statements; (d) review and analysis of complaints and other related materials in litigation commenced by and/or against the Company and/or its affiliates; (e) review of correspondence by and between Plaintiffs' counsel and counsel for Bed Bath; (f) documents (the "Production") produced by the Company in response to Plaintiff Anthony's demand (the "Demand") made pursuant to N.Y. Bus. Corp. L. Section 624 and New York common law; and (g) review of other publicly available information concerning Bed Bath and other persons.

1

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 53 of 229 PageID: 841

## INTRODUCTION AND OVERVIEW

1.      This is a stockholder derivative action brought by stockholders of Bed Bath on behalf of the Company against Defendants seeking to remedy violations of New York law, and harm resulting therefrom, from at least October 2019 to February 2020 that have caused, and continue to cause, substantial monetary losses to Bed Bath and other damages, including damages to the Company's reputation and goodwill.

2.      Bed Bath is a big box retailer, focusing primarily on domestic merchandise and home furnishings. In addition to its Bed Bath and Beyond stores, Bed Bath operates under brand names such as Christmas Tree Shops, Harmon, buybuy BABY and Cost Plus World Market.

3.      In May 2019, as part of the resolution of an intense proxy contest led by three hedge funds raising concerns about severe mismanagement, the Company's CEO and several Board members resigned. Four remaining members of the pre-existing Board remained and were joined by eight new directors.

4.      Defendant Mary A. Winston ("Winston") who had been head of the Company's Audit Committee, was named as the interim Chief Executive Officer ("CEO"), and a search for a new CEO commenced.

5.      Around the same time Winston took temporary control of the Company, Bed Bath announced the creation of a "Business Transformation and Strategy Review Committee" (the "BTSRC"), which would be comprised of individual Board members.

6.      The BTSRC was ostensibly to spearhead four "priorities" to turn around the Company.

7.      Chief among these priorities was to "aggressively reduce up to $1 billion of inventory at retail."

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 54 of 229 PageID: 842

8.      For purportedly serving on the BTSRC, various Board members received additional compensation.

9.       .

10.      .

11.      Like many retailers focusing on the domestic markets, Bed Bath's business is seasonal, and heavily tilted towards the holiday season; its busiest months are November and December.

12.      As part of its leadership shakeup, Bed Bath announced that "[i]n the short term, more than approximately $350 million of inventory will be removed from our stores before the 2019 holiday season."

13.      To monitor this inventory reduction, while still maintaining existing inventory to ensure that the Company's shelves were stocked with key items for the upcoming holiday season, Bed Bath utilized "markdown optimization software," manufactured by a company known as Revionics, which purportedly enabled the Company's leadership to "thoughtfully" and "meaningfully" decrease aged and excess inventory, while still guarding the Company against margin erosion and sales cannibalization.

14.      On October 9, 2019, Bed Bath named Defendant Mark Tritton ("Tritton") as its new CEO, replacing Defendant Winston. For her roughly six months of work, Winston received

3

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 55 of 229 PageID: 843

approximately $550,000 in salary, and $1.9 million in stock. Tritton officially took charge on November 4, 2019, and adopted Winston's inventory reduction plan.

15. 

16.

17.

18.    Had the Board conducted full oversight of the Company's operations and inventory, they would have known that the Company had "poor inventory management" that led to margin erosion, cannibalized sales, and empty store shelves during the Company's most important sales period.

19.    On December 17, 2019, there was an additional major shakeup in the Company's leadership. On that date, the Company announced that Tritton had terminated its Chief Merchandising Officer, Marketing Officer, Digital Officer, General Counsel, and Chief Administrative Officer.

20.

21.

4

████████████████████████████████████████████████████

██████████████████████████ .

22.     On January 8, 2020, the truth gradually began to emerge, when Bed Bath completely withdrew its FY 2019 guidance. Bed Bath also reported a 3Q2109 adjusted loss of earnings per diluted share of $.38 (analysts had predicted a $.02 profit per diluted share), and an 8.3% plunge in comparable sales.

23.     Completely withdrawing earnings guidance is exceedingly rare— ████████████

████████████████████████████████████████████████████

██████████████████████████████████

24.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

25.     Tritton explained that the poor performance "was impacted to some extent by self-inflicted issues, like poor inventory management[.]"

26.     On this news, the Company's stock fell 19%.

27.     ████████████████████████████████████████

████████████████████

28.     ████████████████████████████████████████

████████████████████████████████

29.     Not until February 11, 2020 was the full depth of the Company's holiday season problem revealed.

5

30.     On that date, the Company revealed that its poorly-executed inventory reduction plan had backfired, and disclosed a "5.4% decline in comparable sales driven primarily by store traffic declines combined with inventory management issues," which included "inventory within certain key categories in the [Bed Bath] assortment [were] too low or out-of-stock during the period."

31.     In other words, because of the inventory reduction plan, the Company's shelves were missing key sales items during the Company's most important sales period.



32.     ████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████.

33.     Making matters worse, ██████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████ the Company was repurchasing shares, including: 76,700 shares between October 27, 2019 and November 30, 2019; 30,900 shares between December 1, 2019 and December 29, 2019; 2,600 shares between December 29, 2019 and January 25, 2020; and an additional 5,400 shares between January 26, 2020 and February 29, 2020.

34.     ████████████████████████████████████████████
████████████████████████.

35.     No prudent board would have continued to repurchase its company's stock, at inflated rates, knowing its stock price did not reflect severe inventory management issues.

36.     Following the corrective disclosures, Plaintiff Anthony sent a demand for books and records to the Company pursuant to N.Y. Bus. Corp. L. Section 624 and New York common

6

law to investigate possible breaches of fiduciary duty and other wrongdoing relating to the events described herein.

37.     After receiving the Demand and conferring with counsel, the Company agreed to produce a subset of the documents requested in the Demand (the "Production").

38.     Over the next few months, the Company, through counsel, provided █████████

█████████████████████████

39.     ███████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████.

40.     As a result of the Board's abject failure to oversee the Company's operations, Bed Bath, along with Tritton, Winston, and Defendant Robyn M. D'Elia ("D'Elia"), Bed Bath's former Chief Financial Officer ("CFO") (who participated in the investor calls and public statements where the misstatements were made), are defendants in a securities class action, styled *Vitello, et ano. v Bed Bath & Beyond, Inc.*, *et al.*, No. 2:20-cv 04240 (D.N.J.) (the "Securities Class Action").

41.     Plaintiffs have instituted this action derivatively, because demand on the current Board would be a useless and futile act.

42.     ███████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████ In the wake of that dereliction, the Company suffered severe financial and reputational harm.

**JURISDICTION AND VENUE**

43.     This Court has jurisdiction over the Nominal Defendant pursuant to CPLR Section

7

301 in that Bed Bath is a New York corporation, regularly transacts business in the State of New York, and the events giving rise to this Complaint occurred, in whole or in part, within the State of New York.

44.     This Court has jurisdiction pursuant to CPLR Section 301 over all the Defendants based on their current or former membership on Bed Bath's Board and in light of the fact that their actions giving rise to this Complaint occurred, in whole or in part, within the State of New York.

45.     Venue is proper in this Court under CPLR Section 503(a) because one or more of the parties reside or maintains executive offices in Kings County, a sufficient portion of the transactions and wrongs described herein took place in Kings County, and Defendants received substantial compensation in Kings County by doing business here and engaging in numerous activities that had an effect in Kings County.

## **PARTIES**

46.     Plaintiff Michael A. Anthony was a shareholder of Bed Bath during the time of the wrongdoing complained of herein, has continuously been a shareholder of Bed Bath since that time, and remains a current shareholder of Bed Bath.

47.     Plaintiff Robert Schneider was a stockholder of Bed Bath & Beyond at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and remains a current shareholder of Bed Bath.

48.     Nominal Defendant Bed Bath & Beyond, Inc. is a New York corporation with its corporate headquarters located at 650 Liberty Avenue Union, New Jersey 07083.

49.     Defendant Tritton has been a Bed Bath director, President & CEO and since November 2019. Between November 2019 to June 2020, Defendant Tritton was a member of the BTSRC. Defendant Tritton is also a defendant in the Securities Class Action. For 2019 fiscal year,

8

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 60 of 229 PageID: 848

in exchange of his purported trust, loyalty, and fidelity to Bed Bath, Defendant Tritton received $13,764,398, in total compensation.

50.     Defendant Mary A. Winston has been a Bed Bath director since May 2019. Between May 2019 to November 2019, Defendant Winston served as Bed Bath's interim CEO. Between November 2019 to June 2020, Defendant Winston was a member of the BTSRC. Defendant Winston is also a defendant in the Securities Class Action. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant Winston received $2,480,006, in total compensation.

51.     Defendant Robyn M. D'Elia was Bed Bath's CFO from July 2018 to May 2020. Defendant D'Elia is a defendant in the Securities Class Action. Between 2015 to 2018, Defendant D'Elia was Bed Bath's Vice President of Finance. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant D'Elia received $2,334,406, in total compensation.

52.     Defendant Stephanie Bell-Rose ("Bell-Rose") has been a Bed Bath director from May 2018 to the present. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant Bell-Rose received $175,190, in total compensation.

53.     Defendant Harriet Edelman ("Edelman") has been a Bed Bath director from May 2019 to the present. Defendant Edelman served as Chairperson of the Company's Audit Committee from July 2019 to May 2020. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant Edelman received $182,532, in total compensation.

54.     Defendant John E. Fleming ("Fleming") has been a Bed Bath director from May 2019 to the present. Between July 2019 to June 2020, Defendant Fleming was a member of the BTSRC. For 2019 fiscal year, in exchange of his purported trust, loyalty, and fidelity to Bed Bath,

9

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 61 of 229 PageID: 849

Defendant Fleming received $174,479, in total compensation. Defendant Fleming's 2019 compensation included an additional $10,000 for his purported service in the BTSRC.

55.  Defendant Patrick R. Gaston ("Gaston") was a Bed Bath director from 2007 to May 2020. Defendant Gaston served as Chairman of the Board between April 2019-May 2020. Defendant Gaston also served on the BTSRC from July 2019 to June 2020. For 2019 fiscal year, in exchange of his purported trust, loyalty, and fidelity to Bed Bath, Defendant Gaston received $423,943, in total compensation. Defendant Gaston's 2019 compensation included an additional $10,000 for his purported service in the BTSRC.

56.  Defendant Sue E. Gove ("Gove") has been a Bed Bath director from May 2019 to the present. In 2019, Defendant Gove served on the Company's Nominating and Corporate Governance Committee. Since August 2020, Defendant Gove has been a member of the Company's Audit Committee. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant Gove received $159,294, in total compensation.

57.  Defendant Jeffrey A. Kirwan ("Kirwan") has been a Bed Bath director from May 2019 to the present. Defendant Kirwan served on the BTSRC from July 2019 to June 2020. For 2019 fiscal year, in exchange of his purported trust, loyalty, and fidelity to Bed Bath, Defendant Kirwan received $157,099, in total compensation. Defendant Kirwan's 2019 compensation included an additional $10,000 for his purported service in the BTSRC.

58.  Defendant Johnathan B. Osborne ("Osborne") has been a Bed Bath director from April 2018 to the present. Between July 2019 to June 2020, Defendant Osborne was a member of the Company's Audit Committee. Additionally, Defendant Osborne was a member of the BTSRC between July 2019 to June 2020. For 2019 fiscal year, in exchange of his purported trust, loyalty, and fidelity to Bed Bath, Defendant Osborne received $195,379, in total compensation. Defendant

10

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 62 of 229 PageID: 850

Osborne's 2019 compensation included an additional $10,000 for his purported service in the BTSRC.

59.  Defendant Harsha Ramalingam ("Ramalingam") has been a Bed Bath director from May 2019 to the present. Defendant Ramalingam was a member of the BTSRC between July 2019 to June 2020. For 2019 fiscal year, in exchange of his purported trust, loyalty, and fidelity to Bed Bath, Defendant Ramalingam received $168,610, in total compensation. Defendant Ramalingam's 2019 compensation included an additional $10,000 for his purported service in the BTSRC.

60.  Defendant Virginia P. Ruesterholz ("Ruesterholz") has been a Bed Bath director since 2017. Defendant Ruesterholz is the Chairperson of the Nominating and Corporate Governance Committee. Defendant Ruesterholz is also a member of the Company's Audit Committee and has been since July 2019. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant Ruesterholz received $204,015, in total compensation.

61.  Defendant Joshua Schechter ("Schechter") has been a Bed Bath director from May 2019 to the present. Since June 2020, Defendant Schechter has been the Chairperson of the Company's Audit Committee. For 2019 fiscal year, in exchange of his purported trust, loyalty, and fidelity to Bed Bath, Defendant Schechter received $157,099, in total compensation.

62.  Defendant Andrea Weiss ("Weiss") has been a Bed Bath director from May 2019 to the present. Defendant Weiss is a member of the Audit Committee. Between July 2019 to June 2020, Defendant Weiss was also served as the Chairperson of the BTSRC. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant Weiss received $180,505, in total compensation. Defendant Weiss' 2019 compensation included an additional $20,000 for her purported service as a Chair in the BTSRC.

11

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 63 of 229 PageID: 851

63.     Defendant Ann Yerger ("Yerger") has been a Bed Bath director from May 2019 to the present. Defendant Yerger is a member of Compensation Committee and Nominating and Corporate Governance Committee. For 2019 fiscal year, in exchange of her purported trust, loyalty, and fidelity to Bed Bath, Defendant Yerger received $166,886, in total compensation.

64.     Defendants Tritton, Edelman, Fleming, Gove, Kirwan, Osborne, Ramalingam, Ruesterholz, Schechter, Weiss, Winston, and Yerger are referred to herein as the "Current Board Defendants."

65.     Collectively, the Current Board Defendants and Gaston, are referred to herein as the "Board Defendants."

## GENERAL FIDUCIARY DUTIES OF THE DEFENDANTS

66.     The Board Defendants had and have stringent fiduciary obligations to Bed Bath and its shareholders.

67.     By reason of their positions as Officers, Directors, and/or Fiduciaries of Bed Bath the Board Defendants owed and owe Bed Bath and its shareholders fiduciary obligations of loyalty, good faith, due care, disclosure, and candor and were and are required to use their utmost ability to control and manage Bed Bath in a fair, just, honest, and equitable manner. The Board Defendants were and are required to act in furtherance of the best interest of Bed Bath, and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interest or benefits.

68.     Each director and officer of Bed Bath owed and owes to Bed Bath and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets and to uphold the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to disseminate promptly accurate and truthful

12

Case 2:20-cv-08673-MCA-MAH Document 27-6 Filed 01/04/22 Page 64 of 229 PageID: 852

information with regard to the Company and its financial health and growth prospects.

69.     The Board Defendants, because of their positions of control and authority as directors and/or officers of Bed Bath were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of various public statements issued by Bed Bath. Because of their advisory, executive, managerial, and directorial positions with Bed Bath, each of the Board Defendants had access to adverse, non-public, material information about the operations of Bed Bath.

70.     At all times relevant hereto, each Board Defendant was the agent of the other Defendants and of Bed Bath and was at all times acting within the course and scope of such agency.

71.     To discharge their duties, the officers and directors of Bed Bath were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the operational affairs of the Company. By virtue of such duties, the officers and directors of Bed Bath were required to, among other things:

a.  Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

b.  Ensure that the Company complied with all legal obligations and requirements, including state and federal laws relating to the procurement regulations.

c.  Ensure that the Company was operated in a diligent, honest, and prudent manner.

72.     Each of the Board Defendants, by virtue of their position as a director and/or officer

13

of Bed Bath, owed to the Company and to its shareholders the fiduciary duties of loyalty, good

faith, due care, disclosure and candor in the management and administration of the affairs of the

Company. The conduct of the Board Defendants complained of herein involves a knowing and

culpable violation of their obligations as directors and officers of Bed Bath, the absence of good

faith on their part, and a reckless disregard for their duties to the Company and its stockholders.

The Board Defendants were aware, or should have been aware, that those violations, absences of

good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.

73.     Because of their positions with the Company, and their access to material non-

public information available to them, Bed Bath, through the Board Defendants, knew that the

adverse facts specified herein had not been disclosed to and were being concealed from the public.

As a result of the Board Defendants' misconduct, the Company has suffered significant damages.

Further, various Company executives, as described herein, misled investors and allowed the

Company to breach its customer contracts for which the Company stands liable.

### DUTIES DERIVED FROM THE COMPANY'S CORPORATE GOVERNANCE DOCUMENTS

74.     According to the Company's Policy of Ethical Standards for Business Conduct, the

Company's employees', executives' and board members' responsibilities are described as follows:

> All individuals shall conduct their business affairs on behalf of the Company in
> accordance with all applicable laws of the United States and other governmental
> jurisdictions in which the Company does business, and shall observe the highest
> standards of business ethics. Specifically, and without limitation: …
>
> • All individuals must display the highest standard of legal and ethical
> behavior with respect to the intellectual property rights of third parties.
>
> • All individuals involved in the preparation, review and filing of financial
> reports and other information for public disclosure regarding the Company
> must accurately record all financial dealings and comply with the laws and
> regulations regarding such activities. All associates who provide

14

information as a part of this process must comply with the Company's disclosure controls and procedures.

75.     According to the Company's Corporate Governance Guidelines, the Company's

board members' responsibilities are described as follows:

> As part of its oversight responsibility, the Board receives at least annually a report on the material risks facing the Corporation, which risks are identified through the Corporation's Enterprise Risk Management ("ERM") process. This report is presented to the Audit Committee by a committee of key executives representing legal, finance and internal audit (the "Executive Risk Committee"), and results from a formal process where members of the Executive Risk Committee meet with executives of each principal business function to identify and assess the significant risks in each such business function's areas of responsibility. The members of the Executive Risk Committee then analyze with those executives what risk mitigation efforts are or should be in place to eliminate or reduce such risks to acceptable levels, where possible, and then engage on these matters with the Audit Committee, which then reports to the full Board. In the annual ERM report, areas of risk and mitigation efforts reviewed with the Audit Committee and the full Board, in furtherance of the Board's oversight responsibilities, generally include: general business risks, such as economic forces, competition and weather; employment-related risks, such as recruitment and retention, succession, labor costs and associate relations; data security risks with respect to the Corporation, associate and customer data; compliance risks associated with the range of legal, accounting, tax and financial reporting systems under which the Corporation operates; supply chain risks, including disruption arising from political instability or labor disturbances, supplier financial stability and legal compliance; and compliance with a variety of product, labor, social and environmental standards. The Audit Committee and the full Board are updated on certain risks more frequently than annually, upon request or as developments warrant.

> The ERM process and report to the Audit Committee, and the Audit Committee's report to the full Board, also informs the more detailed Risk Factor disclosure in the Corporation's annual report on Form 10-K, filed with the Securities and Exchange Commission.

76.     According to the Charter of the Audit Committee of the Board of Directors of Bed

Bath, the Audit Committee members' responsibilities are described as follows:

> The Committee shall oversee the Corporation's accounting and financial reporting processes and the audits of the Corporation's financial statements.

> The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of any registered public accounting firm engaged (including resolution of disagreements between management and the

15

Case 2:20-cv-08673-MCA-MAH    Document 27-6    Filed 01/04/22    Page 67 of 229 PageID: 855

Corporation's outside auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Corporation. Each such registered public accounting firm shall report directly to the Committee.

***

Review with management and the outside auditor significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including analyses of critical accounting policies and analyses of the effects of alternative GAAP methods on the financial statements.

The Committee shall review the Corporation's annual audited financial statements, including any certification, report or opinion rendered by the Corporation's outside auditor, and discuss the same with management and the auditor. The Committee shall recommend to the Board whether the annual financial statements should be included in the Corporation's Annual Report on Form 10-K.

The Committee shall review and discuss with the Company's outside auditors and management the Company's quarterly financial statements and review and discuss the Company's quarterly reports on Form 10-Q and annual reports on Form 10-K before such reports are filed with the Securities Exchange Commission (the "SEC"), including the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

***

The Committee shall review with management the Corporation's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, the outside auditors' report on the effectiveness of the Corporation's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

77.     According to the Charter of the Nominating and Corporate Governance Committee of the Board of Directors of Bed Bath, the Committee members' responsibilities are described as follows:

The Committee shall review the Board's committee structure and composition and make recommendations to the Board regarding the performance, composition,

16

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 68 of 229 PageID: 856

duties and responsibilities of each committee and the appointment of directors to serve as members and chairs of each committee.

<div align="center">***</div>

The Committee shall review and evaluate the compensation of directors annually, including the appropriate mix of cash compensation and equity compensation, and make recommendations to the Board regarding director compensation.

<div align="center">

## SUBSTANTIVE ALLEGATIONS

</div>

## I.   THE COMPANY'S TRANSFORMATION PLAN

78.     Bed Bath is a retailer that sells a wide assortment of domestic merchandise and home furnishings.

79.     On April 17, 2019, a group of activist shareholders filed a Proxy Statement with the SEC pressuring the Company to restructure its leadership, to whom it attributed a decade of underperformance. The activist shareholders critiqued the Company's directors' "lack of relevant retail expertise and stale perspectives" and demanded that the Company undertake series of changes to address the Company's stagnant inventory and weak margins. The Proxy Statement stated that the activist shareholders' "slate of director nominees is committed to executing on a strategic plan" prioritizing initiatives such as "***addressing the Company's weak sales, improving gross margins, [and] optimizing inventory levels.***"

80.

81.



<div align="center">17</div>



82.    ▬▬▬▬▬▬▬:

WHEREAS, the Board of Directors has determined that it is appropriate to

83.     That same day, the Company issued a press release, announcing the Board members' departure, and the formation of the Business Transformation and Strategy Review Committee.[4]

84.     In early May 2019, Bed Bath's then-CEO Steven Temares resigned from his role, and Winston, who had been named to the Board a few days prior, was named as the Company's interim CEO, and eight new directors were appointed to the Board.

85.   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬.[5] ▬▬▬▬▬▬▬▬▬:



---

[2] ▬▬▬▬▬▬.
[3] ▬▬▬▬▬▬.
[4] Ex. 2.
[5] ▬▬▬▬▬▬▬▬▬▬▬▬
[6] ▬▬▬▬▬▬.

18

86. ████████████████████████████████████

████████████████ █ ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████.",8

87. ████████████████████████████████████

████████████████████████████████████████████

████████.",9

88. ████████████████████████████████████

████████████████████.10

89. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████.",11



Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 71 of 229 PageID: 859

90.    According to a Form 8-K filed with the SEC[12] on June 3, 2019, the following individuals had been named to the BTSRC:

Andrea M. Weiss, Chair
John E. Fleming
Patrick R. Gaston
Jeffrey A. Kirwan
Johnathan B. Osborne
Harsha Ramalingam

91.    ███████████████████████████████████

████████████████████████████████████████████.[13]



---

[12] Ex. 6.
[13] ████████████████████████████████████████
[14] Gallagher & Co., consultants to the Committee.

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 72 of 229 PageID: 860



92. ▮▮▮▮▮▮▮▮▮▮ .[15]

93.     On July 10, 2019, as part of the Fiscal 2019 First Quarter Earnings Call, the Company issued a PowerPoint presentation.[16] That presentation disclosed, as part of "Critical Work of the Board of Directors," that the Company had "Formed the Business Transformation and Strategy Review Committee," which would "Review and evaluate the ongoing business transformation" and "Make recommendations on how to accelerate the Company's evolution."[17]

94.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ,"[18]

---

[15] ▮▮▮▮▮▮▮▮ .
[16] 
[17] *Id.* at p. 5
[18]

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 73 of 229 PageID: 861



NYSCEF DOC. NO. 24
RECEIVED NYSCEF: 11/24/2021

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 74 of 229 PageID: 862



99.

100.

101.

102.

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 75 of 229 PageID: 863



103.

104.

105.

106.

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 76 of 229 PageID: 864



107. ██████████████████████████ ''34 █████████████

████████████████████████████ 35

108. ████████████████████████████████

████████████████████████████████████

██████████████████████ 36 ██████████████████

████████████████████████████████████

████████████████████████████████████

████████████ ''37

109.     On September 4, 2019, Winston issued a letter[38] to Bed Bath's shareholders and announced the Board's and management's key priorities, which were: "stabilizing and driving top-line growth; resetting the cost structure; reviewing and optimizing the Company's asset base, including the portfolio of retail banners; and refining Bed Bath & Beyond's organization

---



34 █████████████████
35 ███████████████████
36 ███████████████████████
37 ████████████████
38 Ex. 16.

structure." The letter further provided that the Company's plan for reviewing and optimizing its asset base was:

> ***An aggressive reduction of up to $1 billion of inventory is expected to be executed over the next 18 months, including the removal of excess aged inventory from our stores anticipated before the 2019 holiday season.*** This effort should allow us to quickly reset inventory levels in both our stores and distribution centers, as well as refresh our assortment, providing for newness and higher-margin products, all in an effort to drive customer traffic and support top-line performance.

110.



111.

112.     On October 2, 2019, the Company filed a Form 8-K with the SEC reporting BED BATH's 2019 second quarter results. The Form 8-K announced that more than "$350M of inventory (at retail) to be removed from Bed Bath & Beyond stores before 2019 holiday season" and quoted Winston's rosy statements concerning the new management's transformation plan, stating, in pertinent part:

> ***We are making good progress against our four key near-term priorities***, including: (1) stabilizing sales and driving top-line growth; (2) resetting the cost structure; (3) reviewing and optimizing the Company's asset base, including the portfolio of retail banners; and (4) refining our organization structure. ***Our second quarter financial results reflect the relentless effort of our teams and our progress in driving the Company's transformation efforts to delight our customers,***

---



Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 78 of 229 PageID: 866

*enhance our competitive position, improve our financial performance, and drive shareholder value*.

113.   The October 2nd Form 8-K also announced that "[f]or the fiscal 2019 second quarter, the Company reported a net loss of $1.12 per diluted share $138.8 million, which included an unfavorable impact of approximately $1.46 per diluted share from charges related to the first wave of transformation initiatives" and slightly lowered Company's 2019 fiscal year guidance for diluted earnings per share ("EPS") to between $2.08 and $2.13.

114.   Despite these negative results, during a conference call that same day, D'Elia downplayed the risks associated with the Company's "aggressive reduction" plan to review and optimize its asset base and stated that the transformation plan would not be "cannibaliz[ing] sales during holiday period."

115.   In fact, Winston reassured investors that the Company was managing the transformation plan "***thoughtfully to prevent cannibalization of sales***[,]" and trumpeted the Company's systems in place to prevent cannibalization of sales and stated that "[t]o ***optimize this inventory off-load*** the company is [*inter alia*] ***employing markdown optimization software to speed the process***."

116.   Among other software, Bed Bath was utilizing Revionics' software, which enabled the management to access weekly inventory reports and real time data reflecting the progress of the new transformation plan.

117.   As revealed by the former employee statements referenced in the Securities Class Action Complaint,[41] senior Bed Bath management, including Winston and D'Elia, were receiving

---

[41] Ex. 19.

27

detailed Revionics reports demonstrating data on inventory levels, pricing, and margins and were conducting weekly meetings at its Union, New Jersey Headquarters regarding the same.[42]

118.    Former employees also stated that the Company utilized JDA software for general inventory management, which was geared towards "price optimization," as a secondary software to Revionics.[43]

119.    On October 9, 2019, Bed Bath announced that Tritton would be the Company's new CEO, replacing Winston.

120.    On the same day, the Company filed a Form 10-Q with the SEC and echoed previous statements concerning the transformation plan. With respect to the Company's inventory levels, the Form 10-Q reported that:

> Retail inventory, which includes inventory in the Company's distribution facilities for direct to customer shipments, was approximately $2.3 billion at August 31, 2019, a decrease of 17.8% compared to retail inventory at September 1, 2018. The Company continues to focus on its inventory optimization strategies.

121.    

---

[42] *Id.* at 5.
[43] *Id.* at 20.
[44]
[45]
[46]
[47]



29

INDEX NO. 516051/2020
RECEIVED NYSCEF: 11/24/2021

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 81 of 229 PageID: 869



126.     On December 17, 2019, Bed Bath announced via a press release an "extensive restructure of its leadership team, including departure of six senior members." According to the press release, the Chief Brand Officer, resigned the prior week and the Chief Merchandising Officer, Chief Marketing Officer, Chief Digital Officer, Chief Legal Officer & General Counsel, and Chief Administrative Officer were leaving their positions. This executive reshuffle reflected "the priorities of new President and CEO, Mark Tritton, who will launch his new vision for the Company in early 2020."

127.



## II.      THE FAILURE OF THE TRANSFORMATION PLAN IS REVEALED

128.     Following the major leadership shakeup and the positive statements concerning the "aggressive" inventory reduction plan, the truth about the transformation plan was finally revealed on January 8, 2020. On that day, the Company filed its Form 8-K with the SEC, reporting its third

---



Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 82 of 229 PageID: 870

quarter of 2019 results, and announced that the Company withdrew its financial guidance for 2019

fiscal year completely.

129. 

130. In particular part, the January 8, 2020 Form 8-K reported that:

The Company expects its sales and profitability to remain pressured during the fiscal 2019 fourth quarter. Considering these headwinds reflected in the Company's results to date, and the ongoing work by recently appointed President & CEO Mark Tritton to assess the business and finalize the details of the Company's go-forward strategic plan as well as the extensive senior leadership changes within the past month*, the Company believes it is appropriate to withdraw its fiscal 2019 full year financial guidance*.

131. On this news the Company's share price dropped almost 20%, falling $3.20 to close

at $13.40 per share on January 9, 2020.

132. On February 11, 2020, the Company filed a Form 8-K with the SEC announcing

preliminary, unaudited financial performance data for the first two months of the 2019 fourth

quarter. These results showed that Bed Bath's "gross margin during the first two months of the

fiscal 2019 fourth quarter *declined around 300 basis points primarily due to an unfavorable*

*impact on merchandise margin from promotional activity* during the period."

133. Moreover, the results demonstrated "a 5.4% decline in comparable sales driven

primarily by store traffic declines combined with *inventory management issues*" including that

"inventory within *certain key categories* in the [Bed Bath's] assortment [were] *too low or out-of-*

---

[59] ▮

[60] ▮

*stock during the period*." More disturbingly, the Company announced that it is "*immediately reforming its internal planning* and inventory management procedures *to master the fundamentals*," indicating that the Company was not previously mastered the fundamentals with inventory issues, contrary to the public statements made regarding the transformation plan.

134.    On this news, Bed Bath's share price dropped again by over 20% to close at $11.79 per share on February 12, 2020, wiping out $388 million in market capitalization, on heavy trading volume.

135.    On February 18, 2020, during a conference call with the investors, Tritton admitted that Bed Bath's did not "*have price management floated properly* [] coming into the third and fourth quarter", which indicated that the transformation plan was significantly flawed from the start.  During the same call, Tritton detailed the inventory issues Bed Bath's was facing by stating:

> [Bed Bath's] had a double-edged sword in terms of inventory, and I would talk to, firstly, the negative in that we've been dealing with *some out-of-stocks in terms of our primary items that have been driving our business traditionally and that's what's hurt us in the third and fourth quarter*…. So, on that inventory side, *we didn't have enough of the right stuff*…. We just need to course-correct in terms of the mix of merchandise and our focus.

136.    On April 15, 2020, Bed Bath's filed its Form 8-K with the SEC announcing its financial results for its 2019 fiscal fourth quarter and full year.  April 15th Form 8-K reported that 2019 fiscal years diluted EPS of $.46, which was a far cry from the Company's earlier expectations of $2.08 to $2.13. On the same day, during a conference call with the investors, Tritton acknowledged that Bed Bath's was aware of the inventory management issues, which were in part "*self-inflicted*."  In fact, he admitted that Bed Bath's was watching inventory issues "*hour by*

*hour*" in late November 2019 and they knew the Company was "***plagued by issues in December [2019] and January.***" In relevant part, he admitted that:

> ***We knew we were plagued by issues in December and January,…[s]ome of it was self-inflicted***. I mean when we don't have best sellers in stock, ***we've got discounting and we don't have our inventory.*** I mean some of the sales decline we saw in our stores wasn't necessarily traffic. ***We did some intel work on that, saw the customers were coming in, and they just couldn't find the product in stock***. ***So we were shooting ourselves in the foot***.

137.    Moreover, during the same call, Tritton blamed Bed Bath's departure from coupon marketing to an unprecedented promotion scheme for Bed Bath's "burn[ed]" inventory and margins. In particular part, he stated that:

> [W]*e entered into promotional activity in a way that we hadn't ever before*, Seth. I think that if we go back to the end of the third quarter, start of the fourth quarter, it was the first time ***we'd ever really been truly promotional outside of coupon. And we really didn't lay down the plans to get there in the right way***. So ***we burn the margin and we burn a lot of inventory*** and ***weren't prepared to get back into stock***. So they're kind of tough learnings.

138.    On April 30, 2020, Bed Bath announced that D'Elia had resigned. On July 14, 2020, Bed Bath filed a Form 8-K with the SEC announcing its 2020 first quarter results. This Form 8-K reported that the time frame for the "removal of about $1 billion of inventory at retail from [Bed Bath's] stores" was extended from 18 months to 36 months.

## III.    THE COMPANY'S INTERNAL BOOKS AND RECORDS SHOW A DEARTH OF OVERSIGHT

139.    On February 9, 2021, Plaintiff Anthony sent the Books and Records Demand to the Company seeking to investigate possible breaches of fiduciary duty and other wrongdoing relating to the events described above.

140.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 85 of 229 PageID: 873



34

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 86 of 229 PageID: 874



147.    The Board formed the BTSRC specifically to oversee the Company's transformation plan.

148.    BTSRC Board members were amply compensated for service on that committee.



Case 2:20-cv-08673-MCA-MAH    Document 27-6    Filed 01/04/22    Page 87 of 229 PageID: 875

151. 

.

152.

## IV.      DAMAGES TO THE COMPANY

153.    As a result of the Defendants' failure to exercise oversight, the Company's credibility has been devastated, as demonstrated by the Company's 33% (approximately $752 million) market capitalization loss that occurred once the truth emerged.

154.    Due to the Board's failure to oversee the Company's transformation plan, the Company incurred significant lost revenue in the second half of 2019.

155.    Further, by failing to oversee the Company's transformation plan, the Board negatively impacted Bed Bath's ability to attract new customers, and retain existing ones.

156.    And, Bed Bath has expended costs incurred investigating and defending the Company, Tritton, Winston, and D'Elia in the Securities Class Action, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment.

157.    The Company has paid director and executive compensation, bonuses, and benefits to individuals breaching their fiduciary duties, including during the period in which the Board, and BTSRC, completely abnegated their responsibilities.

158.    Finally, between October 27, 2019, and December 28, 2019 _____ the Company repurchased nearly 120,000 shares of its common stock, at vastly inflated rates, overpaying by

36

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 88 of 229 PageID: 876

hundreds of thousands of dollars. Additionally, the Company also repurchased 2,600 shares between December 29, 2019 and January 25, 2020, and 5,400 shares between January 26, 2020 and February 29, 2020 at artificially inflated prices.

159. ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████.

160. Thus, the continued repurchases at inflated prices are attributable to the Board's failure to conduct oversight.

## V.    DERIVATIVE ALLEGATIONS

161. Plaintiffs bring this action derivatively in the right of and for the benefit of the Company to redress injuries suffered, and to be suffered, by the Company as a direct result of the violations of state and federal law, including breaches of fiduciary duty by the Defendants named herein.

162. The Company is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. The Plaintiffs were stockholders of the Company at the time of the transgressions of which they complain and continue to be stockholders of the Company. Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in prosecuting and enforcing

INDEX NO. 516051/2020
RECEIVED NYSCEF: 11/24/2021

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 89 of 229 PageID: 877

their rights. Prosecution of this action, independent of the current Board, is in the best interests of the Company.

163.    The wrongful acts complained of herein subject, and will continue to subject, the Company to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

## VI.    DEMAND FUTILITY

164.    Plaintiffs have not made a demand on the Board to institute this action against the Defendants. Such demand would be futile and useless because, at the time this shareholder derivative litigation was initiated, the Board was incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

165.    At the time this action was initiated, the Board of Bed Bath consists of twelve (12) directors: Mark J. Tritton, Harriet Edelman, John Fleming, Sue E. Gove, Jeffrey Kirwan, Johnathan B. Osborne, Harsha Ramalingam, Virginia P. Ruesterholz, Joshua Schechter, Andrea Weiss, Mary A. Winston, and Ann Yerger.

166.    If demand is futile against seven (7) of twelve (12) of these directors then demand on the Board would be futile. Here, demand is futile for all the Current Board Defendants.

167.    First, the Current Board Defendants Tritton and Winston are named defendants in the Securities Class Action and could not consider instituting this litigation without compromising their defense of the Securities Class Action.

168.    Second, the Current Board Defendants Tritton, Winston, Weiss, Fleming, Kirwan, Osborne, and Ramalingam all served on the BTSRC and received additional compensation for so doing. ██████████████████████████████████████████

██████████████████████████████████████████

38

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 90 of 229 PageID: 878



169.

170.

171.     Defendants Edelman, Osborne, Ruesterholz, Schechter, and Weiss, as members of the Audit Committee, reviewed and approved the improper statements. The Audit Committee's Charter provides that it is responsible for compliance with legal and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described

39

herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

172.   Accordingly, having failed to exercise the most basic functions of prudential oversight, the entire Board faces a substantial likelihood of liability for their breaches of fiduciary duties, so any demand on them is futile.

173.   The principal professional occupation of defendant Tritton is his employment with Bed Bath & Beyond, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendant Tritton lacks independence from defendants Edelman, Fleming, Gove, Kirwan, Osborne, Ramalingam, Ruesterholz, Schechter, Weiss, Winston, and Yerger due to his interest in maintaining his executive position at Bed Bath & Beyond. This lack of independence renders defendant Tritton incapable of impartially considering a demand to commence and vigorously prosecute this action. Bed Bath paid defendant Tritton the following compensation:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2019 | $346,154 | $375,000 | $11,632,199 | $750,000 | $661,045 | $13,764,398 |

Accordingly, defendant Tritton is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Tritton.

### COUNT I
**Breach of Fiduciary Duty**
**(Derivatively Against all Defendants)**

174.   Plaintiffs incorporate by reference and re-alleges each and every allegation

40

contained in paragraphs 1 to 173, as though fully set forth herein.

175.    Each of the Board Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Board Defendants owed the Company the highest obligation of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to stockholders.

176.    These Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to the Company's stockholders.

177.    Each of these Defendants failed to conduct proper oversight of the Company, as described above.

178.    Such conduct could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

179.    In addition, by their actions alleged herein, the Defendants, either directly or through aiding and abetting one another, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Bed Bath in a manner consistent with the operations of a publicly-held corporation.

180.    As a direct and proximate result of the breaches of duty alleged herein, the Company has sustained and will sustain significant damages.

41

181.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duty
### (Derivatively Against the Current Board Defendants)

182.    Plaintiffs incorporate by reference and re-allege each and every allegation contained in paragraphs 1 to 173, as though fully set forth herein.

183.    Each of the Board Defendants owe and owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Board Defendants owed and owe the Company the highest obligation of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to stockholders.

184.    Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, and fair dealing by allowing the Company to continue to repurchase shares, while they remained ignorant of the state of the Company's transformation process.

185.    As a direct and proximate result of the breaches of duty alleged herein, Bed Bath has sustained and will sustain significant damages.

186.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT III

### Unjust Enrichment
### (Derivatively Against all Defendants)

187.    Plaintiffs incorporate by reference and re-allege each and every allegation contained in paragraphs 1 to 173, as though fully set forth herein.

188.    By violating and breaching their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to the Company's stockholders and failing to conduct proper oversight of the Company, the Defendants were unjustly enriched at the expense of and to

42

the detriment of the Company. The Defendants were unjustly enriched as a result of the excessive compensation they received while breaching fiduciary duties owed to Bed Bath.

189.    Plaintiffs, as stockholders and representatives of Bed Bath, seek restitution from these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

190.    Plaintiffs, on behalf of Bed Bath, have no adequate remedy at law.

## COUNT IV

### Waste of Corporate Assets
### (Derivatively Against the Current Board Defendants)

191.    Plaintiffs incorporate by reference and re-allege each and every allegation contained in paragraphs 1 to 173, as though fully set forth herein.

192.    As a result of their self-dealing, the Company has wasted its valuable assets by paying the Defendants' excessive compensation.

193.    Moreover, while the Board Defendants were violating and breaching their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to the Company's stockholders and failing to conduct proper oversight of the Company, they also caused the Company to repurchase its own stock at an artificially inflated prices and wasted Bed Bath's assets.

194.    As a result of the waste of corporate assets, the Board Defendants are liable to the Company.

195.    Plaintiffs, on behalf of Bed Bath, have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

43

a.     Against all of the Defendants and in favor of Bed Bath for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

b.     Directing Bed Bath to take all necessary actions to reform and improve its corporate governance and internal procedures to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder votes resolutions and amendments to the By-Laws and Articles of Incorporation, and any other measures able to guard against a repetition of the circumstances described herein, including measures to reform the Company's internal governance documents and Board charters;

c.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Bed Bath has an effective remedy;

d.     Awarding to Bed Bath restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

e.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

f.     And such other relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: November 24, 2021                    NEWMAN FERRARA LLP

                                            _/s Roger A. Sachar_____

44

Roger A. Sachar
1250 Broadway, 27th floor
New York, NY 10001
Telephone: (212) 619-5400
Facsimile:  (212) 619-3090
E-mail: rsachar@nfllp.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173
E-mail: srudman@rgrdlaw.com

*Liaison Counsel*

s/ Melinda A. Nicholson
_____
KAHN SWICK & FOTI, LLC
Melinda A. Nicholson
100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 648-1842
Facsimile: (504) 455-1498
E-mail: melinda.nicholson@ksfcounsel.com

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
        csmith@robbinsllp.com
        ssanders@robbinsllp.com

*Co-Lead Counsel*

1550524_3

45

INDEX NO. 516051/2020
RECEIVED NYSCEF: 11/24/2021

Case 2:20-cv-08673-MCA-MAH   Document 27-6   Filed 01/04/22   Page 97 of 229 PageID: 885

# VERIFICATION

I, ROGER A. SACHAR, an attorney duly admitted to practice law before the Courts of the State of New York, hereby affirms the truth of the following under the penalties of perjury and pursuant to CPLR 2106:

1. I am the attorney in the above-entitled action with offices located at 1250 Broadway, 27th Floor, City of New York, County of New York.

2. I have read the foregoing complaint, and know the contents thereof, which are a true to the best of my knowledge, except as to the matters stated to be alleged upon information and belief, and with respect to those matters, I believe them to be true.

3. The reason this verification is made by me instead of the plaintiff is because the plaintiff is not within New York City, which is where the undersigned has his office.

Executed this 24th day of November, 2021.

*s/Roger A. Sachar*
ROGER A. SACHAR

46

# EXHIBIT R

# *STATE OF NEW YORK*

# *DEPARTMENT OF STATE*

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on December 2, 2011.

Daniel E. Shapiro
First Deputy Secretary of State

Rev. 06/07

SENT BY:Proskauer (23) 23f|   : 6- 1-92 : 2:00PM :   23rd FLOOR ANNEX→   16164636610:# 2

  

F920602000228

### RESTATED CERTIFICATE OF INCORPORATION
### OF
### BED BATH & Beyond Inc.

#### (under Section 807 of the Business Corporation Law)

The undersigned, being the President and Secretary, respectively, of BED BATH & Beyond Inc., pursuant to Section 807 of the Business Corporation Law of the State of New York (the "Business Corporation Law"), do hereby restate, certify and set forth:

1.   The name of the corporation is BED BATH & Beyond Inc.  The name under which the corporation was originally formed is B & B Textile Corporation.

2.   The original Certificate of Incorporation was filed by the Department of State on October 5, 1971.

3.   The Certificate of Incorporation, as amended heretofore, is hereby further amended to effect the following amendments authorized by the Business Corporation Law:

(a)   Paragraph THIRD relating to the authorized capital stock of the corporation is amended to: (i) increase the number of shares which the corporation has the authority to issue from 100,000 shares, consisting of 50,000 shares of Class A Common, Voting no par value shares ("Class A Common") and 50,000 shares of Class B Common,

Non-Voting no par value shares ("Class B Common"), all of which are issued and outstanding, to 71,000,000 shares, consisting of 70,000,000 shares of Common Stock, par value $0.01 per share ("Common Stock"), and 1,000,000 shares of Preferred Stock, par value $0.01 per share ("Preferred Stock"), and (ii) convert each issued and outstanding share of Class A Common and Class B Common at the rate of 145.625 for one into 14,562,508 shares of Common Stock; provided, however, that if a shareholder would be entitled to receive a fractional share of Common Stock based upon the foregoing conversion ratio, such shareholder shall receive a whole share of Common Stock in lieu of such fractional share.

(b) revise the description of the corporate purposes of the corporation;

(c) add a provision, subject to conditions and qualifications provided by statute, eliminating or limiting the personal liability of directors to the corporation or its shareholders for damages for any breach of duty in such capacity;

(d) change the address to which the Secretary of State shall mail a copy of any process against the corporation served upon him;

2

(e)  delete the provision relating to contracts or
other transactions between the corporation and one
or more of its directors, or between the
corporation and any other entity in which one or
more of its directors are directors or officers;
and

(f)  add a provision providing for a classified board
in the event the Business Corporation Law is
hereafter amended to provide that a classified
board may include less than three directors in
each class.

4.   The text of the Certificate of Incorporation as
heretofore and hereby amended is hereby restated as amended to
read as herein set forth in full:

FIRST:   The name of the corporation is Bed Bath &
Beyond Inc.

SECOND:   The purpose for which the corporation is
formed is to engage in any lawful act or activity for which
corporations may be organized under the Business Corporation Law,
provided that the corporation may not engage in any act or
activity requiring the consent or approval of any state official,
department, board, agency or other body without such consent or
approval first being obtained.

3

SENT BY:Proskauer (23) 23?1   ; 8- 1-82 ; 2:01PM ;   23rc FLOOR ANNEX⁻   15184838619;# 5

For the accomplishment of the aforesaid purposes, and in furtherance thereof, the corporation shall have, and may exercise, all of the powers conferred by the Business Corporation Law upon corporations formed thereunder, subject to any limitations contained in Article 2 of said law or in accordance with the provisions of any other statute of the State of New York.

THIRD:  The office of the corporation is to be located in the County of New York, State of New York.

FOURTH:  (a)  Authorized Classes of Stock:  The total number of shares which the corporation shall have the authority to issue is 71,000,000, of which 70,000,000 shares are designated Common Stock, par value $.01 per share ("Common Stock"), and 1,000,000 shares are designated Preferred Stock, par value $.01 per share ("Preferred Stock");

(b)  Description of Preferred Stock:  The Board of Directors is hereby authorized to issue the shares of the Preferred Stock from time to time in one or more classes or series, each such class or series to have such rights, preferences and limitations as shall be determined by the Board of Directors in a resolution or resolutions providing for the issue of such class or series of Preferred Stock, including, but not limited to, the determination of the following rights, preferences and limitations:

(i)  the rate of dividend;



(ii) whether shares can be redeemed or called and, if so, the redemption or call price and terms and conditions of redemption or call;

(iii) the amount payable upon shares in the event of dissolution, voluntary and involuntary liquidation or winding up of the affairs of the corporation;

(iv) purchase, retirement or sinking fund provisions, if any, for the call, redemption or purchase of shares;

(v) the terms and conditions, if any, on which shares may be converted into Common Stock or any other securities;

(vi) whether or not shares have voting rights, and the extent of such voting rights, if any; and

(vii) whether shares shall be cumulative, noncumulative, or partially cumulative as to dividends and the dates from which any cumulative dividends are to accumulate.

The Board of Directors shall determine the number of shares constituting each class or series of Preferred Stock and each series of a class shall have a distinguishing designation.

FIXTH: No shareholder of this corporation shall, by reason of his holding of Common stock, have any preemptive or preferential right to purchase or subscribe to any shares of stock of this corporation now or hereafter authorised, or any notes, debentures, bonds or other securities convertible into or carrying options, warrants or other rights to purchase shares now or hereafter authorised, whether or not the issuance of any such shares or such notes, debentures, bonds or other securities would adversely affect the dividend rights of such shareholder, other

5

than such rights, if any, as the Board of Directors in its discretion, from time to time, may grant, and at such price as the Board of Directors in its discretion may fix; and the Board of Directors may issue shares of stock of this corporation, or any notes, debentures, bonds or other securities convertible into or carrying options, warrants or other rights to purchase shares of stock, without offering any such shares of stock or other securities or rights, either in whole or in part, to the existing shareholders of the corporation.

SIXTH: The Secretary of State is designated as the agent of the corporation upon whom process against the corporation may be served, and the address to which the Secretary of State shall mail a copy of any process against the corporation served upon him is Bed Bath & Beyond Inc., 715 Morris Avenue, Springfield, New Jersey 07081, Attention: Chairman.

SEVENTH: (a) The number of directors comprising the entire Board of Directors shall be fixed from time to time in accordance with the specific provisions of the By-laws of the corporation.

(b) If the event the Business Corporation Law is hereafter amended to provide that a classified board may include less than three directors in each class, and that the Business Corporation Law, as so amended, would permit the Board of Directors then in office to be divided into three classes, at the first annual meeting of shareholders following the effective date of such change in the Business Corporation Law the Board of



SENT BY:Proskauer (23) 23f1   : 6- 1-92 : 2:03PM :   23rd FLOOR ANNEX→        15184638618:# 8

Directors shall, without further action of the directors or the
shareholders (except as otherwise then required by the Business
Corporation Law and except for the nomination and election of
directors for each class), be divided into three classes, each
class to be as nearly equal in number as possible.  The classes
shall be designated as Class A, Class B and Class C.  The term of
office of the initial Class A directors shall expire at the first
succeeding annual meeting of shareholders following their initial
classification and election; that of the initial Class B
directors at the second succeeding annual meeting of
shareholders; and that of the initial Class C directors at the
third succeeding annual meeting of shareholders.  At each annual
meeting of shareholders following such initial classification,
directors elected to succeed those directors whose terms expire
shall be elected for a term of office to expire at the third
succeeding annual meeting of shareholders after their election.
Each director shall be elected by a plurality of votes cast at
the annual meeting of shareholders by the holders of shares
entitled to vote thereon to serve until his or her respective
successor is duly elected and qualified.  In the event the Board
of Directors is classified pursuant to this subsection (b), the
provisions of this subsection (b) of Paragraph SEVENTH may only
be amended or modified by vote of the holders of at least 80% of
all outstanding shares entitled to vote thereon at a meeting of
shareholders.

SENT BY:Proskauer (23) 29th   ; 6- 1-92 ; 2:03PM ;   23rd FLOOR ANNEX→       15184638610;# 9

EIGHTH:  No director of the corporation shall be personally liable to the corporation or any of its shareholders for damages for any breach of duty in such capacity except for liability of any director if a judgment or other final adjudication adverse to the director establishes that his acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law or that he personally gained in fact a financial profit or other advantage to which he was not legally entitled or that his acts violated Section 719 of the Business Corporation Law.  If the Business Corporation Law is hereafter amended to authorize the further elimination or limitation of the liability of directors, then the liability of a director of the corporation, in addition to the limitation on personal liability provided herein, shall be limited to the fullest extent permitted by the amended Business Corporation Law.  Any repeal or modification of this Article shall be prospective only, and shall not adversely affect any limitation on the personal liability of a director of the corporation existing at the time of such repeal or modification.

5.  This Restated Certificate of Incorporation was authorized by resolution adopted by unanimous written consent of the Board of Directors dated May 5, 1992 and by unanimous written consent of shareholders of the corporation dated May 5, 1992.



IN WITNESS WHEREOF, we have subscribed this document on the date set forth below and do hereby affirm, under the penalties of perjury, that the statements contained therein have been examined by us and are true and correct.

Date:  May  31, 1992

LEONARD FEINSTEIN, President

WARREN EISENBERG, Secretary



F920602000228 **PH**

RESTATED CERTIFICATE OF INCORPORATION

OF

BED BATH & BEYOND INC.

920602000248

RECEIVED
Jun 1  4 10 PM '92

ICC

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED    JUN 0 2 1992
TAX $
BY:

PROSKAUER ROSE GOETZ & MENDELSOHN
1585 BROADWAY
NEW YORK, NEW YORK   10036

BILLED

# *STATE OF NEW YORK*

# *DEPARTMENT OF STATE*

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on December 2, 2011.

Daniel E. Shapiro
First Deputy Secretary of State

Rev. 06/07

JUN 29'94 13:36 FR 18                    212 989 2900 TO 01-S-15184638819 P.02

F 940629000 III

PH - 32

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

OF

BED BATH & BEYOND INC.

(Under Section 805 of the Business Corporation Law)

PH - 32

It is certified that:

1.   The name of the corporation is BED BATH & BEYOND
INC.  The name under which the corporation was originally formed
is B & B TEXTILE CORPORATION.

2.   The original Certificate of Incorporation of the
corporation was filed by the Department of State of the State of
New York on October 5, 1971.

3.   Paragraph (a) of Article Fourth of the Certificate
of Incorporation of the Company, providing for the authorization
of 70,000,000 shares of Common Stock, par value $.01 per share,
will be amended to increase the total number of authorized shares
of Common Stock, par value $.01 per share, to 100,000,000 shares
of Common Stock, par value $.01 per share.  The new paragraph (a)
of Article Fourth shall read in its entirety as follows:

   "(a) Authorized Classes of Stock:  The total
   number of shares which the corporation shall have the
   authority to issue is 101,000,000 of which 100,000,000
   are designated Common Stock, par value $.01 per share

** TOTAL PAGE.002 **

("Common Stock"), and 1,000,000 shares are designated
Preferred Stock, par value $.01 per share ("Preferred
Stock")."

3.   The amendment of the Certificate of Incorporation
was authorized first by vote of the Board of Directors of the
corporation and then by the vote of the holders of a majority of
all outstanding shares entitled to vote thereon.

IN WITNESS WHEREOF, we have subscribed this document on
June 24, 1994, and do hereby affirm, under the penalties of
perjury, that the statements contained herein have been examined
by us and are true and correct.

_____
LEONARD FEINSTEIN, President

_____
WARREN EISENBERG, Secretary

08 27 04   13 37   ☎212 969 2900   PROSKAUER (T)   ☑004

F 940629000 |||

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

OF

BED BATH & BEYOND INC.

I-CC

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED    JUN 29 1994
TAX $    150
BY:    _____

NEW YORK

PROSKAUER ROSE GOETZ & MENDELSOHN
1585 Broadway
New York, New York 10036

3

940629000 //8

# *STATE OF NEW YORK*

# *DEPARTMENT OF STATE*

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on December 2, 2011.

Daniel E. Shapiro
First Deputy Secretary of State

Rev. 06/07



960718000331
CSC 45

## CERTIFICATE OF AMENDMENT
OF
## CERTIFICATE OF INCORPORATION
OF
### BED BATH & BEYOND INC.
(Under Section 805 of the Business Corporation Law)

It is certified that:

1.    The name of the corporation is BED BATH & BEYOND INC.  The name under which the corporation was originally formed is B & B TEXTILE CORPORATION.

2.    The original Certificate of Incorporation of the corporation was filed by the Department of State of the State of New York on October 5, 1971.

3.    Paragraph (a) of the Certificate of Incorporation is amended as follows: to increase the number of shares from the presently authorized 100,000,000 shares of common stock PV .01 per share to 150,000,000 shares of common stock PV .01. The 1,000,000 shares of preferred stock PV .01 shall remain unchanged.

"(a) Authorized Classes of Stock:  The total number of shares which the coporation shall have the authority to issue is 151,000,000 of which 150,000,000 are designated Common Stock, par value $.01 per share ("Common Stock"), and 1,000,000 shares are designated Preferred Stock, par value $.01 per share ("Preferred Stock")."

4.    The amendment of the Certificate of Incorporation was authorized first by vote of the Board of Directors of the corporation and then by the vote of the holders of a majority of all outstanding shares entitled to vote thereon.

IN WITNESS WHEREOF, we have subscribed this document on July 10, 1996, and do hereby affirm, under the penalties of perjury, that the statements contained herein have been examined by us and are true and correct.

LEONARD FEINSTEIN, President

WARREN EISENBERG, Secretary

F 96071800033/

**CSC 45**

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

OF

BED BATH & BEYOND INC.

ICC

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED   JUL 18 1996

TAX $   250

BY.   BC

MY

Tw # 250
Bc.

RECEIVED

PROSKAUER ROSE GOETZ & MENDELSOHN LLP
1585 Broadway
New York, New York 10036-8299

**BILLED**
96071800035/

# *STATE OF NEW YORK*

# *DEPARTMENT OF STATE*

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on December 2, 2011.

Daniel E. Shapiro
First Deputy Secretary of State

Rev. 06/07

F 961025000◼1249

## CERTIFICATE OF CORRECTION

**CSC 45**

of

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

OF

BED BATH & BEYOND INC.

(Under Section 105 of the Business Corporation Law)

It is certified that:

1.   The name of the corporation is BED BATH & BEYOND INC.  The name under which the corporation was originally formed is B & B TEXTILE CORPORATION.

2.   The Certificate of Amendment to the Certificate of Incorporation (the "Certificate of Amendment") to be corrected hereby was filed by the Department of State of the State of New York on July 18, 1996.

3.   The error in the Certificate of Amendment to be corrected was that Section 3 of said certificate indicated that "Paragraph (a)" of the Certificate of Incorporation was being amended rather than "Paragraph (a) of Article Fourth" of the Certificate of Incorporation.  Section 3 of the Certificate of Amendment as corrected reads as follows:

"3.  Paragraph (a) of Article Fourth of the Certificate of Incorporation is amended as follows to increase the number of shares from the presently authorized 100,000,000 shares of common

OCT 23'96 14:53 FR PROSKAUER 23                    TO 1*7*815194828864 P.03

stock PV .01 per share to 150,000,000 shares of common stock PV
.01. The 1,000,000 shares of preferred stock PV .01 shall remain
unchanged.

"(a) <u>Authorized Classes of Stock</u>: The total number of
shares which the Corporation shall have the authority to issue is
151,000,000 of which 150,000,000 are designated Common Stock, par
value $.01 per share ("Common Stock"), and 1,000,000 shares are
designated Preferred Stock, par value $.01 per share ("Preferred
Stock")."

IN WITNESS WHEREOF, we have subscribed this document on
October 23 , 1996, and do hereby affirm, under the penalties of
perjury, that the statements contained herein have been examined
by us and are true and correct.

_____
LEONARD FEINSTEIN, President

_____
WARREN EISENBERG, Secretary

2

** TOTAL PAGE.003 **

F 961025000 249

## CSC 45

RECEIVED

Oct 24

CERTIFICATE OF CORRECTION

OF

BED BATH & BEYOND INC.

Under Section 105 of the Business Corporation Law

ICC
STATE OF NEW YORK
DEPARTMENT OF STATE
FILED OCT 2 5 1996
TAX $ _____
BY: MMR

ny

BILLED

Bed Bath & Beyond
715 Morris Avenue
Springfield, New Jersey 07001

3

259
961025000 259

# *STATE OF NEW YORK*

# *DEPARTMENT OF STATE*

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.

WITNESS my hand and official seal of the Department of State, at the City of Albany, on December 2, 2011.



Daniel E. Shapiro
First Deputy Secretary of State

Rev. 06/07

970630000 277

CSC 45

CERTIFICATE OF AMENDMENT
OF
CERTIFICATE OF INCORPORATION
OF
BED BATH & BEYOND INC.

(under Section 805 of the Business Corporation Law)

It is hereby certified that:

      1.    The name of the corporation (hereinafter called the "Corporation") is BED BATH & BEYOND INC.

      2.    The original Certificate of Incorporation of the Corporation was filed by the Department of State of the State of New York on October 5, 1971.  It was filed under the original name of B & B TEXTILE CORPORATION.

      3.    The certificate of incorporation of the Corporation is hereby amended by striking out Article SEVENTH thereof and by substituting in lieu of said Article the following new Article SEVENTH:

      "**SEVENTH**:  (a)  The number of directors comprising the entire Board of Directors shall be fixed from time to time in accordance with the specific provisions of the By-laws of the corporation.

      (b)  The Board of Directors shall be divided into three classes, each class to be as nearly equal in number as possible.  The classes shall be designated as Class A, Class B and Class C.  The term of office of the initial Class A directors shall expire at the 1998 annual meeting of shareholders; that of the initial Class B directors at the 1999 annual meeting of shareholders; and that of the

4243/12594-001 NYLIB2/412811 v1

initial Class C directors at the 2000 annual meeting of shareholders. At each annual meeting of shareholders, directors elected to succeed those directors whose terms expire shall be elected for a term of office to expire at the third succeeding annual meeting of shareholders after their election. Each director shall be elected by a plurality of votes cast at the annual meeting of shareholders by the holders of shares entitled to vote thereon to serve until his or her respective successor is duly elected and qualified. Except as otherwise provided by law, if the number of directors is changed, any increase or decrease shall be apportioned among the classes so as to maintain the number of directors in each class as nearly equal as possible; provided, however, that no decrease in the number of directors shall shorten the term of any incumbent director. Any vacancies in the Board of Directors that occur for any reason prior to the expiration of the term of office of the class in which the vacancy occurs, including vacancies that occur by reason of an increase in the number of directors, may be filled only by a plurality of the votes cast at a meeting of shareholders by the holders of shares entitled to vote thereon or by the Board of Directors of the corporation, acting by the affirmative vote of a majority of the remaining directors then in office (even if less than a quorum). A director elected to fill a vacancy shall hold office during the term to which his or her predecessor had been elected and until his or her successor shall have been elected and shall qualify, or until his or her earlier death, resignation or removal.

(c) Notwithstanding anything contained in this Certificate of Incorporation to the contrary, any amendment or modification of this Paragraph SEVENTH, or any amendment or modification of this Certificate of Incorporation that has the effect of amending or modifying this Paragraph SEVENTH, shall require the affirmative vote of the holders of at least 80% of voting power of all the then-outstanding shares of voting stock of the corporation entitled to vote at an election of directors ("Voting Stock"), voting together as a single class.

(d) The provisions of the By-laws of the corporation relating to the Board of Directors and

meetings of shareholders may be amended or modified only
by (i) the affirmative vote of the holders of at least
80% of voting power of all the then-outstanding shares of
Voting Stock, voting together as a single class, or
(ii) the affirmative vote of a majority of the total
number of directors then in office."

3.    The amendment of the certificate of incorporation

herein certified was authorized first by vote of the Board of

Directors of the corporation and then by the vote of the majority

of all outstanding shares entitled to vote thereon.

IN WITNESS WHEREOF, we have subscribed this document on

June 26, 1997, and do hereby affirm, under penalties of perjury,

that the statements contained herein have been examined by us and

are true and correct.

_____
Leonard Feinstein,
President

_____
Warren Eisenberg,
Secretary

970630000 277

CSC 45

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

OF

BED BATH & BEYOND INC.

UNDER SECTION 805 OF THE BUSINESS CORPORATION LAW

BILLED

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED JUN 3 0 1997
TAX $
BY:

New York

Filer:       PROSKAUER ROSE LLP
             1585 BROADWAY
             NEW YORK, NY   10036-8299

445339-cep

4

970630000 284

# *STATE OF NEW YORK*

# *DEPARTMENT OF STATE*

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on December 2, 2011.

Daniel E. Shapiro
First Deputy Secretary of State

Rev. 06/07

## CERTIFICATE OF CHANGE

OF  ƒ970730000₀2₀

CSC 45

### BED BATH & BEYOND INC.

Under Section 805-A of the Business Corporation Law

FIRST:   The name of the corporation (hereinafter called the "Corporation") is BED BATH & BEYOND INC.

SECOND:   The original Certificate of Incorporation of the Corporation was filed by the Department of State of the State of New York on October 5, 1971. It was filed under the original name of B & B TEXTILE CORPORATION.

THIRD:   The change in the Certificate of Incorporation effected by this certificate of change is as follows:

To change the post office address to which the Secretary of State of the State of New York shall mail a copy of any process against the Corporation served upon said Secretary of State.

FOURTH:   To accomplish the foregoing change, Article SIXTH of the Certificate of Incorporation is hereby stricken out in its entirety, and the following new Article SIXTH is substituted in lieu thereof:

"SIXTH: The Secretary of State is designated as the agent of the corporation upon whom process against the corporation may be served, and the address to which the Secretary of State shall mail a copy of any process against the corporation served upon him is Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, Attention: Chairman."

FIFTH:     The foregoing change was approved by the Board of Directors.

IN WITNESS WHEREOF, we have subscribed our names to this document on the date set forth below and do hereby affirm, under the penalties of perjury, that the statements contained herein have been examined by us and are true and correct.

Date:  July 23, 1997

Leonard Feinstein
President

Warren Eisenberg
Secretary

CERTIFICATE OF CHANGE

f 970730000020

OF

CSC 45

BED BATH & BEYOND INC.

Under Section 805-A of the Business Corporation Law

I CC

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED  JUL 3 0 1997

TAX $ _____

BY: _____ PSM _____

NY. C.

FILED BY: THOMAS W. YANG, ESQ
PROSKAUER ROSE LLP
1585 BROADWAY
NEW YORK, NY  10036-8299

477763SAM

DILLED

970730000025

3

# STATE OF NEW YORK

# DEPARTMENT OF STATE

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on December 2, 2011.

Daniel E. Shapiro
First Deputy Secretary of State

Rev. 06/07

06/29/98  09:18  CSC US CORP CO → 815184334741                                NO.847  P003/003

F980629000721

GSC 45

## CERTIFICATE OF AMENDMENT
## OF
## CERTIFICATE OF INCORPORATION
## OF
## BED BATH & BEYOND INC.
### (Under Section 805 of the Business Corporation Law)

It is certified that:

1.    The name of the corporation is BED BATH & BEYOND INC. The name under which the corporation was originally formed is B & B TEXTILE CORPORATION.

2.    The original Certificate of Incorporation of the corporation was filed by the Department of State of the State of New York on October 5, 1971.

3.    Paragraph (a) of Article Fourth of the Certificate of Incorporation is amended as follows to increase the number of shares from the presently authorized 150,000,000 shares of common stock par value $.01 per share to 350,000,000 shares of common stock par value $.01. The 1,000,000 shares of preferred stock par value $.01 shall remain unchanged.

"(a)  Authorized Classes of Stock: The total number of shares which the corporation shall have the authority to issue is 351,000,000 of which 350,000,000 are designated Common Stock, par value $.01 per share ("Common Stock"), and 1,000,000 shares are designated Preferred Stock, par value $.01 per share ("Preferred Stock")."

4.    The amendment of the Certificate of Incorporation was authorized first by vote of the Board of Directors of the corporation and then by the vote of the holders of a majority of all outstanding shares entitled to vote thereon.

IN WITNESS WHEREOF, we have subscribed this document on June 26, 1998, and do hereby affirm, under the penalties of perjury, that the statements contained herein have been examined by us and are true and correct.

LEONARD FEINSTEIN, President

WARREN EISENBERG, Secretary

CSC 45   F980629000721

CERTIFICATE OF AMENDMENT

OF

BED BATH & BEYOND INC.

Under Section 805 of the Business Corporation Law

RECEIVED
Jun 23 12 05 PM '98

FILED BY: Diana I. Holtzman, Esq
          PROSKAUER ROSE LLP
          1585 Broadway
          19th Floor
          New York, NY   10036-8299
             872893GIR



STATE OF NEW YORK
DEPARTMENT OF STATE
FILED JUN 29
1998

BILLED

980629000747

# *STATE OF NEW YORK*

# *DEPARTMENT OF STATE*

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on December 2, 2011.

Daniel E. Shapiro
First Deputy Secretary of State

Rev. 06/07

F010329000314

CSC 45

## CERTIFICATE OF MERGER OF
## BBBL, INC.
## INTO
## BED BATH & BEYOND INC.
### (Under Section 905 of the New York Business Corporation Law)

It is hereby certified by the corporation named herein as the surviving corporation as follows:

**FIRST:** The Board of Directors of Bed Bath & Beyond Inc., a New York corporation, and the corporation named herein as the surviving corporation (the *"Corporation"*) has adopted a plan of merger setting forth the terms and conditions of merging BBBL, Inc., a Delaware corporation, and the corporation named herein as the subsidiary corporation (the *"Subsidiary Corporation"*) into the Corporation.

**SECOND:** The laws of the jurisdiction of incorporation of the Subsidiary Corporation permit the merger of the kind certified herein, and Subsidiary Corporation has taken all requisite action required thereby.

**THIRD:** The name of the Subsidiary Corporation is BBBL, Inc. The Subsidiary Corporation was organized under the laws of the State of Delaware on September 8, 1992. The Subsidiary Corporation did not conduct business in the State of New York, therefore no Application for Authority in the State of New York to transact business as a foreign corporation was filed with the Department of State of New York.

**FOURTH:** The Corporation was formed by the filing of a certificate of incorporation with the Department of State of the State of New York on October 5, 1971. The name under which the Corporation was formed is B&B Textile Corporation.

**FIFTH:** The Subsidiary Corporation has authorized Three Thousand (3,000) shares of common stock. The Subsidiary Corporation has One Thousand (1000) shares issued, and all of such One (1000) Thousand Shares are owned by the Corporation.

**SIXTH:** The effective date of the merger herein certified insofar as the provisions of the New York Business Corporation Law govern such effective date shall be April, 1, 2001.

BED BATH & BEYOND INC.

Signed on March 26, 2001

By _____

Name: Warren Eisenberg

Title: Co-Chairman & Co-Chief Executive Officer

010329000384

CERTIFICATE OF MERGER

CSC 45

OF

BBBL, INC.

INTO

BED BATH & BEYOND, INC.

Section 905 of the Business Corporation Law

Filer:  Bed Bath & Beyond
        650 Liberty Avenue
        Union, NJ  07083
Cust. Ref#092587CST

DRAWDOWN

STATE OF NEW YORK
DEPARTMENT OF STATE
FILE   MAR 2 9 2001



010329000383

# *STATE OF NEW YORK*

# *DEPARTMENT OF STATE*

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.

WITNESS my hand and official seal of the Department of State, at the City of Albany, on December 2, 2011.



Daniel E. Shapiro
First Deputy Secretary of State

Rev. 06/07

AUG 16 2001 10:39 FR PROSKAUER ROSE                    TO #0809*12594001*7 P.02/03

F01081600040

# CERTIFICATE OF AMENDMENT
## OF
## CERTIFICATE OF INCORPORATION
## OF
## BED BATH & BEYOND INC.
### (Under Section 805 of the Business Corporation Law)

It is certified that:

1.  The name of the corporation is BED BATH & BEYOND INC. The name under which the corporation was originally formed is B & B TEXTILE CORPORATION.

2.  The original Certificate of Incorporation of the corporation was filed by the Department of State of the State of New York on October 5, 1971.

3.  Paragraph (a) of Article Fourth of the Certificate of Incorporation is amended as follows to increase the number of shares from the presently authorized 350,000,000 shares of common stock, par value $.01 per share, to 900,000,000 shares of common stock, par value $.01 per share. The 1,000,000 shares of preferred stock, par value $.01 per share, shall remain unchanged.

"(a)  Authorized Classes of Stock:  The total number of shares which the corporation shall have the authority to issue is 901,000,000 of which 900,000,000 shares are designated Common Stock, par value $.01 per share ("Common Stock"), and 1,000,000 shares are designated Preferred Stock, par value $.01 per share ("Preferred Stock")."

4.  The amendment of the Certificate of Incorporation was authorized first by vote of the Board of Directors of the corporation and then by the vote of the holders of a majority of all outstanding shares entitled to vote thereon.

IN WITNESS WHEREOF, we have subscribed this document on July 26, 2001 and do hereby affirm, under the penalties of perjury, that the statements contained herein have been examined by us and are true and correct.

_____
STEVEN H. TEMARES, President

_____
WARREN EISENBERG, Secretary

0103/12594-001 NYLIB2/833037 v1

F01081600040**3**

CSC 45

CERTIFICATE OF AMENDMENT

OF

BED BATH & BEYOND INC.

Under Section 805 of the Business Corporation Law

FILED
Aug 16  1 58 PM '01

NY - 2750      NY

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED  AUG 1 6 2001
TAX $  2750
BY:

NY

FILED BY:

    PROSKAUER ROSE LLP
    1585 Broadway
    New York, NY  10036
Cust. Ref#427752DAV

DRAWDOWN

2

RECEIVED
010816000**430**

# *STATE OF NEW YORK*

# *DEPARTMENT OF STATE*

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.

WITNESS my hand and official seal of the Department of State, at the City of Albany, on December 2, 2011.



Daniel E. Shapiro
First Deputy Secretary of State

Rev. 06/07

*F* 060814000 *301*

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

OF

BED BATH & BEYOND INC.

Under Section 805 of the Business Corporation Law

It is certified that:

1. The name of the corporation (hereinafter called the "Corporation") is BED BATH & BEYOND INC. The name under which the Corporation was originally formed is B & B TEXTILE CORPORATION.

2. The original Certificate of Incorporation of the Corporation was filed by the Department of State of the State of New York on October 5, 1971.

3. The certificate of incorporation of the Corporation is hereby amended by striking out Article SEVENTH which relates to the election and service term of the Board of Directors and the voting rights of the Board of Directors and Shareholders of the Corporation, and substituting in lieu of said Article the following new Article SEVENTH:

"SEVENTH: (a) The number of directors comprising the entire Board of Directors shall be fixed from time to time in accordance with the specific provisions of the By-laws of the corporation.

(b) At each annual meeting of shareholders, directors shall be elected to hold office until the next annual meeting and until his or her successor is elected and qualified; provided, however, that any director who prior to the annual meeting of shareholders in 2007 was elected to a term that continues beyond the date of the annual meeting of shareholders in 2007, shall continue in office for the remainder of his or her elected term or until his or her earlier death, resignation or removal.

(c) Notwithstanding anything contained in this Certificate of Incorporation to the contrary, any amendment or modification of subparagraphs (a), (c) or (d) of this Paragraph SEVENTH, or any amendment or modification of this Certificate of Incorporation that has the effect of amending or modifying subparagraphs (a), (c) or (d) this Paragraph SEVENTH, shall require the affirmative vote of the holders of at least 80% of voting power of all the then-outstanding shares of voting stock of the corporation entitled to vote at an election of directors ("Voting Stock"), voting together as a single class.

(d) The provisions of the By-laws of the corporation relating to the Board of Directors and meetings of shareholders may be amended or modified only by (i) the affirmative

vote of the holders of at least 80% of voting power of all the then-outstanding shares of Voting Stock, voting together as a single class, or (ii) the affirmative vote of a majority of the total number of directors then in office.

4. The amendment of the certificate of incorporation herein certified was authorized first by vote of the Board of Directors of the Corporation and then by the affirmative vote of the holders of at least 80% of voting power of all of the outstanding shares of voting stock of the Corporation entitled to vote at an election of directors.

IN WITNESS WHEREOF, we have subscribed this document on June 29, 2006, and do hereby affirm, under the penalties of perjury, that the statements contained herein have been examined by us and are true and correct.

*/s/ Steven H. Temares*
Steven H. Temares
Chief Executive Officer

2

Γ 060814000 301

3CC

CERTIFICATE OF AMENDMENT

OF

BED BATH & BEYOND INC.

Under Section 805 of the Business Corporation Law

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED  AUG 1 4 2006

TAX $ __O__

BY: __LB__

New Y

CSC 45
DRAW DOWN

Filed by: Proskauer Rose LLP
_____
(Name)

1585 Broadway
_____
(Mailing address)

New York, NY  10036
_____
(City, State and Zip code)

CUSTRef: 307434DB

326

3

# STATE OF NEW YORK

# DEPARTMENT OF STATE

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on December 2, 2011.

Daniel E. Shapiro
First Deputy Secretary of State

Rev. 06/07



**CERTIFICATE OF AMENDMENT**

**OF THE**

**CERTIFICATE OF INCORPORATION**

**OF**

<u>**BED BATH & BEYOND INC.**</u>

0907010005J0

Under Section 805 of the Business Corporation Law

It is certified that:

1. The name of the corporation (hereinafter called the "Corporation") is BED BATH & BEYOND INC. The name under which the Corporation was originally formed is B & B TEXTILE CORPORATION.

2. The original Certificate of Incorporation of the Corporation was filed by the Department of State of the State of New York on October 5, 1971.

3. The Certificate of Incorporation of the Corporation is hereby amended by striking out Article SEVENTH which relates to the election and service term of the Board of Directors and the voting rights of the Board of Directors and shareholders of the Corporation, and substituting in lieu of said Article the following new Article SEVENTH:

"SEVENTH: (a) The number of directors comprising the entire Board of Directors shall be fixed from time to time in accordance with the specific provisions of the By-laws of the Corporation.

(b) At each annual meeting of shareholders, directors shall be elected to hold office until the next annual meeting and until his or her successor is elected and qualified.

(c) The vote required for the election of directors by the shareholders shall be the affirmative vote of a "majority of votes cast" (as defined herein), unless the election is contested, in which case directors shall be elected by a plurality of votes cast. An election shall be contested if, as of the record date (or such later date as may be determined by the Board of Directors based on events occurring after the record date, but in no event later than the date the Corporation files its definitive proxy statement with the Securities and Exchange Commission), the number of nominees exceeds the number of directors to be elected. A "majority of votes cast" means that the number of shares voted "for" a director exceeds the number of votes "withheld" or cast "against" that director. Abstentions and broker non-votes shall not constitute votes cast or votes withheld."

4. The Certificate of Incorporation of the Corporation is hereby amended by adding the following new Article EIGHTH which relates to the vote required for shareholder approval to adopt a plan of merger or consolidation in accordance with Section 903 of the Business Corporation Law of the State of New York (the "Business Corporation Law"), the sale, lease or exchange of all or substantially all of the Corporation's assets in accordance with Section 909 of the Business Corporation Law, a share exchange in accordance with Section 913 of the Business Corporation Law or a dissolution in accordance with Section 1001 of the Business Corporation Law:

"EIGHTH: The affirmative vote of the shareholders entitled to cast a majority of the votes entitled to be cast shall be required to (i) adopt a plan of merger or consolidation in accordance with Section 903 of the Business Corporation Law, (ii) approve the sale, lease or exchange of all or substantially all of the assets of the Corporation in accordance with Section 909 of the Business Corporation Law, (iii) approve a share exchange in accordance with Section 913 of the Business Corporation Law, (iv) dissolve in accordance with Section 1001 of the Business Corporation Law, or (v) act under any successor provision to the foregoing provisions of the Business Corporation Law."

5. The amendment of the Certificate of Incorporation herein certified was authorized first by vote of the Board of Directors of the Corporation and then by the affirmative vote of the holders of at least 80% of voting power of all of the outstanding shares of voting stock of the Corporation entitled to vote at an election of directors.

IN WITNESS WHEREOF, the undersigned has signed this Certificate of Amendment this 30th day of June, 2009.

BED BATH & BEYOND INC.

*/s/ Steven H. Temares*
Steven H. Temares
Chief Executive Officer

CSC 46
DRAW DOWN

0907010005 3o

# Certificate

## of Amendment

## of the

# Certificate

## of Incorporation

## of

# Bed Bath & Beyond Inc.

(Under Section 805 of the Business Corporation Law)

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED   JUL 0 1 2009

TAX $ _____

BY: _____

**Proskauer Rose LLP**
1585 Broadway
New York, New York 10036

FILED

2009 JUN 31 PH 12:44

2009 JUL - 1 AM 11:28

RECEIVED

# EXHIBIT S

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

STEPHEN AND JUNE VITIELLO,
Individually and On Behalf of All Others
Similarly Situated,

                     Plaintiffs,

      v.

BED BATH & BEYOND, INC., MARK J.
TRITTON, MARY A. WINSTON, AND
ROBYN M. D'ELIA,

                    Defendants.

No. 2:20-cv-04240-MCA-MAH

<u>JURY TRIAL DEMANDED</u>

## AMENDED CLASS ACTION COMPLAINT
## <u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

Lead Plaintiff Kavin Bakhda ("Lead Plaintiff"), and additional named plaintiff Richard Lipka (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, undersigned counsel's investigation, which includes, without limitation, review and analysis of filings with the United States Securities and Exchange Commission ("SEC"), press releases, news articles, analyst reports, conference call transcripts, and interviews with former Bed Bath & Beyond Inc. ("BBBY" or the "Company") employees. Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. BBBY is a retailer of a wide variety of domestic merchandise and home furnishings and is widely known for its coupon discounts. BBBY operates under many brand names, including Christmas Tree Shops, Harmon, buybuy BABY, and Cost Plus World Market.

2. After a major management shakeup, BBBY's new management – led by the Individual Defendants (defined *infra*) – announced in September 2019 that the Company would rid itself of $1 billion in excess inventory in eighteen months (the "Program"). Specifically, Defendants represented that the Program targeted aged and lower-margin inventory through promotions and markdowns; refocused BBBY on profits and selling higher-margin goods; and paved the way for a successful 2019 holiday season, which was "critical" to BBBY.

3. At all times relevant, investors were led to believe that the Program was the product of adequate and careful planning by BBBY. Defendants also emphasized that BBBY had meaningful oversight on the Program, and, in particular, that BBBY safeguarded against the Program causing adverse effects, such as margin erosion and sales cannibalization. To eliminate

these risks, Defendants assured investors that BBBY, among other things, employed highly functional industry software that tracked the Program's progress in real time.

4.     As detailed *infra*, Defendants' representations were materially false and misleading when made, *inter alia*, because Defendants knew or recklessly disregarded that the Program was not the product of adequate and careful planning by BBBY; BBBY's management overhaul (which continued through 2020) left the Company without key personnel to properly execute and oversee the Program; and the Program was causing precisely the adverse consequences Defendants assured investors it would not cause – aggressive erosion of BBBY's margins and cannibalization of BBBY's 2019 holiday sales.

5.     In January 2020, BBBY shocked the market by pulling its previously announced financial guidance completely and reporting that its gross margins had dropped by 80 basis points. One month later, in February 2020, BBBY revealed the full truth when it announced preliminary results for 4Q19 and disclosed that BBBY's inventory management – *i.e.* the personnel, planning, and tools for the Program – was in a shambles, BBBY's gross margins had plummeted by 300 basis points, and the Program had not only cannibalized BBBY's sales, but also led to empty and minimally stocked shelves of higher margin products needed to ensure a successful 2019 holiday season.    As a result, BBBY stated it was "immediately reforming its internal planning and inventory management procedures to master the fundamentals."   Defendants only belatedly conceded that these failures were, in fact, largely "self-inflicted".

6.     This is a class action on behalf of all persons and entities that purchased or otherwise acquired BBBY securities between September 4, 2019 and February 11, 2020, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the

"Exchange Act"). BBBY's alleged fraud caused investors to suffer hundreds of millions of dollars in damages.

7.      Prior to the start of the Class Period, in March 2019, three activist investors (Legion Partners Asset Management, Macellum Advisors, and Ancora Advisors (the "Activist Investors")) demanded that BBBY address its stagnant inventory and weak margins, restructure its board of directors, and appoint a new CEO to replace then-current CEO Steven Temares. The Activist Investors got their wish. BBBY's board was restructured to include Defendant Mary Winston and, on May 10, 2019, Temares resigned as BBBY CEO and director. Defendant Winston was named interim CEO while BBBY looked for a permanent replacement. Defendants Winston and then-current CFO Robyn D'Elia (who has since resigned from BBBY) were keen to address the Activist Investors' concerns about stagnant inventory and ailing margins.

8.      On the first day of the Class Period, September 4, 2019, Defendant Winston issued a letter to BBBY shareholders announcing the Program. The letter stated that the Program was designed to "reduc[e] up to $1 billion of inventory" over the next 18 months, including removing excess aged inventory to "quickly reset inventory levels in both our stores and distribution centers" and provide for "higher-margin products, all in an effort to drive customer traffic and support top-line performance" ahead of the 2019 holiday season. The letter did not disclose *any* risks related to the Program.

9.      Throughout an October 2, 2019 conference call, Defendants continued to tout the Program to investors. Importantly, Defendant D'Elia also assured investors that due to thoughtful and diligent management, the Program safeguarded against harming BBBY's margins or "cannibaliz[ing] sales during the holiday period" – which were material concerns for BBBY

investors.  On the same call, Defendant Winston echoed that BBBY was managing the Program "thoughtfully to prevent cannibalization of sales."[1]

10.    These assurances were material to investors.   Margins were of particular importance to BBBY because, as the Activist Investors pointed out, the Company's margins had been badly suffering for years.  Unloading aged inventory in a manner that would further harm BBBY's margins was counterproductive.  Investors were thus soothed by assurances made by Defendants D'Elia and Winston that the Program expressly protected BBBY against this risk.

11.    BBBY also announced on October 2, 2019 that it planned to remove $350 million in inventory by end-of-year for the holiday season through various markdowns.[2] These markdowns were a departure from BBBY's traditional coupon-centered marketing.  Markdowns were a new strategy for BBBY and important to the Program because, as Defendants represented, BBBY could markdown targeted aged inventory in one fell swoop, and, purportedly, without harming higher-margin products in the process.

12.    At all times relevant, Defendants represented to investors that BBBY properly planned for the Program, and had the requisite personnel and tools in place to execute the Program,

---

[1] Cannibalization of sales is broadly defined as a loss in sales caused by a company's introduction of a new product that displaces one of its own older products. Promotions can cause cannibalization of sales by causing customers to buy lower-margin goods instead of higher-margin goods. https://www.investopedia.com/terms/m/marketcannibilization.asp

[2] Markdowns are broadly defined as the difference between the original retail sales price and the actual selling price. Markdowns reduce prices on certain goods across-the-board. https://www.thebalancesmb.com/retail-markdowns-2890140#:~:text=Read%20The%20 Balance's%20editorial%20policies,ended%20up%20selling%20it%20for.  In contrast, a coupon, or discount, is a reduction in the price of an item or transaction based upon the customer making the purchase. Coupons reduce prices on any non-exempt purchase(s) when the coupon is redeemed.        https://retailminded.com/markdowns-vs-discounts-whats-the-difference-2/#.X4DGedBKiUk.

including to manage inventory, to strategically deploy markdowns, and to ensure the Program was achieving its goals without ill effects.

13.     In that regard, Defendant Winston assured investors during the October 2, 2019 call that "[t]o optimize this inventory off-load the company is [among other things] employing 'markdown optimization software' to speed the process."  This software, as well as other inventory management software utilized by BBBY, purportedly provided up-to-date, in-depth, and real-time data about inventory, allowing the Company, among other things, to optimize reductions in selling price by recommending the best timing and depth of markdowns.  Indeed, the software took each product's stock levels, shelf-life, current pricing, lifecycle, and seasonality trends into account to allow BBBY to, as Defendants D'Elia and Winston stated, "thoughtfully" and "mindfully" decrease aged and excess inventory, which guarding against margin erosion and sales cannibalization risk.  This software was critical because it kept Defendants apprised of the Program's progress in real time, from day one.

14.     BBBY utilized software supplied by, among others, Revionics.  Revionics' software included weekly reports containing data about pricing, sales and margins.  A former senior BBBY employee (CW-1) reported that BBBY senior management, including Defendants D'Elia and Winston, received these weekly inventory reports and likewise participated in weekly meetings together.  Defendants also had access to extensive, real-time information about the Program through the software.  BBBY stated that it "heavily" relied on its software to "manage inventory replenishment, summarize results and control distribution of products."

15.     On October 2, 2019, BBBY slightly lowered its FY2019 earnings per diluted share guidance to between $2.08 and $2.13.[3]

16.     One week later, on October 9, 2019, BBBY named Defendant Mark Tritton as BBBY's new CEO, replacing Defendant Winston.  For time served (about six months), Defendant Winston received a salary of $550,000, and an additional $1.9 million in BBBY stock on November 4, 2019, which is when Defendant Tritton took the helm.  As the new CEO of BBBY, Defendant Tritton adopted the Program put in place by Defendant Winston.

17.     In December 2019, there was another major shakeup in BBBY's C-suite. Specifically, on December 17, 2019, BBBY announced that Defendant Tritton had fired the Company's Chief Merchandising Officer, Marketing Officer, Digital Officer, General Counsel and Chief Administrative Officer.  The Company's Chief Brand Officer resigned the prior week.

18.     On January 8, 2020, the truth about the Program began to come to light.  On that date, BBBY withdrew its FY2019 guidance completely and disclosed plummeting margins. Pulling guidance is a rare and draconian step; executives often revise guidance when warranted, but withdrawing it completely is highly unusual.[4]  BBBY also reported a 3Q2019 adjusted net loss of earnings per diluted share of $.38 – far short of the $.02 profit consensus projected by analysts, and an 8.3% plunge in comparable sales that also widely missed expectations.  For the three and nine months ending in Q319, BBBY revealed that its gross margins had declined by 80 and 250 basis points, respectively.

---

[3] BBBY first announced FY2019 earnings per diluted share guidance of $2.11 to $2.20 in April 2019.

[4] *See, e.g.*, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3077262 at 22 (withdrawing financial guidance is "rare").

19.     Defendant Tritton admitted during a January 8, 2020 conference call that BBBY's "performance was impacted to some extent by self-inflicted issues, like poor inventory management", but he did not disclose the full extent of BBBY's inventory management problems or the ill effects of the Program on BBBY, which Defendants were privy to in real time.

20.     On this news, BBBY's share price plummeted almost 20%, falling $3.20 to close at $13.40 per share on January 9, 2020.

21.     The other shoe dropped on February 11, 2020.  On that date, BBBY issued a press release entitled "Bed Bath & Beyond Inc. Provides Update on Fourth Quarter Financial Performance"  announcing preliminary 4Q19 financial results – with gross margins declining by 300 basis points – and disclosing "a 5.4% decline in comparable sales driven primarily by store traffic declines *combined with inventory management issues*" including that "*inventory within certain key categories in the [BBBY] assortment [were] too low or out-of-stock during the period*."  Thus, the Program had eroded margins and cannibalized sales, precisely what Defendants D'Elia and Winston said the Program guarded against due to diligent planning, management oversight, and real-time access to data.  BBBY also stated that it was "immediately reforming its internal planning and inventory management procedures to master the fundamentals."  The fact that BBBY had to now "master the fundamentals" shows how profound the failures in the Company's inventory management were.

22.     On this news, BBBY's share price plummeted again – this time by over 20% – to close at $11.79 per share on February 12, 2020, on unusually heavy trading volume.

23.     On February 18, 2020 – more than a week after the Company's February 11, 2020 revelations – Defendant Tritton admitted that BBBY's inventory management was fatally flawed since the start of the Class Period:  "We're going to have price management floated properly,

*which we didn't have coming into the third and fourth quarter*." BBBY's third quarter began on September 1, 2019, three days before the Class Period started.

24.    On April 15, 2020, BBBY announced FY2019 earnings per diluted share of $.46 – radically lower than the Company's earlier expectations of $2.08 to $2.13.[5]    Defendant Tritton admitted on a conference call that day that "*[w]e knew we were plagued by issues in December and January*,…[and] [s]ome of it was self-inflicted[,]" and that "customers were coming in, and they just couldn't find the product in stock[.]"   Defendant Tritton also noted during the call that BBBY was watching inventory issues "*hour by hour*" in late November 2019 (at "Thanksgiving time").   In fact, Defendants knew or recklessly disregarded the serious issues plaguing the Program in real-time thanks to BBBY's use of the industry software they touted – Defendants Winston and D'Elia since the start of the Class Period and Defendant Tritton since November 2019 when he joined the Company.

25.    Defendant Tritton also confessed on the April 15 call that – contrary to prior representations – "*we really didn't lay down the plans [on the Program] in the right way*" and, thus, "*burn[ed] the margin and [] burn[ed] a lot of inventory[,]*" and that "[w]e really saw some pain points there based on the promotional activity and how we managed it."

26.    Two weeks later, on April 30, 2020, BBBY announced that Defendant D'Elia had resigned.

27.    On July 14, 2020, BBBY stated that it "expect[ed] further improvement in working capital through the removal of about $1 billion of inventory at retail from [BBBY] stores over the

---

[5] The FY2019 earnings per diluted share of $.46 excluded non-cash impairment charges related to goodwill, tradenames, and certain store level assets, severance costs, shareholder activity costs, an incremental charge for markdowns associated with the Company's inventory reduction initiative, and a loss on a sale-leaseback transaction.

next 24 months." In other words, the Program would take twice as long as claimed back in September – lasting until July 2022 (36 months) rather than April 2021.

28.     BBBY investors paid the price for Defendants' misstatements and omissions of material fact about the Program – suffering hundreds of millions of dollars in losses as the truth was disclosed.

## JURISDICTION AND VENUE

29.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

31.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this judicial district. The Company's headquarters, as well as some of its stores, are in this District. While employed by BBBY, Defendants worked in this District.

32.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

33.     Lead Plaintiff Kavin Bakhda, as set forth in the certification submitted herewith, purchased BBBY securities during the Class Period and suffered damages as a result of the federal

securities law violations and false and/or misleading statements and/or material omissions alleged herein.

34.     Additional named plaintiff Richard Lipka, as set forth in the certification submitted herewith, purchased BBBY securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

35.     Defendant Bed Bath & Beyond is incorporated under the laws of Delaware with its principal executive offices located in Union, New Jersey.   BBBY's common stock trades on the NASDAQ exchange under the symbol "BBBY."

36.     Defendant Mary A. Winston ("Winston") was the Company's Interim CEO from May 2019 to November 2019.   Defendant Winston received compensation of approximately $550,000 for serving as BBBY's Interim CEO for less than six months.  Defendant Winston also received a $1.9 million BBBY stock grant on November 4, 2019.

37.     Defendant Robyn M. D'Elia ("D'Elia") was the Company's Chief Financial Officer ("CFO") at all relevant times.  Defendant D'Elia resigned from the Company on May 4, 2020. Defendant D'Elia received $1.55 million in BBBY stock and was paid $750,000 per year in salary during the Class Period.

38.     Defendant Mark J. Tritton ("Tritton") has been the Company's Chief Executive Officer ("CEO") since November 2019.  Defendant Tritton receives approximately $11,250,000 annually consisting of a $1.2 million annual base salary, a $750,000 opportunity at target to be earned by developing and delivering to the Board a short-term strategic and business stabilization plan, a $1.125 million payment based on the Compensation Committee's assessment that Defendant Tritton exceeded objectives set for him, a $500,000 one-time sign-on cash award of

time-vesting RSUs that will vest on November 4, 2020, subject to Defendant Tritton's remaining with the Company through that date, a $750,000 make-whole cash bonus, and a $6.9 million make-whole RSU award.

39.     Defendants Winston, D'Elia, and Tritton (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.

40.     The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

41.     Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. As alleged herein, the Individual Defendants had access to, and received, among other things, weekly inventory report through Revionics that reflected the progress of the Program in real time.

42.     The Individual Defendants are liable for the false statements pleaded herein.

### SUBSTANTIVE ALLEGATIONS

### A.     BACKGROUND ABOUT BBBY

43.     BBBY sells a wide variety of domestic merchandise and home furnishings and is widely-known for its coupon discounts.  BBBY operates under many brand names including Christmas Tree Shops, Harmon, buybuy BABY, and Cost Plus World Market.  Holiday sales are a key revenue driver for, and of singular importance to, BBBY.  Indeed, Defendant Winston stated on October 2, 2019 that holiday sales were "critical" to the Company.

44.     BBBY performed poorly between 2014 and 2019, with its stock price dropping from the mid-$60 range in 2014 to approximately $15 during mid-2019.  Part of the problem was BBBY's coupon campaign.  For decades, BBBY relied heavily on coupon mailers to attract consumers, but the Company failed to evolve its business beyond that strategy.  An April 26, 2019 *Washington Post* article entitled "Your love of Bed Bath & Beyond coupons could be killing the retailer," by Abha Bhattarai stated:

> [BBBY] has built a business on coupons. The housewares chain began mailing out 20 percent off "Big Blue" coupons nearly 30 years ago, at a time when sweeping discounts were a novelty. The idea was that the coupons would draw shoppers into the store, where they would then buy other items at full price. For many years, it worked.
>
> But now, after years of stalled sales and declining profits, the New Jersey-based retailer is pulling back on coupons in a broad effort to turn around its business.

45.     Even after "years of stalled sales and declining profits", it was only under pressure from the Activist Investors in early 2019 that the Company began to move away from its traditional coupon merchandising to try a different strategy: promotions and markdowns.

**B.     BBBY RELIES ON INVENTORY SOFTWARE**

46.     Both before and during the Class Period, BBBY used industry software from, among others, Revionics.  This software was key to BBBY's inventory management because it enabled management to quickly make complex decisions about inventory across the Company's fleet of stores and distribution centers.  A statement by BBBY's Chief Value Optimization Officer Barrie Carmel demonstrates the huge scale of BBBY's business and the accompanying need for inventory management software:

> We have more than 1,000 stores in our fleet, which gives us tremendous leverage, scope and reach to the customer, but it's very different when we are competing against a digital-only presence," said Carmel. "A digital [seller] can change price by pushing a button, and the price changes instantaneously. I push a button, and 1,000 people need to make 1,000 changes in the stores. That is a very realistic thing for us.

See, Mark Hamstra, "Bed Bath & Beyond Tackles Heightened Pricing Competition Amid Quicksilver Online Sellers" (Mar. 3, 2020), https://www.uschamber.com/co/good-company/launch-pad/bed-bath-beyond-pricing-strategy?utm_content=bufferc3acc&utm_medium=social&utm_source=facebook.com&utm_campaign=buffer

47. At all times relevant, BBBY utilized inventory management software supplied by Revionics, among others. Revionics' website emphasizes the "real-time" speed with which companies can access information through its software, stating that "data-driven retailers who turn to AI to **gather and evaluate real-time insights** will be the winners this holiday season."[6]

48. Without utilizing inventory software, BBBY could not compete effectively. That is why BBBY discussed its use of such software with analysts. *See* ¶¶82, 147.

49. In a January 9, 2019 conference call, then-CEO Temares specifically trumpeted BBBY's use of Revionics' software for "inventory optimization":

> We continue to focus on **inventory optimization strategies**…. [including] our enterprise order management system, our human capital management system, **we talked about the things we're doing with Revionics and our value optimization group, rolling out the point of sale, the workforce management**. There are so many things that we put into place that now we're starting to see and we're getting the cadence of when we're going to get these benefits, so it allows us to be we're closer to that timeframe, it allows us to have greater visibility and so that's a shorter term, so that's where we're at.

### C. THE ACTIVIST INVESTORS DEMAND CHANGE AT BBBY

50. In April 2019, after years of disappointing financial performance by BBBY, the Activist Investors strenuously pushed for top-down changes at the Company. Specifically, the Activist Investors argued that BBBY shareholders should elect their slate of board nominees, portraying BBBY's current leadership as unable to keep up in an evolving consumer landscape.

51. The Activist Investors were successful and BBBY's board was restructured in May 2019. This restructuring included appointing Defendant Winston to the BBBY board.

---

[6] Aditya Rastogi, "Leveraging Customer Insights to Avoid Product Cannibalization in Retail, (Mar. 31, 2020), https://revionics.com/article/revamping-your-pricing-strategy-as-retail-reopens/

52. On May 10, 2019, the Activist Investors filed a proxy statement with the SEC outlining additional changes they still deemed necessary at BBBY:

> Our slate of director nominees is committed to executing on a comprehensive strategic plan that we released, which includes a quantified time and action plan that prioritizes the following initiatives: …*addressing the Company's weak sales, improving gross margins, [and] optimizing inventory levels*. (Emphasis added).

53. The proxy repeatedly noted that BBBY's "inventory turns are very low and likely lead to more clearance" and emphasized the need to "improve inventory by increasing inventory turns". The proxy also stated that BBBY had to "increase inventory turns which would result in a substantial release of cash tied up in slow moving goods."

54. In addition, the Activist Investors stressed that the board changes were not enough:

> Not until faced with stockholder pressure, did the Board take steps to change its composition. We do not believe the recent Board changes go far enough to address the prolonged underperformance of the Company and destruction of shareholder value.

55. Apparently in response, on May 13, 2019, BBBY's long-term CEO Temares resigned and Defendant Winston became Interim CEO, effective immediately. In her new role as Interim CEO, Defendant Winston, along with Defendant D'Elia, was keen to address the Activist Investors' concerns related to inventory management.

**D.    BBBY ISSUES AND REITERATES FY2019 GUIDANCE**

56. On April 10, 2019, BBBY issued FY2019 net earnings per diluted share of $2.11 to $2.20.

57. On July 10, 2019, BBBY reiterated such guidance and estimated it to be toward the lower end of the range.

**E.    BBBY ANNOUNCES THE $1 BILLION PROGRAM**

58. On September 4, 2019, the first day of the Class Period, Defendant Winston issued a letter to shareholders that, among other things, addressed the Activist Investors' concerns over inventory and margins. In that letter, which unveiled the Program, Defendant Winston stated that BBBY was "reduc[ing] up to $1 billion of inventory" over the next 18 months, including removing

excess aged inventory before the critical 2019 holiday season.  Defendant Winston stressed that the Program prioritized sales of higher-margin goods, stating that "[t]his effort should allow us to quickly reset inventory levels in both our stores and distribution centers, as well as refresh our assortment, ***providing for newness and higher-margin products***, all in an effort to drive customer traffic and support top-line performance."  The letter did not identify or address any risks associated with the Program.

59.     The market viewed BBBY's Program as central to the Company's turnaround. After BBBY's September 4, 2019 letter (which was issued after market close), BBBY's stock price jumped 7% to close at $9.64 per share on September 5, 2019, after closing on September 4, 2019 at $9.01 per share.

60.     Thereafter, the market continued to be buoyed by news of the Program.  On September 30, 2019, Wedbush Securities analysts Seth Basham and Nathan Friedman noted that the Company "has formulated a plan to reduce inventory by -$1b (~35%) [and] is rapidly refreshing stores to improve the shopping experience ahead of the holiday selling period."  In light of the foregoing, Wedbush raised its rating to "outperform" with a 12-month target of $16.

### F.     BBBY SLIGHTLY LOWERS FY2019 GUIDANCE

61.     On October 2, 2019, BBBY slightly lowered its FY2019 net earnings per share guidance to between $2.08 and $2.13.  BBBY also announced, as part of the Program, that it was removing $350 million in inventory by end-of-year for the holiday season.

### G.     BBBY RELIES ON KEY SOFTWARE TO FACILITATE THE PROGRAM'S SUCCESS

62.     During an October 2, 2019 conference call, BBBY updated investors with more details about the Program.  In particular, Defendant Winston stated that "[t]o optimize this inventory off-load the company is employing markdown optimization software to facilitate and manage the inventory reduction process."  This software was critical to the success of the Program, *inter alia*, because it tracked the Program in real time and ensured goals were achieved (Defendants

claimed) without harming BBBY, *i.e.*, by further reducing BBBY's already suffering margins or by cannibalizing sales.  This software was also critical to the success of the Program because BBBY had traditionally been a coupon-centered company, not a markdown-centered company.  Thus, the Program and its focus on markdowns was a departure from the Company's past practice and BBBY needed inventory software to closely monitor the Program.

63.     During the October 2 call, Defendants also stressed that they were ahead of the risk of the Program eating into margins and cannibalizing sales.  Defendants D'Elia and Winston claimed they had the necessary tools to address those risks – among them, this key software – and that they also had adequate oversight in place (*i.e.*, personnel and planning).

64.     Markdown optimization software manages and monitors inventory, allowing companies to optimize the reduction in selling price by recommending the best timing and depth of markdowns.  Retailers apply markdown optimization methods to have an optimal inventory in line with consumer demand, thus ensuring the highest margins.  Markdown optimization software takes into account each product's stock levels, shelf-life, current pricing, lifecycle, and seasonality trends for the purpose of decreasing excess inventory.  The software also analyzes changing product life-cycles, seasonal demand, different assortments of goods, varieties in the customer base, new stores, price competition, and any other factors that may change after the initial decision-making point.  Markdown optimization software also allows companies to avoid selling products too cheaply and, thus, cannibalizing sales of other higher-margin goods.

65.     As noted *supra*, Revionics is one of the companies that provides software to BBBY.  Revionics' website discusses cannibalization and emphasizes that even promotions can cannibalize revenues:

> Product cannibalization, also known as demand substitution, happens when similar products compete against each other for the same sales. People most often think of cannibalization in the context of a new product being introduced and taking sales away from an older item in the same portfolio. ***However, this isn't the only case. Product cannibalization in retail can occur from other events, including promotions and discounts….***

> Typically, product cannibalization in retail is considered a negative outcome. And you

can see why; if one product merely takes all the sales of another, you now have more inventory but the same amount of sales and revenue.[7]

66.     More specifically, promotions can cannibalize revenues and sales by affecting shopping behavior.  If two products are almost perfect substitutes for each other, and one of the products is on substantial discount because of an ongoing sales promotion, customers commonly buy the promoted product instead of the one sold at a normal price.  Consequently, the sales promotion of one product decreases, or cannibalizes, the sales of similar products.

67.     BBBY continued to use software, including software supplied by Revionics, during the Class Period, but began to focus on utilizing that software to manage markdowns and track the Program's progress in addition to utilizing it for inventory management.  A January 6, 2020 news article on *businessinsider.com* entitled "NRF 2020: Revionics to Host Panel with Bed Bath & Beyond, DICK'S Sporting Goods & Leroy Merlin Brazil on Pricing for the Multichannel Retailer" discussed a January 13, 2020 Revionics panel moderated by, among others, BBBY's Chief Value Optimization Officer Barrie Carmel.  Among other things, the article stated that Revionics' software enabled companies like BBBY to improve margins and avoid cannibalization of sales – precisely what Defendants E'Elia and Winston claimed the Program would avoid – and maximize inventory returns through markdowns:

Revionics' top executives and technical experts will be available at their exhibit to show retailers why pricing smarter doesn't have to be harder with Revionics AI and science-based solutions, which include:

Pricing: As the top priority of shoppers, retailers' prices must take into account current market, competitive and shopper conditions across all channels. This means providing carefully crafted AI-powered pricing that delivers a win-win: providing shoppers with prices they love on the products they care most about, while ensuring retailers capture overall margins that enable them to sustain a healthy business in the long run.

***Promotion: Promotion analytics and optimization enable retailers to break the cycle of ineffective promotions and the race to the bottom with in-depth insights into consumer buying influences, cannibalization and halo effects, and identifying the most compelling vehicles and offers for different types of shoppers.***

---

[7] https://revionics.com/article/avoid-product-cannibalization/

*Markdown: With AI-based markdowns designed to maximize return on inventory, margins and sell-through, retailers can deliver the discounts that customers want, where they want them, and when they want them.*

Dynamic Pricing: Revionics enables retailers to leverage machine learning science and competitive and shopper insights to price the right items at the right time, against the right competitors and in the right channels.

Competitive Insights: Retailers can better serve customers, exploit hidden opportunities, and achieve a higher ROI with real-time competitive insights.[8]

68.     A March 3, 2020 article by Mark Hamstra entitled "Bed Bath & Beyond Tackles Heightened Pricing Competition Amid Quicksilver Online Sellers", (available at https://www.uschamber.com/co/good-company/launch-pad/bed-bath-beyond-pricing-strategy?utm_content=bufferc3acc&utm_medium=social&utm_source=facebook.com&utm_ca mpaign=buffer) also discussed BBBY's use of Revionics' software.  That article quoted BBBY's Carmel and stated that Revionics' software helped every aspect of BBBY's inventory management:

**Home retail chain Bed Bath & Beyond discusses its pricing strategy as it relates to technology and its competition against digital retailers within the industry….**

"We have more than 1,000 stores in our fleet, which gives us tremendous leverage, scope and reach to the customer, but it's very different when we are competing against a digital-only presence," said Carmel. "A digital [seller] can change price by pushing a button, and the price changes instantaneously. I push a button, and 1,000 people need to make 1,000 changes in the stores. That is a very realistic thing for us."

***Bed Bath & Beyond, which uses price optimization technology from Revionics, is coping with those challenges by fostering collaboration among its merchandisers and data scientists and looking beyond having the lowest prices to communicate an overall impression of value, she said***….

At Bed Bath & Beyond, changing the price of an item not only affects the physical shelf tags in the stores, but it can also impact several other consumer communication vehicles, including social media posts, email marketing messages and other digital advertising. These must all be positioned not only to convey the accurate pricing and appropriate value messaging, but also to drive traffic to the stores, Carmel explained.

---

[8] A "halo effect" is when buying one product leads to buying a separate product.

Bed Bath & Beyond seeks to create a strong value impression right from the start of the customer's journey online, she said, which is also where the challenge of integrating the brand's coupon strategy comes into play. Consumers, particularly younger shoppers, who are comparing prices online might not be aware that a coupon is available that would make an item more price-competitive, Carmel said.

**H.  A FORMER SENIOR BBBY EMPLOYEE REPORTS THAT SENIOR MANAGEMENT, INCLUDING DEFENDANTS D'ELIA AND WINSTON, RECEIVED WEEKLY REVIONICS REPORTS, WHICH INCLUDED DETAILED INVENTORY AND MARGIN DATA**

69.     CW-1 is a former senior BBBY employee.  CW-1 worked as a divisional merchandise manager for BBBY from summer 2017 to July 2019.  CW-1 was based at BBBY headquarters in Union, New Jersey.  CW-1 reported to Vice President of General Merchandise and Manager Dave Eckert.

70.     As a divisional merchandise manager for BBBY, CW-1 guided a 12-person team in the merchandising division. CW-1 was hired to help reverse sales decline and stabilize a division with $400 million in annual revenue.  CW-1 reengineered product offerings, eliminated job redundancies, and established accountability practices.

71.     CW-1 stated that BBBY had a lack of clear merchandising direction after BBBY President Art Stark left the Company in May 2018.  CW-1 stated that Stark's exit left the Company with inadequate merchant expertise in the ranks of upper management.  Similarly, CW-1 stated that Chief Merchandise Officer Todd Johnson was "in over his head".  Johnson left BBBY in December 2019, three months into the Program.  As set forth *infra*, the Chief Merchandise Officer was a key position whose role was fundamentally important to inventory management and, relatedly, the Program.

72.     CW-1 stated that in 2019, BBBY was in the process of culling the number of items its stores carried in each category as part of an SKU (stock keeping unit) rationalization inventory optimization strategy.  The effort was ongoing when CW-1 left the Company in July 2019 and far

from complete.

73.     CW-1 reported that BBBY used Revionics markdown optimization software for price optimization as well as for initial pricing.  CW-1 reported that the markdown optimization software had three components: (i) initial pricing, which suggested the ticket price; (ii) promo pricing, which was for temporary markdowns rolled out to promote products and optimize gross margins; and (iii) markdowns, for pricing clearance items.

74.     Revionics software sets prices, particularly when goods are on clearance, and on promotions.  CW-1 gave the following example:  If you have $100 toaster ovens that have been on the shelf for 5 years, the software would look at pricing history and say sell them at $25.

75.     CW-1 stated that there were weekly Revionics reports that included data on inventory levels, pricing, and margins, all the way down to the SKU level, which included product color and size.  These weekly reports were "very detailed".

76.     CW-1 stated that these weekly reports were sent to senior BBBY management, including Defendants Winston and D'Elia.

77.     CW-1 also stated that there were weekly meetings at the Union, New Jersey headquarters with Defendants Winston and D'Elia.

78.     Additionally, CW-1 stated that BBBY also used JDA software for general inventory management.  CW-1 stated that JDA was a general "inventory tool" while Revionics was more geared towards "price optimization," although BBBY also utilized Revionics software for initial pricing.

**I.      DEFENDANTS  WINSTON  AND  D'ELIA  CONTINUE  TO  TOUT  THE PROGRAM AND CLAIM BBBY WAS AHEAD OF KEY RISKS**

79.     Defendants Winston and D'Elia repeatedly discussed the Program during investor presentations, and continued to tout the Program's benefits to BBBY, while downplaying any harm that the Program could have on the Company.  On the October 2, 2019 conference call, Defendant D'Elia described the Program as follows:

> Well, this inventory write-down is tied to our strategic initiatives. It's flagging inventory that we see as aged inventory or duplicative SKUs in our assortment. So we've been

actively working on identifying those duplicative SKUs and wanting to move them out of our assortment again so that we can present a clearer point of view from an inventory and merchandising perspective to our customers. So we view this as tied to transformation.

80. Defendant Winston stated during the same call that BBBY was removing aged inventory through the Program to "refresh" the Company's assortment and make room for high volume, higher margin goods before the critical 2019 holiday season:

> During our call, we have provided a lot of transparency around the things that we are doing to advance our strategic priorities, including plans to aggressively reduce up to $1 billion of inventory at retail over the next 18 months, including the removal of aged inventory from our stores before the 2019 holiday season to refresh our assortment and support top line performance; the initiation of a rapid store refresh of nearly 160 of our highest volume and most profitable Bed Bath & Beyond stores to improve the in-store shopping experience; the completion of our initial fleet optimization analysis for Bed Bath & Beyond and the decision to close 40 Bed Bath & Beyond stores and 20 other concept stores this year; our decision to close down one of our least productive e-commerce businesses; and finally, the ongoing evaluation of our business concepts and our real estate holdings.

81. Defendants D'Elia and Winston also stressed to investors that they had their arms around the Program, explaining that BBBY's planning, personnel, and software safeguarded the Company against margin erosion and/or sales cannibalization. Thus, Defendants D'Elia and Winston appreciated the risks posed by the Program – but told investors that those risks were addressed. Indeed, Defendant Winston stated that "more than approximately $350 million of inventory at retail will be removed from our stores before the 2019 holiday season" and "[t]his will be accomplished with a series of markdowns and clearance events as well as with the assistance of an independent liquidator, *all to be managed thoughtfully to prevent cannibalization of sales*."

82. Defendant Winston also trumpeted BBBY's "new data-driven insights" and the Company's markdown optimization software, stating that these were fueling the $1 billion inventory sell-through:

> Our #1 priority is stabilizing our top line and optimizing our sales opportunities. A core component of our sales stabilization efforts and our transformation overall *is based on new data-driven insights* that we are using to identify opportunities for improving our

customer value proposition….

*We continue to make strategic pricing decisions to deliver noticeable value to our customers. These strategies include refining our dynamic pricing algorithms and online and in-store pricing actions to address customer price perceptions.  The implementation of markdown optimization software and processes is accelerating sell-through, resulting in less aged inventory and optimizing the profitability of our seasonal and fashion assortment.*  We believe that more effective pricing will drive both top line growth and profit improvement. These near-term opportunities will provide the foundation required to invest in and execute the shopping transformation consumers are demanding and allow us to reinvigorate our iconic brand.

83.     Defendant D'Elia reiterated during the call that the Program was protecting BBBY's margins:  "[O]n the inventory, you're asking about the margin impact as we take out the merchandise. *Again, we're mindful not to cannibalize sales during the holiday period*."

84.     By repeatedly emphasizing that BBBY had the tools, including software, that specifically guarded against the risks of margin erosion and sales cannibalization, Defendants D'Elia and Winston gave BBBY investors the impression that – although the Program was no slam dunk in ease of execution – the Program was not exacerbating BBBY's problems.

85.     On October 3, 2020, Wedbush analyst Seth Basham stated that "clearing aged inventory and inventory not consistent with the company's curated merchandize assortment strategy will declutter stores and leave room to add traffic-driving treasure hunt merchandise." The report also stated that "[r]apidly refreshing 160 of BBBY's best stores prior to the holidays should also create a more exciting shopping environment to drive sales" and "[s]hifting and adding promotions and advertising to the holiday period should also drive traffic and sales…"

86.     On October 9, 2019, BBBY filed its quarterly report on Form 10-Q.  That report incorporated risk language from the Company's 2019 Annual Report, which stated that the Company "heavily" relied on its inventory software:

BBBY relies heavily on [information technology] systems to process transactions, *manage inventory replenishment*, summarize results and control distribution of products.  (Emphasis added).

**J.     UNBEKNOWNST TO INVESTORS, BBBY'S UNSTABLE MANAGEMENT WAS UNDERMINING THE PROGRAM**

87.     On the October 2, 2019 conference call, Defendant Winston discussed BBBY's

talent recruitment goals and realignment efforts, but did not reveal that BBBY's then-current management instability was actually undermining the Program:

> Our fourth and final near-term priority is to take a fresh look at our organization structure. It is critically important that as we transform Bed Bath & Beyond, we ensure we have not only the right talent and expertise but also the right team structures in place to facilitate a connected and efficient organization. During this interim period, we have realigned the reporting structure of the organization such that all other business concepts now report into one leader.

88.     One week later, on October 9, 2019, BBBY announced that its search for a permanent CEO replacement for Temares had ended, and that Defendant Tritton would become the Company's new CEO.

89.     Defendant Tritton became BBBY's CEO on November 4, 2019, approximately two months after Defendant Winston initiated the Program.

90.     Rather than pause the Program for evaluation, Defendant Tritton ratified the Program immediately upon starting at the Company.  Defendant Tritton also began to further the management overhaul that the Activist Investors had begun in May 2019.

91.     On December 17, 2019, three months into the Program, BBBY disclosed that Defendant Tritton had axed six senior management, including the Chief Merchandise Officer, from the Company to pave the way for a new guard:

> UNION, N.J., Dec. 17, 2019 /PRNewswire/ -- Bed Bath & Beyond Inc. (Nasdaq: BBBY) today announced an extensive restructure of its leadership team, including the departure of six senior members….  The new team will be charged with streamlining decision-making, accelerating the pace of transformation, and re-establishing Bed Bath & Beyond's authority in the home space through a more customer focused, omnichannel retail operation, a redefined product assortment, and a more convenient and inspirational shopping experience….
>
> In redefining the structure and roles of the new leadership team, five senior members are leaving their positions, including the Chief Merchandising Officer, Chief Marketing Officer, Chief Digital Officer, Chief Legal Officer & General Counsel, and Chief Administrative Officer.  The sixth member, the Chief Brand Officer, resigned last week.  While interim leads have been appointed, the Company has commenced a search to fill the positions of Chief Merchandising Officer, Chief Digital Officer, General Counsel, as well as a newly combined Chief Marketing and Brand Officer position.

BBBY did not replace its Chief Merchandising Officer (Todd Johnson), a role inherently important

to the Program, until March 2020. Thus, BBBY had a critical vacancy between December 17, 2019 and the end of the Class Period – right at the important holiday sales season. Moreover, BBBY did not disclose that this significant and ongoing shift in leadership was impeding the Program, including, *inter alia*, by creating gaps in oversight over the Program.

### K.    FOUR MONTHS INTO THE PROGRAM, BBBY PULLS ITS FY2019 GUIDANCE AND BEGINS TO REVEAL FALLING MARGINS

92.    On January 8, 2020, BBBY announced an adjusted net loss of $.38 per share (far below the $.02 consensus), withdrew its guidance, and reported falling margins – but did not disclose the profound problems with the Company's inventory management or the full extent of the problems with the Program:

> UNION, N.J., Jan. 8, 2020 /PRNewswire/ -- Bed Bath & Beyond Inc. (Nasdaq: BBBY) today reported financial results for the third quarter of fiscal 2019 ended November 30, 2019…
>
> **Fiscal 2019 Third Quarter Results**
>
> ***For the fiscal 2019 third quarter, the Company reported a net loss of $(0.31) per diluted share ($(38.6) million),…*** Net sales for the fiscal 2019 third quarter were $2.8 billion, a decrease of 9.0% compared to the prior year period. Comparable sales in the fiscal 2019 third quarter declined 8.3%....(Emphasis added).
>
> **Outlook**
>
> The Company expects its sales and profitability to remain pressured during the fiscal 2019 fourth quarter. Considering these headwinds reflected in the Company's results to date, and the ongoing work by recently appointed President & CEO Mark Tritton to assess the business and finalize the details of the Company's go-forward strategic plan as well as the extensive senior leadership changes within the past month, ***the Company believes it is appropriate to withdraw its fiscal 2019 full year financial guidance***. (Emphasis added).

93.    Pulling guidance is a rare and draconian step; executives often revise guidance

when warranted, but withdrawing it completely is highly unusual.[9]

94.     On a January 8, 2020 conference call, Defendant D'Elia disclosed that BBBY's gross margins had plummeted by 80 basis points.  Defendant D'Elia stated that the "80 basis point decline is primarily due to a decrease in merchandise margin driven by a higher level of promotional activity in the quarter and was partially offset by a decrease in net direct-to-customer shipping expense."

95.     For the first time, Defendant Tritton also admitted that BBBY was out of its depth with the promotional strategy, stating that "in terms of the Thanksgiving period, this was the first time that we actually deployed an active mass promotional strategy, not a coupon strategy."

96.     On the same call, when discussing BBBY's problems at the end of 2019, Defendant Tritton confirmed that BBBY was monitoring inventory as part of the Program on a real-time basis – indeed, "hour by hour":

> [W]e started entering into Thanksgiving period, and we saw real pressure on sales. And we realized that some of our activity in digital, by trying to remain independently profitable in that space and not thinking about the gateway experience on the Thanksgiving period, was distorting our true price value equation and what we could mean to the customer at that time. We made really sharp pivots, and I was really proud of the team, and we instantly saw key items we're winning share back. **We're watching it hour by hour**. (Emphasis added).

97.     Defendant Tritton also emphasized that he was on top of the situation given his experience as a veteran in the field:  "I'm no stranger to this, I've been through it before, converting promotional sales or clearance sales to regular price sales."  Defendant Tritton also stated on the call that BBBY was "taking aggressive steps to rationalize the assortment and better manage inventory".

98.     However, Defendant Tritton did not disclose the extent of the inventory management problems that were materially undermining BBBY's margins and cannibalizing sales, *i.e.*, that while BBBY was unloading inventory through the Program, it was doing so at the expense

---

[9]  *See, e.g.*, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3077262 at 22 (withdrawing financial guidance is "rare").

of sales cannibalization and margin reduction – the very issues Defendants assured investors they avoided and had the tools and oversight to safeguard against.

99.     Defendant Tritton also discussed the rapidly-changing landscape of BBBY's internal management on the call, but failed to acknowledge that BBBY's then-current instability within management was actually impeding the Program:

> As we reconstruct and modernize our operating model, we need to embed the right leadership capabilities and accountability measures to ensure the business operates efficiently and effectively. A rethink of the company's leadership team was necessary to propel Bed Bath & Beyond forward. Last month, I announced extensive changes to our leadership team, including the departure of 6 senior members. We'll be putting a team in place that will not only have the right talent and expertise to execute our new vision and inject new ideas but also the right organizational structure to facilitate a more streamlined decision-making, to accelerate the pace of transformation and to reestablish Bed Bath & Beyond's authority in the home space.

100.     Analysts reacted swiftly to the January 8, 2020 disclosures, immediately realizing the significance of BBBY's plunging margins – including the Company's "largest adjusted EPS loss in [] history" and the collapse of the Company's EBIT margins by 200 basis points. Wells Fargo published a January 8, 2020 report entitled "BBBY: Shares Living The Dream, But Fundamental Nightmare Continues" by Zachary Fadem, Eric Cohen and David Lantz, noting its surprise over BBBY's low margins and the Company's lack of transparency, and that Defendant Tritton was picking up with the Program where Defendant Winston left off instead of previewing his own strategic initiatives:

> **While Q3 was not supposed to be about the numbers, poor results the largest incremental takeaway.** *In our view, Q3 results were clearly worse than expected* and with shares +67% over the past 3 months (+12% SPX), we believe a pullback tomorrow is warranted. Calendar headwinds were well documented, but comp declines of -8.3% were -400bps below consensus,… *EBIT margins compressed -222bps and BBBY posted its largest adjusted EPS loss (-38c) in history*…. We believe tonight wasn't supposed to be about the numbers, as investors widely anticipated new CEO Mark Tritton's plan for the future, opportunities for improvement, and prospects for a comp inflection. Instead, <u>few concrete details were provided (aside from already anticipated opportunities in</u> <u>digital, merchandising, private brands and real estate rationalization), and with BBBY</u> <u>posting its worst comp in over a decade (maybe ever), negative EBIT margins and</u>

widening FCF losses, we view the prospects for NT improvement increasingly distant at
this stage. (Underline and bold in original).[10]

101.    Guggenheim also published a January 8, 2020 report entitled "BBBY – 3Q Shortfall
Resets 2020 "Starting Point" – Curtailing Customer Attrition in Focus; NEUTAL" by analysts
Steven Forbes, John Heinbockel and Stephen Kovalsky discussing BBBY's historic negative EBIT
margins:

> Adjusted gross margin eroded 85 basis points year-over-year, despite an estimated ~30
> basis point benefit from the net change in the company's sales return liability. And,
> adjusted SG&A expenses delevered ~130 basis points, even with an estimated ~25 basis
> point benefit from the recent corporate workforce reduction… ***Bottom line, 3Q results
> were disappointing as EBIT margin turned negative for the first time in recent history***.
> (Emphasis added).

## THE FULL TRUTH IS REVEALED: THE PROGRAM
## SUBSTANTIALLY ERODED MARGINS AND CANNIBALIZED REVENUES

102.    On February 11, 2020, after market close, BBBY disclosed that the Program was
harming BBBY precisely in the manner Defendants claimed to have guarded against through
BBBY's planning, oversight, and software tools.   Namely, the Program's promotions and
markdowns cannibalized sales and caused key, high-margin goods to be out of stock ahead of the
holiday season.  The Program also harmed margins far more than was revealed on January 8, 2020.
The February 11, 2020 disclosure further revealed that Defendants lacked the "thoughtful",
"mindful" and diligent oversight that they represented to investors they had over the Program.  A
press release of February 11, 2020 provided, in relevant part:

> Bed Bath & Beyond Inc. (Nasdaq: BBBY) today reported preliminary, unaudited
> financial performance data for the first two months of the fiscal 2019 fourth quarter
> (December 2019 and January 2020), ***including a 5.4% decline in comparable sales
> driven primarily by store traffic declines combined with inventory management issues,
> and increased promotional activity and markdowns***.  The Company is providing this
> update today to provide visibility into the current pressures on the business, which the
> Company's new management has been reviewing to ascertain insights and key learnings.

---

[10] The "calendar headwinds" in the report refer to the fact that BBBY's 3Q2019 included the day
after Thanksgiving – but (unlike 3Q2018) not the Monday (cyber Monday) and week following.

(Emphasis added).

Mark J. Tritton, President and CEO of Bed Bath & Beyond, said, "We are experiencing short-term pain in our efforts to stabilize the business, including the pressures of store traffic trends coupled with our own executional challenges….

Fiscal December 2019/January 2020 Comparable Sales…

***Product availability leading into the holiday period was also a contributing factor, as inventory within certain key categories in the Bed Bath & Beyond assortment was too low or out-of-stock during the period. The Company is immediately reforming its internal planning and inventory management procedures to master the fundamentals.*** (Emphasis added).

103. On this news, the Company's share price fell $3.06 per share, or over 20%, to close at $11.79 per share on February 12, 2020, on unusually heavy trading volume.

104. Analysts again pounced on BBBY for the unexpected bad news. A February 11, 2020 Wells Fargo report by Zachary Fadem, Eric Cohen and David Lantz was highly critical of the Company, characterizing the announcement as a "discouraging start to the Tritton era" and noting that BBBY's gross margins had plunged by 300 basis points – the "largest decline in 10+ years":

**BBBY: Falling Further Off The Bed; Preannounce Dashes NT Turnaround Hopes**

**BBBY's FQ4 pre-announcement suggests NT trends even worse than feared; Expecting aggressive plan at Spring 2020**

**Analyst Day.** This evening (2/11), just one month following new CEO Mark Tritton's first earnings call, BBBY provided disappointing preliminary financial results for December/January, which were well below Consensus. Details include: **1)** A -5.4% reported comp decline (vs. our/Street of -3.5%/-3.8%), comprised of -11% store comps and a +20% increase online (implying digital is ~27.5% of sales); **2)** ***Roughly -300bps of gross margin pressure (the largest decline in 10+ years) owing to heightened promotional activity and mix shift to lower margin (online) channels***; and **3)** Implied adjusted EBIT margins of +1.5% (-490bps y/y). ***BBBY cited declining traffic, increased promo activity and poor inventory management as key drivers***, and as a result plans to expedite efforts to rebalance its portfolio, reset the cost structure and enhance its leadership/talent. ***In our view, this represents a discouraging start to the Tritton era, and while it's widely understood that a BBBY turnaround would be no easy task, we believe it's safe to say that NT improvement appears increasingly unlikely at this point***. As a result, we anticipate a deeply negative reaction from the market tomorrow…we are lowering our FY19/20 EPS estimates by -77%/-55% to $0.28/$0.60 (from $1.21/$1.34).

Our new price target is $10 (16x our FY20E EPS), down from $12. Reiterate Underweight. (Emphasis added).

105.    Credit Suisse also published a critical report on February 12, 2020 by analysts Seth Sigman, Kieran McGrath and Lavesh Hemnani.  That report discussed BBBY's out-of-stock goods during the critical holiday period, the cannibalization of revenues resulting from BBBY's holiday promotions, and the collapse of BBBY's margins by 300 basis points.  In other words, Credit Suisse noted that the Program failed in the very ways that BBBY claimed to have safeguarded against:

Tough Getting Out of This Bed; Still See Pressure Continuing; Monitoring Upcoming Catalysts…

**3. Execution challenges noted.** *The company cited traffic- and execution-related issues, incl. out of stocks. It promoted key promotional items during the Thanksgiving period, with more attractive dynamic pricing and excluded the coupon*. *This sale went well over Thanksgiving (as noted previously, this supported the 7% comps during that holiday week), but caused BBBY to move through a lot of inventory, leaving it out of stock into the Christmas period*. December was weak, and the company was anticipating an improvement in January, which it did not see. We believe these pressures will continue into 1H….(Emphasis added)

**5. GM -300 bps y/y vs. -85 bps last quarter,** *due to promotional/markdown activity, mix of key promotional items (such as kitchen appliances which are lower margin) and more online sales* (Cyber shift, recall last quarter got the benefit of lower shipping costs due to the decline in online sales). (Emphasis added).

106.    A February 11, 2020 UBS report by analysts Michael Lasser, Atul Maheswari and Mark Carden also highlighted the negative effect of BBBY's Program:

Bed Bath & Beyond Inc.
It's Hard to Look At This Bath as Half Full

**BBBY comps declined -5.4% for Dec/Jan (down -13% on a shifted basis)**

*Any way you slice it, it was a rough holiday for Bed Bath*….

**Bed Bath will likely end FY'19 with around a 1% operating margin**

*We think BBBY's increased promotions heavily impacted its GM (this line was down -300 bps in Dec/Jan vs. the cons. of -50 bps for 4Q).* Notably, its 4Q GM dollars are on track to decline -14% in 4Q, showing how fast the business deteriorated. At the same time, its adj. SG&A deleveraged 190 bps due to a lower comp & increased advertising.

We now lower our 4Q EPS to $0.19 (was $0.97). Clearly, BBBY needs to demonstrate its ability to balance its sales and profitability in the short run. (Emphasis added).

107. On February 12, 2020, Wedbush Securities analysts Seth Basham and Nathan Friedman also described its surprise that BBBY's margins continued to fall – when BBBY assured they would not – and noted the Company's promotions had cannibalized revenues and caused the plummeting margins:

**Breaking Down the House in Order to Fix It**

**The Wedbush View**
Yesterday AMC, BBBY provided an update on FQ419 performance that is trending considerably worse than expectations. *The surprise was not in comparable store sales, but in both gross and SG&A margins. Gross margins declined ~-300 bps through the first two months of the quarter (vs. our -10 bps and consensus' -60 bps F4Q estimates) while adjusted SG&A deleveraged 190 bps (vs. our +20 bps and consensus' +10 bps F4Q estimates). Higher promotional activity drove the gross margin weakness*, while a sales mix shift to the online channel also contributed…..

BBBY announced that for the first two months of 4Q19 same-store sales declined -5.4% y/y, slightly below our estimated -5.0% y/y for the quarter and further below consensus of -4.1% y/y. This decline was driven by a low-double-digit percentage decrease in transactions per store offset by a mid-single-digit increase in average ticket amount (similar to the dynamics we saw in 3Q19) and was partly caused by *a lack of in demand inventory* and a muted reaction to some initial promotions. (Emphasis added).

108. A Guggenheim report entitled "BBBY – P&L Uncertainty Increases Meaningfully—A Year of Management Transition + FCF Neutrality, Lowering Estimates" by Steven Forbes, John Heinbockel and Stephen Kovalsky dated February 12, 2020 also noted that BBBY's "margin erosion" was attributed to the Program:

4Q Update: ~500 Basis Points of EBIT Margin Erosion—BBBY Is Now a 1.00% Margin Business; Lowering Estimates. As shown within Exhibit 1, BBBY's 4Q update results in a meaningful change in the recent trajectory of the company's EBIT(DA) margin profile, elevating P&L uncertainty as we head into 2020.

109. A February 12, 2020 J.P. Morgan report by Christopher Horvers, Megan Alexander, Tami Zakaria and C. Jerry Sullivan also noted the significant problems that BBBY had just disclosed concerning the Program:

**Takeaways from our follow-up with the company. (1)** Product availability issues were primarily related to key holiday categories (*i.e.* small home appliances such as Instant Pots) resulting from increased promotions and dynamic pricing actions taken around Black Friday leading to out of stocks into Christmas with issues still affecting comps currently.

110.    Market commentators also noted BBBY's ongoing inventory management problems, which Defendants claimed were managed through proper planning, oversight and industry software.  On February 11, 2020, *USA TODAY* published an article by Kelly Tyko entitled "Bed Bath & Beyond CEO Mark Tritton says company experiencing 'short-term pain,' sales decline" stating that BBBY had acknowledged that "[p]roduct availability was a contributing factor" and "inventory within certain key categories in the [BBBY] was too low or out-of-stock during the period."

111.    BBBY held a conference call with analysts on February 18, 2020.  On the call, Defendant Tritton expanded on the inventory issues that beset the Program, including that BBBY failed to manage its stock of key, higher-margin products that the Program was specifically designed to prioritize:

> [BBBY] had a double-edged sword in terms of inventory, and I would talk to, firstly, the negative in that we've been dealing with some ***out-of-stocks in terms of our primary items that have been driving our business traditionally and that's what's hurt us in the third and fourth quarter***…. ***So on that inventory side, we didn't have enough of the right stuff***…. We just need to course-correct in terms of the mix of merchandise and our focus.

The entire purpose of the Program, as represented to investors, was to fix BBBY's aged and bloated inventory problem by unloading low margin inventory so BBBY could focus on the high margin inventory.

112.    These analyst reports and news articles, as well as Defendant Tritton's statement during the February 18, 2020 conference call, demonstrate that the Program was not as Defendants represented.

### AFTER THE CLASS PERIOD, TRITTON ADMITS
### THAT BBBY KNEW OF THE PROGRAM'S PROBLEMS EARLY ON

113.    On April 15, 2020, BBBY held a conference call to discuss its FY2019 results –

which included FY2019 diluted earnings per share of only $.46, radically below BBBY's repeated guidance of $2.08 to $2.13 – and the failures of the Program. On the call, Defendant D'Elia reported that the Company's general margins plummeted by 210 basis points "primarily due to unfavorable impact on merchandise margin from promotional activity and markdowns." Defendant Tritton also disclosed that BBBY was aware of the inventory management problems that beset the Program from early on. Defendant Tritton admitted that BBBY had done "intel work" and knew in December 2019 and January 2020 that BBBY had failed to ensure that best-selling products were in stock for customers during the holiday season:

**Curtis Smyser Nagle** - BofA Merrill Lynch, Research Division – VP

…As you said, February and 4Q are very much in the rear view. But I just wanted to – if you could possibly hash out some of the math in terms of what was implied for the February comp. And I think it improved relative to what was going on in the 2 prior months, but anything you could comment on that would be great.

**Mark J. Tritton** - Bed Bath & Beyond Inc. - President, CEO & Director

Yes. I think for us, it was tough to hit the COVID moment when we just saw some pivots happening in February. *We knew we were plagued by issues in December and January,…[s]ome of it was self-inflicted. I mean when we don't have best sellers in stock, we've got discounting and we don't have our inventory. I mean some of the sales decline we saw in our stores wasn't necessarily traffic. We did some intel work on that, saw the customers were coming in, and they just couldn't find the product in stock*. So we were shooting ourselves in the foot.

In addition, as detailed *supra*, Defendants had real-time access to data that informed management about BBBY's inventory, and thus the Program's failures, from day one. *See supra* ¶¶62-68. Defendant Tritton's candor therefore was too little too late.

114. Further demonstrating the depth of the inventory management problems at BBBY, Defendant Tritton noted that the Company was investing "about $250 million on our core business and key projects…such as…omni *inventory management*".

115. Defendants D'Elia and Tritton also admitted on the call that BBBY's failure to monitor the promotions and markdowns caused the fourth quarter plunge in margins:

**Peter Sloan Benedict - Robert W. Baird & Co. Incorporated, Research Division - Senior Research Analyst**

[B]ack to the -- in the fourth quarter, can you give us a sense how much of that -- of the 210 basis point hit to gross margin, how much of that was from the digital fulfillment headwinds?

**Robyn M. D'Elia - Bed Bath & Beyond Inc. - CFO & Treasurer**

The majority was really on -- ***related to markdowns and promotional activity***. So more heavily weighted there, with just a lesser extent was the shift in the mix to digital.

**Mark J. Tritton - Bed Bath & Beyond Inc. - President, CEO & Director**

Yes. ***We really saw some pain points there based on the promotional activity and how we managed it***. And that, as I said earlier, Peter, has been a tight learning. There was some impact of the digital sale, but it was outweighed by the margin impact that we took with markdowns and promos….

Now turning to the fourth quarter, which just seem like a lifetime ago. In short, the pressures of store traffic trends and heavy promotional activity, coupled with the inventory management issues around the holiday selling period, hampered our efforts to stabilize the business in the fourth quarter.

116. Defendant Tritton also specified on the call that "certain key promotional categories" like "kitchen electrics" were at the heart of the end of 2019 inventory problems:

All 4 of our e-commerce fulfillment centers are currently operating. And by the end of this week, we will have converted approximately 25% of our Bed Bath & Beyond and buybuy BABY stores in the U.S. and Canada into regional fulfillment centers to use our vast inventory resources to assign orders locally and deliver quickly….

***Product availability with certain key promotional categories, such as kitchen electrics, leading into the holiday period were either too low or just out of stock. We just didn't have enough of the right stuff, which hurt us***. (Emphasis added).

117. In response to a question by Guggenheim analyst Steven Forbes, Defendant Tritton expanded on the inventory problems that the Program was supposed to cure, not exacerbate, conceding "big misses" during the critical holiday season. Defendant Tritton also conceded that these problems, in part, were caused by management instability and key personnel vacancies at BBBY – in particular the Company's lack of a Chief Merchandising Officer since December 2019 – that were critical to managing inventory, particularly stocking and seasonality:

**Steven Paul Forbes** - Guggenheim Securities, LLC, Research Division – Analyst

And then maybe just a quick follow-up on inventory management. It's sort of interesting here given your comments around not having enough inventory this holiday, right, holiday 2019, about all the uncertainty that exists today. So maybe just give us an update or discuss how you're planning your inventory buys this year, and particularly for holiday 2020, what's sort of the typical time frame when you have to make those decisions and commit to those POs? And how important, right, is it that you're open by the time those commitments occur?

**Mark J. Tritton** - Bed Bath & Beyond Inc. - President, CEO & Director

Yes. Look, I mean, a couple of things there. I think that we've been – Joe [Hartsig, BBBY's new Chief Merchandising Officer] has been leading the charge here and having deep conversation with all our majors and our general vendor bases about flow. If you go back to the inventory position that we had, there's kind of 2 things going there. The good news was that overall, we reduced our inventory by about 16% at the close of the quarter. And so we were working leaner on that. But inside of that, *we did have big misses*. Not by having more inventory. We think that's a good level that we can come down to. ***But we could have traded some of our mix to be more in stock of our key items and generated more sales and gross margin by having the right merchandise***. So again, the level coming down is a positive, the curation within the level becomes critical. Joe has really lent into that charge, getting it back in stock about top 100, 250, 500 items and making sure that we can draw that down. I think also getting the flexibility to draw the stock from different places helps us to kind of speed up sales and get clarity and delivery to the customer on time. (Emphasis added).

In terms of the point around the commitments, we quickly moved into an evaluation of high-risk merchandise, seasonal merchandise and anything that kind of -- if we looked at our long-term plan of what could have been a close at hold, really looking at minimizing our quantification of risk and adjusting flow. So that's a very fluid discussion, a very real discussion. And that began on day 1 when we started to see the problem emerge. So it's a real strength in having Joe on board, focusing on this. And our overall inventory plans are really highlighted by being in stock with best sellers, getting our preplan with our vendors in place so that we could get that in stock and we play out the third and fourth quarter in a different way and then keeping a close eye on seasonality and flow of merchandise from offshore vendors.

118.    By frankly discussing the problems that the new Chief Merchandising Officer (Hartsig) had to rectify, Defendant Tritton tacitly conceded that BBBY's lack of a Chief Merchandising Officer as of December 2019 (and effectively before then since it was known Defendant Tritton was continuing the management overhaul prompted by the Activist Investors) exacerbated the Company's inventory management problems.

119.    Notably, Chief Merchandising Officers are responsible for overseeing a company's

buying and selling activities and utilizing the information gathered to develop a plan of action toward future purchase decisions. Thus, BBBY's Chief Merchandising Officer was crucial for managing inventory and to executing and overseeing the Program.

120.    Defendant Tritton also noted on the call that "recruiting talent remains a top priority" for BBBY – demonstrating that the Company still had many key management vacancies to fill even after hiring Hartsig.

121.    Defendant Tritton also conceded on the call that BBBY's promotions – which were very different than the Company's usual coupon marketing – "burn[ed]" (or cannibalized) the Company's inventory and margins, which were the precise risks Defendants D'Elia and Winston had assured investors would not happen:

**Seth Ian Sigman** - Crédit Suisse AG, Research Division - United States Hardline Retail Equity Research Analyst

Just wanted to start with pricing. Mark, it seems like you were pleased with some of the results as you sharpen price over the holiday period. What are you learning about in terms of Bed Bath's pricing today? What changes should we expect in the current environment and, I guess, beyond that?

**Mark J. Tritton** - Bed Bath & Beyond Inc. - President, CEO & Director

Yes. Look, I mean I think that we entered into promotional activity in a way that we hadn't ever before, Seth. *I think that if we go back to the end of the third quarter, start of the fourth quarter, it was the first time we'd ever really been truly promotional outside of coupon. And we really didn't lay down the plans to get there in the right way. So we burn the margin and we burn a lot of inventory and weren't prepared to get back into stock. So they're kind of tough learnings.*

122.    These were indeed "tough learnings" for BBBY investors who saw hundreds of millions of dollars in market capitalization wiped out of their investments in BBBY.

**L.    THE INDIVIDUAL DEFENDANTS KNEW OF, OR RECKLESSLY DISREGARDED, THE PROGRAM'S PROBLEMS FROM EARLY ON**

123.    The software utilized by BBBY, including that of Revionics, provided real-time information about inventory, pricing, promotions, and was specifically geared to ensure that the Company did not cannibalize sales and revenues.

124. CW-1 stated that senior BBBY management, including Defendants D'Elia and Winston, received weekly Revionics reports. *See* ¶76.

125. As CEO, Defendant Tritton was the highest BBBY manager. Thus, Defendant Tritton also received these reports.

126. These weekly Revionics reports contained extensive real-time data about inventory, pricing, margins, promotions, and markdowns. Indeed, Defendant Tritton conceded that key inventory data was reviewed "hour by hour" (¶96). In addition to these reports, Defendants had real time access to the data through the software directly.

127. BBBY admitted that (i) holiday promotions and markdowns cannibalized BBBY sales and revenues and materially reduced margins (¶¶92, 94, 115, 121 197, 201); and (ii) the Company was out of stock of key goods and had minimal stock of others (¶102).

128. BBBY's inventory software, including Revionics, disclosed these problems with promotions, markdowns, out-of-stock inventory, and reduced margins throughout the Class Period. As set forth *supra*, the software tracked the progress of the Program.

129. In addition to software problems, the Individual Defendants also knew or recklessly disregarded that BBBY lacked the key personnel necessary to execute and oversee the Program in a manner that would not cause adverse effects. Specifically, BBBY's Chief Merchandising Officer Todd Johnson resigned in December 2019. BBBY did not replace him until March 2020. *See supra* ¶91. Because of the pivotal importance of the Chief Merchandising Officer to the Program, a vacancy in that office materially undermined the Program.

130. Furthermore, the Individual Defendants knew or recklessly disregarded (as conceded by Defendant Tritton, *see* ¶25) that, despite representations to the contrary, BBBY did not adequately plan for the Program's success.

**DEFENDANTS HAD TO COMPLY WITH REGULATION S-K**

131. SEC Regulation S-K contains disclosure requirements for companies' SEC filings. Regulation S-K includes Item 303 and Item 105.

132. Item 303 of Regulation S-K, 17 C.F.R. § 229.303 requires that quarterly (or

"interim period") financial reports "describe any known trends or uncertainties that have had or that registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" from the end of the preceding fiscal year to the date of the most recent interim balance sheet:

[a] (ii) ***Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations***. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed….

b) ***Interim periods***. If interim period financial statements are included or are required to be included by Article 3 of Regulation S–X (17 CFR 210), a management's discussion and analysis of the financial condition and results of operations shall be provided so as to enable the reader to assess material changes in financial condition and results of operations between the periods specified in paragraphs (b)(1) and (2) of this Item. ***The discussion and analysis shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item***, except that the impact of inflation and changing prices on operations for interim periods need not be addressed.

(1) Material changes in financial condition. Discuss any material changes in financial condition ***from the end of the preceding fiscal year to the date of the most recent interim balance sheet provided***….

(2) Material changes in results of operations. Discuss any material changes in the registrant's results of operations with respect to the ***most recent fiscal year-to-date period*** for which a statement of comprehensive income (or statement of operations if comprehensive income is presented in two separate but consecutive financial statements or if no other comprehensive income) is provided and the corresponding year-to-date period of the preceding fiscal year.[11]

133.    BBBY filed its 2Q19 financial report on October 9, 2019 for the time period of June 1, 2019 through August 31, 2019.

134.    BBBY filed its 3Q19 financial report on January 9, 2020 for the time period of

---

[11] Paragraph (a) provides: "Discuss registrant's financial condition, changes in financial condition and results of operations. The discussion shall provide information as specified in paragraphs (a)(1) through (5) of this Item and also shall provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations."

September 1, 2019 through November 30, 2019.

135.    Item 303 required BBBY's October 2019 and January 2020 Forms 10-Q to discuss any "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" between (i) March 3, 2019 (the date of the last BBBY annual report) and August 31, 2019 for the October 2019 Form 10-Q; and (ii) March 3, 2019 and November 30, 2019 for the January 2020 Form 10-Q.  As alleged below (*see* ¶¶168, 188), the October 2019 and January 2020 Forms 10-Q failed to discuss the known trends and uncertainties surrounding the Program.

136.    Item 105 of Regulation S-K, 17 C.F.R. § 229.105 required a discussion in the October 2019 and January 2020 Forms 10-Q of the most significant factors that made investing in BBBY risky or speculative and that each risk factor adequately describe the risk:

> Where appropriate, provide under the caption "Risk Factors" a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky. This discussion must be concise and organized logically. Do not present risks that could apply generically to any registrant or any offering. Explain how the risk affects the registrant or the securities being offered. Set forth each risk factor under a subcaption that adequately describes the risk. If the risk factor discussion is included in a registration statement, it must immediately follow the summary section. If you do not include a summary section, the risk factor section must immediately follow the cover page of the prospectus or the pricing information section that immediately follows the cover page. Pricing information means price and price-related information that you may omit from the prospectus in an effective registration statement based on Rule 430A (§ 230.430A(a) of this chapter). The registrant must furnish this information in plain English. See § 230.421(d) of Regulation C of this chapter.

137.    Despite Item 105's requirements, the Forms 10-Q failed to disclose the risk posed by the significant flaws in the Program.  Because the omitted material facts alleged herein were not disclosed, as well as the consequent material adverse effects on the Company's future results and prospects, BBBY violated Item 105.  *See* ¶¶171, 191.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

138.    The Class Period begins on September 4, 2019.  On that date, BBBY filed a Form 8-K with the SEC.  The Form 8-K was signed by Defendant D'Elia and attached a letter from

Defendant Winston to BBBY shareholders about the Program. That letter provided, in relevant

part, as follows:

Dear Fellow Shareholders,

In recent months, we have initiated significant changes at Bed Bath & Beyond, including at the Board level and across the entire organization. Our objectives are to accelerate improvement in our financial performance, enhance our competitive positioning and ensure we have a best-in-class governance structure. While in its early stages, the transformation underway is advancing, and we wanted to share an update on the progress we are making toward achieving these objectives.

The Board and management team are aligned around four key priorities, which interim CEO Mary Winston communicated during the Company's first quarter 2019 earnings conference call in July. These priorities include stabilizing and driving top-line growth; resetting the cost structure; ***reviewing and optimizing the Company's asset base***, including the portfolio of retail banners; and refining Bed Bath & Beyond's organization structure. We are relentless in our pursuit of short-term opportunities to effect meaningful change, while laying the foundation for transforming our Company for long-term success. Some examples are…

***Reviewing and Optimizing Our Asset Base*** *– An aggressive reduction of up to $1 billion of inventory is expected to be executed over the next 18 months, including the removal of excess aged inventory from our stores anticipated before the 2019 holiday season. This effort should allow us to quickly reset inventory levels in both our stores and distribution centers, as well as refresh our assortment, providing for newness and higher-margin products, all in an effort to drive customer traffic and support top-line performance.*

139. These statements were materially false and misleading when made because:

(i) As later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196) – thus, the Program was fatally flawed from the start; and

(ii) Defendants Winston, D'Elia and BBBY omitted to disclose the serious risks relating to the Program, namely that BBBY:

(a) might not be able to remove "excess aged inventory" without material adverse consequences such as cannibalizing sales, causing inventory shortages in higher-margin products, and reducing earnings and margins (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201);

(b) lacked adequate plans and personnel to meaningfully execute and oversee the Program – particularly in the middle of a management overhaul that included a search for a more permanent CEO for BBBY (*see* ¶¶121, 87-91); and

(c) had no experience executing or overseeing wide-scale markdowns and promotions and was out of its depth (*see* ¶121).

140.   On October 2, 2019, BBBY announced FY2019 adjusted earnings per share guidance of $2.08 to $2.13 per share:

Fiscal 2019 Updated Financial Outlook

Fiscal 2019 full-year results continue to be in line with the Company's most recent guidance and assumes current investment plans to drive top-line performance in the back half, as well as its comp sales trends year to date, and excludes goodwill and other impairments, severance costs, shareholder activity costs, the inventory write down, and any incremental impact from tariffs. Fiscal 2019 full-year net sales are estimated to be around $11.4 billion and ***net earnings per diluted share are estimated to be between $2.08 and $2.13***.

141.   BBBY's net earnings per diluted share guidance had no reasonable basis, and was materially false and misleading when made, because Defendants knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as also admitted by Defendant Tritton, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

142.    BBBY held a conference call with analysts on October 2, 2019.  During that call, Defendants Winston and D'Elia repeatedly and extensively discussed the Program.  Indeed, the Program was a chief concern of analysts on the call.

143.    During the call, Defendant Winston provided an overview of the Program – but was anything but "transparent" about the serious risks with it:

> During our call, we have provided a lot of transparency around the things that we are doing to advance our strategic priorities, including plans to aggressively reduce up to $1 billion of inventory at retail over the next 18 months, including the removal of aged inventory from our stores before the 2019 holiday season to refresh our assortment and support top line performance; the initiation of a rapid store refresh of nearly 160 of our highest volume and most profitable Bed Bath & Beyond stores to improve the in-store shopping experience; the completion of our initial fleet optimization analysis for Bed Bath & Beyond and the decision to close 40 Bed Bath & Beyond stores and 20 other concept stores this year; our decision to close down one of our least productive e-commerce businesses; and finally, the ongoing evaluation of our business concepts and our real estate holdings.

144.    Defendant Winston's statements were materially false and misleading when made because Defendant Winston knew or recklessly disregarded that:

> (i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

> (ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

>> (a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

>> (b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

> (iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶¶121).

145.    Defendant Winston also stated on the call:

In the short term, more than approximately $350 million of inventory at retail will be removed from our stores before the 2019 holiday season. This will be accomplished with a series of markdowns and clearance events as well as with the assistance of an independent liquidator, all to be managed thoughtfully to prevent cannibalization of sales.

146.    These statements were materially false and misleading when made because Defendant Winston knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

147.    Defendant Winston also touted the importance of industry software in managing the Program.  Defendant Winston trumpeted BBBY's "new data-driven insights" and the Company's "markdown optimization software", assuring investors that these tools would fuel the $1 billion inventory sell-through while avoiding the risk of margin erosion and sales

cannibalization:

> Our #1 priority is stabilizing our top line and optimizing our sales opportunities. A core component of our sales stabilization efforts and our transformation overall ***is based on new data-driven insights*** that we are using to identify opportunities for improving our customer value proposition….
>
> ***We continue to make strategic pricing decisions to deliver noticeable value to our customers. These strategies include refining our dynamic pricing algorithms and online and in-store pricing actions to address customer price perceptions. The implementation of markdown optimization software and processes is accelerating sell-through, resulting in less aged inventory and optimizing the profitability of our seasonal and fashion assortment.*** We believe that more effective pricing will drive both top line growth and profit improvement. These near-term opportunities will provide the foundation required to invest in and execute the shopping transformation consumers are demanding and allow us to reinvigorate our iconic brand. (Emphasis added).

148.     Defendant Winston's statement that BBBY was using its software and that it was "accelerating sell-through" and "optimizing profitability of seasonal and fashion assortment" was materially false and misleading when made because Defendant Winston knew or recklessly disregarded that:

> (i) as later admitted, BBBY did not "have price management floated properly []coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);
>
> (ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):
>
>> (a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and; and
>>
>> (b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶ 94, 102, 104, 106-108);
>
> (iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and
>
> (iv) as later admitted, BBBY was out of its depth because it had never conducted

markdown promotions like this before (*see* ¶121).

149. Defendant Winston also stated on the call:

We feel good about the progress we are making against our 4 key near-term priorities, including stabilizing sales and driving top line growth; resetting the cost structure; ***reviewing and optimizing the company's asset base***, including the portfolio of retail banners; and refining our organization structure. This work is being done with the support and guidance of the Business Transformation and Strategy Review Committee of the Board and a highly engaged leadership team. I'm even more confident in the tremendous opportunity in front of us. Today, I would like to provide an update on the progress we have made against each of our 4 priorities as well as what this means for our path forward. Our goal is to ***ensure our customers see a meaningful difference this critical holiday season*** while laying the foundation for transforming our company for long-term success. (Emphasis added).

150. Defendant Winston's statement was materially false and misleading when made because Defendant Winston knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and; and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

151. Thus, the only "difference" BBBY customers saw during the 2019 holiday season was empty or minimally stocked shelves.

152.     Later on the call, Defendant D'Elia boasted of BBBY's growing gross margins and represented that the Program would not undermine them – which was an issue of particular importance to analysts and the market:

**Robert Kenneth Griffin** - Raymond James & Associates, Inc., Research Division - Senior Research Associate

I was first hoping to dive a little bit into the gross margin aspect. Can you maybe give us a little color, by concept or maybe month by month, the progress you're making in improving the margin structure? And then basically the same question on the SG&A side, too, if we can get some color around, month-over-month, how it's improved and where the bigger opportunities are for the remainder of the year.

**Robyn M. D'Elia** - Bed Bath & Beyond Inc. - CFO & Treasurer

Sure. Just to address your point on breaking out the components by concept, that is not historically been our reporting cadence to break it out at that granular level. But from a gross margin perspective, we are pleased that this quarter, we have favorable trends, 20 basis points improvement. That is a significant shift from what we've been experiencing from a trending perspective. And it's driven by benefits in coupons and net direct-to-customer shipping with some offset in merchandise margin. But that merchandise margin, which I'm talking about on a consolidated basis, ***the trend in that has been improving due to some of the ongoing initiatives that we have in place***. So for some select product, we've actually moved to direct importing and gained efficiencies from our own supply chain, which has benefited us. We've also been actively engaging in vendor negotiations around our merchandise. ***And then we've also continued with some strategic pricing initiatives, which has helped benefit our margin.  And we have more to come***. (Emphasis added).

153.     These statements were materially false and misleading because Defendants knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly []
coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose
reports the Individual Defendants received weekly, and which provided them with
real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse
consequences in that they were cannibalizing revenues, causing inventory
shortages in higher-margin products, and reducing earnings and margins
ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121,
123-130, 197, 201); and; and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

154.    Later on the same call, Defendant D'Elia represented to a Wedbush Securities analyst that BBBY's holiday promotions and markdowns were "built" into the earnings model and would enable the Company to meet its earnings guidance:

**Seth Basham – Wedbush Securities**

My question is around the outlook for holidays. You guys are shifting a bunch of marketing dollars and promotional dollars to the holiday period. Can you first quantify how much you're shifting and how much you're adding? And secondly, what type of improvement do you expect in those sales as well as margin over this period?

**Robyn M. D'Elia - Bed Bath & Beyond Inc. - CFO & Treasurer**

Sure. Thanks, Seth. So as you've mentioned, we are shifting dollars into the back half for promotional and marketing support. Those dollars are being generated from ongoing transformation initiatives as well as the benefits that Mary mentioned in our cost structure savings initiatives. And those dollars that we're planning to invest will be spent on promotional events during Thanksgiving week through Cyber Monday as well as driving enrollment in BEYOND+ and investing in new communication channels, such as digital, video and radio. In terms of quantifying it, ***we've built it all in for the model, and those – the reinvestment of those dollars is allowing us to maintain our top line at around $11.4 billion [revenues] as well as maintain our bottom line within the previously guided range***. (Emphasis added).

155.    This statement was materially false and misleading when made because Defendant D'Elia knew or recklessly disregarded that the "bottom line" FY2019 earnings guidance had no reasonable basis because:

(i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose

reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

> (a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and; and

> (b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

156.  Defendants Winston and D'Elia further stressed BBBY's continued profitability and its ability to meet the FY2019 guidance on the call:

**Daniel Harry Hofkin - William Blair & Company L.L.C., Research Division – Analyst**

Just a quick question about general fundamentals and then a quick – just a couple of quick housekeeping questions. So you talked about efforts to drive more sales in the back half and to the holidays. Can you just talk about what sort of impact you expect on profit margins or profitability from that and how that could kind of build over time? Obviously, driving top line is important but in terms of the trade-up between sales and margins and then, like I said, I have a couple of quick housekeeping questions after that.

**Mary A. Winston** - Bed Bath & Beyond Inc. - Interim CEO & Director

So let me just start, and then I'm going to turn it over to Robyn to maybe talk at a little bit more detailed level. But even as we said in the fourth quarter, we are focused on driving – I mean the first quarter call, we're focused on driving top line, but we're focused on maintaining profitability as well. So we believe, given the number of levers we have to pull and the number of opportunities we have in the business, ***that we can drive sales and we may be on promotion, of course, through the holiday season and be doing more advertising. But we think we have other levers to pull to control the cost structure to maintain profitability***.

157.  These statements were materially false and misleading when made because

Defendant D'Elia and Winston knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

> (a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and; and

> (b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

158.    Defendant D'Elia also stated at the end of the call that BBBY was "maintaining our guidance of the sales around $11.4 billion and then EPS between $2.08 and $2.13."

159.    Defendant D'Elia's reiteration of the earnings guidance was materially false and misleading when made because Defendant D'Elia knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

> (a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and; and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

160. Defendant D'Elia then soothed analyst concerns over previously undisclosed risks of the Program, representing that the Program safeguarded against margin erosion and sales cannibalization:

**Oliver Wintermantel** - Evercore ISI Institutional Equities, Research Division - MD & Fundamental Research Analyst

I just wanted to clarify, when you said that the inventory fell [sic] through, that should not have a gross margin impact towards the rest of the year. So I just want to clarify that. And then my other question on gross margins is like the shipping cost seemed to be a benefit in the second quarter. So was that driven by lower sales and that's why shipping costs were better? And then now looking into the back end of the year, do you expect that your sales are going to improve throughout the year?...

**Robyn M. D'Elia** - Bed Bath & Beyond Inc. - CFO & Treasurer

So that was a multipart question. I'm going to start with the first one, and I may have to ask you to repeat a couple of your sub-bullet points. ***So on the inventory, you're asking about the margin impact as we take out the merchandise. Again, we're mindful not to cannibalize sales during the holiday period***. And we can, using a third-party liquidator, remove that merchandise from our stores but not have it out in the market competing against ourselves or be liquidating it in a heavy fashion during this time frame. (Emphasis added).

161. These statements were materially false and misleading when made because Defendant D'Elia knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and; and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

162.   Defendant Winston further discussed the Program and echoed Defendant D'Elia's earlier claim during the call that cannibalization of sales was not an issue:

As we mentioned in the recent shareholder letter, we have plans to aggressively reduce up to $1 billion of inventory at retail over the next 18 months. As a result of the decision, we took $194 million inventory writedown in the second quarter.  We believe this aggressive disposition of inventory will enable us to more quickly reset inventory levels in both our Bed Bath & Beyond stores and distribution centers to allow for a faster refresh of our assortment, as well as to enable us to refocus store labor activity to better support our customers and drive sales. ***In the short term, more than approximately $350 million of inventory at retail will be removed from our stores before the 2019 holiday season. This will be accomplished through a series of markdowns and clearance events, as well as with the assistance of the independent liquidator, all to be managed thoughtfully to prevent cannibalization of sales*…. (Emphasis added).**

163.   These statements were materially false and misleading when made because Defendant Winston knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly []coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory

shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and; and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

164. After analyst Simeon Gutman asked Defendant D'Elia about inventory issues, Defendant D'Elia again reiterated that the Program safeguarded against "cannibaliz[ing] sales during this holiday period":

**Simeon Ari Gutman - Morgan Stanley, Research Division - Executive Director**

My first question, back on some of the inventory and the destocking. I know you said an 18-month process, can you tell us maybe what inning is it in from, I guess, a store perspective? And the impact that it's having as the customer shops, can you give us some sense? Are you seeing a basket-size change? Are you seeing conversion then go up online if they're not finding something in the store? And then I have one follow-up on the gross margin.

**Robyn M. D'Elia - Bed Bath & Beyond Inc. - CFO & Treasurer**

From a timing perspective, in the short term, we are planning that – to have about $350 million of the inventory out of the stores before holiday. We are in the early innings of starting that process and of removing the inventory from the physical store locations. *As we're working through that, we're mindful not to cannibalize sales during this holiday period*. (Emphasis added).

165. This statement was materially false and misleading when made because Defendant D'Elia knew or recklessly disregarded that:

(i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with

real-time data from the start of the Program):

> (a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

> (b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

(iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

166.    On October 9, 2019 (amended on October 15, 2019), Bed Bath & Beyond filed its quarterly report for the period ended August 31, 2019, signed by Defendant D'Elia.  That Form 10-Q stated as follows in the Management's Discussion and Analysis section:

Gross profit for the three months ended August 31, 2019 was $727.0 million, or 26.7% of net sales, compared with $988.6 million, or 33.7% of net sales, for the three months ended September 1, 2018. Gross profit for the six months ended August 31, 2019 was $1.614 billion, or 30.5%, of net sales, compared with $1.953 billion, or 34.3% of net sales, for the six months ended September 1, 2018. The decrease in the gross profit margin as a percentage of net sales for the three and six months ended August 31, 2019 was primarily attributable to a decrease in merchandise margin, as a result of an incremental reserve for future markdowns of approximately $194.0 million taken in the second quarter of fiscal 2019 related to the Company's transformation initiatives, which was an incremental charge to the actual markdowns recorded in the second quarter of fiscal 2019.

***This incremental reserve for future markdowns was the result of the Company's strategic decision to reduce inventory by up to $1.0 billion at retail over the next 18 months. This reduction is being driven by the acceleration of the Company's inventory rationalization efforts, including reductions of aged and duplicative SKUs within the Company's assortment. By taking this action, the Company is seeking to reset its inventory levels in both stores and distribution centers, as well as refresh its assortment, providing for newness and higher-margin products, all in an effort to drive customer traffic and support top-line performance***. (Emphasis added).

167.    These statements were materially false and misleading when made because

Defendants BBBY and D'Elia knew or recklessly disregarded that:

> (i) as later admitted, BBBY did not "have price management floated properly []
> coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

> (ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose
> reports the Individual Defendants received weekly, and which provided them with
> real-time data from the start of the Program):

>> (a) the Program's promotions and markdowns were having material adverse
>> consequences in that they were cannibalizing revenues, causing inventory
>> shortages in higher-margin products, and reducing earnings and margins
>> ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121,
>> 123-130, 197, 201); and

>> (b) BBBY was selling higher margin inventory under promotions that
>> reduced margins and/or such inventory could not be restocked ahead of the
>> critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

> (iii) BBBY was in the middle of a management overhaul and search for a new CEO
> and lacked adequate plans and personnel to meaningfully execute and oversee the
> Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121,
> 87-91); and

> (iv) as later admitted, BBBY was out of its depth because it had never conducted
> markdown promotions like this before (*see* ¶121).

168. Defendants BBBY and D'Elia also knew or recklessly disregarded that these statements were materially false and misleading when made because they violated Item 303 by failing to disclose the trends and uncertainties discussed in ¶167(i)-(iv).

169. The October 2019 Form 10-Q also incorporated the following discussion about the risks in investing in BBBY from the Company's 2018 annual report filed on April 30, 2019:

> The Company's operating results could be negatively impacted by a major disruption of the Company's information technology systems. ***The Company relies heavily on these systems to process transactions, manage inventory replenishment***, summarize results and control distribution of products. Despite numerous safeguards and careful contingency planning, these systems are still subject to power outages, telecommunication failures, cybercrimes, cybersecurity attacks and other catastrophic events. A major disruption of the systems and their backup mechanisms may cause the Company to incur significant costs to repair the systems, experience a critical loss of data and/or result in business interruptions.

170. These statements were materially false and misleading when made because

Defendants knew or recklessly disregarded that:

> (i) as later admitted, BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

> (ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

>> (a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

>> (b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

> (iii) BBBY was in the middle of a management overhaul and search for a new CEO and lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶121, 87-91); and

> (iv) as later admitted, BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

171.    Defendants BBBY and D'Elia also knew or recklessly disregarded that the statements in paragraph 169 were materially false and misleading because they violated Item 105 by failing to disclose the "most significant factor" relating to the risks in investing in BBBY as articulated in ¶167(i)-(iv) above.

**BBBY BEGINS TO DISCLOSE THAT THE PROGRAM WAS HARMING MARGINS AND WITHDRAWS ITS GUIDANCE – BUT CONTINUES TO HIDE THE FULL EXTENT OF THE PROBLEMS**

172.    The truth began to emerge on January 8, 2020 when BBBY reported that the Company's earnings and margins had plunged and that it was pulling its FY2019 guidance – but the Company did not disclose the depth of either its inventory problems or its margin collapse, concealing the full extent of the collateral damage caused by the Program.  In a press release entitled "Bed Bath & Beyond Inc. Reports Results for Fiscal 2019 Third Quarter" that day, BBBY

stated, in relevant part:

> Fiscal 2019 Third Quarter Results
>
> For the fiscal 2019 third quarter, the Company reported a net loss of $(0.31) per diluted share ($(38.6) million),... Net sales for the fiscal 2019 third quarter were $2.8 billion, a decrease of 9.0% compared to the prior year period. Comparable sales in the fiscal 2019 third quarter declined 8.3%.
>
> Outlook
>
> The Company expects its sales and profitability to remain pressured during the fiscal 2019 fourth quarter. Considering these headwinds reflected in the Company's results to date, and the ongoing work by recently appointed President & CEO Mark Tritton to assess the business and finalize the details of the Company's go-forward strategic plan as well as the extensive senior leadership changes within the past month, ***the Company believes it is appropriate to withdraw its fiscal 2019 full year financial guidance.*** (Emphasis added).

173.    BBBY also held a conference call on January 8, 2020.  On that call, Defendant D'Elia stated:

> Th[e] 80 basis point decline is primarily due to a decrease in merchandise margin driven by a higher level of promotional activity in the quarter and was partially offset by a decrease in net direct-to-customer shipping expense.

174.    On the call, Defendant Tritton acknowledged that "[p]erformance was impacted to some extent by ***self-inflicted*** issues, like [p]oor inventory management."  *See also id.* ("We're experiencing short-term pain, some of which has been self-inflicted").

175.    The January 8, 2020 disclosures did not reveal the full truth about BBBY's inventory management problems or the full extent of the Program's adverse impact.

176.    Defendant Tritton's statement that BBBY's "performance was impacted to some extent by self-inflicted issues, like poor inventory management" was materially false and misleading when made because it omitted the true extent of the inventory management problems and the adverse effects of the Program as:

(i) Defendant Tritton admitted:

> (a) he knew of BBBY's inventory problems in November 2019 when he reviewed the issue "hour by hour" (*see* ¶96);

(b) he knew of BBBY's inventory management problems, including unstocked and minimally stocked shelves, in December 2019 and January 2020 (*see* ¶113);

(c) BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(d) BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

(ii) shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul, with six senior BBBY managers including the Company's Chief Merchandising Officer, leaving in December 2019 and, thus, lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶87-91, 121).

177. Yet, after admitting the "self-inflicted" inventory management problems, Defendant Tritton "doubled down" on the "solid[ity]" of the Program:

I want to be really clear here, continuing to accelerate the existing transformation work that was put in place which **is really solid, and we've been able to double down on that since me coming onboard**.

178. Defendant Tritton's statement was materially false and misleading when made because:

i) as Defendant Tritton admitted:

(a) he knew of BBBY's inventory problems in November 2019 when he reviewed the issue "hour by hour" (*see* ¶96);

(b) he knew of BBBY's inventory management problems, including

unstocked and minimally stocked shelves, in December 2019 and January 2020 (*see* ¶113);

(c) BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(d) BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul, with six senior BBBY managers including the Company's Chief Merchandising Officer, leaving in December 2019 and, thus, lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶87-91, 121).

179. Defendant Tritton also stated on the call that BBBY was on top of the important dynamic between sales growth and inventory growth:

I think one of the real strengths of the season when we're under pressure is that we were able to maintain our inventories and always look at that mix of sales growth versus inventory growth. And the team had done a great job in terms of keeping the lid on inventory and really culling through that aged and excess inventory side of the business.

180. Defendant Tritton's statements were materially false and misleading when made because:

i) as Defendant Tritton admitted:

(a) he knew of BBBY's inventory problems in November 2019 when he reviewed the issue "hour by hour" (*see* ¶96);

(b) he knew of BBBY's inventory management problems, including

unstocked and minimally stocked shelves, in December 2019 and January 2020 (*see* ¶113);

(c) BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(d) BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul, with six senior BBBY managers including the Company's Chief Merchandising Officer, leaving in December 2019 and, thus, lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶87-91, 121).

181.    After the January 8, 2020 revelations, BBBY's share price fell $3.20, or almost 20%, to close at $13.4 per share on January 9, 2020, on unusually heavy trading volume.

182.    On January 9, 2020, Bed Bath & Beyond filed its quarterly report on Form 10-Q for the period ended November 30, 2019, signed by Defendant D'Elia.  The January 2020 Form 10-Q contained the same Management's Discussion and Analysis and Risk Factors as the October 2019 Form 10-Q and was misleading for the same reasons as the October 2019 Form 10-Q.  *See supra* ¶167.

183.    The January 2020 Form 10-Q also stated as follows:

Gross profit for the three months ended November 30, 2019 was $913.8 million, or 33.1% of net sales, compared with $1.004 billion, or 33.1% of net sales, for the three months ended December 1, 2018. Gross profit for the nine months ended November 30, 2019 was $2.528 billion, or 31.4% of net sales, compared with $2.957 billion, or 33.9% of net sales, for the nine months ended December 1, 2018. The decrease in the gross profit margin for

the nine months ended November 30, 2019 was primarily attributable to a decrease in merchandise margin, as a result of an incremental inventory reserve for future markdowns of approximately $169.8 million related to the Company's transformation initiatives, which was an incremental charge to the actual markdowns recorded in the second and third quarters of fiscal 2019.

This incremental reserve for future markdowns was the result of the Company's strategic decision to reduce inventory by up to $1.0 billion at retail from the end of the second quarter of fiscal 2019 through the end of fiscal 2020. ***This reduction is being driven by the Company's inventory rationalization efforts, including reductions of aged and duplicative SKUs within the Company's assortment. By taking this action, the Company is seeking to reset its inventory levels in both stores and distribution centers, as well as refresh its assortment, providing for newness and higher-margin products, all in an effort to drive customer traffic and support top-line performance***.

184. These statements were materially false and misleading when made because Defendants D'Elia and BBBY knew or recklessly disregarded that:

i) as later admitted:

    (a) BBBY's inventory problems were evident in November 2019 when the Company reviewed those issues "hour by hour" (*see* ¶96);

    (b) he knew of BBBY's inventory management problems, including unstocked and minimally stocked shelves, in December 2019 and January 2020 (*see* ¶113);

    (c) BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

    (d) BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

    (a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

    (b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul, with six senior BBBY managers including the Company's Chief Merchandising Officer, leaving in December 2019 and, thus, lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶87-91, 121).

185.    Defendant D'Elia and BBBY also knew or recklessly disregarded that these statements were materially false and misleading when made because they violated Item 303 by failing to disclose the known trends and uncertainties relating to the Program listed in ¶184(i)-(iii).

186.    The January 2020 Form 10-Q also stated:

In other activity, the Company has been further evaluating its product assortment and taking aggressive steps to rationalize the assortment and better manage its inventory. These are among the early accelerated actions being taken to lay the foundation to create a new vision for the Company.

187.    These statements were materially false and misleading when made because (i) Defendant D'Elia and BBBY knew or recklessly disregarded that:

i) as admitted:

(a) BBBY's inventory problems were evident in November 2019 when BBBY reviewed those issues "hour by hour" (*see* ¶96);

(b) BBBY had serious inventory management problems, including unstocked and minimally stocked shelves, in December 2019 and January 2020 (*see* ¶113);

(c) BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(d) BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* ¶121).

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul, with six senior BBBY managers including the Company's Chief Merchandising Officer, leaving in December 2019 and, thus, lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶87-91, 121).

188.     Defendants also knew or recklessly disregarded that these statements were materially false and misleading when made because they violated Item 303 by failing to disclose a "known trend or uncertainty" relating to the Program; namely, that it was materially reducing, and would continue to materially reduce, earnings and margins and cause cannibalization of sales and revenues.

189.     The January 2020 Form 10-Q also incorporated the following discussion about the risks in investing in BBBY from the Company's 2018, which was filed on April 30, 2019:

> The Company's operating results could be negatively impacted by a major disruption of the Company's information technology systems. ***The Company relies heavily on these systems to process transactions, manage inventory replenishment***, summarize results and control distribution of products. Despite numerous safeguards and careful contingency planning, these systems are still subject to power outages, telecommunication failures, cybercrimes, cybersecurity attacks and other catastrophic events. A major disruption of the systems and their backup mechanisms may cause the Company to incur significant costs to repair the systems, experience a critical loss of data and/or result in business interruptions. (Emphasis added).

190.     These statements were materially false and misleading when made because Defendants D'Elia and BBBY knew or recklessly disregarded that:

i) as admitted:

(a) BBBY's inventory problems were evident in November 2019 when BBBY reviewed those issues "hour by hour" (*see* ¶¶96);

(b) he knew of BBBY's inventory management problems, including unstocked and minimally stocked shelves, in December 2019 and January 2020 (*see* ¶113);

(c) BBBY did not "have price management floated properly [] coming into the third and fourth quarter", *i.e.*, as of September 1, 2019 (*see* ¶196);

(d) BBBY was out of its depth because it had never conducted markdown promotions like this before (*see* 121).

(ii) as shown by, *inter alia*, BBBY's software, including that of Revionics (whose reports the Individual Defendants received weekly, and which provided them with real-time data from the start of the Program):

(a) the Program's promotions and markdowns were having material adverse consequences in that they were cannibalizing revenues, causing inventory shortages in higher-margin products, and reducing earnings and margins ahead of the critical 2019 holiday season (*see* ¶¶46-49, 62-78, 115, 121, 123-130, 197, 201); and

(b) BBBY was selling higher margin inventory under promotions that reduced margins and/or such inventory could not be restocked ahead of the critical 2019 holiday season (*see* ¶¶94, 102, 104, 106-108);

(iii) BBBY was in the middle of a management overhaul, with six senior BBBY managers including the Company's Chief Merchandising Officer, leaving in December 2019 and, thus, lacked adequate plans and personnel to meaningfully execute and oversee the Program and prevent further margin erosion and sales cannibalization (*see* ¶¶87-91, 121).

191.    Defendants BBBY and D'Elia also knew or recklessly disregarded that these statements were materially false and misleading because they violated Item 105 by failing to disclose the "most significant factor" relating to the risks in investing in BBBY; namely, that the Program was cannibalizing revenues and materially harming earnings and margins, which risk was only exacerbated by BBBY's ongoing management overhaul.

## BBBY DISCLOSES THE FULL TRUTH: THE PROGRAM CANNIBALIZED REVENUES, DECIMATED MARGINS, AND CAUSED EMPTY OR SPARSELY STOCKED SHELVES OF KEY HOLIDAY ITEMS

192.    On February 11, 2020, BBBY issued a press release announcing abysmal preliminary fourth-quarter 2019 financial results, including a free-fall in margin by 300 basis points. The Company disclosed that despite assurances that the Program was safeguarding against margin erosion and sales cannibalization (*see* ¶¶81, 93, 160, 162, 164) it did precisely that:

Bed Bath & Beyond Inc. (Nasdaq: BBBY) today reported preliminary, unaudited financial performance data for the first two months of the fiscal 2019 fourth quarter (December 2019 and January 2020), ***including a 5.4% decline in comparable sales***

***driven primarily by store traffic declines combined with inventory management issues, and increased promotional activity and markdowns***. (Emphasis added).

Fiscal December 2019/January 2020 Comparable Sales…

***Product availability leading into the holiday period was also a contributing factor, as inventory within certain key categories in the Bed Bath & Beyond assortment was too low or out-of-stock during the period. The Company is immediately reforming its internal planning and inventory management procedures to master the fundamentals.*** (Emphasis added).

193. On this news, the Company's share price fell $3.06 per share, or over 20%, to close at $11.79 per share on February 12, 2020, on unusually heavy trading volume.

194. The market was taken aback by BBBY's negative announcements. For example, on February 12, 2020, Wedbush stated that it was "surpris[ed]" that BBBY's promotions had cannibalized revenues and "drove the gross margin weakness":

The surprise was not in comparable store sales, ***but in both gross and SG&A margins***. ***Gross margins declined ~-300 bps through the first two months of the quarter (vs. our -10 bps and consensus' -60bps F4Q estimates)*** while adjusted SG&A deleveraged 190 bps (vs. our +20 bps and consensus' +10 bps F4Q estimates). ***Higher promotional activity drove the gross margin weakness***, while a sales mix shift to the online channel also contributed.

**POST-CLASS PERIOD ADMISSIONS**

195. BBBY held a conference call with analysts on February 18, 2020. On the call, Defendant Tritton admitted that the Company had been out-of-stock of key products, which was precisely what the Program and the purported tools utilized to execute and oversee the Program were supposed to have avoided:

**Seth Mckain Basham** - Wedbush Securities Inc., Research Division - MD Of Equity Research
…And as it relates to your inventory plans, a few – I guess a couple of quarters ago, there was a plan to take out about $1 billion of inventory out of retail. Is that plan still intact for 2020?

**Mark J. Tritton** - Bed Bath & Beyond Inc. - President, CEO & Director

***Yes, it is. I mean a couple of things on inventory. We've had a double-edged sword in terms of inventory, and I would talk to, firstly, the negative in that we've been dealing with some out-of-stocks in terms of our primary items that have been driving our***

*business traditionally and that's what's hurt us in the third and fourth quarter*. We see that as fully rectifiable in terms of the learning plan and implementation for 3rd and 4th in 2020. ***So on that inventory side, we didn't have enough of the right stuff***. Overall, though, we've got $1 billion worth of inventory that we look to take out through aged merchandise. About 1/3 of that we've already traded through ahead of our schedule. So we're pleased with the progress there. It is affecting a little bit heavily in clearance sales, but we see that as a moment in time. Overall, though, we have been trading – we're closing at the moment with about 15% less inventory. So we're operating leaner and getting better turns. ***We just need to course-correct in terms of the mix of merchandise and our focus***. So a lot of messages in there around inventory. Less inventory. We continue to trade on less inventory, and that's going to free up cash for us in the future. And we need to right-size our current inventory into the right items and the best sellers and getting the stock of those both now and in the future.

196.     Defendant Tritton also stated that going forward, things would be different – but he admitted on the call that BBBY was not managing prices properly "coming into the third and fourth quarter", *i.e.*, as of September 1, 2019, and that many of the issues that beset the Program were "self-inflicted":

We're going to have price management floated properly, ***which we didn't have coming into the third and fourth quarter.*** We're going to have our inventory right-sized. It's clear learnings there, and we're going to be able to de-stack and manage our promotions. So we feel like there's enough self-inflicted wounds that for us we'll be able to quantify the recovery on that, and we can adjust out what that means in terms of the performance of the quarter to be a lot more stable and really stem the declines that we saw in the third and fourth.

197.     On February 20, 2020, UBS issued a report by analysts Michael Lasser, Atul Maheswari and Mark Carden noting that BBBY's promotions "caused the sales and margin shortfall" and that "poor inventory management caused out of stocks":

The shortfall in December/January was driven by a confluence of several factors. ***First, wasteful promos lowered margin as not enough thought was given on the overall profitability impact to the company.*** Plus, digital grew much faster causing enhanced shipping costs. ***Poor inventory management caused out of stocks.  All of these hit together in 4Q and caused the sales and margin shortfall.*** (Emphasis added).

198.     On April 15, 2020, BBBY announced earnings per diluted share of only $.46 – radically below BBBY's Class Period guidance of $2.08 to $2.13.  On that date, BBBY also held a conference call discussing its FY2019 results and the Company's problems at the end of 2019. On the call, ***Defendant Tritton admitted that, in addition to having software reflecting the***

*Program's progress in real-time, BBBY also knew of the inventory issues in December 2019 and*

*January 2020* – indeed, the Company had done "intel" work and knew customers could not find

their desired products:

> **Curtis Smyser Nagle** - BofA Merrill Lynch, Research Division – VP
> …As you said, February and 4Q are very much in the rear view. But I just wanted to –
> if you could possibly hash out some of the math in terms of what was implied for the
> February comp. And I think it improved relative to what was going on in the 2 prior
> months, but anything you could comment on that would be great.

> **Mark J. Tritton** - Bed Bath & Beyond Inc. - President, CEO & Director

> Yes. I think for us, it was tough to hit the COVID moment when we just saw some pivots
> happening in February. *We knew we were plagued by issues in December and
> January*,… *Some of it was self-inflicted. I mean when we don't have best sellers in
> stock, we've got discounting and we don't have our inventory. I mean some of the sales
> decline we saw in our stores wasn't necessarily traffic. We did some intel work on that,
> saw the customers were coming in, and they just couldn't find the product in stock.* So
> we were shooting ourselves in the foot.

    199.    Defendant Tritton specified that "certain key promotional categories" like "kitchen

electrics" were at the heart of the end of 2019 inventory problems:

> All 4 of our e-commerce fulfillment centers are currently operating. And by the end of
> this week, we will have converted approximately 25% of our Bed Bath & Beyond and
> buybuy BABY stores in the U.S. and Canada into regional fulfillment centers to use our
> vast inventory resources to assign orders locally and deliver quickly….

> *Product availability with certain key promotional categories, such as kitchen electrics,
> leading into the holiday period were either too low or just out of stock. We just didn't
> have enough of the right stuff, which hurt us.*

    200.    After BBBY's misrepresentations and omissions about the inventory reduction

program, Guggenheim analyst Steven Forbes was skeptical of whether BBBY would be able to

accurately manage inventory in the future.  Defendant Tritton engaged in classic damage control,

but conceded "big misses" and the Company's failure to have the right goods in stock:

> **Steven Paul Forbes** - Guggenheim Securities, LLC, Research Division – Analyst
> And then maybe just a quick follow-up on inventory management. It's sort of interesting
> here given your comments around not having enough inventory this holiday, right,
> holiday 2019, about all the uncertainty that exists today. So maybe just give us an update
> or discuss how you're planning your inventory buys this year, and particularly for holiday
> 2020, what's sort of the typical time frame when you have to make those decisions and

commit to those POs? And how important, right, is it that you're open by the time those commitments occur?

**Mark J. Tritton** - Bed Bath & Beyond Inc. - President, CEO & Director

Yes. Look, I mean, a couple of things there. I think that we've been – Joe has been leading the charge here and having deep conversation with all our majors and our general vendor bases about flow. If you go back to the inventory position that we had, there's kind of 2 things going there. The good news was that overall, we reduced our inventory by about 16% at the close of the quarter. And so we were working leaner on that. ***But inside of that, we did have big misses***. Not by having more inventory. We think that's a good level that we can come down to. ***But we could have traded some of our mix to be more in stock of our key items and generated more sales and gross margin by having the right merchandise***. (Emphasis added).

201. Defendant Tritton also admitted that BBBY's unprecedented promotions had "burn[ed]" (or cannibalized) inventory and margins:

**Seth Ian Sigman** - Crédit Suisse AG, Research Division - United States Hardline Retail Equity Research Analyst

Just wanted to start with pricing. Mark, it seems like you were pleased with some of the results as you sharpen price over the holiday period. What are you learning about in terms of Bed Bath's pricing today? What changes should we expect in the current environment and, I guess, beyond that?

**Mark J. Tritton** - Bed Bath & Beyond Inc. - President, CEO & Director

Yes. Look, I mean I think that ***we entered into promotional activity in a way that we hadn't ever before***, Seth. I think that if we go back to the end of the third quarter, start of the fourth quarter, ***it was the first time we'd ever really been truly promotional outside of coupon. And we really didn't lay down the plans to get there in the right way. So we burn the margin and we burn a lot of inventory and weren't prepared to get back into stock. So they're kind of tough learnings***. (Emphasis added).

202. On July 8, 2020 in the BBBY-Q1 2020 Earnings Call, BBBY Chief Merchandising Officer Robert Hartsig stated that "we're doing a lot of work around inventory management in terms of centralizing inventory planning. We're using new tools and processes to manage efficiencies for inventory." In other words, BBBY had to fundamentally re-orient its inventory management systems after the failures of the end of 2019.

**ADDITIONAL SCIENTER/FALSITY ALLEGATIONS**

203. As alleged herein, Defendants acted with scienter since Defendants knew that the

public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding BBBY, their control over and/or receipt and/or modification of BBBY allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning BBBY, participated in the fraudulent scheme alleged herein.

### A. The Individual Defendants Received Detailed, Weekly Revionics Reports That Contained Up-to-date Information About Inventory, Pricing, and Margins And Had Access To Real-Time Data Through The Software

204. During the Class Period, BBBY used industry software, including that of Revionics, to manage and oversee the Program. *See* ¶¶62-68, 82.

205. BBBY's software, including that of Revionics, analyzed and optimized promotions and markdowns and provided in-depth knowledge about consumer buying influences, cannibalization and halo effects, and identified the most compelling vehicles and offers for different types of shoppers. *See* ¶¶62-68. In short, in tracked the progress of the Program in real time.

206. Revionics software contained AI-based information on markdowns – specifically designed to maximize return on inventory, margins and sell-through.

207. CW-1 reported that BBBY's CEO and CFO, including Defendants D'Elia and Winston, received these weekly Revionics reports. *See* ¶76. Defendant Tritton would have received the same reports. The Individual Defendants likewise had access to real time data concerning inventory and the Program's status through the software itself.

208. CW-1 also reported that there were weekly meetings at the Union, New Jersey headquarters with Interim CEO Winston and CFO D'Elia.

209. Because of the weekly reports, as well as the weekly meetings, the Individual

Defendants knew or recklessly disregarded that the Program was cutting margins and cannibalizing sales.

**B. Defendant Tritton's Admissions**

210.    Defendant Tritton made numerous admissions during and after the Class Period.

211.    On the January 8, 2020 conference call, Defendant Tritton admitted that at "Thanksgiving time" he had been "watching [the Company's sales and inventory] hour by hour", confirming the real-time access Defendants had to data bearing on the success or failure of the Program.

212.    On the February 18, 2020 conference call, Defendant Tritton admitted that Defendants did not have "proper price management" as of September 2019 (the first month of the Company's 3Q2019):

> We're going to have price management floated properly, *which we didn't have coming into the third and fourth quarter*.  (Emphasis added).

213.    Defendant Tritton also made several admissions on the April 15, 2020 call that further demonstrate Defendants' scienter at different times.

214.    Defendant Tritton admitted on the call that "we really ***didn't lay down the plans*** [on promotional activity] to get there in the right way".  (Emphasis added). *See* ¶121.  With this statement, Defendant Tritton admitted that Defendants BBBY, D'Elia and Winston knew their statements about the Program, inventory, and margins were materially false and misleading when made because they knew they "didn't lay down the plans" underlying the Program "in the right way".  Since the Program involved a complete departure from the coupon discounts BBBY was accustomed to, and BBBY adopted unprecedented markdowns and promotions, robust planning was necessary to execute and oversee the Program.  Defendants gave investors the false sense that such planning had been done, but, as Defendant Tritton admitted, that was not actually the case – a fact he knew or recklessly disregarded immediately upon joining the Company when he adopted the Program without a reset.

215.    Defendant Tritton also admitted on the April 15, 2020 conference call that BBBY

knew of the inventory problems in December 2019 and January 2020:

- "*We knew* we were plagued by [inventory] issues *in December [2019] and January [2020]*" (¶113)*.*

- "We did some intel work [in December 2019 and January 2020] on that, *saw the customers were coming in*, and they just couldn't find the product in stock" (¶113)

216.   These admissions demonstrate that Defendants knew their statements were misleading when made.

### C.  The Individual Defendants Repeatedly Discussed The Program – Which Was Critical to Turning Around the Company – With Analysts

217.   BBBY announced its inventory reduction program on September 4, 2019.

218.   The Company's inventory reduction program was at the heart of turning BBBY around from years of poor results.

219.   The Individual Defendants repeatedly engaged in lengthy colloquies with analysts (who then wrote detailed reports) about BBBY's inventory and the Program (*see* ¶¶79-85, 95-97, 99-101, 104-111, 113-117, 120-121), demonstrating that they were well aware of these issues.

### D.  The Individual Defendants Knew BBBY Management Had Critical Vacancies During the Class Period

220.   On December 17, 2019, three months into the Program, BBBY disclosed that Defendant Tritton had fired five senior management from the Company, including the Chief Merchandising Officer, Chief Marketing Officer, Chief Digital Officer, Chief Legal Officer & General Counsel, and Chief Administrative Officer.  *See* ¶92.  The sixth member, the Chief Brand Officer, resigned the prior week.  *See id.*

221.   BBBY did not replace its Chief Merchandising Officer (Todd Johnson), a role inherently important to the Program, until March 2020.  Thus, BBBY had a critical vacancy between December 17, 2019 and the end of the Class Period – right at the important holiday sales season.  Departures of this kind are also rarely immediate and this key departure likely was set in motion even before December.

### E.  Defendants Winston and D'Elia Were Particularly Aware of the Program

**Because BBBY Had Tried Unsuccessfully To Reduce Inventory In The Past**

222.     As early as the beginning of 2018, BBBY had tried to reduce inventory in its stores. As explained by CW-1, this effort "never got off the ground".

223.     When BBBY doubled down in September 2019 and announced the $1 billion Program, Defendants Winston and D'Elia were acutely aware of the need to make inventory reduction work this time.

**F.  The Individual Defendants Were Motivated to Commit Fraud to Satisfy the Activist Investors**

224.     After five years of poor results, the Activist Investors succeeded in restructuring BBBY's board of directors and replacing its CEO in May 2019.  *See* ¶51.

225.     The Activist Investors criticized BBBY for, *inter alia*, its serious inventory management problems and low margins in April and May 2019.

226.     The Activist Investors succeeded in restructuring BBBY's board and ousting its CEO.

227.     The Individual Defendants were motivated to commit fraud to address the Activist Investors' concerns about BBBY's stagnant and bloated inventory, as well as the Company's low margins.

228.     Defendants D'Elia and Tritton were motivated to maintain their jobs and avoid the fate of ousted CEO Stephen Temares.

**G.  Defendants Winston and D'Elia Were Motivated to Commit Fraud to Increase the Value of Their BBBY Stock and to Maintain Exorbitant Salaries**

229.     Defendant D'Elia received BBBY stock in the amount of $1,559,469 during 2019.

230.     Defendant Winston received a restricted stock award with a value of $1,900,000 on November 4, 2019, the day Defendant Tritton became CEO.

231.     Defendants D'Elia and Winston were motivated to artificially inflate BBBY's stock to increase the value of their BBBY stock award.

232.     Defendant D'Elia was paid $750,000 in yearly salary during the Class Period.

233. Defendant Winston earned approximately $550,000 in salary while working as BBBY's CEO for only six months.

234. Defendant D'Elia was motivated to commit fraud to continue to receive her salary.

235. Defendant Winston was motivated to commit fraud to stay at the Company for as long as possible, reaping her large salary.

236. Defendant Tritton received approximately $11,250,000 annually consisting of a $1.2 million annual base salary, a $750,000 opportunity at target to be earned by developing and delivering to the Board a short-term strategic and business stabilization plan, a $1.125 million payment based on the Compensation Committee's assessment that Defendant Tritton exceeded objectives set for him, a $500,000 one-time sign-on cash award of time-vesting RSUs that will vest on November 4, 2020, subject to Defendant Tritton's remaining with the Company through that date, a $750,000 make-whole cash bonus, and a $6.9 million make-whole RSU award.

237. Defendant Tritton was motivated to commit fraud to stay at the Company and receive the exorbitant benefits described in ¶236.

**PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

238. At all relevant times, the market for BBBY securities was efficient for the following reasons, among others: (1) the securities were listed and actively traded on the NASDAQ, a highly efficient and automated market; (2) as an issuer, BBBY filed periodic public reports on Form 10-K and Form 10-Q with the SEC; (3) BBBY regularly issued press releases that were carried by the national news wires, were publicly available, and entered the public marketplace; and (4) BBBY was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

239. As a result, the market for BBBY securities promptly digested current information regarding BBBY from all publicly available sources and reflected such information in BBBY share price.

240.     Under these circumstances, all purchasers of BBBY securities during the Class Period suffered similar injury through their purchase of BBBY securities at artificially inflated prices and a presumption of reliance applies.

## LOSS CAUSATION / ECONOMIC LOSS

241.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of BBBY securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about BBBY business, operations, and prospects as alleged herein.

242.     During the Class Period, as detailed herein, BBBY securities were artificially inflated due to Defendants' misleading statements and omissions.  When Defendants' prior misrepresentations and omissions were disclosed and became apparent to the market, the price of BBBY securities fell as the prior artificial inflation came out.

243.     As a result of their purchases of BBBY securities during the Class Period,  Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the securities laws.

244.     The decline in the price of BBBY securities after the corrective disclosures on January 8, 2020 and February 11, 2020, was a direct result of Defendants' misrepresentations being revealed to investors and the market.

245.     The decline in the price of BBBY securities was also the result of the materialization of the concealed investment risks concerning BBBY.

246.     Defendants' materially false and misleading statements relate to the Company's inventory reduction program.

247.     The corrective disclosure on January 8, 2020 revealed that BBBY's earnings and margins had plunged in the 3Q19, and began to reveal the Company's inventory management issues.

248.     After this disclosure, BBBY stock fell almost 20%.  *See* ¶¶20, 181.

249.     Analysts' statements after the January 8, 2020 disclosure show the importance of Defendants' revelations of that date.  *See* ¶¶100-101.

250.     The January 8, 2020 disclosure did not fully reveal the truth about BBBY's inventory management problems.

251.     The corrective disclosure on February 11, 2020 revealed the full extent of the truth; namely, that the Program, including its promotions and markdowns, had caused out-of-stock and minimally stocked goods and cannibalized sales and revenues.

252.     After this disclosure, BBBY stock again fell, this time by over 20%.  *See* ¶¶22, 103.

253.     Analysts' statements after the February 11, 2020 disclosure show the importance of Defendants' revelations.  *See* ¶¶104-109.

254.     The timing and magnitude of the price declines in BBBY securities negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' statements.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' misstatements and omissions and the subsequent significant decline in the value of BBBY securities when Defendants' misrepresentations were revealed.

## CLASS ACTION ALLEGATIONS

255.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired BBBY securities between September 4, 2019 and February 11, 2020, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

256.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, BBBY common shares actively traded on the

NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.  Millions of shares of BBBY common stock were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by BBBY or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

257.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

258.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

259.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of BBBY; and

(c)      to what extent the members of the Class have sustained damages, and the proper measure of damages.

260.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the

wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder Against all Defendants**

261.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

262.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase BBBY securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

263.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for BBBY securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

264.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about BBBY's inventory reduction program, as specified herein.

265.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of BBBY's value and performance,

which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about BBBY and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

266. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants had access to BBBY's inventory management software: (iv) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (v) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

267. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Thus, Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing material problems with BBBY business and financial results from the investing public and supporting the artificially inflated price of its securities.

268. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of BBBY

securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired BBBY securities during the Class Period at artificially high prices and were damaged thereby.

269. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that BBBY was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their BBBY securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

270. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

271. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

272. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

273. Individual Defendants acted as controlling persons of BBBY within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing

public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

274. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

275. As set forth above, BBBY and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(A) Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(B) Awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Securities Exchange Act of 1934, in an amount to be proven at trial, including interest thereon;

(C)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D)     Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED: October 20, 2020

Respectfully submitted,

/s/ Richard L. Elem

_____

Richard L. Elem
Law Offices of Jan Meyer & Associates, P.C.
1029 Teaneck Road
Second Floor
Teaneck, New Jersey  07666
Tel:  (201) 862-9500
Email: relem@janmeyerlaw.com

*Liaison Counsel for Plaintiffs and the Proposed Class*

**BERNSTEIN LIEBHARD LLP**
Laurence J. Hasson (admitted pro hac vice)
Joseph R. Seidman, Jr. (admitted pro hac vice)
Matthew E. Guarnero
10 East 40th Street
New York, NY  10016
Telephone: (212) 779-1414
Facsimile:  (212) 779-3218
lhasson@bernlieb.com
seidman@bernlieb.com
mguarnero@bernlieb.com

*Lead Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that October 20, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

*/s/ Richard L. Elem*

RICHARD L. ELEM